# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5    LORI ANN MORRIS,        )
6         Plaintiff,    )
7    vs.              ) CASE NUMBER:
8    FLORIDA TRANSFORMER,    ) 3:05-CV-962-T
9    EDWARD NEAL THOMPSON,   )
10   et al.,            )
11        Defendants.   )
12
13     DEPOSITION OF EDWARD NEAL THOMPSON
14     In accordance with Rule 5(d) of
15   The Alabama Rules of Civil Procedure, as
16   Amended, effective May 15, 1988, I, Cindy
17   Weldon, am hereby delivering to Henry L.
18   Penick, the original transcript of the oral
19   testimony taken on the 14th day of July,
20   2006, along with exhibits.
21     Please be advised that this is the
22   same and not retained by the Court Reporter,
23   nor filed with the Court.

Page 2

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5    LORI ANN MORRIS,        )
6         Plaintiff,    )
7    vs.              ) CASE NUMBER:
8                    ) 3:05-CV-962-T
9    FLORIDA TRANSFORMER,    )
10   EDWARD NEAL THOMPSON,   )
11   et al.,            )
12        Defendants.    )
13
14       STIPULATION
15     IT IS STIPULATED AND AGREED, by
16   and between the parties through their
17   respective counsel, that the deposition of
18   EDWARD NEAL THOMPSON, may be taken before
19   Cindy Weldon, Certified Shorthand Reporter,
20   Commissioner and Notary Public, at 732 North
21   9th Street, DeFuniak Springs, Florida, on
22   July the 14th, 2006 at 1:15 p.m.
23     IT IS FURTHER STIPULATED AND

Page 3

1    AGREED that the signature to and the reading
2    of the deposition by the witness is waived,
3    the deposition to have the same force and
4    effect as if full compliance had been had
5    with all laws and rules of Court relating to
6    the taking of depositions.
7        IT IS FURTHER STIPULATED AND
8    AGREED that it shall not be necessary for
9    any objections to be made by counsel to any
10   questions, except as to form or leading
11   questions, and that counsel for the parties
12   may make objections and assign grounds at
13   the time of trial, or at the time said
14   deposition is offered in evidence, or prior
15   thereto.
16        IT IS FURTHER STIPULATED AND
17   AGREED that notice of filing of the
18   deposition by the Commissioner is waived.
19
20
21
22
23

Page 4

1      A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4         MR. HENRY L. PENICK
5         THE PENICK BUILDING
6         319 - 17TH STREET NORTH, SUITE 200
7         BIRMINGHAM, ALABAMA 35203
8
9    FOR THE DEFENDANT:
10        MR. RICHARD BROUGHTON
11        2000 INTERSTATE PARK DRIVE
12        SUITE 204
13        MONTGOMERY, ALABAMA 36109
14
15   ALSO PRESENT:
16        MR. FRANKLIN SCOTT SEAY
17
18
19
20
21
22
23

1 (Pages 1 to 4)

EXHIBIT F

# FREEDOM COURT REPORTING

Page 25

1    A.  No, sir.
2    Q.  -- that you weren't working out
3  well?
4    A.  No, sir.
5    Q.  Did you have any violations or
6  anything while you were there?
7    A.  No, sir.
8    Q.  Okay.
9    A.  I don't recall.
10    Q.  What year did you leave?
11    A.  2003.
12    Q.  Do you know what year you left --
13  I mean what month you left McLane's?
14        (Whereupon, there was a brief
15  interruption.)
16    Q.  Do you recall getting a speeding
17  ticket out in Houston County in May of 2003?
18    A.  Yes, sir.
19    Q.  Was that while you were driving
20  with McLane's?
21    A.  Yes, sir.  It was on a personal
22  vehicle.
23    Q.  Let me go back and ask you about

Page 26

1  your driving record since we're looking at
2  it right now.  Let me mark this as
3  Plaintiff's Exhibit 1 to his deposition.
4        (Whereupon, Plaintiff's Exhibit
5  No. 1 was marked for identification.)
6    Q.  On that occasion, were you
7  driving, according to this record,
8  sixty-nine in a forty-five mile per hour
9  zone?
10    MR. BROUGHTON:  Henry, for
11  clarification of the record, you gave him a
12  May 2003 date.  That's not the date of the
13  infraction.  You see that --
14    MR. PENICK:  That's correct.
15    MR. BROUGHTON:  I just want to
16  make sure we're clear on that.
17    Q.  Well, in February of 2003, do you
18  recall driving forty-five in a sixty-five --
19  sixty-nine -- I'm sorry -- driving
20  sixty-nine in a forty-five mile an hour
21  zone?
22    A.  I was fixing -- I recall the
23  ticket.  And I disputed it.  But instead of

Page 27

1  going to court and taking the day off, I
2  just paid it.  I went on.  I was in my
3  personal vehicle.
4    Q.  All right.  Looking down back into
5  '99, do you recall picking up another
6  speeding ticket in Texas?
7    A.  I recall.  But I don't remember --
8  I remember -- I see the ticket and all.  I
9  don't remember when it was and --
10    Q.  To the far right, do you see where
11  it asks whether or not it was a commercial
12  vehicle and it says yes?  Do you recall
13  doing some truck driving out in Texas in '99
14  and picking up a ticket?
15    A.  Let me think just a minute.  The
16  only time that I got a ticket out on a
17  truck, there was two or three of us running
18  together and we got caught.
19        That's the only -- we got a
20  speeding ticket.  And instead of disputing
21  it, it's easier to pay it than it is to go
22  to court and fight it.
23    Q.  All right.  And you were truck

Page 28

1  driving during that period of time, weren't
2  you?
3    A.  Yes, sir.
4    Q.  Do you recall who you were truck
5  driving with?
6    A.  I believe it was R.E. Garrison.
7  I'm not sure.  But I believe that's who it
8  was.
9    MR. PENICK:  Off the record.
10        (Whereupon, there was a brief
11  off-the-record discussion.)
12    Q.  Then in '98, another speeding
13  ticket.  Well, it says June 10th of '98.
14  Over where it says commercial vehicle, it
15  says no.  That's in Geneva County, Alabama,
16  is it?
17    A.  Yes, sir.
18    Q.  Do you recall getting that ticket
19  back then?
20    A.  No, sir, I don't recall.  I'm
21  sitting here looking at it trying to figure
22  out.  I don't recall getting a speeding
23  ticket or anything in Geneva County.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

Page 29

1    Q.  Well, first of all, you wouldn't
2  dispute that this is your official record
3  and it's probably correct, would you?
4    A.  I wouldn't dispute it, no, sir.
5    Q.  Now, just looking at these moving
6  violations, other than the ones we've talked
7  about, do you remember any of these other
8  ones?
9    A.  No, sir.  It's been so long ago.
10  The DUI in Slocomb, 3-19-93 --
11    Q.  '83.
12    A.  Yes.  '83.  I'm sorry.  I remember
13  getting that.  But what all went on, I don't
14  remember.  But I vaguely remember that.
15    Q.  You were barely twenty-one then.
16  You were twenty going on twenty-one.  We
17  understand how you got that one.
18    A.  Yes.
19    Q.  Okay.  Now, the -- I guess you
20  were just young is what I'm saying; right?
21    A.  Yes.
22    Q.  Were you married at that time?
23    A.  No.

Page 30

1    Q.  Are you married now?
2    A.  No, sir.
3    Q.  Have you ever been married?
4    A.  Unfortunately three times.
5    Q.  Now, down at the accident
6  portions, do you remember any of these?
7    A.  Houston County.
8    Q.  Tell me about that one.
9    A.  I was on Ross Clark Circle where
10  you come off Ross Clark Circle in Dothan to
11  get on 84 to come west.  And a lady, girl,
12  something behind me -- it was a woman --
13  bumped me.  I'm talking about barely bumped
14  me.  Didn't even leave a scratch.
15       And she left.  And the city
16  policeman was sitting there in the parking
17  lot.  He motioned for me to pull over and he
18  wrote an accident report.  He said we need
19  to do that just in case she comes back and
20  -- because, you know, she got my tag number
21  and I got her's.
22       Just in case she comes back and
23  says something, you're covered.  I said,

Page 31

1  sir, there's no damage.  But he still wrote
2  it up.
3    Q.  But she ran into you?
4    A.  She ran into me.  I was sitting
5  still.  She just bumped into me.
6    Q.  What about the -- oh, by the way,
7  you were driving a -- Were you driving your
8  customer vehicle then?
9    A.  No, sir.  I was in a personal
10  vehicle.
11    Q.  I just noticed I saw that COM.
12  But that doesn't mean commercial vehicle.
13  Oh, it says no.  Is that what it says there?
14    A.  No.
15    Q.  No for no?
16    A.  Yes, sir.
17    Q.  And then what about the accident
18  in '97?  Do you remember that one?
19    A.  I looked at that a while ago.  I
20  had a -- When I was in the log truck, the
21  pancake busted on the brake chamber.  And I
22  was coming down off a side road, coming on
23  Highway 29 over there fourteen miles north

Page 32

1  of Brewton and coming down to Highway 29.
2       There's a beaver pond right out in
3  front of where the road dead ends at and I
4  swung over and went back in a way hoping I'd
5  get enough swing, but with the logs being
6  top heavy, it slid over and slid off the
7  side of the highway.  Luckily, there was
8  nobody coming.
9    Q.  All right.  So it was a one car
10  accident?
11    A.  Yes, sir.
12    Q.  Or one vehicle accident?
13    A.  Yes, sir.  It was just luck that
14  there was nobody there but me.
15    Q.  What about then in '87?
16    A.  I'm trying to -- It wasn't no
17  commercial vehicle.  I'm trying to figure
18  out what that was.
19    Q.  In Ozark, Alabama.
20       MR. BROUGHTON:  That's got a U for
21  commercial vehicle.  What does that mean,
22  unknown?
23    A.  I can't -- I don't remember

8 (Pages 29 to 32)

## FREEDOM COURT REPORTING

Page 37

1  Nashville to do?
2     A.  It's not supposed to be on my
3  record.  It was something that I couldn't
4  help.  Completely unavoidable.  The judge
5  said it shouldn't have been wrote up like
6  that.
7     Q.  Let me show you what's mark as
8  Plaintiff's Exhibit 2 to your deposition.
9     (Whereupon, Plaintiff's Exhibit
10  No. 2 was marked for identification.)
11     A.  Yes, sir.
12     Q.  Is this the -- Did Dart write this
13  up?
14     A.  Yes, sir.
15     Q.  And what did they do, mail it to
16  you?
17     A.  No.  I think they faxed it to
18  Scott.
19     Q.  But you reported it to them;
20  right?
21     A.  Yes, sir.
22     Q.  Was anybody injured in that
23  accident?

Page 38

1     A.  No, sir.
2     Q.  Did anybody have to be taken to
3  the hospital?
4     A.  No.
5     Q.  Was any vehicle towed after the
6  accident?
7     A.  Yes, sir.
8     Q.  Whose vehicle was towed?
9     A.  The car that I ran into.
10     Q.  I noticed that on Plaintiff's
11  Exhibit 2, it asked whether or not you had
12  -- did you take any test after the
13  accident.  Did you take any?
14     A.  Supposed -- They didn't tell me I
15  had to.  I asked them that.  They told me
16  no, there wasn't any injuries; so I didn't
17  have to take -- because that's the first
18  question I asked them.
19     Q.  Okay.
20     A.  Where did I need to go to do it,
21  so, you know, I could follow the federal
22  guidelines.
23     Q.  And they told you you didn't have

Page 39

1  to; right?
2     A.  Yes, sir.
3     Q.  And that was somebody at Dart?
4     A.  Yes, sir.  In the safety
5  department.
6     Q.  Did you have any other accidents
7  or infraction or anything while you were at
8  Dart?
9     A.  No, sir.
10     Q.  Any other tickets or anything?
11     A.  No, sir.
12     Q.  Did you leave voluntarily?
13     A.  Yes, sir.
14     Q.  Did anyone ask you to leave?
15     A.  No, sir.
16     Q.  That was an independent
17  contracting situation, also, wasn't it?
18     A.  Yes, sir.
19     Q.  What did you do after that?
20     A.  I came to work at Florida
21  Transformer.
22     Q.  How did you hear about the job at
23  Florida Transformer?

Page 40

1     A.  A friend of the family.  And I
2  came down and --
3     Q.  Which one was the friend of the
4  family?
5     A.  His name is Mr. Collins.
6     Q.  Does he work for FTI?
7     A.  Yes, sir.
8     Q.  What's Mr. Collins' first name?
9     A.  I'm trying to think of what his --
10  Carl Collins.
11     Q.  What did he tell you?
12     A.  He just said that they were
13  looking for a driver.  I was tired of being
14  gone all the time and they was looking for a
15  driver and I came down and talked to Scott,
16  got application and filled it out.
17     Q.  What did he tell you would be
18  required of you to drive for Florida
19  Transformer?
20     A.  Deliver transformers and deliver
21  ones out they refurbishd and bring back some
22  to be redone.
23     Q.  What was the pay arrangement?

10  (Pages 37 to 40)

## FREEDOM COURT REPORTING

Page 41

1    A.  I believe it was nine dollars an
2  hour or nine dollars a quarter starting
3  off.  The best I can remember.
4    Q.  Was there any other compensation
5  involved?
6    A.  No.
7    Q.  No mileage, no load?
8    A.  No.
9    Q.  Nothing like that?
10    A.  No, sir.
11    Q.  All right.  Do you recall filling
12  out a statement when they asked you whether
13  or not you had any violations at all within
14  the previous year?
15    A.  Yes, sir.
16    Q.  Let me show you what's marked as
17  Plaintiff's Exhibit 3.
18        (Whereupon, Plaintiff's Exhibit
19  No. 3 was marked for identification.)
20    Q.  Is that your signature?
21    A.  Yes, sir.
22    Q.  All right.  Had you had any
23  traffic violations within twelve months

Page 42

1  leading up to the application here?
2    A.  No, sir.
3    Q.  Now, I believe that the nearest
4  traffic violation you had to your date of
5  employment was that speeding ticket in
6  Houston County; is that right?
7    A.  Yes, sir.
8    Q.  That was in May of 2003?
9    A.  Yes, sir.  I think the day I got
10  it was February of 2003.
11    Q.  Okay.  Did you ever have to take a
12  physical to get that job?
13    A.  Yes, sir.
14    Q.  Where did you go to take the
15  physical?
16    A.  For which job?
17    Q.  The Florida Transformer job.
18    A.  The doctor's office right down
19  here.  I don't know his name.
20    Q.  He's here -- When you say right
21  down here, you mean in DeFuniak Springs?
22    A.  Yes, sir.
23    Q.  Is he associated with any clinic

Page 43

1  or anything?
2    A.  No, sir.  He's at a doctor's
3  office here.
4    Q.  And do you recall the outcome of
5  your physical?
6    A.  Yes, sir.  I passed.
7    Q.  Did they tell you anything you
8  were to do?
9    A.  No, sir.
10    Q.  Any medications you had to take?
11    A.  No, sir.  I'm already taking
12  medication.
13    Q.  And what are you taking?
14    A.  I believe it's Glucotrol and
15  Glucophage.  I take pills for diabetic.
16    Q.  How long have you been a diabetic?
17    A.  Ever since -- I've known about it
18  since '97, '98.  Somewhere in there.
19    Q.  How did you realize you had
20  diabetes?
21    A.  I went and took a urine test and
22  that's when I realized I had it.  I had to
23  -- They put me on medication, put me on

Page 44

1  pills.  That's what I've been taking.
2    Q.  Did you ever -- Was there anything
3  about your conduct that made you realize
4  that you just weren't right?
5    A.  Yes.  You urinate a lot more.  And
6  that's why -- one reason I had to go take a
7  physical or take a drug test ever so often.
8  And they realized that.  For about a month,
9  I didn't really know what was going on.
10      I know I lost about thirty
11  pounds.  When they found that out, they --
12  the Dr. Mitchum in Geneva put me on pills.
13  And I've been taking them ever since.
14    Q.  Do you know Dr. Mitchum's first
15  name?
16    A.  O.D. Mitchum.
17    Q.  Have you ever been on the needle
18  insulin?
19    A.  No, sir.
20    Q.  Has anybody given you a shot of
21  insulin --
22    A.  No.
23    Q.  -- as an emergency kind of

11 (Pages 41 to 44)

Page 45

1  precaution?
2      A.  No, sir.
3      Q.  And what year was it that you said
4  Dr. Mitchum put you on?
5      A.  I want to say '97, '98.  I'm not
6  quite sure of the exact year.
7      Q.  And have you been getting your
8  prescriptions filled?
9      A.  Yes, sir.
10     Q.  Where have you been getting them
11 filled?
12     A.  Center Drugs in Geneva.
13     Q.  Have you been getting them filled
14 anywhere else?
15     A.  No, sir.
16     Q.  What's the address of Center
17 Drugs?
18     A.  Maple Avenue, Geneva.
19     Q.  Did Dr. Mitchim diagnose you with
20 any other medical problem other than --
21     A.  No, sir.
22     Q.  I take it that was diabetes;
23 right?

Page 46

1      A.  Yes, sir.
2      Q.  And did he diagnose you with
3  anything other than diabetes?
4      A.  No, sir.
5      Q.  Do you have any other medical
6  conditions?
7      A.  No, sir.
8      Q.  Do you take any other kind of
9  medication other than pills?
10     A.  No, sir.
11     Q.  Do you take anything for pain?
12     A.  No, sir.
13     Q.  When you do have to take something
14 for pain, what do you normally take?
15     A.  Nothing stronger than Advil or
16 Tylenol.
17     Q.  Do you recall when you were given
18 your physical back in August of '04?
19     A.  Yes, sir.
20     Q.  Who were you driving with at that
21 time?
22     A.  In August of '04?
23         MR. BROUGHTON:  August or April?

Page 47

1      Q.  April of '04.
2      A.  With Dart.
3      Q.  Was that when you first started or
4  was that somewhere along the way?
5      A.  I want to say it was somewhere
6  along the way.  Maybe it was when I first
7  started.  But I had to go and take a
8  physical.
9      Q.  Why do you -- Why did they have
10 you take a physical in mid stream of your
11 employment?
12     A.  Well, what I had done, when I went
13 up there and took it, I had -- I got there
14 for a while where I could sort of monitor my
15 blood sugar without -- with watching what I
16 eat.  And I could keep it down and wouldn't
17 have to take the medicine.
18         And I had let it slip up on me.
19 It was up a little higher than what the
20 requirements are.  The best I can remember,
21 I think blood sugar one sixty-five or below,
22 they have no problem with it.  Mine was just
23 -- it was just a little above one

Page 48

1  sixty-five.
2      Q.  Let me show you some documents
3  we're going to mark as Plaintiff's Exhibit 4
4  to your deposition.
5         (Whereupon, Plaintiff's Exhibit
6  No. 4 was marked for identification.)
7      A.  But I got back on my medication,
8  went back over there and they seen that I
9  was back on medication.  It was coming down
10 and didn't have any more trouble.
11     Q.  Could you flip through these
12 documents so that you can tell me what these
13 documents are?
14     A.  Yes, sir.  This first here is when
15 they're checking your health history.
16     Q.  You're on page number two of that
17 document?
18     A.  Yes, sir.
19     Q.  All right.  And what is
20 significant about that?
21     A.  On the bottom of it or --
22     Q.  Anywhere.
23     A.  On the bottom of it, it shows

12  (Pages 45 to 48)

**Page 49**

1  where I'm taking the Glucofage, Glucotrol,
2  blood sugar being below one sixty-five, the
3  best I can read that. I can't read that on
4  the bottom right there. It's all scribbled
5  together.
6      Q. Does it tell you to come back in
7  two days, start the above medication?
8      A. That may be what it is.
9      Q. Return in two days?
10     A. Like I said, when I went back, I
11 was taking medicine and it came down.
12 Didn't have no problem with it then.
13     Q. Okay. Now, had you just -- Were
14 you not taking them or just hadn't had them
15 -- had your prescription filled?
16     A. I just wasn't taking them. I keep
17 my prescription filled.
18     Q. Did she give you a shot or
19 anything while you were there?
20     A. No, sir.
21     Q. On this occasion, it says B.
22 Elliott, ARN. Is that a registered nurse?
23     A. I guess.

**Page 50**

1      Q. Did she ever represent herself to
2  be a doctor?
3      A. No, sir.
4      Q. Do you know what clinic you went
5  to?
6      A. No, sir. That's Louisville,
7  Kentucky.
8      Q. Do you know who sent you to that
9  clinic?
10     A. Dart did.
11     Q. Other than the urination problems,
12 had you noticed anything about your behavior
13 that made you realize that maybe your blood
14 sugar had gotten up?
15     A. No, sir.
16     Q. What about the next page?
17     A. Okay. The next page shows your
18 eyesight.
19     Q. Do you wear glasses?
20     A. No, sir.
21     Q. Did they ever ask you to wear
22 glasses?
23     A. No, sir.

**Page 51**

1      MR. BROUGHTON: It looks like it's
2  twenty sixteen. That's better than twenty
3  twenty, I guess.
4      A. I don't know. I always thought
5  twenty twenty was it. Said blood pressure
6  -- what was the reading?
7      Q. At the bottom right, do you see
8  your blood sugar level?
9      A. Yes, sir.
10     Q. And what was it?
11     A. It shows two thousand.
12     Q. Okay.
13     A. But two thousand, you're dead.
14     Q. That was way above one sixty-five,
15 wasn't it?
16     A. Yes. That's what I'm saying. I
17 don't know how that is. But that can't be
18 right. If your blood sugar is two thousand,
19 you're dead. Any doctor will tell you that.
20     Q. We don't know that. But that's
21 what it says, though; right?
22     A. Yes, sir. I understand. I agree
23 with what it says.

**Page 52**

1      Q. Well, that's why I was asking.
2  Had you noticed anything about whether or
3  not you were lethargic or wobbling or felt
4  drunk or light headed or slow reaction or
5  anything like that, that caused you to
6  realize that your blood sugar was out of
7  whack?
8      A. No, sir.
9      Q. You said you had lost some weight,
10 though; right?
11     A. Yes, sir. You'll lose weight.
12     MR. BROUGHTON: Wait, wait.
13 You're confusing two time frames. He said
14 when he was initially tested for diabetes I
15 guess back in -- whenever that was. That's
16 when he was losing weight.
17     Q. Well, let me fast forward then to
18 this dated '04. Had you noticed anything
19 about your behavior then or about your
20 weight or anything that would have caused
21 you to say to yourself that you need to go
22 and see a doctor?
23     A. No, sir.

13  (Pages 49 to 52)

## FREEDOM COURT REPORTING

Page 53

1    Q.  Okay.  And your testimony is that
2  in mid stream of your employment, Dart just
3  told you to go see a doctor?
4    A.  Yes, sir.
5    Q.  Did they not get a physical before
6  you were hired?
7    A.  Well, you got a physical.  Most
8  trucking companies -- which we do it, too --
9  as you are employed through your employment,
10  you get a random drug test.
11    Q.  But this -- You don't guess this
12  was a random drug test, was it?
13    A.  They told me to go down there.  I
14  don't ask questions.  I do what the employer
15  tells me to go do.
16    Q.  Okay.  Now, the next sheet you
17  have, do you see on that last sheet -- I
18  guess the way you have them stacked.
19    A.  I've got it right here.
20    Q.  That last sheet.  Do you see
21  whether or not you -- she rated you to be
22  qualified or disqualified from driving?
23    A.  Undoubtedly I was qualified to

Page 54

1  come back in -- it looks like April of 2005.
2    Q.  Okay.  But what about the check
3  mark below?  What does it say?
4    A.  It shows temporarily
5  disqualified.  That's -- And then when I
6  went back and took it, that's when they
7  qualified me here.  But it still says
8  temporarily disqualified.
9    Q.  Due to what?
10    A.  Diabetes.
11    Q.  Okay.  And was that when you were
12  -- when she checked you, she found out that
13  your diabetes was above one sixty-five?
14    A.  Yes.  That's when I went back.
15  They -- That's when they first checked me
16  the first time and then I went back.
17    Q.  And according to what she wrote,
18  you were at two thousand?
19    A.  No.  That's --
20    Q.  According to what she wrote?
21    A.  I disagree with that because
22  anybody -- It also says right here in the
23  bottom of that page, too, it was -- at

Page 55

1  fasting, it was two oh seven.
2    Q.  It says Glucosa, two oh seven
3  fasting?
4    A.  That's your blood --
5    Q.  Does that mean with the Glucosa?
6    A.  No.  That's just where they said
7  that's what your sugar is.
8    Q.  Yes.  But do you notice that on
9  that date, it's got 4-28 in front of it
10  instead of 4-26?
11    A.  Yes, sir.
12    Q.  Do you think that was a different
13  reading on 4-28, two days later?
14    A.  Yes, sir.  It was coming down.
15    Q.  All right.  But that doesn't
16  indicate what it was on 4-26 then, does it?
17    A.  No, sir.  But I disagree with the
18  two thousand.
19    Q.  Okay.  All right.  Do you know
20  whether or not the Glucofage and the
21  Glucosa, whether or not it includes insulin
22  in those drugs?
23    A.  I don't know.  I take it as a

Page 56

1  pill.
2    Q.  Okay.
3    A.  The best of my knowledge -- and I
4  may not be wrong with this -- may not be
5  right with this -- but a type one diabetic
6  is insulin.  I'm a type two, which is pills.
7    Q.  Okay.  But in both cases, it's a
8  lack of insulin production in the body
9  that's causing this diabetes; right?
10    A.  The best I understand.
11    Q.  Okay.
12    A.  You can control it with pills or
13  taking insulin.  And I take pills.
14    Q.  Okay.  Are you aware of any
15  occasion that any doctor has administered
16  insulin to you?
17    A.  No, sir.  No doctor has ever
18  administered insulin to me, no.
19    Q.  As a result of this examination,
20  did she issue you this certificate that's on
21  the first page of Plaintiff's Exhibit 4?
22    A.  Yes, sir.
23    Q.  And it shows, I guess, the

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  certificate expiration date is 4-26-05;
2  right?
3      A.  Yes, sir.
4      Q.  Did you have it redone by April
5  26, 2005?
6      A.  Yes, sir.
7      Q.  Were you then employed with FTI?
8      A.  Yes, sir.
9      Q.  And do you know how you came out
10 on that?
11     A.  Came out with no problem.
12     Q.  Okay.  Were you recommended to
13 continue to take your pills?
14     A.  The physical -- The one that give
15 me the physical didn't say.  But I take my
16 pills everyday religiously.
17     Q.  Were you taking them every day
18 when you had this exam --
19     A.  No.
20     Q.  -- in April of 2004?
21     A.  No, sir.
22     Q.  What other doctors have you seen
23 other than Dr. Mitchum --

Page 58

1      A.  I seen --
2      Q.  -- in the last let's say ten
3  years?
4      A.  Dr. Cosper.
5      Q.  And where is he?
6      A.  In Geneva.
7      Q.  And what is he treating you for?
8      A.  He's just a family practitioner,
9  family doctor.
10     Q.  Do you know what his first name
11 is?
12     A.  No, sir, I sure don't.
13     Q.  Okay.  What did he treat you for?
14     A.  I went to him to have a checkup.
15 Ever so often, when taking this medicine,
16 you have to go get checkups so they can redo
17 your prescription so you can continue taking
18 it.
19     Q.  Did he ever change your
20 prescription?
21     A.  No, sir.
22     Q.  What year did you go see Dr.
23 Cosper?

Page 59

1      A.  2005, I believe it was.
2      Q.  Did you see anybody -- any other
3  doctor between Dr. Mitchum in 1997 or '98
4  and Dr. Cosper in 2005?
5      A.  Not that I can remember.
6      Q.  Did you remain with Dr. Mitchum
7  over that seven year period before you went
8  to Dr. Cosper?
9      A.  Yes, sir.
10     Q.  Did Dr. Cosper treat any other
11 medical condition other than your diabetes?
12     A.  My back was hurting.  I went to
13 him.  Did an MRI on my back.
14     Q.  What did he prescribe for it?
15     A.  He said being I'm a driver, I take
16 some kind of medication, either Advil or
17 Tylenol.
18     Q.  And that's what you've been
19 taking?
20     A.  Yes, sir.  It's hard to take
21 anything else and drive.
22     Q.  Okay.  Has anybody prescribed any
23 other kind of stronger pain medication for

Page 60

1  you?
2      A.  Not that I can recall.
3          (Whereupon, there was a brief
4  interruption.)
5      Q.  We were talking about Dr. Cosper
6  or anybody other than Dr. Cosper and whether
7  or not anybody had ever prescribed any
8  medication stronger than Advil or Tylenol.
9  I think your answer was --
10     A.  I'm trying to -- I can't remember.
11     Q.  Do you remember any other doctor
12 other than Dr. Cosper treated you?
13     A.  I'm trying to think.  Back when we
14 had the wreck now, we came down here.  And
15 that's what I'm trying to refresh my
16 memory.  Came down to DeFuniak Clinic.  I
17 guess that's what it would be called.
18     Q.  Do you know where it's located in
19 DeFuniak?
20     A.  On 331 south.
21     Q.  Do you know what doctor treated
22 you?
23     A.  I can't think of the lady's name.

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 65

1    Q.   Have you been treated for any
2  other medical condition other than what you
3  have told me about?
4    A.   No, sir.
5    Q.   Have you taken any other -- Have
6  you been prescribed any prescription for any
7  medication other than what you have told me
8  about?
9    A.   Not to the best of my knowledge.
10    Q.   Back to this Exhibit 4.
11    A.   Yes, sir.
12    Q.   Based on the representations made
13  on the last page, were you disqualified to
14  drive from April 26, 2004 until you came
15  back on April 28, 2004?
16    A.   Yes, sir.  What that was, we was
17  having a class during that time.  Until I
18  started taking my medication to bring it
19  back down, the class was over with.  I went
20  back by there.  They took my sugar.  It was
21  down.  So they give me a one year
22  certification.
23    Q.   Did anybody ask you -- Well, first

Page 66

1  of all, did they ask you at the clinic where
2  you had the test done on April 24th to come
3  back -- I'm sorry -- on April 26, did they
4  ask you to come back on the 28th?
5    A.   Yes, sir.  I explained to them I
6  had my medication.  I just hadn't took it in
7  about a month.  And they told me to start
8  taking it and to come back.
9    Q.   Is there any other employment that
10  we haven't talked about?
11    A.   Not to the best of my knowledge.
12    Q.   And you're clear that there's no
13  other medical treatment you received that we
14  haven't talked about; right?
15    A.   To the best of my knowledge, no.
16    Q.   Let's move onto your employment
17  then at Florida Transformer.  When you first
18  came to Florida Transformer, did they send
19  you to get a medical certification?
20    A.   I went and took a urine test.
21    Q.   And that was over at the DeFuniak
22  clinic?
23    A.   Yes, sir.

Page 67

1    Q.   Did you go and have your
2  pre-employment physical with Dr. Garcia?
3    A.   Yes, sir.
4    Q.   Do you remember his first name?
5    A.   No, sir.
6    Q.   He's located here in DeFuniak
7  Springs?
8    A.   Yes, sir.
9    Q.   Do you know the address?
10    A.   Highway 90, Highway 90 east.
11    Q.   Do you know what was the outcome
12  of your pre-employment physical?
13    A.   Everything come back negative.
14    Q.   Okay.  Did he give you a follow-up
15  date to come back and see him for any
16  reason?
17    A.   No, sir.
18    Q.   Were the results of these tests
19  communicated to Florida Transformer?
20    A.   Yes, sir.
21    Q.   Did you carry it yourself or did
22  they --
23    A.   I carried a paper back showing

Page 68

1  that I had took it.  And they sent the
2  results back once they got it done.
3    Q.   All right.  Other than taking the
4  pre-employment physical, what else did you
5  have to do to get the job at FTI?
6    A.   I rode with -- Let's see.  I went
7  to work on the yard for about a half a day.
8  Went down to Wauchula, Florida.  Came back
9  and was off the next day.
10      And William Tidwell was going to
11  show me the paperwork and check my --
12  evaluate my driving.  That was about it the
13  best I can remember.
14    Q.   Let me show you what we've marked
15  for identification as Plaintiff's Exhibit 5.
16      (Whereupon, Plaintiff's Exhibit
17  No. 5 was marked for identification.)
18    Q.   Can you tell me what's Plaintiff's
19  Exhibit 5?
20    A.   Yes, sir.
21    Q.   And what is that?
22    A.   That's where James Cook and myself
23  left out at 12:30 on -- I don't remember

17  (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1 what date it was.
2   Q.  Is this for August 31st, 2004 at
3 the top?
4   A.  Yes, sir.  August 31st.
5   Q.  And is this your duty -- driver's
6 duty status records for August 31st?
7   A.  Yes, sir.
8   Q.  2004?
9   A.  Yes, sir.  I drove down to
10 Wauchula, Florida.  We loaded the truck.
11 And at 2:15 in the afternoon, I got in the
12 sleeper and he drove back home.
13   Q.  So based on what you're telling me
14 here, you were on duty with the truck from
15 -- I think you said 12:15?
16   A.  Yes, sir.
17   Q.  All the way up to 2:15?
18   A.  Yes, sir.
19   Q.  And it says here that you all
20 switched up in Ocala, Florida; is that
21 right?
22   A.  Yes, sir.
23   Q.  You were on your way back then?

Page 70

1   A.  Yes, sir.
2   Q.  Did you drop off a load of
3 transformers?
4   A.  We went down, picked a load up,
5 stuff that the hurricane had destroyed.  We
6 go down and pick them up and bring them back
7 and refurbish them.
8   Q.  That was Hurricane Charlie?
9   A.  I don't remember which hurricane
10 it was.  But I would believe you're right.
11 I'm not sure.
12   Q.  So when you drove down, you didn't
13 have a load then, did you?
14   A.  The best I can recall, I didn't.
15 I just went down and picked up.
16   Q.  But then you did drive part of the
17 way back?
18   A.  No, sir.  I didn't -- Once we left
19 from down there, I didn't drive any.
20   Q.  What part -- Is that 2:15?  Is
21 that when you left coming back?
22   A.  No, sir.  We had left before
23 that.  That's just when I went in the

Page 71

1 sleeper.  I was on duty up until then.  He
2 was driving.
3   Q.  After it was loaded, he started
4 driving then?
5   A.  Yes, sir.
6   Q.  And what time can you tell me from
7 looking at this did you start driving back?
8   A.  What time he started driving back,
9 I'm not quite sure.
10   Q.  Let me show you what's been marked
11 as Plaintiff's Exhibit 6.
12     (Whereupon, Plaintiff's Exhibit
13 No. 6 was marked for identification.)
14   Q.  Can you tell me what that is?
15   A.  Yes, sir.
16   Q.  What is that?
17   A.  It's a mileage sheet.
18   Q.  Okay.  And tell me what the
19 speedometer reading is.  First of all, you
20 have two speedometer readings; is that
21 correct?
22   A.  Yes, sir.  You have a starting and
23 a finish.

Page 72

1   Q.  And what was the starting
2 speedometer reading?
3   A.  Eight hundred eighty-seven
4 thousand nine hundred and six.
5   Q.  And what was the ending
6 speedometer reading?
7   A.  Eight hundred eighty-eight
8 thousand eight hundred and fifty-six.
9   Q.  And that was what the reading was
10 when the truck got back to the --
11   A.  Yes, sir.
12   Q.  -- to FTI; right?
13   A.  Yes, sir.
14   Q.  Now, I noticed that on the bottom
15 you've got -- you've got Alabama, Florida
16 and Georgia.  Could you explain those
17 numbers to me?
18   A.  That's what I was just looking
19 at.  I don't know how them got on there.  I
20 didn't put them on there.  They've got a
21 line drawed across there where it's
22 something else.  I have no idea what that
23 is.

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    Q.   Is that the number of miles you
2   did in each of those states?
3    A.   No, sir.  We just went in Florida
4   and come back in Florida.
5    Q.   So you don't know why they have
6   this Alabama and Georgia on this?
7    A.   No, sir.
8    Q.   Show you what's marked as Exhibit
9   7.
10       (Whereupon, Plaintiff's Exhibit
11  No. 7 was marked for identification.)
12   Q.   Can you tell me what that is?
13   A.   This is transformers we picked up.
14   Q.   Okay.  And you do notice that this
15  is page one of eight; is that right?
16   A.   Probably so.
17   Q.   Okay.  And is this the -- Did you
18  go down to Pace River Electric Co-op?
19   A.   No, sir.  We went to Wauchula
20  Peace River, Wauchula.
21   Q.   Yes, Peace River.  I'm sorry.
22   A.   But that's transformers -- that's
23  the total amount of transformers we picked

Page 74

1   up from down there.
2    Q.   So that ninety-six poles means
3   pole mounted transformers?
4    A.   Yes, sir.
5    Q.   One control panel and one auto
6   booster; right?
7    A.   Yes, sir.
8    Q.   Now, looking back at Plaintiff's
9   Exhibit No. 5 --
10   A.   Yes, sir.
11   Q.   -- when were you taken off duty?
12   A.   When was I taken off duty
13  altogether?
14   Q.   Yes.
15   A.   What I'm trying to do is answer
16  your question.  Being completely through
17  with the trip?
18   Q.   Yes.
19   A.   About 8:30 in the afternoon.
20   Q.   All right.  What did you do after
21  that?
22   A.   I went home.
23   Q.   And what did you do after that?

Page 75

1    A.   Stayed at the house.  Got up
2   sometime the next morning.  Not no certain
3   time, not no set time.  And I want to say I
4   rode down here to Florida Transformer, but
5   I'm not sure.
6        But I know about four o'clock that
7   afternoon, I went to bed because I had to
8   leave back out the next night.
9    Q.   So you went to bed at about 4:00
10  that afternoon?
11   A.   Yes, sir.
12   Q.   On the 1st?
13   A.   Yes, sir.
14   Q.   Then you slept until what time?
15   A.   Somewhere around 11:30, 12:00 that
16  night.
17   Q.   And you were at your home in
18  Geneva?
19   A.   Yes, sir.
20   Q.   How long did it take to drive from
21  Geneva to Florida Transformer here in
22  DeFuniak Springs?
23   A.   Twenty-five, thirty minutes.

Page 76

1    Q.   Do you recall what time you
2   arrived at work at FTI on the morning of
3   September the 2nd?
4    A.   The best I can recall, somewhere
5   around 12:45 a.m.  12:30, 12:45.
6    Q.   Do you recall whether or not your
7   sleep between 4:00 and 12:00 was interrupted
8   in any way?
9    A.   No, sir, it wasn't interrupted at
10  all.
11   Q.   Let me show you what's been marked
12  for identification as Plaintiff's Exhibit
13  8.
14       (Whereupon, Plaintiff's Exhibit
15  No. 8 was marked for identification.)
16   Q.   Can you tell me what's Plaintiff's
17  Exhibit 8?
18   A.   It's my starting log for September
19  2nd, 2004.
20   Q.   What time did you come on that
21  morning?
22   A.   12:45 a.m.
23   Q.   And what did you do when you got

19  (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 77

1  in at 12:45?
2      A.   Met William Tidwell here and we
3  done a pre-trip inspection on the truck.
4      Q.   On which sheet do you mark the
5  pre-trip inspection?
6      A.   It's on the back of a log page.
7      Q.   Do you recall any notations you
8  made about your pre-trip inspection on the
9  back of the log page for September the 2nd,
10  2004?
11     A.   No, sir.  There was nothing wrong
12  with the truck that we could find.
13         MR. BROUGHTON:  Henry, do you not
14  have the back of these pages?
15         MR. PENICK:  I don't recall.  I'd
16  have to go through it again.  I don't think
17  so.  I don't recall seeing any.  But I will
18  search again.
19         MR. BROUGHTON:  Well, I've got an
20  extra copy.  Sometimes when these things get
21  produced, they don't get the -- people don't
22  copy the back.  You've got that one.  Do you
23  have this one?

Page 78

1          MR. PENICK:  No, I didn't get this
2   one I don't think.
3          MR. BROUGHTON:  And I don't know
4   if you have these or not.  But these are the
5   -- I've got extra copies of those.
6          MR. PENICK:  We're looking at 9-2
7   already I think.
8          MR. BROUGHTON:  So you don't need
9   that?  So you need that one?
10         MR. PENICK:  We need the 9 --
11         MR. BROUGHTON:  That's the front
12  and back.
13         MR. PENICK:  Oh, I don't have the
14  back of any of them.
15         MR. BROUGHTON:  That's why I have
16  given you that.
17         MR. PENICK:  I do have one back.
18  But I don't recall seeing this back.  Well,
19  let's substitute the back for the --
20  particularly the back for the September 2nd,
21  2004, September 3rd -- well, there's no --
22  September 3rd, he was off all day on that
23  one.  And September 2nd.

Page 79

1      Q.   Now, what -- I'm just going to
2  mark this for identification.  We'll put a
3  sticker on it later.  But this is the -- Is
4  this the back of your driver's log for
5  September the 2nd, 2004?
6      A.   Yes, sir, it is.
7      Q.   And is this a pre-trip inspection?
8      A.   Yes, sir.
9      Q.   And were you pulling trailer 220?
10     A.   It was supposed to have been 228.
11     Q.   Okay.  Tractor 11 and trailer 228?
12     A.   Yes, sir.
13     Q.   And did you certify on here that
14  there's no defects on it?
15     A.   Yes, sir.
16     Q.   Had you ever driven tractor 11
17  before?
18     A.   That was the second time I drove
19  it.  I drove down to Wauchula and back.
20     Q.   Did you have any problems with it
21  when you drove it down to Wauchula?
22     A.   No, sir.
23     Q.   Did you have to put any oil in it

Page 80

1   or anything?
2       A.   No.
3       Q.   Or fluids or anything?
4       A.   No, sir.
5           MR. BROUGHTON:  By any fluids, you
6   mean gasoline or diesel fuel?  Y'all are on
7   the same page.
8       Q.   Did you get any -- You did buy
9   gasoline, though; right?
10      A.   I think James bought some on the
11  way back.  I didn't have to buy any.
12      Q.   How many miles would you say you'd
13  get on a tank of diesel fuel on that truck?
14      A.   On that truck, I have no idea on
15  that truck.
16      Q.   Well, you went down to Wauchula
17  and back.  You didn't have to buy gas but
18  one time on the way back; right?
19      A.   He stopped and got I think
20  approximately -- probably fifty or hundred
21  gallons in Ocala and came on back.  Now, how
22  close it was to running out, I wasn't paying
23  attention.

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    Q.   But if you leave DeFuniak and
2    drive down to Wauchula and come back up to
3    Ocala, what would you say you've done?
4        A.   Mileage-wise?
5        Q.   Yes.
6        A.   Oh, Lord.  Leaving here just to go
7    to Ocala, somewhere right around three
8    twenty-five, three hundred, three
9    twenty-five, three fifty, somewhere in that
10   area give or take a few miles.
11       Q.   When you did the pre-trip
12   inspection with Tidwell, did you all have
13   any conversation about the route you were
14   going to take?
15       A.   No, sir.  We just -- I just asked
16   him which way would be the best way to go,
17   which we talked about go through Troy and
18   Montgomery, 85.  The easiest way to go on
19   Interstate 85.
20       Q.   And you knew the route to get
21   there; right?
22       A.   Yes, sir.
23       Q.   But you didn't know who the

Page 82

1    customer was in Atlanta, though; right?
2        A.   No, sir.  When you first leave
3    out, they give you cards to tell you how to
4    get to wherever you're going to, direction
5    cards.
6        Q.   Do you recall any conversations
7    you were having with him right before y'all
8    pulled in?
9        A.   No, sir.  None other than the best
10   way to go.
11       Q.   All right.  I'm going to ask this
12   question and then we're going to take a
13   break.  And then we're going to come back
14   and pick up at the beginning of the trip.
15   Of course you hadn't had anything to drink
16   that night; right?
17       A.   No, sir.
18       Q.   Do you drink?
19       A.   Very seldom.
20       Q.   Before you all started on this
21   trip, when was the last time you think you
22   had anything to drink?
23       A.   Probably that Saturday.

Page 83

1    Q.   And this was on what day of the
2    week?
3        A.   The best I can remember, it was on
4    a Thursday.
5        Q.   Okay.  And what do you drink?
6        A.   If I drink anything, it's Bush
7    Light or Bud Light.
8        Q.   And if you had something that
9    Saturday before, you think that's what it
10   was?
11       A.   That's all it would have been.
12       Q.   And you don't recall having
13   anything during that week?
14       A.   No, sir.  I don't drink during the
15   week.
16       Q.   When you have to drive?
17       A.   Or when I have to drive.  That's
18   something I don't do.
19       Q.   Okay.
20       MR. PENICK:  We'll take a break
21   for now.
22       (Whereupon, a short recess was
23   taken.)

Page 84

1    Q.   Tell me whether or not there was
2    anything -- Well, first of all, you all -- I
3    think you said -- according to Mr. Tidwell's
4    testimony, you all inspected the load;
5    right?
6        A.   Yes, sir.
7        Q.   He said something about you tied
8    it down?
9        A.   Yes, sir.
10       Q.   After that, did you all take off?
11       A.   Yes, sir.  After we tied it down,
12   done the pre-trip inspection on the truck,
13   walked around, make sure everything --
14   visually look at everything on the truck and
15   trailer.
16       Q.   As you all were traveling, do you
17   recall any conversation the two of you were
18   having along the way?
19       A.   Very light conversation, if much.
20   Wasn't too much -- you know, paying
21   attention more to what I was doing than
22   talking.
23       Q.   Was he trying to give you any

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1 instructions about driving?
2    A.  No, sir.  I think he was sitting
3 over there about half asleep.  No.  I'm just
4 kidding.
5    Q.  He knew of the number of years
6 that you had truck driving?
7    A.  Yes, sir.
8    Q.  And he knew also that you had more
9 truck driving experience than he had?
10    A.  I believe -- during the -- You
11 know, we had started good.  The best I can
12 remember, we may have had the conversation.
13    Q.  Then you all stopped at a Phillips
14 66 in Troy?
15    A.  No, sir.  It's at Taylor Road
16 junction 271 and 231 in Montgomery.
17    Q.  All right.  What did you all do at
18 that stop?
19    A.  Ran into the bathroom.  I got a
20 cup of coffee and got back in the truck and
21 eased on up the road.
22    Q.  What did you have in your coffee?
23 Did you mix it with anything?

Page 86

1    A.  I generally mix like one little
2 thing of sugar and some half and half.
3    Q.  By that time, you had been awake
4 from sleep possibly about two hours?
5    A.  Probably about three hours, three
6 and half hours.  Something like that.
7 Between three, three and a half.
8    Q.  Did anything else -- Did y'all
9 have any other conversation or anything
10 eventful happen as you moved through
11 Montgomery?
12    A.  No.  Just everything -- You know,
13 casual conversation or something.  I can't
14 even remember what all we did talk about.
15    Q.  As you got on I-85 headed north,
16 do you recall any conversation?
17    A.  The only thing, you know, that
18 even vaguely that I can remember is
19 somewhere through there, he was saying he
20 didn't like going to Atlanta.  He's scared
21 of Atlanta.
22    Q.  And what did you say about that?
23    A.  Oh, I told him it wasn't nothing

Page 87

1 but a piece of cake.  Just take your time
2 and ease through it.  Pay attention to what
3 you're doing and you'll have no trouble.
4    Don't get in no hurry.  Don't try
5 to get in a real big hurry or cut anybody
6 off.  Just take your time and go easy and
7 you won't have a bit of trouble.
8    Q.  Do you recall any other
9 conversation?
10    A.  We talked very little.  I can't
11 remember what all -- like I said, what all
12 we did talk about.
13    Q.  Do you recall making any
14 adjustments to your equipment at all while
15 traveling on I-85 north?
16    A.  No, sir.
17    Q.  Describe what kind of night it
18 was.
19    A.  When we left, I mean, there was --
20 coming up toward 231 and all, there was a
21 very light fog in a couple of places, low
22 lying areas, a little bit of misty rain
23 getting on 231.

Page 88

1    Got up a little closer to
2 Montgomery, about Pine Level, it cleared
3 up.  It was a dark night, but it wasn't
4 raining or foggy.  All the way up to
5 Interstate 85, it was dark.  But it wasn't
6 no fog, no rain.
7    Q.  Did you have your high beams on?
8    A.  The best I can recall -- I can't
9 remember.  I'd say I had my low beams on.
10    Q.  Did you ever during that night
11 have your high beams on?
12    A.  Yes, sir.  When I run on two lane
13 roads and stuff, non-interstate four lanes,
14 I'll run my high beam on until I can see
15 somebody coming way up the road and I turn
16 my low beams back on.
17    On the interstate, I run my low
18 beams on.  Common courtesy to the other
19 vehicles that you're meeting because you're
20 constantly meeting them on the interstate.
21    Q.  You would meet them going in the
22 same direction --
23    A.  No.

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1    Q.  -- or coming towards you?
2    A.  Coming towards me, meeting me.
3  And I just keep my low beams on.
4    Q.  Do you recall whether or not you
5  had your low beams on this night when you
6  hit I-85?
7    A.  When I got on 85, the best I
8  remember, I had my low beams on.  I'm not
9  sure.  But we was meeting quite a bit of
10  traffic at that time of the morning.
11    Q.  How did the illumination of the
12  lights on this Peterbilt you were driving
13  compare to other trucks you had been
14  driving?
15    A.  The same.
16    Q.  How far in the distance would you
17  say you could see while driving?
18    A.  I haven't really never paid no --
19  it's a pretty good distance.  But I haven't
20  ever really paid attention to how far.
21    Q.  When you say a pretty good
22  distance, how far are you talking about?
23    A.  Probably fifty to sixty feet,

Page 90

1  seventy feet.  I'm not quite sure.  That's
2  just an --
3    MR. BROUGHTON:  Don't guess.  If
4  you've got an idea or if you've ever
5  measured it, you can tell him.
6    A.  I haven't never measured
7  anything.  So I really have no idea.
8    Q.  I believe you said on a previous
9  occasion it was dark that night?
10    A.  Yes, sir.
11    Q.  Were there any stars, moon,
12  anything like that?
13    A.  Not that I can remember.
14    Q.  By the time you hit I-85 going
15  north, as far as you know, the pavement was
16  dry; is that right?
17    A.  The best I can recall, it was.
18    Q.  Tell me exactly what happened as
19  you approached the point of the collision.
20  Describe the collision for me.
21    A.  We was in the right lane going up
22  I-85.  As we were going up, we was meeting a
23  few cars, you know, coming.  We went around

Page 91

1  a little curve.  It wasn't a real sharp
2  curve.  It was like a little ole curve.
3    We seen something across the
4  road.  I slammed on brakes.  To start with,
5  we couldn't really tell -- When we first
6  just got a glimpse of it, we couldn't tell
7  what it was.  I slammed on brakes.
8    All you could see was underneath
9  -- the tires was up on the side.  It was
10  black.  You couldn't -- and I slammed on
11  brakes and locked the truck up and we
12  collided into Mr. Morris' truck.
13    Q.  Do you know whether or not you
14  left any skid marks that night?
15    A.  To the best of my knowledge, I
16  don't remember.  We didn't -- I didn't get
17  out that night and look.  We was getting out
18  trying to get people stopped because it had
19  knocked our circuit breaker and all out on
20  the trucks and we didn't have no lights on.
21    We was trying to get people
22  stopped to avoid further collisions.  And we
23  then once we got somebody stopped, we was

Page 92

1  trying to find him.
2    Q.  Did I hear you say that the brakes
3  locked?
4    A.  When you mash the brakes up, I'm
5  talking about start mashing the pedal down,
6  you know, locking your brakes down.
7    Q.  All right.  While sitting up in
8  that Peterbilt, how high would you say you
9  were off the ground?
10    A.  Probably about four or five feet
11  approximately.
12    Q.  Would you say it's higher than
13  eight feet sitting up?  Once you're sitting
14  up in a Peterbilt, would you say it's eight
15  feet high?
16    A.  I wouldn't.  I have never measured
17  that.
18    MR. BROUGHTON:  Don't guess.  If
19  you don't know --
20    Q.  For example, if you're standing on
21  the ground and you're about to climb up into
22  the cab, the seat -- where would the seat be
23  with respect to your height?

23  (Pages  89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1    A.   Let's see.  I ain't never paid
2    that any attention.  Let me think just a
3    minute.  Probably -- If you open the door
4    and you're sitting in the seat, the seat
5    probably comes about right here on me
6    (indicating).
7    Q.   If you are standing on the ground?
8    A.   Standing on the ground.
9    Q.   And you're indicating midway your
10   chest?
11   A.   In here somewhere (indicating).
12   Q.   Your chest?
13   A.   Uh-huh.
14   Q.   And once you sit up in the seat,
15   how high would you say your vision is?
16   A.   I mean, I'd be guessing.  So I'm
17   not sure.
18   Q.   Now, did you see any kind of
19   reflection whatsoever from Morris' truck?
20   A.   No.
21   Q.   Did you see any headlights?
22   A.   No, sir.
23   Q.   Did you see any shining over into

Page 94

1    the woods?
2    A.   No, sir.
3    Q.   Did you see any rear -- the
4    reflection of any rear lights?
5    A.   No, sir.
6    Q.   Did you get any reflection off of
7    any tape?
8    A.   No, sir.
9    Q.   Did you get any reflection off of
10   any reflectors?
11   A.   No, sir.
12   Q.   In your opinion -- Let me show you
13   what we've examined as -- and we'll just
14   call it Plaintiff's Exhibit 9 to your
15   deposition.
16       (Whereupon, Plaintiff's Exhibit
17   No. 9 was marked for identification.)
18   Q.   Let me show you what we've marked
19   as Plaintiff's Exhibit 9.  Have you seen
20   that before?
21   A.   I don't recall if -- I don't
22   believe so.  I may have.
23   Q.   Can you identify what it is,

Page 95

1    though?
2    A.   Yes, sir.
3    Q.   What is it?
4    A.   A uniform traffic accident report.
5    Q.   And what is it a report of?
6    A.   Mr. Morris and myself, the wreck
7    we had on September of 2004.
8    Q.   All right.  And when you look at
9    the information regarding yourself, most of
10   this information appears to be correct; is
11   that correct?  Do you see anything that's
12   incorrect about this?
13   A.   No, sir.
14   Q.   Let me call your attention to what
15   we've marked as page four of this document.
16   Have you ever seen this diagram before?
17   A.   No, sir.
18   Q.   All right.  When you all were
19   traveling, you were traveling on I-85 north;
20   is that correct?
21   A.   Yes, sir.
22   Q.   All right.  What's your
23   recollection about what lane you were in?

Page 96

1    A.   I was in the right lane.
2    Q.   Are you certain of that?
3    A.   Yes, sir.
4    Q.   Now, when you saw Morris' tractor
5    -- Well, did you see the bottom of the
6    tractor or the bottom of the trailer both?
7    A.   I seen the bottom of the trailer.
8    Q.   The bottom of the trailer?
9    A.   The best I can remember, it was
10   the bottom of the trailer.  It was all
11   black.
12   Q.   And did you see the bottom of the
13   tractor?
14   A.   As we got closer to it, yes, sir.
15   Q.   All right.  Now, the tractor does
16   have lights at the tail end of the tractor,
17   doesn't it?
18   A.   It's supposed to have.  They was
19   not working.
20   Q.   You're certain that they were not
21   working?
22   A.   No lights was on.
23   Q.   Do you recall whether or not the

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  headlights were on?
2      A.  The headlights were not on.
3      Q.  Do you know whether or not they
4  were not on or you just didn't see them?
5      A.  They were not on.
6      Q.  Do you recall giving an affidavit
7  in this case before?
8      A.  Not that I know of.
9      Q.  Let me show you what I'll mark for
10  identification as Plaintiff's Exhibit 10.
11         (Whereupon, Plaintiff's Exhibit
12  No. 10 was marked for identification.)
13      Q.  We can substitute a clean copy for
14  this.  Let me show you what we've marked as
15  Plaintiff's 10, the last page of Plaintiff's
16  10.  Does that appear to be your signature?
17      A.  No, sir.
18      Q.  That is not your signature?
19      A.  No, sir.
20      Q.  I'm sorry.  I gave you the wrong
21  one.  Now let me show you what we've marked
22  as Plaintiff's Exhibit 10.
23      A.  We might get along on this one.

Page 98

1      Q.  Let me show you the last page.  Is
2  that your signature?
3      A.  Yes, sir.
4      Q.  All right.  Let me call your
5  attention to that second page.
6      A.  All right, sir.
7      Q.  Well, first of all, look at the
8  entire document.  And after you have looked
9  at the entire document, tell me where if at
10  any point where you said that the lights on
11  Morris' tractor trailer were not on.
12      A.  Where it says I never saw any
13  reflector lights or tape or any headlights,
14  taillights or other lights from the
15  overturned tractor trailer.
16      Q.  Okay.  It says that you never saw
17  them; right?
18      A.  No, sir.
19      Q.  Now, does it say that the lights
20  were not on on Morris' vehicle?
21      A.  No, sir.
22      Q.  Okay.  Here today, would you say
23  that you didn't see them or would you say

Page 99

1  that they just were not on?
2      A.  They were not on.
3      Q.  Okay.  Let me also call your
4  attention then back to Plaintiff's Exhibit
5  9.  I believe you said that when you -- as
6  you approached Morris' overturned tractor
7  trailer, you saw some tires; is that right?
8      A.  Yes, sir.
9      Q.  Do you know if those were the
10  tires of the tractor or the tires of the
11  trailer?
12      A.  Tires of the trailer.
13      Q.  The tires of the trailer?
14      A.  Yes, sir.
15      Q.  All right.  What lane was the
16  tires of the trailer in?
17      A.  They was probably to the mid -- in
18  the median type --
19      Q.  You mean like in the middle
20  between the two lanes?
21      A.  No.  They was in the median
22  because the tractor was slammed across the
23  highway into the emergency lane.

Page 100

1      Q.  Do you know whether or not the
2  tractor was over in the emergency lane?
3      A.  To the best of my knowledge, it
4  was over a couple of feet.  The best I can
5  remember.
6      Q.  Let me call your attention back to
7  Plaintiff's Exhibit 10 again.  Is 10 the
8  affidavit that you gave?  Do you see
9  anywhere in your affidavit where you said
10  that the tractor of Morris' vehicle was all
11  the way across both lanes and into the
12  emergency lane?
13      A.  Let's see.  It was a very dark
14  night.  As we approached where the accident
15  occurred, all of a sudden, I saw in my
16  headlights what appeared to be vehicle tires
17  out across the road.
18         And I said oh, my God and slammed
19  on the brakes.  We braced for the
20  collision.  We were not able to stop before
21  the front of my tractor hit the underside of
22  the tractor on the other vehicle.
23         There was no time to react other

25  (Pages 97 to 100)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1 than the way I did react. I was unable to
2 avoid this collision.
3    Q.   Now, do you see anywhere in this
4 affidavit where you say that the overturned
5 tractor trailer, Morris' tractor trailer,
6 was blocking all or both of the lanes,
7 including into the emergency lane?
8    A.   It was across the road.
9    Q.   But it doesn't mention emergency
10 lane at all, does it?
11    A.   No, sir.
12    Q.   As a matter of fact, it doesn't
13 really state that it was blocking both lanes
14 of the road either, does it?
15    A.   No, sir.
16       MR. BROUGHTON: Wait a second
17 now. Read that next paragraph. You stopped
18 at --
19       MR. PENICK: Wait a minute. Don't
20 coach him. Don't coach him.
21       MR. BROUGTON: Well, let him read
22 the whole thing.
23    A.   As soon as our vehicle stopped --

Page 102

1       MR. BROUGHTON: No. The next
2 paragraph that --
3    Q.   Let's take this up on the
4 re-examination in just a minute, okay,
5 because he's going to ask you about it later
6 on. But let us move on with this.
7       MR. BROUGHTON: Well, let him read
8 the thing. The question was, does it say
9 anywhere in there that it was blocking both
10 lanes of traffic.
11       MR. PENICK: And what I'm saying
12 is that you're trying to coach him to
13 wherever he wants to read to wherever you
14 want him to read. And that's something that
15 you might want to do on examination when you
16 get the witness in just a minute.
17    A.   Are we trying to -- You asked
18 about the affidavit. We want to put it all
19 out the way it actually happened. And on
20 here, it says there was nothing wrong with
21 the headlights on our truck or with the
22 brakes on our truck.
23       I did everything I could do to

Page 103

1 avoid the accident. The first thing I saw
2 -- I saw that told me there was an object
3 blocking both lanes of traffic ahead of me
4 was some tires and then the underside of the
5 overturned tractor trailer.
6    Q.   And where are you reading?
7    A.   I never saw any reflector lights
8 or tape, or any headlights, taillights or
9 other lights from the overturned tractor
10 trailer.
11       From my view of the overturned
12 tractor trailer after the accident, it was
13 apparent that any reflectors or reflector
14 tape would have been either against the
15 pavement on the driver's side or facing the
16 sky on the passenger's side or facing the
17 median on the rear end of the tractor and
18 trailer.
19       Any headlights would have been
20 shining off the highway on the right. Any
21 taillights would have been shining to the
22 rear and to the median. If either the
23 headlights or taillights was still

Page 104

1 functioning as we approached, there was no
2 vision -- it was not visible to me.
3       The first thing that I saw that
4 indicated there was an overturned vehicle
5 was when my headlights picked up the tires
6 and I slammed on the brakes just quickly as
7 I could at that point.
8       I had not seen Morris' vehicle
9 before that point and only learned
10 afterwards that it had been down in the
11 median before overturning.
12    Q.   All right. Now, again, none of
13 that mentioned that Morris' tractor was
14 blocking the emergency lane, does it?
15    A.   To the best my knowledge, no.
16    Q.   Okay. Now, on this stretch of
17 highway, just to the right of the emergency
18 lane, just to the right of the emergency
19 lane, do you recall whether or not -- what
20 kind of slope, if any, there was over to the
21 right-hand side?
22    A.   There's a pretty steep slope there
23 right where he was at.

26  (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1  recollection about the width? That's all
2  we're trying to do or say.
3          Does that refresh your
4  recollection about the width of the
5  emergency lane, the topography of the land
6  around the lane?
7      A.  I'm not sure. I'm not sure what
8  side of the highway and all that's on.
9      Q.  Do you guess the emergency lane is
10  a different width on the other side of the
11  highway?
12      A.  They have been doing some
13  construction. They were doing construction
14  during the time this accident happened.
15      Q.  Okay. All right. So you were in
16  a straight away at the time of the accident;
17  right?
18      A.  Yes, sir.
19      Q.  Okay. Now, from looking at the
20  picture that I've just shown you, does it
21  refresh your recollection about whether or
22  not there was a steep drop off on the side
23  of the highway?

Page 110

1      A.  I don't recall because I'm not
2  sure if these pictures are from the north
3  bound or the south bound side. There's not
4  any indication as to where this picture was
5  taken from.
6      Q.  All right. So what did you do
7  immediately after you had the collision?
8      A.  As quick as we could get out, we
9  ran back flagging traffic down because there
10  were some more headlights coming toward us.
11          And I knew the headlights from his
12  truck and my truck was knocked out and we
13  needed to stop the other traffic, to keep it
14  from having a bigger pile up than what we
15  already had.
16      Q.  And were you successful in
17  stopping the other traffic?
18      A.  We stopped a -- a UPS truck slid
19  up to where you couldn't put your hand
20  between his front bumper and my door. Once
21  we got stopped enough, we got out and got to
22  looking for Mr. Morris.
23      Q.  Now, there has been some testimony

Page 111

1  that the UPS truck pulled between the two
2  tractor trailers.
3      A.  He slide right up in between them.
4      Q.  All right. Now, from looking at
5  this diagram, does it appear from the
6  diagram that the point of impact was in the
7  left lane?
8          MR. BROUGHTON:  Wait a minute. I
9  have the same objection as before. This is
10  a drawing that this witness did not make.
11  He doesn't know who made the drawing.
12          And you're asking him to interpret
13  something that somebody else drew. And I
14  think the document speaks for itself.
15      Q.  Okay. I'm just asking for your
16  opinion of this document, the way it looks,
17  whether it's right or wrong, does it appear
18  that the point of impact is shown in the
19  left lane on this document?
20      A.  As you stated -- As it looks on
21  this paper, whether it is right or wrong, it
22  appears on the paper. And my agreeing to
23  where the impact and all actually happened

Page 112

1  --
2      Q.  We're going to get to that. But
3  right now, we're just trying to establish
4  the point that on this document it appears
5  to be in the left lane; right?
6      A.  As it appears on this document,
7  whether it's right or wrong, that's what it
8  shows on the document.
9      Q.  All right. And that's the lane
10  other than what you were traveling in. You
11  said you were traveling in the right lane;
12  right?
13      A.  I was in the right lane.
14      Q.  And what is your estimation about
15  the point of impact? Do you recall whether
16  or not you had the point of impact in the
17  right lane or the left lane?
18      A.  It was in the right lane.
19      Q.  Do you recall what part of Morris'
20  tractor you hit?
21      A.  Right behind the steer tires.
22      Q.  That would be the front tires?
23      A.  Yes. Right in his fuel tank. In

28  (Pages 109 to 112)

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660



PLAINTIFF'S
EXHIBIT
8

# DRIVER'S VEHICLE CONDITION REPORT

AS REQUIRED BY THE DEPARTMENT OF TRANSPORTATION
FEDERAL MOTOR CARRIER SAFETY REGULATIONS PARTS 396.11, 13

Check any defective item and give details under "Remarks"
or check "Satisfactory" if none below.

DATE _9-2-04_ TIME _12:48_ A.M. ___ P.M. ___

I (√) DETECT NO DEFECT OR DEFICIENCY IN THE VEHICLE(S)
SHOWN BELOW THAT WOULD BE LIKELY TO AFFECT THE SAFETY OF
OPERATION OR RESULT IN MECHANICAL BREAKDOWN.

I (√) DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN VEHICLE(S) SHOWN
BELOW THAT WOULD BE LIKELY TO AFFECT THE SAFETY OF OPERATION OR RESULT
IN MECHANICAL BREAKDOWN. (explain defects or "remarks" section)

TRACTOR NO. ___11___

| [ ] Air Compressor | [ ] Drive Line | [ ] Horn/Warning | [ ] Tachograph | TRAILER (s) NO. (s) 212 |
| [ ] Battery | [ ] Engine | [ ] Mirrors | [ ] Tires | [ ] Brake Connections [ ] Roof |
| [ ] Body | [ ] Fifth Wheel | [ ] Oil Pressure | [ ] Transmission | [ ] Brakes [ ] Springs |
| [ ] Brake Accessories | [ ] Front Axle | [ ] Radiator | [ ] Wheels | [ ] Coupling Chains [ ] Tarpaulin |
| [ ] Brakes | [ ] Fuel Tanks | [ ] Rear End | [ ] Windows | [ ] Coupling (King) Pin [ ] Tires |
| [ ] Clutch | [ ] Heater | [ ] Safety Equipment | [ ] Windshield Wiper | [ ] Doors [ ] Wheels |
| [ ] Defroster | [ ] Horn | [ ] Springs | [ ] Hitch | |
| [ ] Door Handles | [ ] Lights | [ ] Starter | [ ] OTHER | [ ] Landing Gear |
| | | | | [ ] Lights [ ] OTHER |

REMARKS _____

Driver's Signature _____

Mechanic's Signature _____

Signature of Driver reviewing the report

A condition above indicates a possible mechanical defect exists.

TIME 0820
3346843945 FLORIDA TRANSFO   DOB:
CCU:07667205953 H-00582741   10/30/62
102 LM   Y CO- 0766720953

THOMPSON, NEAL                          041/10

09/02/04   09/03/04   09/03/04   7796

Community Hos/Tallassee- COC   01157225
                                          95
Emp                                       95
                              AL  36078-

COLLECTORS NAME:
MRO NAME:
EASON FOR TEST: POST ACCIDENT
hain-of-Custody Protocol     Performed                UI
nd-Sample Handling                                    UI
   Split specimen bottle has been received
069187 5:Crt-Gunn

                                             (ng/mL)   UI
                              RESULT    SCREEN   CONFIR
   DRUG                                  CUTOFF   CUTOFF

Amphetamines                  Negative        1000      UI
Barbiturate                   Negative         200      UI
Cannabinoid                   Negative         100      UI
Cocaine (Metab.)              Negative         300      UI
Opiates                       Negative        2000      UI
Creatinine, Urine             67.1     mg/dL  20.0- 300.0  UI
Comment:
   According to guidance from Department of Health and Human
   Services, a urine specimen is defined as follows: "DILUTE"
   If the creatinine is .20 mg/dL and the specific gravity is
   (1.003; "SUBSTITUTED" if the creatinine is (or= 5 mg/dL and
   the specific gravity is (or 1.001.0 (or=(1.020
Nitrite Urine, Quantitative   Negative                 500      UI

LAB: UI LabCorp OTS RTP
     1904 Alexander Drive RTP, NC 27709-3800

R INQUIRIES, THE PHYSICIAN MAY CONTACT: BRANCH: 205-581-5600 LAB: 919-672-6900
                              LAST PAGE OF REPORT

©2004 Laboratory Corporation of America Holdings
All Rights Reserved

THOMPSON, NEAL        PATID: 417889319   SPEC DATE: 09/03/2004

PLAINTIFF'S
EXHIBIT

11