# DEPOSITION OF JAMES PATTERSON

## July 10, 2006

## Pages 1 through 136

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

EXHIBIT H

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  LORI ANN MORRIS,
6      Plaintiff,
7  Vs.            CIVIL ACTION NO.
            3:02-CV-962-T
8  FLORIDA TRANSFORMER,
   EDWARD NEAL THOMPSON,
9  et al.,
10     Defendants.
11
12
13
            * * * * * * * * * * * * *
14
15     DEPOSITION OF JAMES PATTERSON, taken
16  pursuant to stipulation and agreement before
17  Haley A. Phillips, Certified Shorthand Reporter,
18  and Commissioner for the State of Alabama at Large,
19  at 301 South Ripley Street, Montgomery, Alabama, on
20  Monday, July 10, 2006, commencing at approximately
21  10:30 a.m.
22
23     * * * * * * * * * * * * *

**Page 2**

1
2     APPEARANCES
3  FOR THE PLAINTIFF:
4  Henry L. Penick, Esq.
   Attorney at Law
5  Post Office Box 967
   Birmingham, Alabama 35201
6
   FOR THE DEFENDANT:
7
   Richard E. Broughton, Esq.
8  Ball, Ball, Matthews & Novak
   Attorneys at Law
9  Suite 204
   2000 Interstate Park Drive
10 Montgomery, Alabama 36109
11
            * * * * * * * * * * * *
12
      EXAMINATION INDEX
13
14  BY MR. BROUGHTON . . . . . . . . . .   6
    BY MR. PENICK . . . . . . . . . .   54
    BY MR. BROUGHTON . . . . . . . . 129
15  BY MR. PENICK . . . . . . . . . 130
16
      PLAINTIFF'S EXHIBIT INDEX
17
    1  Mr. Patterson's resume         79
18
19    DEFENDANT'S EXHIBIT INDEX
20
21  1  Alabama Uniform Traffic Accident Report   34
22  2  Photograph                     26
23  3  Photograph                     41

**Page 3**

1     DEFENDANT'S EXHIBIT INDEX
2  4  Photograph                     42
3  5  Photograph                     43
4  6  Photograph                     45
5
6
            * * * * * * * * * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 4**

1     STIPULATION
2      It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of JAMES PATTERSON is taken pursuant to
5  the Federal Rules of Civil Procedure and that said
6  deposition may be taken before Haley A. Phillips,
7  Certified Shorthand Reporter, and Commissioner for
8  the State of Alabama at Large, without the
9  formality of a commission, that objections to
10 questions other than objections as to the form of
11 the question need not be made at this time but may
12 be reserved for a ruling at such time as the said
13 deposition may be offered in evidence or used for
14 any other purpose by either party provided for by
15 the Statute.
16     It is further stipulated and agreed by and
17 between counsel representing the parties in this
18 case that the filing of said deposition is hereby
19 waived and may be introduced at the trial of this
20 case or used in any other manner by either party
21 hereto provided for by the Statute regardless of
22 the waiving of the filing of the same.
23     It is further stipulated and agreed by and

Page 5

```
 1    between the parties hereto and the witness that the
 2    signature of the witness to this deposition is
 3    hereby waived.
 4              COURT REPORTER:  Usual
 5          stipulations okay?
 6          MR. BROUGHTON:  Yeah.  With the
 7          one exception that if, Henry,
 8          Sergeant Patterson is unable
 9          to attend trial for whatever
10          reason, he gets conflicted,
11          then I may want to use this
12          deposition at trial.
13          MR. PENICK:  Well, I don't think I
14          should use the usual
15          stipulations, because I need
16          to make my objections.  For
17          example, if he gives expert
18          opinions, I need to go ahead
19          and make those then.
20          MR. BROUGHTON:  That's fine.  And
21          I don't know how that's going
22          to work out.  I just know we
23          don't have -- and Sergeant
```

Page 6

```
 1          Patterson probably doesn't
 2          have control over whether
 3          he'll be able to make it to
 4          trial or not, so I just wanted
 5          to make sure I'm clear on
 6          that.
 7          MR. PENICK:  So I'm not going with
 8          the usual stipulations.  I'm
 9          going to treat it as a trial
10          deposition.
11          COURT REPORTER:  All right.
12     * * * * * * * * * * * *
       JAMES PATTERSON
13
       The witness, after having first been duly
14
       sworn to speak the truth, the whole truth and
15
       nothing but the truth testified as follows:
16
              EXAMINATION
17
       BY MR. BROUGHTON:
18
    Q.  Sergeant Patterson, you're here today
19
       pursuant to, I believe, our subpoena or
20
       notice to take your deposition; is that
21
       correct?
22
    A.  That is correct.
23
```

Page 7

```
 1    Broughton.  I represent the defendants in
 2    this case.  Tell us -- You've given a
 3    deposition before, haven't you?
 4 A.  I have.
 5 Q.  Okay.  And so you know that answers have to
 6    be verbal and if you need to take a break
 7    during the course of this, let us know.  I
 8    think this will be a relatively short
 9    deposition so that probably won't be
10    necessary.
11 A.  Yes, sir.
12 Q.  But if you have any questions at all during
13    the process, just let us know.
14       Please state your name.
15 A.  James D. Patterson.
16 Q.  What is your current occupation?
17 A.  I'm an Alabama state trooper, rank of
18    sergeant, assigned to the highway patrol
19    division.
20 Q.  How long have you been with the Alabama
21    State Troopers?
22 A.  Since 1993.
23 Q.  What are your duties as a sergeant with the
```

Page 8

```
 1    Alabama State Troopers?
 2 A.  I'm a member of the Headquarters Highway
 3    Patrol Staff assigned as commander of the
 4    traffic homicide unit.
 5 Q.  How long have you been in that position?
 6 A.  Let me think.
 7 Q.  Approximately.
 8 A.  Approximately three years.  I've been on
 9    the highway patrol headquarters staff.  I
10    was an assistant to the coordinator
11    beginning in 1999.  In 2003 I took over as
12    coordinator.
13 Q.  Would you have been the commander at the
14    time of this accident in September --
15 A.  Yes.
16 Q.  -- of '04?
17 A.  Yes, sir.
18 Q.  And what are your duties, day-to-day
19    activities?
20 A.  I command the activities of the traffic
21    homicide unit, which is comprised of some
22    80 investigators deployed throughout the
23    state.  They're assigned to conduct crash
```

Page 9

1   investigations and motor vehicle crash
2   reconstruction in cases in which criminal
3   charges are possible.
4   Q.   Were you working on the night -- really, I
5   guess the early morning hours of September
6   2, 2004?
7   A.   Not initially, but I responded to this
8   crash.
9   Q.   And did you have an opportunity to
10  investigate this particular accident that
11  occurred on September 2, 2004 around, it
12  looks like 3:25 a.m.?
13  A.   I responded to the scene of this crash to
14  evaluate whether it met the criteria to
15  initiate an investigation by my unit.  Once
16  there, found that it did not.  Therefore,
17  no investigation by this unit was
18  initiated.  The investigation was conducted
19  by a normal -- a regular member of the
20  highway patrol.
21  Q.   Who was that?
22  A.   Trooper Alex Huntley, who is not a member
23  of the traffic homicide unit.

Page 10

1   Q.   Tell me, what time did you arrive at the
2   accident scene, approximately?
3   A.   Somewhere after 4 a.m.  I'm not certain
4   exactly.  One moment.  I can ... Between 4
5   and 5 a.m., but I don't know exactly what
6   time.
7   Q.   Can you tell me what all you did --
8   A.   I just --
9   Q.   -- at the scene?
10  A.   I walked through the scene to form an
11  opinion as to how the crash had occurred
12  and why the crash had occurred by
13  inspecting the vehicles, the marks on the
14  roadway, the final rest positions of the
15  vehicles and I photographed the scene.
16  Q.   What conclusions or opinions did you reach?
17       MR. PENICK:  I'm going to object
18       to conclusions based on the
19       fact there's no predicate that
20       he's qualified to give expert
21       opinion.
22  Q.   Can you tell me what opinions you've
23  reached?  And we'll fill in the

Page 11

1   credentials.
2   A.   Based on the evidence that I saw at the
3   scene, it was my opinion that --
4       MR. PENICK:  Same objection before
5       he gives his opinion.
6   A.   It was my opinion that the 1998 Kenworth
7   truck tractor and -- had been the primary
8   contributing unit in this crash.  The
9   driver of that vehicle, Mr. Vernell B.
10  Morris was deceased at the scene, which
11  eliminated the possibility of criminal
12  charges against the prime contributing
13  driver in this crash.  Therefore, no
14  investigation was conducted by my unit.
15  Q.   Were you able to form any opinions as to
16  the avoidability of the accident, whether
17  it was or was not avoidable by the driver
18  of the Peterbilt?
19       MR. PENICK:  Objection.  Same
20       objection.  Lack of predicate
21       to qualify this witness as an
22       expert witness to give expert
23       testimony on that regard -- on

Page 12

1   that point.
2   A.   I did form an opinion.
3   Q.   And what was your opinion?
4       MR. PENICK:  Same objection.
5   A.   I believe that the crash was not avoidable
6   by Mr. Thompson, the driver of the 1995
7   Peterbilt.
8   Q.   And what was the basis of that opinion?
9   A.   The night of September 2, 2004 -- This
10  crash occurred at approximately 3:25 a.m.
11  on an unlit highway.  It was very dark that
12  night.  No moon.  An overcast night.  And
13  due to visibility issues, there was no way,
14  in my opinion, for Mr. Thompson to perceive
15  the vehicle in his path prior to striking
16  it.
17  Q.   What was it about the vehicle in its path
18  that made it imperceivable, if that's a
19  word?
20       MR. PENICK:  I want to -- Let me
21       just give a standing objection
22       to any expert opinion he gives
23       at which there's been no

Page 13

1    predicate to qualify him as an
2    expert.
3    MR. BROUGHTON: And we're going to
4    clear that up, Henry. I
5    wanted to find out first if
6    Sergeant Patterson had any
7    opinions. If he didn't have
8    any opinions, then it
9    wasn't -- wasn't going to be a
10   need to go through his
11   background. But we will clear
12   that up for the judge and the
13   jury.
14   A.  The vehicle -- The Morris vehicle had been
15      involved in a crash and had come to rest in
16      the -- come out of the median, come to rest
17      in the northbound lanes of I-85. It was
18      unlit at the time of the crash. The
19      Thompson vehicle's driver would not have
20      been able to perceive it in his pathway
21      until it was too late for him to avoid
22      striking it.
23   Q.  All right. Now, let's get back and clear

Page 14

1    this up for Mr. Penick and for the judge
2    and the jury. Tell me your background with
3    the troopers, what all your experiences
4    have been as far as investigating accidents
5    and reconstructing accidents.
6    A.  Well, I need to go back a little farther
7       than the troopers. In 1998 I became
8       employed with the Guntersville, Alabama
9       Police Department as a patrolman. And I
10      was assigned to the patrol division --
11   Q.  I'm sorry. Nineteen --
12   A.  1988.
13   Q.  '88. Okay.
14   A.  I was assigned as a patrolman with the
15      Guntersville, Alabama Police Department.
16      There my duties consisted of traffic
17      enforcement, general criminal response and
18      accident investigation. In 1990 I attended
19      a course in advanced traffic accident
20      investigation at the Northeast Alabama
21      Police Academy. And in 1992 I attended a
22      course in hazardous materials instant
23      response training at the National Fire

Page 15

1    College.
2    Q.  During your years with the Guntersville
3       Police Department, how many accidents did
4       you investigate?
5    A.  I can't put a number on that. But
6       hundreds.
7    Q.  Hundreds. All right. Go ahead. I'm
8       sorry.
9    A.  I continued in my day-to-day duties to
10      investigate crashes and achieve this
11      advanced traffic accident investigating
12      training and was placed in command of our
13      fatal accident response team. Then in
14      nineteen -- Well, until being promoted to
15      sergeant when I was a shift commander and
16      continued to investigate crashes, I was
17      then promoted to lieutenant assigned to the
18      criminal investigation division and then in
19      1993 was hired by the Alabama State
20      Troopers.
21         I left my position at the Guntersville
22      Police Department and went to the Alabama
23      State Trooper Academy where I received 80

Page 16

1    hours of additional training in crash
2    investigation. In 1994 I attended traffic
3    homicide investigation school; 1995
4    commercial vehicle safety inspector
5    training. In 1996 I attended advanced
6    traffic homicide investigation at the
7    University of North Florida. In 1997 I
8    attended advanced accident investigation at
9    the Institute of Police Technology and
10   Management.
11      In 1997 I attended the Michelin
12   American Tire and Vehicle Dynamics course
13   in Reno, Nevada. In 1997 I attended
14   traffic accident reconstruction. I've
15   taken an annual 40-hour course called
16   Special Problems in Accident Reconstruction
17   at the Institute of Police Technology and
18   Management since 1998. I've attended
19   advanced traffic accident reconstruction
20   with the use of microcomputers also at
21   IPTM, the Institute of Police Technology
22   and Management.
23      I'm certified as a VC-2000 performance

Page 17

1   computer operator. I've trained in
2   forensic laser mapping of crash scenes,
3   interviewing and interrogation for the
4   traffic crash investigator, commercial
5   vehicle accident investigation, linear
6   momentum and vector diagramming of the
7   crash scene, computerized collision
8   diagramming, pedestrian accident
9   investigation, motorcycle accident
10  investigation, applied physics for accident
11  reconstruction, photography for the traffic
12  crash investigator.
13      And since that time I've also
14  reattended an update of traffic crash
15  reconstruction in 2003. I'm trained as an
16  operator of the Vetronic Crash Data
17  Retrieval Systems. I'm also certified by
18  the Alabama Peace Officers Standards and
19  Training Commission as an instructor in the
20  field of traffic crash investigation.
21  Q.  Do you as part of your duties or have you
22  as part of your duties with the Alabama
23  State Troopers reconstructed truck

Page 18

1   accidents?
2   A.  Yes, sir, I have.
3   Q.  And for how many years have you done that?
4   A.  Since 1993.
5   Q.  Do you -- Are you qualified as an accident
6   reconstructionist?
7       MR. PENICK: Objection to whether
8       or not he's qualified.
9   A.  That would be a question for the Court.
10  I'm trained as an accident
11  reconstructionist.
12  Q.  Do you consider yourself qualified as an
13  accident reconstruction?
14      MR. PENICK: Same objection.
15  Q.  You can answer.
16  A.  That would be a question for the Court to
17  answer.
18  Q.  Have you testified in any civil or criminal
19  cases as an accident reconstructionist?
20  A.  Yes, sir, I have.
21  Q.  How many, approximately?
22  A.  Many. I don't know. Quite a few.
23  Q.  In state and federal court?

Page 19

1   A.  Yes, sir.
2   Q.  Do you know if you've testified as an
3   accident reconstructionist in -- expert in
4   federal court here in the Middle District
5   of Alabama?
6   A.  I don't know. I can't recall.
7       MR. BROUGHTON: I'm going to
8       offer -- Henry, I'm going to
9       offer Sergeant Patterson as an
10      expert in accident
11      reconstruction to the extent
12      he has opinions that he formed
13      from his investigation of this
14      particular case at this time.
15      MR. PENICK: We renew our
16      objection to any expert
17      opinion rendered by this
18      witness for lack of predicate,
19      lack of qualifications as an
20      expert in the area of accident
21      reconstruction.
22  Q.  Sergeant Patterson, just to make sure that
23  the Record is clear on this, you did form

Page 20

1   an opinion as I understand it about whether
2   the accident was avoidable or unavoidable
3   by Mr. Thompson, the driver of the
4   Peterbilt?
5   A.  Yes, sir, I did.
6   Q.  And that opinion was what?
7       MR. PENICK: Same objection about
8       lack of predicate to testify
9       as an expert witness.
10  A.  It's my opinion that it was not possible
11  for Mr. Thompson to avoid this crash faced
12  with the circumstances that he was.
13  Q.  And that opinion is based on a reasonable
14  degree of accident reconstruction certainty
15  based on your investigation of this
16  accident?
17  A.  I'm sorry. Would you repeat that?
18  Q.  Yes, sir. Is that opinion based on a
19  reasonable degree of accident
20  reconstructionist's certainty based on your
21  investigation of this accident?
22      MR. PENICK: Same objection to the
23      form of the question and to

**Page 21**

1     lack of predicate to qualify
2     him as an expert witness.
3    A.   My opinion is based on the existing
4     lighting conditions, the alignment of the
5     vehicles just prior to impact and my
6     knowledge of the visibility allowed by the
7     headlights of vehicles, yes, sir, in
8     similar circumstances.
9    Q.   Did you in -- as part of your
10     investigation -- Well, the other thing --
11     the opinion that I heard you say had to do
12     with the Panther vehicle. And what was
13     your opinion as to any contribution or not
14     of the driver of the Panther vehicle to
15     causing this accident?
16    A.   The vehicle driven by Mr. Morris had gone
17     into the median and then come out of the
18     median and overturned and come to rest
19     blocking the northbound lanes of I-85.
20    Q.   Do you have any opinion based on your years
21     of accident investigation and
22     reconstruction as to why or for what reason
23     the Panther vehicle had initially exited

**Page 22**

1     I-85 and gone down into the median?
2     MR. PENICK: Object to the form of
3     the question and to lack of
4     proper predicate to qualify
5     him as an expert witness to
6     give an expert opinion about
7     that fact.
8    A.   I do not have an opinion as to why this
9     crash had occurred. It's three o'clock in
10     the morning, approximately 3:25 a.m. There
11     are various things that could have led to
12     that. However, due to the fact that there
13     was no potential for criminal charges, I
14     conducted no follow-up investigation to
15     delve further into that, therefore, have
16     not formed an opinion as to what caused
17     that driver to do so.
18    Q.   And in your experience is there a
19     difference in the way the tire marks appear
20     leaving an interstate going into a
21     median -- Is there a difference between the
22     way those tire marks would look, and also
23     coming back up, if there was a defect in

**Page 23**

1     the vehicle as opposed to a -- the driver
2     falling asleep or having a medical
3     condition?
4     MR. PENICK: Object to the form of
5     the question. It requires
6     speculation. Lack of proper
7     predicate as to whether or not
8     this witness can testify about
9     that fact.
10    A.   That would be completely dependent on what
11     the defect in the vehicle was.
12    Q.   Did you participate in any inspections of
13     the vehicles -- either of the vehicles to
14     determine if there were any defects in the
15     vehicles?
16    A.   I did not.
17    Q.   Do you have an opinion as to what a prudent
18     driver of an eighteen-wheeler should do if
19     faced with a situation where he finds
20     himself for whatever reason in the median
21     parallel in an interstate?
22     MR. PENICK: Object to the form of
23     the question. Object to

**Page 24**

1     this --
2     MR. BROUGHTON: I'm just asking if
3     he had an opinion.
4     MR. PENICK: -- lack of proper
5     predicate for him to express
6     an opinion.
7    A.   Again, it would be circumstance dependent.
8     But being in the median is an unattended
9     event. He should do whatever is necessary
10     to safely regain control of his vehicle.
11     That might be stop the vehicle within the
12     median without attempting to re-enter the
13     roadway. That might be to re-enter the
14     roadway in a safe manner. But, again, it's
15     completely circumstance dependent.
16    Q.   What was the speed limit in the area of
17     this accident at the time of this accident?
18    A.   70 miles per hour.
19    Q.   Were you able to reconstruct any of this
20     accident to determine the speeds of either
21     of the vehicles?
22    A.   I don't know whether I would have been able
23     to or not. However, since there was not a

Deposition of James Patterson                                                                July 10, 2006

Page 25

1      criminal investigation initiated by my
2      unit, I did not attempt to do so.
3  Q.  Did you interview either of the occupants
4      of the Peterbilt?
5  A.  It was not possible to interview
6      Mr. Morris, and I don't recall whether I
7      spoke with Mr. Thompson or not.
8  Q.  Well, he had a passenger too.  You don't
9      recall --
10  A.  I don't recall speaking to anyone.  I may
11      have.  I'm not saying I didn't.  I just
12      don't recall whether that conversation
13      occurred or if -- and even if it did the
14      content of those conversations.
15  Q.  When you took the -- Do your photographs --
16      any of your photographs depict any evidence
17      on the roadway as to where and in which
18      lanes the Panther vehicle had overturned in
19      the initial accident as you described it?
20  A.  I believe that it was blocking all of the
21      leftmost lane and partially blocking the
22      right lane, if not completely.
23

Page 26

1          (Defendant's Exhibit P-2 was marked
2                  for identification.)
3  Q.  Let me show you what I've marked as
4      Defendant's Exhibit P-2 and ask you did you
5      take that photograph.
6  A.  I did.
7  Q.  Does that photograph fairly and accurately
8      depict the scene as it was that night when
9      you arrived?
10  A.  Yes, sir, it did -- it does.
11  Q.  Have either of those vehicles been -- Were
12      either of those vehicles moved before your
13      arrival?
14  A.  No, sir.
15  Q.  Can you tell me in that photograph or can
16      you describe in that photograph how the
17      trailer of the -- that the Peterbilt was
18      pulling is positioned?
19  A.  The trailer of the Peterbilt is aligned to
20      the right side of the rightmost lane with
21      the right side trailer wheels just outside
22      the fog line to the right of the roadway.
23      In other words, it's partially out of the

Page 27

1      right-hand lane to the right.
2  Q.  Were you able to determine a point of
3      impact between the Peterbilt and the -- or
4      an area of impact between the Peterbilt and
5      the overturned Panther vehicle?
6          MR. PENICK:  Let me object to
7              testimony at this point as to
8              whether or not he even
9              determined the point of
10              impact.
11          MR. BROUGHTON:  That's what I
12              asked.
13          MR. PENICK:  So lack of proper
14              predicate for him to give
15              testimony on this point.
16  A.  I have an opinion as to an approximate area
17      of impact.  As far as a specific point, I
18      can't narrow it down that closely, but I do
19      believe I can narrow it down to an area.
20  Q.  What's your opinion as to the area of
21      impact?
22  A.  It's within the right-hand northbound lane
23      of I-85.

Page 28

1  Q.  Does the --
2  A.  And when I describe that, I'm referring to
3      the nose of the Peterbilt at the point that
4      it collided with the trailer of the
5      Kenworth.
6          MR. PENICK:  Same objection.
7  Q.  Did -- Can you show me on that photograph
8      that approximate area of impact?
9  A.  It's further back than this photograph
10      depicts.
11  Q.  All right.  In Defendant's Exhibit P-2 if
12      you'll look on the pavement there -- And
13      tell me first, what is -- what is the
14      pavement?  What material of construction is
15      in that area?  Do you remember?
16  A.  Asphalt.
17  Q.  Asphalt.
18  A.  It's just standard asphalt.  It's not a
19      concrete roadway.
20  Q.  The marks I'm looking at -- And let me walk
21      around if I can.  There are some curved
22      marks in the left-hand lane.  What is your
23      observation of those marks?  You were out

Page 29

1    there, you saw them. What were those
2    marks?
3    A.    These marks here?
4    Q.    Yes, sir.
5    A.    The curve marks in the left-hand lane are
6    created as the truck tractor -- the
7    Kenworth truck tractor was deflected from
8    its original position in the right-hand
9    lane. It swung around, pivoting about the
10    rear of the trailer. It swung around in a
11    counterclockwise manner. As the Peterbilt
12    struck it, it moved it out of its path in a
13    counterclockwise manner, swung it from
14    approximately this position in the
15    right-hand lane, swung it around to the
16    left.
17    Q.    All right. And those are scrape marks? Is
18    that metal scraping on --
19    A.    Metal on asphalt, yes, sir.
20    Q.    All right. Now, these marks over here in
21    the right-hand lane look like more of a
22    broad brush. Can you tell what those --
23    Are those metal scrape marks as well?

Page 30

1        MR. PENICK: Let me object to that
2        being the right-hand lane.
3    Q.    Well, tell me what lane -- And I'm pointing
4        to a specific part of this photograph,
5        which is over on -- closer, I guess, in
6        this photograph -- And it's hard to tell
7        the jury without having the picture in
8        front of them. But closer to the trailer
9        of the Peterbilt is what I'm referring to.
10        And that's a broad mark. And my first
11        question is -- Before we identify which
12        lane it's in, my first question is, is that
13        a scrape mark, metal on asphalt?
14    A.    I can't be certain. It has some
15        characteristics which appear to be scrape
16        marks. However, I believe that it's made
17        by the drive axles of the Kenworth as that
18        vehicle began to jackknife -- post-impact
19        began to jackknife and the drive axles of
20        the Kenworth came over to their final rest
21        position.
22    Q.    You're saying the Peterbilt?
23    A.    Yes, Peterbilt. The green truck.

Page 31

1    Q.    Okay. Do you -- In that photograph, do you
2        see any tire marks behind the trailer of
3        the Peterbilt?
4    A.    I do.
5    Q.    And those are -- Do you remember seeing
6        those on the night of the accident?
7    A.    I don't recall seeing those at that time,
8        but --
9    Q.    How would you describe those marks?
10    A.    Well, they're braking -- braking tire marks
11        aligned down the right side of the
12        right-hand lane.
13    Q.    And those would have been made -- Do you
14        know what axles or what tires would have
15        made those marks?
16        MR. PENICK: Let me have an
17        objection about him testifying
18        about this, because it
19        requires an expert opinion.
20        We're objecting on the ground
21        saying that he's not qualified
22        to make that objection.
23    A.    Based on what I can see in this

Page 32

1    photograph -- and, again, I don't recall
2    seeing these tire marks at the time of the
3    crash --
4        MR. PENICK: We'd also object to
5        him --
6        MR. BROUGHTON: Let him finish his
7        answer and then you --
8        MR. PENICK: Let me get my
9        objection in. Let me get my
10        objection in. We'd also
11        object to him speculating
12        about these tire marks as he
13        says he doesn't recall seeing
14        them at the time, so any
15        opinion would be faulty based
16        on some conjecture about the
17        tire marks.
18    Q.    Sergeant Patterson, you took these
19        photographs out there the night of the
20        accident, correct?
21    A.    I did.
22    Q.    And the scene had not been changed before
23        your arrival?

Page 33

1    A.    It had not.
2    Q.    And any tire marks that are depicted in
3          that photograph were there the night of
4          this accident, correct?
5    A.    That is correct.
6    Q.    And, again, describe what you were
7          describing about these particular tire
8          marks.
9    A.    These tire marks are aligned down the
10         right-side lane and --
11   Q.    The right side of --
12   A.    The right side of the right-hand lane.
13         They appear to lead directly to the trailer
14         tires of the --
15         This is the Peterbilt, is it not?
16   Q.    Right. That's confusing.
17   A.    -- the Peterbilt.
18   Q.    Which trailer tires? Which side of the
19         trailer?
20   A.    The left side tandems of the trailer, the
21         utility trailer pulled by that truck. They
22         appear to lead directly to it. I cannot
23         see in this photograph if they continue on

Page 34

1          past that to determine for certain whether
2          they're from the drive axle or the tandem.
3          However, they appear to stop directly at
4          the tire position of the trailer.
5              (Defendant's Exhibit P-1 was marked
6              for identification.)
7    Q.    All right. Let me show you Defendant's
8          Exhibit P-2 and ask you to identify -- I
9          mean, Defendant's Exhibit P-1 which I
10         haven't yet offered, and ask you what that
11         is.
12   A.    This is the crash report prepared by
13         Trooper Alex Huntley regarding this crash.
14   Q.    All right. And it has been reported by
15         other people that have reviewed Defendant's
16         Exhibit P-1 that that drawing shows no skid
17         marks or tire marks.
18         MR. PENICK: Object to the preface
19             of the question about what
20             other people have said about
21             it.
22   Q.    And my question to you is, does that
23         drawing show the tire marks or skid marks

Page 35

1          that are shown in Defendant's Exhibit P-2?
2    A.    No, sir, it does not, nor does it
3          accurately depict the positions of the
4          vehicles.
5          MR. PENICK: Object to the
6              answer. It was nonresponsive
7              to the question.
8    Q.    And do you have an explanation for that?
9    A.    An explanation for why the tire marks are
10         not depicted?
11   Q.    Why the tire marks are not depicted and why
12         the scene might not be accurately depicted
13         in that particular drawing in Defendant's
14         Exhibit P-1.
15   A.    Trooper --
16         MR. PENICK: Object to the -- this
17             question because it requires
18             speculation on the part of the
19             witness.
20   Q.    Go ahead.
21   A.    Trooper Huntley prepared a not-to-scale
22         diagram. It's not intended to perfectly
23         depict the final position of this vehicle.

Page 36

1          And it poorly depicts the final positions
2          of the -- particularly vehicle number two,
3          the Thompson vehicle. And I don't know why
4          he left the tire marks off. This was a
5          very dark night. He may have failed to
6          observe them and not realized they were
7          there. But, again, that is speculating. I
8          don't know why he left them off. However,
9          they were present. He didn't put them on
10         the diagram.
11   Q.    In the absence --
12         MR. PENICK: We renew our
13             objection to that answer since
14             it was speculation on his
15             part.
16   Q.    Also on the drawing -- And this is I
17         guess -- Is there a page number on that
18         drawing? I call it page four of
19         Defendant's Exhibit P-1. Why don't we
20         number these?
21         MR. BROUGHTON: Henry, do you have
22             an issue with that --
23         MR. PENICK: No, I don't.

Page 37

1    MR. BROUGHTON: -- so we can
2    clarify? I'm going to number
3    them up in the top corner.
4    Q. And I have just numbered Defendant's
5    Exhibit P-1 in the top right corner of
6    pages one through eight. And we were
7    looking at page four of Defendant's Exhibit
8    P-1. And my other question was, does
9    Defendant's Exhibit P-1 accurately describe
10   the point of impact?
11   A. No, sir, it does not.
12   Q. And that point of impact --
13       MR. PENICK: We renew our
14       objection.
15   Q. -- I understand you don't know precisely --
16       MR. PENICK: Hold on. Let me get
17       my objection out. We renew
18       our objection about him
19       testifying about the point of
20       impact since he did not draw
21       this particular diagram, did
22       not do the investigation to
23       determine the point of

Page 38

1    impact.
2    Q. And the point of impact or the area of
3    impact should be located where?
4        MR. PENICK: Same objection.
5    A. Considerably further south and more to the
6    right within the right-hand lane.
7    Q. All right. In Defendant's Exhibit P-2, the
8    photograph that we're looking at, can you
9    see a -- any markings that divide the
10   right-hand lane from the left-hand lane?
11   And I'm going to call those -- Do you call
12   those eastbound lanes of I-85?
13   A. I call I-85 a northbound/southbound
14   roadway. But it proceeded more in a
15   northeasterly manner at this point. But
16   for the sake of our description, when I say
17   north, I'm referring to toward Opelika and
18   south I'm referring to toward Birmingham.
19   Q. All right.
20   A. I'm directing toward Montgomery for the
21   scene of this crash.
22   Q. Both of the vehicles involved in this
23   accident were heading north from --

Page 39

1    generally from Montgomery to Atlanta;
2    correct?
3    A. That is correct.
4    Q. And the right-hand lane is the -- I guess
5    also referred to as the outside lane or the
6    inside lane? I think we get -- I get that
7    confused often.
8    A. I call it the outside lane.
9    Q. So the right-hand lane is the outside
10   lane. The left-hand lane is the lane
11   closest to the median; correct?
12   A. That's correct.
13   Q. Okay. And were there any -- Are there any
14   markings in Defendant's Exhibit P-2 that
15   show the centerline between the right-hand
16   lane and the left-hand lane?
17   A. A dashed white stripe -- approximately ten
18   feet white stripes with a 20 foot gap is
19   visible.
20   Q. And where is that visible? Can you point
21   that out to us?
22   A. It's obscured by the scrape marks in the
23   roadway. In the lower portion of the

Page 40

1    photograph and then leads directly to the
2    gas tank area or fuel tank area of the
3    green truck, the Peterbilt, at final rest.
4    Q. Can you put -- I'm not sure what will show
5    up on these drawings. They're so -- Can
6    you mark that photograph to show the
7    centerline?
8    A. Seeing the areas that I can see of it, I'm
9    circling with a green Sharpie pen and
10   putting my initials beside that.
11   Q. All right. And that shows a hash mark up
12   close to the tractor of the Peterbilt?
13   A. That's correct.
14   Q. All right. And then the next one partially
15   obscured would be under --
16   A. I believe it to be in this area. However,
17   due to the markings on the roadway, I
18   can't be certain enough to circle it.
19   However, basing it on the difference from
20   the right-hand fog line, which is visible
21   under the trailer of the Peterbilt --
22   Q. Right.
23   A. -- I can tell that it would be --

July 10, 2006

Page 41

1    MR. PENICK:  We would object to
2    speculation on the part --
3    since he's already testified
4    that he cannot see it and
5    doesn't know exactly which way
6    it's going.
7  Q.  Well, Sergeant Patterson, you were out
8    there on the night of this accident, and
9    you can tell the difference between the
10    right-hand lane and the left-hand lane when
11    you're out there on the scene; correct?
12  A.  Yes, sir.  The lanes are approximately 12
13    feet wide, and it's fairly easy to find the
14    centerline or the center area of that
15    northbound roadway.
16        (Defendant's Exhibit P-3 was marked
17        for identification.)
18  Q.  Let me show you Defendant's Exhibit P-3,
19    which is a similar photograph from the same
20    direction but a little further back and see
21    if that more accurately shows or more
22    clearly shows the hash marks separating the
23    right lane from the left lane.

Page 42

1  A.  Yes, sir, it does.
2  Q.  And for the -- For Mr. Penick's benefit and
3    the judge and jury's benefit, can you also
4    mark on that exhibit where those centerline
5    hash marks are?
6  A.  Yes, sir.  I'm circling them with green ink
7    and marking them with my initials.
8  Q.  And we may have to do better than that at
9    trial, but that's the best we have at the
10    deposition.  I appreciate that.
11        (Defendant's Exhibit P-4 was marked
12        for identification.)
13  Q.  Defendant's Exhibit P-4, let me ask you
14    what view this depicts of the accident
15    scene?
16  A.  This --
17  Q.  This one.
18  A.  I'm sorry.  P-4.
19  Q.  Yes, sir.
20  A.  This is a photograph taken from north of
21    the final rest positions of the vehicles
22    facing back toward the -- toward the south
23    showing the right side of the Peterbilt.

Page 43

1  Q.  Does that also show what lane the Peterbilt
2    tractor or trailer was in at the time of
3    impact and also its final resting place?
4  A.  Of course does not show its position at the
5    time of impact.  You can extrapolate its
6    position at the time of impact based on
7    final rest position.  It does show its
8    final rest position quite well.
9  Q.  And that -- what -- Where is it -- Where is
10    that trailer at its final rest?
11  A.  The trailer is aligned over the right-hand
12    side -- the right-hand fog line, solid
13    white line on the right-hand side of the
14    right-hand northbound lane.
15        (Defendant's Exhibit P-5 was marked
16        for identification.)
17  Q.  Defendant's Exhibit P-5 might -- My
18    question on that exhibit is in the
19    foreground of that photograph it looks like
20    there's another eighteen-wheeler stopped
21    there at the accident scene.  Do you see
22    what I'm talking about?
23  A.  Yes.

Page 44

1  Q.  What is -- What kind of truck was that?
2  A.  A truck bearing the markings of the United
3    Parcel Service.
4  Q.  It's a UPS truck?
5  A.  Yes.
6  Q.  Did you know -- Did you or any of the other
7    troopers investigating the accident speak
8    to anybody in the UPS truck?  Do you know?
9  A.  I know that I did, and I didn't recall his
10    presence there until you showed me that
11    photograph.  But I do recall him being
12    there.  I did speak with the driver of that
13    UPS truck, but I don't recall -- two years
14    later I don't recall the substance of that
15    conversation.  But now that I see this
16    photograph, I do recall speaking to him.
17  Q.  Do you know how we can find the driver of
18    that truck?  I've been trying to find -- to
19    locate him.  You didn't get -- You didn't
20    get a -- You don't recall a name?  Can you
21    describe him?  Do you remember?
22  A.  I have no recollection of what he looked
23    like.  But finding him should not be a

Page 45

1   difficult task.
2   Q.   Well, is that truck marked in any way?
3   A.   It bears the markings of the United Parcel
4     Service.
5   Q.   Right.
6   A.   I feel that I -- with this criminal case,
7     I'd find him.
8   Q.   Well, I'll see what I can do.
9     (Defendant's Exhibit P-6 was marked
10     for identification.)
11   Q.   Defendant's Exhibit P-6, my question here
12     and -- Does Defendant's Exhibit -- Or tell
13     me what Defendant's Exhibit P-6 depicts.
14   A.   This is a view from the western side of the
15     median. The camera angle is directly
16     toward the final rest position of the
17     tractors -- the truck tractors. It shows
18     the top of the overturned trailer of the
19     Kenworth, the damaged tractor of the
20     Kenworth. It's a very poor photograph. Due
21     to that highly reflective sign, it didn't
22     expose very well. The camera bounced light
23     off that highly reflective sign and didn't

Page 46

1   take a very good picture, but it does --
2   you can make out the final rest position
3   particularly of the Kenworth truck tractor
4   and the overturned trailer.
5   Q.   The -- Are the -- Are there any markings in
6     the grass median that were -- that you
7     found were consistent with the overturning
8     of the tractor-trailer?
9   A.   They're not -- There are some markings in
10     the lower right-hand corner of the
11     photograph. Due to the quality of the
12     photograph, I cannot be certain that these
13     markings came from that --
14   Q.   From the overturn?
15   A.   From the initial overturning of the
16     Kenworth.
17   Q.   Okay.
18   A.   But there are markings in the lower
19     right-hand corner that appear to be dirt
20     thrown up.
21   Q.   Is there a way to describe for the judge
22     and the jury based on your observations out
23     there that night how the Kenworth tractor

Page 47

1   and trailer moved after the impact from the
2   Peterbilt?
3     MR. PENICK: We would object to
4     the -- this witness answering
5     any questions for lack of
6     proper predicate, lack of
7     qualifications as an expert
8     and lack of the unexact
9     science of determining the
10     positions after -- by looking
11     at the resting position of the
12     vehicles.
13   A.   Yes, sir. It's quite clear that there are
14     scrape marks that come out that are aligned
15     well down the centerline of the northbound
16     roadway, the dashed lines that I circled
17     earlier. Those scrape marks proceed north
18     and stop just inside the right-hand lane.
19     They then redirect toward the left --
20     (Brief interruption.)
21   A.   One moment.
22     The scrape marks that are proceeding
23     down the centerline proceed in a slightly

Page 48

1   curved manner going to the right. These
2   are caused by the Kenworth truck as it's
3   sliding after coming out of the median and
4   overturning. They stop and then proceed
5   again at a sharp angle to the left. These
6   scrape marks were caused by the initial
7   vehicle as it slid to a stop or a near
8   stop.
9   Q.   All right. And when you're saying --
10     you're pointing to the --
11     (Brief interruption.)
12   Q.   Do you want to stop and get that?
13     (Off-the-Record discussion.)
14   Q.   And you were describing -- And you
15     initially described the scrape marks that
16     sort of go down and curve a little to the
17     right in the right lane, and I was going to
18     get you to, I guess, mark those in some
19     way. Why don't we put a green A, if it
20     will show up on that.
21   A.   This is a much better view of the scrape
22     marks than the photograph that I looked at
23     earlier.

Page 49

1  Q.  Right.
2  A.  I've basically outlined the scrape marks,
3      the area that I can see with a somewhat
4      curved trapezoid and I'm placing the letter
5      A within that trapezoid.
6  Q.  All right.  And, again, those scrape marks
7      were made by what?
8  A.  Some portion of the overturned Kenworth as
9      it slid to final rest.
10 Q.  Before the impact by the Peterbilt?
11 A.  Yes, sir.
12 Q.  And then go ahead.  And then the other
13     curve marks we want to mark the same way.
14 A.  These are caused as the impact with the
15     Peterbilt induced a rotation, spun the
16     tractor-trailer combination of the Kenworth
17     basically out of the path of the
18     Peterbilt.  I've marked those with the
19     letter B and outlined them also.  But they
20     are -- They are indifferent.  Those marked
21     letter A and those marked letter B proceed
22     in different directions.  Therefore, they
23     had to be caused by a different force.  A

Page 50

1      different force caused them.  I believe
2      that those marked letter A were caused by
3      the Kenworth as it slid to a stop or a near
4      stop and those marked letter B were marks
5      from the Kenworth but were caused by the
6      force of the Peterbilt striking it and
7      basically displacing it out of its place.
8  Q.  Right.  And those -- The final rest of the
9      Kenworth trailer that is overturned in the
10     left side of this photograph is where in
11     the roadway?
12 A.  The final rest of the Kenworth truck is
13     just off the left side of the left-hand
14     lane.
15 Q.  All right.  Did you form an opinion as to
16     the configuration of the Kenworth tractor
17     and trailer across the roadway prior to the
18     impact with the Peterbilt?
19     MR. PENICK:  We reserve our
20        objections about this
21        particular witness expressing
22        an opinion based upon the
23        resting place of the

Page 51

1      vehicles.
2  A.  I believe that it was aligned with the
3      tractor portion.
4      MR. PENICK:  Wait.  Let me -- I
5         forgot to clear up my
6         objection to -- I want to also
7         clear up my objection about --
8      MR. BROUGHTON:  Let him answer,
9      Henry.
10     MR. PENICK:  -- lack of proper
11        predicate as an expert witness
12        to testify to this.
13 A.  The tractor portion of the Kenworth was
14     aligned across the right-hand northbound
15     lane, the right-hand lane mostly blocking
16     the right-hand lane of the northbound
17     interstate.
18 Q.  But at what sort of an angle?  I mean,
19     could you tell that from your -- from the
20     markings out there?
21 A.  After it had been displaced with the
22     limited amount of investigation time that I
23     put into this crash post-crash, I did not

Page 52

1      determine its exact alignment.  But it was
2      across the right-hand lane.
3      MR. BROUGHTON:  And, Henry, I want
4         to offer as exhibits --
5  Q.  Sergeant Patterson, just make sure I'm
6      clear on this.  Defendant's Exhibits P-2
7      through P-6 are photographs that you took
8      on the night of the accident after you
9      arrived on the scene?
10 A.  That is correct.
11 Q.  And these photographs fairly and accurately
12     depict the scene of the accident at the
13     time that you took these photographs?
14 A.  Yes.
15     MR. BROUGHTON:  And I want to
16        offer these exhibits as --
17        offer these Defendant's
18        Exhibits P-2 through 6 and P-1
19        as evidence at this time.
20     MR. PENICK:  No objection.
21     MR. BROUGHTON:  Let's leave these
22        here for Henry.  Let me see if
23        I have any other questions.

Page 53

1 Q. The -- What photography equipment did you
2 use for these photographs?
3 A. I shot digital photography. I don't recall
4 what camera I was using at that time.
5 Q. Did you use a flash?
6 A. Yes.
7 Q. All right. So the -- the photographs with
8 a flash, would they make those objects in
9 those photographs more visible with that
10 flash than they would have been to a -- an
11 oncoming driver?
12 A. Considerably so. Light cast on the objects
13 would make them visible. This was a very
14 dark night, very dark. And I had
15 difficulty photographing this crash because
16 of that darkness. The distance that a
17 flash will go out and, you know, reveal
18 objects to the lens is limited. It was
19 further compounded by the fact that there
20 was a highly reflective sign right in the
21 midst of this crash scene, a speed limit
22 sign. The reflective tape on the back of
23 the Peterbilt truck trailer also caused

Page 54

1 it -- made difficult circumstances for
2 photographing. In other words, you get a
3 really good picture of the reflective tape
4 but you don't get a very good picture of
5 the roadway surface which is dark.
6 Q. Have you investigated rollover -- let's
7 call them one vehicle rollover accidents?
8 A. I have.
9 Q. Have you investigated any with fatalities?
10 A. I have.
11 Q. You know, a rollover without a vehicle
12 being struck by another vehicle?
13 A. Yes.
14 Q. And there have been fatalities?
15 A. Yes.
16 MR. BROUGHTON: That's all I have
17 at this time.
18 EXAMINATION
19 BY MR. PENICK:
20 Q. Sergeant, about these rollover fatalities
21 you just talked about, how many of them did
22 you see fatalities where the rollover was a
23 mere fall over to the side rather than a

Page 55

1 complete 180 degree turnover?
2 A. Say that one more time for me, Mr. Penick.
3 Q. My question really is have you seen
4 fatalities where a truck just laid over on
5 its side? Have you seen --
6 A. Well, trucks don't just lay over.
7 Something has to cause that truck to turn
8 over. So I want to make sure I understand
9 what you're asking. But when a vehicle --
10 a commercial vehicle -- let's say a
11 high-profile vehicle such as a commercial
12 truck tractor overturns, there's a great
13 deal of force required to overturn that
14 vehicle, typically a tripping mechanism of
15 some sort. That vehicle has gone into an
16 uncontrolled sideways maneuver and then
17 trips and overturns. And when it overturns
18 there's a great deal of force applied. It
19 hits the ground hard for one of a better
20 term. So, yes, I've seen many fatalities
21 caused by just that.
22 Q. Okay. And --
23 A. In fact, I would say that's the most common

Page 56

1 cause of fatalities in commercial vehicle
2 crashes.
3 Q. All right. Now, I'm talking about those
4 instances where the vehicle rolls over or
5 lays over on its side but does not strike
6 another object.
7 A. Yes, sir. I understand. And that's
8 exactly what I'm referring. Most common
9 type of fatality in my experience in
10 commercial vehicle crashes is when the
11 truck rolls over and that rolling over is
12 the cause of death, whether -- with no
13 other vehicle involved.
14 Q. And we're talking about a rollover or a lay
15 over where it's not a full 180 degree
16 upside down turn. You understand that;
17 right?
18 A. Yes, sir. I'm talking about the vehicle is
19 now lying on its side. Be it the right or
20 the left, it's now on its side, not on its
21 roof, on its side. Very common.
22 Q. Can you name any instance where you have
23 seen that occur? Do have you any

Page 57

1  recollection of that?
2  A.  Well, I can recall, you know, visually
3  pictures of this in my mind of crashes I've
4  been -- Being able to sit here unprepared
5  for the question and tell you what county,
6  what date, who the fatality was, no,
7  because I have been to the scenes of
8  hundreds of fatal wrecks.  And I can't give
9  you names, dates and times.  That's all I
10  do every day is investigate fatal wrecks.
11  Q.  Okay.  But right here as we talk today, you
12  can't remember any of those where you had a
13  fatality where the vehicle just laid over
14  on its side and did not strike another
15  object?
16  A.  No, sir.  That's not what I said.  I said,
17  I can remember many.  I cannot give you
18  dates, times and names.
19  Q.  I mean, what I'm saying is you can't give
20  me any specific occasion here today?
21  A.  I cannot give you dates, times and names,
22  but I remember many crashes like that.
23  Q.  Sergeant Patterson, you were -- started out

Page 58

1  as you said as a patrolman; right?
2  A.  In 1988.
3  Q.  Right.  And when did you cease being a
4  patrolman?
5  A.  Now, we're referring with the Guntersville
6  Police Department where I was a patrolman.
7  I was a patrolman for approximately two
8  years before I achieved the rank of
9  sergeant and became a shift commander.
10  Q.  As a shift commander, would you also have
11  to go out and investigate wrecks?
12  A.  Yes, sir.
13  Q.  And how long did you continue to
14  investigate wrecks being a sergeant?
15  A.  About a year.  I was a sergeant for about a
16  year until 1991 when I was promoted to
17  lieutenant.  And I was transferred then
18  from the patrol division to the criminal
19  investigation division and became the
20  acting commander of the detective division
21  criminal investigation unit.  However, due
22  to my training and experience -- and we as
23  detectives continue to participate in the

Page 59

1  investigation of fatal crashes.  We didn't
2  work routine wrecks, but we did work fatal
3  crashes even as an investigator.
4  Q.  Okay.  But as a detective then, you were
5  also investigating other homicides other
6  than any -- other than fatalities involved
7  in wrecks?
8  A.  My primary assignment was criminal
9  investigation of burglaries, murders,
10  rapes, that type crime.  However, if a
11  fatal accident occurred within the city
12  limits of Guntersville, then I was called
13  to assist in that investigation.
14  Q.  And how long were you a lieutenant?
15  A.  Until I left the department in 1993 to join
16  the ranks of the state troopers.
17  Q.  When you left the Guntersville Police
18  Department in 1993, how many years of
19  experience did you have being a policeman?
20  A.  From 1988 till 1993.  That's five.
21  Q.  Okay.  And throughout those five years, had
22  you investigated accidents?
23  A.  Yes, sir.

Page 60

1  Q.  But you -- when you -- But when 1991 rolled
2  around and you became a lieutenant, you
3  didn't investigate them as much as you did
4  as a patrolman; is that correct?
5  A.  I didn't investigate what we call
6  property-type accidents, but a serious
7  injury-type crash where someone was
8  seriously injured or a fatality, due to my
9  having the highest level of accident
10  investigation within that small department,
11  I would be called to assist in that
12  investigation and give technical
13  assistance.
14  Q.  And that would be those two years that you
15  were a lieutenant then; right?
16  A.  During those two years, yes, sir.
17  Q.  Do you know how many crashes involving
18  fatalities happened within the jurisdiction
19  of Guntersville from '91 to '93?
20  A.  I'd have to look that up.  I don't know.
21  But not many.  It's a small town.
22  Q.  By the time you left the Guntersville
23  Police Department, how many fatalities do

Page 61

```
1      you think you had investigated involving a
2      traffic accident?
3   A.  I don't recall.
4   Q.  All right.  Then after that, where did you
5      go after 1993?
6   A.  In 1993 I was hired by the Department of
7      Public Safety and attended the Alabama
8      State Trooper Academy.
9   Q.  And after you came out of the academy,
10      where did you go?
11   A.  I was assigned to the highway patrol
12      division, Opelika post, Lee County.
13   Q.  And did you investigate any homicides -- I
14      mean -- Sorry.  Did you investigate any
15      traffic fatalities or traffic fatality
16      accidents at that time?
17   A.  Yes, sir.
18   Q.  And how long were you in that position?
19   A.  I was a trooper in the highway patrol
20      division from my completion of the academy
21      in early 1994 until I was promoted to
22      corporal in 1999.  At that time I was
23      promoted to corporal assigned to highway
```

Page 62

```
1      patrol headquarters as the assistant
2      commander of the traffic homicide unit.
3   Q.  So from '93 to '99, how many accidents
4      would you say you investigated that
5      involved fatalities?
6   A.  I lost track of the numbers a long time
7      ago, Mr. Penick.  I don't know.  But a lot.
8   Q.  All right.  And then you said in '93 you
9      became the commander of the traffic
10      fatalities division or something?
11   A.  I'm sorry.  What year did you say?
12   Q.  Was that in 1999?
13   A.  In 1999 I became the assistant commander of
14      the traffic homicide unit assigned to
15      highway patrol headquarters.
16   Q.  And do you know how many fatalities you
17      investigated from '99 until you became the
18      commander of that division?
19   A.  In that position, my -- I was not directly
20      assigned as lead investigator on many
21      crashes.  My duties were to assist other
22      investigators to guide them in their
23      investigations.  I reviewed every single
```

Page 63

```
1      fatality crash that happened within the
2      state of Alabama during that time and
3      reviewed every single traffic homicide
4      investigation conducted by the 80-some
5      investigators of the unit.  So my -- At
6      that point, my job was to review their work
7      and determine its accuracy and completeness
8      and then forward that case onto the
9      district attorney for criminal prosecution.
10   Q.  Do you know how many traffic homicides you
11      reviewed during that period of time?
12   A.  We investigate some 330 to 340 traffic
13      homicide cases per year.
14   Q.  And I think you were the assistant for how
15      many years?
16   A.  From 1999 until 2003.
17   Q.  And at that time did you become the
18      commander of that unit?
19   A.  I did.
20   Q.  And then did you do any investigations as
21      commander?
22   A.  I do a few.  In highly complicated crashes,
23      crashes which are extremely high profile
```

Page 64

```
1      such as those that involve multiple
2      facilities, anything involving a state
3      vehicle.  I continue to investigate
4      crashes.  And, also, I respond to the scene
5      any time it's convenient for me to do so.
6      If one of my investigators is out
7      investigating a crash and I can get there,
8      I do get there just as a means of helping
9      them do their job.  That's my assignment as
10      a supervisor is to help them do their job.
11   Q.  Okay.  But how many investigations did you
12      conduct while you were commander?
13   A.  Its -- Depending on what you call
14      investigation.  We assign a lead
15      investigator, and I am rarely assigned as
16      lead investigator.  But that lead
17      investigator's job involves everything from
18      photography, processing the scene, marking
19      the scene, mapping the scene.  They gather
20      the evidence.  Very often I am asked to
21      review the evidence.  If they do a scene
22      diagram, I can then complete a
23      reconstruction never having been to the
```

Page 65

1    scene of the crash if they properly
2    gathered the evidence that I need to do
3    that reconstruction.
4         So when you say complete an
5    investigation, I've participated in
6    hundreds. However, having done every part
7    of an investigation myself, I rarely do
8    that.
9    Q.  So as commander you didn't conduct any
10    investigations then?
11    A.  No, sir, that's not at all what I said.
12    Q.  I think you said in most of the cases that
13    would be a lead investigator who would
14    actually do the investigation and you would
15    review it.
16    A.  That -- That's a portion of what I said.  I
17    have investigators who are assigned to
18    collect the evidence in these cases,
19    analyze that evidence where it's within
20    their skills and their training to do so.
21    If not, they collect the evidence and
22    forward it on to either one of my
23    assistants or to me for further review, for

Page 66

1    reconstruction.
2         So when you say did I complete an
3    investigation, I complete an investigation
4    on many of these cases.  However, it's
5    based on evidence gathered by other members
6    of this unit and I take it further.
7    Because I have -- I might be able to do
8    something with a case that they're not
9    trained to do, but they are trained to
10    gather the evidence that I need to conduct
11    that further investigation.
12    Q.  But I think you did say that on each one of
13    the fatalities or accidents involving
14    fatalities there would be a lead
15    investigator who would really conduct the
16    investigation?
17    A.  Every case that we work as a traffic
18    homicide has a lead investigator.  Every
19    case that is a fatality but does not
20    involve a homicide, not a criminal case,
21    has a lead investigator.  Someone initially
22    responds to that case.  However, he's got
23    the resources of the entire highway patrol

Page 67

1    division.  If he needs further help, he
2    calls for it.
3    Q.  And as a commander, though, you didn't
4    conduct those investigations; right?
5    A.  No, sir.  I said that I have assisted,
6    helped in many of those investigations.  I
7    work every day to make sure those
8    investigations are completed correctly,
9    whether I do them myself or someone else
10    does them.  But I review them or have them
11    reviewed by one of my two assistants who
12    come to me when they have complicated
13    situations.
14    Q.  What's the difference between reviewing an
15    investigation and conducting an
16    investigation?
17    A.  The investigator is on the scene, gathers
18    the evidence himself.  The reviewing
19    supervisor checks the math, if there was
20    mathematical knowledge of the vehicle
21    speeds.  He looks at the diagram to see if
22    it matches the photographs.  For example,
23    in this case the erroneous diagram would

Page 68

1    not have gotten through this unit had it
2    been a traffic homicide because it's quite
3    obvious from the photographs that the
4    diagram does not match.
5         The role of the reviewer is to use his
6    training and skills in crash reconstruction
7    to make sure no errors exist in the final
8    report.  In this case had this been a
9    traffic homicide investigation, we would
10    have caught the fact that the initial
11    diagram does not match what was actually
12    there at the scene --
13    Q.  Do you know who reviewed --
14    A.  -- as to point of impact and final rest.
15    Q.  Do you know who reviewed this particular
16    accident report?
17    A.  I don't know, but I could be able to look
18    at it and determine it.  The copy I have is
19    left blank under supervisor reviewed.  So,
20    apparently, it was turned in and never
21    reviewed.
22    Q.  You're not aware of any person other than
23    yourself who was out there who would have

Page 69

```
 1        been in a superior position to tell this
 2        patrolman Alex Huntley that his diagram was
 3        wrong?
 4   A.   I'm not aware of anyone.  However, this
 5        diagram was completed -- The report is
 6        dated 9/7/04.  The crash occurred on
 7        9/2/04.  So he completed -- He didn't
 8        complete this diagram at the scene standing
 9        there in the highway off I-85.  He
10        completed this either back at his desk or
11        back at his office a few days later based
12        on his recollection of the scene and any
13        field notes that he made.
14             So my involvement with this case ended
15        on the morning of 9/2/04.  And I've never
16        seen this report until I received it as
17        part of a subpoena for this deposition.  I
18        do not recall any other supervisors being
19        at the scene.  However, had they been, they
20        would not have had an opportunity to review
21        this report.  It should have been reviewed
22        later by a supervisor and, apparently, was
23        not for some reason.  This happened at the
```

Page 70

```
 1        Opelika post.  I work at headquarters.  I
 2        have no idea why it was not reviewed.
 3   Q.   But he would have made field notes right
 4        there at the scene so that when it was time
 5        to draw this diagram he would refer to
 6        those notes to draw that diagram; right?
 7   A.   You would have to ask Trooper Huntley that.
 8   Q.   Can you think of any other traffic fatality
 9        investigations you've done other than what
10        we've talked about to this point?
11   A.   I'm not sure I understand the question.
12   Q.   Can you think of any other traffic fatality
13        investigations that you've done other than
14        what we've talked about up to this point?
15   A.   Yes.
16   Q.   Are there any others?
17   A.   Yes, sir.
18   Q.   What other times have you done traffic
19        investigation?
20   A.   What other times have I done traffic --
21   Q.   Traffic fatality investigations --
22   A.   Traffic fatality investigation has been my
23        primary assigned duty since 1999 and was a
```

Page 71

```
 1        significant portion of my duties from 1988
 2        till 1999.
 3   Q.   And have I covered those with you just now?
 4   A.   No, sir, you haven't scratched the surface
 5        of those.
 6   Q.   Did I leave out a period of time that you
 7        were doing investigations that I didn't ask
 8        you about?
 9   A.   No, sir.  From -- I've been employed in law
10        enforcement from 1988 until today.  Since
11        1999 my primary duties have been
12        investigation of fatal crashes.  Prior to
13        1999 that was a significant portion of my
14        duties but was not my primary duty.
15   Q.   I understand.  But the only thing I'm
16        asking you is that we talked about the
17        Guntersville position.  We talked about the
18        position down -- when you were stationed
19        out of Lee County and we talked about your
20        position here.  And what I'm asking you is,
21        is there any other time that we haven't
22        talked about that you did traffic fatality
23        investigation?
```

Page 72

```
 1   A.   No, sir.  '88 till present.
 2   Q.   Okay.  Now, let me take you back to your
 3        education.  Did you complete college?
 4   A.   No, sir.
 5   Q.   Did you graduate from high school?
 6   A.   I did.
 7   Q.   Which high school did you graduate from?
 8   A.   J.B. Pennington High School, Blountsville,
 9        Alabama.
10   Q.   And --
11   A.   Now, when you say you complete college, I do
12        not have a degree.  I have a significant
13        number of hours.  I've attended Southern
14        Union Community College, Wallace State
15        Community College, Snead State Junior
16        College, Samford University.  I do not have
17        a degree.
18   Q.   Let's talk about those.  I think the first
19        one you mentioned was Southern University.
20   A.   Southern Union Community College.
21   Q.   Okay.  And where is that?
22   A.   Opelika, Alabama.
23   Q.   And what did you study there?
```

Page 77

1  Q.  Is it safe to say that the only college
2      that you took some criminal justice courses
3      was at Wallace State?
4  A.  Well, I have attended many, many courses at
5      the Institute of Police Technology and
6      Management, which is a division of the
7      University of North Florida.  I have taken
8      many courses there.  All those are college
9      credit level courses.  However, since I'm
10     not pursuing a degree, I've not evaluated
11     what the college credit would be for each
12     of those courses.  However, I've been
13     taking courses there for years.
14  Q.  Where is this University of North Florida
15      located?
16  A.  Jacksonville, Florida.
17  Q.  Okay.  And when did you first start going
18      and how long did you go there?
19  A.  Well, it's -- When you say how long, I
20      take, like, two-week courses there.  But
21      they're intense.  You know, 40 hours a
22      week, two-week courses.  We also contract
23      with the University of North Florida

Page 78

1      Institute of Police Technology and
2      Management to send instructors to our
3      academy where they present these courses,
4      again, courses which qualify for college
5      credits.  I took my first -- IPTM is how
6      it's referred to -- course in 1994.
7  Q.  Okay.  And how many courses would you say
8      you took there altogether?
9  A.  Well, I have to count them up for you.
10     MR. BROUGHTON:  Do you have that
11         in a curriculum vitae format
12         or something --
13     THE WITNESS:  It may not be
14         up-to-date.
15     MR. BROUGHTON:  -- that can be
16         printed out as an exhibit?
17  Q.  Would you do that for us, print out an
18      exhibit?  And we'll call it Plaintiff's
19      Exhibit 1.
20  A.  I've taken over 20 courses at the Institute
21      of Police Technology and Management.  My CV
22      is up-to-date up through 2003.  I haven't
23      updated it since then.  I can print you

Page 79

1      what I have, however it's not going to
2      include any training that I've had from
3      2003 to present.
4      MR. BROUGHTON:  How big an effort
5          is that to update that?
6      THE WITNESS:  I have to go through
7          my files and certificates.
8          I'm not going to do it today.
9      MR. BROUGHTON:  No.  I understand.
10         I understand.
11  Q.  Could you print it out through 2003?
12  A.  I'm doing so.
13         (Plaintiff's Exhibit 1 was marked
14         for identification.)
15  Q.  Okay.  Now, out of these courses that
16      you've taken, these IPTM courses, how many
17      of them would you say have to do with
18      traffic investigation involving fatalities?
19  A.  All of them.
20  Q.  Other than the -- these IPTM courses at the
21      University of North Florida, have you any
22      other higher education you've taken?  I'm
23      not counting -- I think you said you have

Page 80

1      to do continuing education hours, units.
2      I'm not talking about those.  I'm just
3      talking about those that have involved
4      study or training through a university or
5      an institute of higher learning?
6  A.  Yes, sir, there are other courses that are
7      related.  You want specifically crash
8      investigation related stuff, right, or
9      stuff that could enhance my skills in crash
10     investigation; right?
11  Q.  Yes.
12  A.  In 1991 I took a course in homicide
13      investigation, which entailed a great deal
14      of evidence gathering.  Again, the
15      hazardous materials incident response
16      training, kinesic interviewing.  We conduct
17      interviews at crash scenes.  DUI
18      enforcement, field sobriety testing,
19      commercial vehicle safety inspector
20      training, narcotics interdiction training.
21      We often investigate crashes which involve
22      narcotics.
23      I'm trained in tire forensics to study

Page 81

1    tire failure. Performance computers, which
2    is friction testing of roadways. I'm an
3    alcohol breath tester. I'm trained in
4    forensic laser mapping as an instructor.
5    Commercial vehicle accident investigation.
6    Trained in linear momentum and vector
7    diagramming of crash scenes for the purpose
8    of speed analysis.
9    Q.   By the way, you didn't do any of that on
10    this particular investigation, did you?
11    A.   No, sir. Again, this was not a criminal
12    case because the driver of the prime
13    contributing unit was deceased.
14    Q.   All right. Now, let me see if we can get
15    back on track with what I'm asking. Is
16    there any other university or higher
17    educational institute that you went to
18    other than what we've talked about?
19    A.   I attend conferences yearly that are
20    strictly devoted to crash investigation.
21    Q.   Okay.
22    A.   They are usually sponsored by crash
23    investigation societies, members -- you

Page 82

1    know, my peers from other states and other
2    countries. And we do live crash testing
3    and analyze results of those crashes.
4    They're training sessions but it's --
5    Q.   And when you go to these training sessions,
6    how -- how many hours do you put in on each
7    one of those sessions?
8    A.   Most of them are one week, 40 hours. Some
9    are less, three-day conferences.
10    Q.   Now -- But then there's some courses on
11    here such as survival Spanish for uniformed
12    officers. That's not related to fatality
13    investigations, is it?
14    A.   Well, I often have to conduct -- with our
15    increasing Hispanic population, I often
16    have to conduct investigations which
17    involve people who do not speak English.
18    Therefore, in a way it's related. However,
19    it doesn't help me to determine by physical
20    evidence how a crash occurred. But it
21    helps me to interview a witness who doesn't
22    speak English. So I took it because of my
23    accident investigation need.

Page 83

1    Q.   Now, you said that this Exhibit 1 that we
2    have -- Plaintiff's Exhibit 1 covers your
3    experiences up through 2003. Can you
4    recall just off the top of your head what
5    other training you've had since 2003?
6    A.   I've attended more conferences. I can't
7    recall what they were. I know I went to
8    the Southeastern Association Crash
9    Conference where we did live crash testing
10    and analysis. I've also been to the
11    conference at the Institute of Police
12    Technology and Management since then. We
13    also went to a -- Nope. That would have
14    been in 2003. Those are the only two I can
15    recall off the top of my head.
16    Q.   Were these for CEUs?
17    A.   No. We don't --
18    Q.   Do you have CEUs where you have to do so
19    many classes --
20    A.   All police officers within the state of
21    Alabama must maintain credit hours.
22    However, they don't specifically relate to
23    crash investigation. I mean, I may meet my

Page 84

1    CEUs through just standard department
2    training that we have to have every year
3    just as law enforcement officers. Firearms
4    training, things such as that. That meets
5    my CEU requirement. There's no CEU
6    requirement for crash investigators within
7    the state of Alabama.
8    Q.   So when you went to the Southeastern
9    conference and you took an IPTM course
10    since this 2003 resume that was not for
11    CEUs, that was --
12    A.   No. That was strictly to enhance my
13    ability to do my primarily assigned job.
14    Q.   Okay. Is there any other education or
15    conferences that you want to tell us about
16    before we move on?
17    A.   Not that I can think of. You know, my
18    career evolves around crash investigation,
19    so I've been to a lot of schools.
20    Q.   Any one of your classes had to do with
21    lighting, the physics of lighting?
22    A.   Yes, sir. I'm trained in human factors
23    which is -- deals a great deal with

Page 85

1    conspicuity issues, how the human eye
2    reacts to various lighting conditions.
3    There is a course in human factors and
4    motor crash investigation which deals
5    almost exclusively with conspicuity and
6    perception-reaction time of drivers faced
7    with varying circumstances.
8    Q.  Where and when did you take that course?
9    A.  I took that course in 2002.  It was taught
10   at our academy by instructors from the
11   Institute of Police Technology and
12   Management.
13   Q.  You said our academy.  Where is that
14   located?
15   A.  In Selma, Alabama.  I contract with the
16   University of North Florida to send
17   instructors to us because it saves our
18   state money for me to bring the instructors
19   here rather than sending my students to
20   Selma.
21   Q.  Do you know how much time you spent on this
22   human factors course?
23   A.  That's a 40-hour course.

Page 86

1    Q.  Do you --
2    A.  Many of the conferences that I've attended
3    also dealt with conspicuity issues and
4    perception-reaction time.
5    Q.  Okay.  Have you ever taken any physics?
6    A.  I'm trained in Applied Physics for the
7    Traffic Crash Investigator.
8    Q.  Well, have you taken any physics course is
9    what I asked?
10   A.  That's the title of the course, Applied
11   Physics for the Traffic Crash Investigator.
12   Q.  Okay.  And how long was that course?
13   A.  I think that was also a 40 classroom hour
14   course with lots of homework.
15   Q.  Any other physics course?
16   A.  No, sir.  Other than high school physics.
17   Q.  Did you take physics in high school?
18   A.  We touched on physics during many of my
19   math courses.  That's been a long time
20   ago.  I don't remember what the name of the
21   courses were.
22   Q.  But you don't recall taking a physics
23   course in high school, do you?

Page 87

1    A.  I recall studying physics issues during
2    high school, but I don't know if the name
3    of the course was physics.
4    Q.  Now, let's go and talk about this accident
5    that occurred on this occasion.  I believe
6    you said that you arrived at the scene
7    somewhere between four and five o'clock; is
8    that correct?
9    A.  That's my best estimate based on the time
10   that the crash occurred and when I took the
11   photograph.
12   Q.  And as best you know, the accident occurred
13   about 3:25 a.m.; is that correct?
14   A.  Based on what was reported to me.
15   Q.  And do you know whether or not any one of
16   the vehicles was moved in that 35
17   minutes or hour and 35 minutes before you
18   arrived?
19   A.  There were no wreckers present.
20   Q.  But you don't know whether or not any of
21   the vehicles were moved from the time of
22   the accident until you got there?
23   A.  They were not moved from the time of the

Page 88

1    accident until I arrived.  There were no
2    wreckers present.
3    Q.  And I think you said you arrived on the
4    scene and Alex Huntley was already there;
5    is that right?
6    A.  Yes, sir.
7    Q.  And was he busy taking field notes?
8    A.  I don't know.
9    Q.  Was he taking measurements?
10   A.  No, sir.
11   Q.  Was he doing any pacing to pace off the
12   distances?
13   A.  I wasn't paying attention to Mr. Huntley.
14   I don't know what he was doing.
15   Q.  For example, on Defendant's Exhibit 1,
16   there's a notation that there's 530 feet
17   from off roadway to re-enter roadway.  Do
18   you know who took those measurements?
19   A.  It's on Trooper Huntley's report, and I
20   would assume that he measured that with his
21   issued roll-up tape, which means that he
22   walked back down the roadway and saw that
23   the vehicle traveled -- that the Morris

July 10, 2006

Page 89

1    vehicle traveled for 530 feet from the time
2    it ran off the road into the median until
3    it came back into the roadway.
4    Q.   All right.  Now -- And so you arrived at
5        the scene.  And was there anybody other
6        than Alex Huntley there taking field notes?
7    A.   I'm sure there were a lot of people there.
8        These crashes tend to draw lots of
9        emergency personnel when they involve
10       commercial vehicles.  There were firemen
11       there.  I don't recall if there were other
12       troopers there.  You know, I've been to
13       many, many crashes since this time.  I
14       don't -- I didn't make any notes as to who
15       was present.
16   Q.   And I think you said that you were there
17       for a limited time.  How long were you
18       there?
19   A.   I don't know.  Maybe an hour, hour and a
20       half, I'm guessing.  I have no idea exactly
21       how long I was there.
22   Q.   All right.  When you got there, did you see
23       the driver of the Peterbilt, Mr. Thompson?

Page 90

1    A.   I don't recall seeing him.
2    Q.   Do you recall talking to him?
3    A.   No, sir, I don't recall that.
4    Q.   Do you recall talking to the passenger in
5        the vehicle with Mr. Thompson, Mr. Tidwell?
6    A.   I do not -- I do not recall that.
7    Q.   Did you interview or talk to anyone?
8    A.   I don't -- I remember talking to the driver
9        of the UPS truck.  I recalled that today.
10       I don't remember the substance of that
11       conversation.
12   Q.   But you don't know whether or not the
13       driver of the UPS truck actually witnessed
14       the collision, though, do you?
15   A.   My best recollection is that he did.  I
16       know that he was involved in a hard braking
17       event to avoid colliding into the rear of
18       the truck.  But I don't recall exactly what
19       he said.
20   Q.   Do you think that hard braking that he did,
21       though, was to avoid colliding with some
22       stationary objects that he saw in front of
23       him?  In other words, these two other

Page 91

1    vehicles that had come to a rest by the
2    time he saw them.
3    A.   It's possible.
4    Q.   Okay.  So you're not -- So you can't say
5        for certain that the UPS driver saw any of
6        this accident?
7    A.   My best recollection is that he did, but I
8        do not recall that for 100 percent
9        certainty.
10   Q.   Do you recall talking to Trooper Huntley?
11   A.   I don't recall talking to him.  I'm sure I
12       did.  It would be unnatural for me not to
13       be at the scene of a crash and speak with
14       the trooper on the scene.  However, I don't
15       recall speaking to him.
16   Q.   Do you recall speaking to anybody there
17       other than the UPS driver?
18   A.   No.  But I'm sure I did.
19   Q.   Now is your chance.  Is there anybody else
20       that you spoke to?
21   A.   Again, yes, I'm sure there are other people
22       I spoke to.  I thought I just answered
23       that, Mr. Penick.  I don't recall who they

Page 92

1    were or what we talked about.  Once I
2    determined that the driver of the causative
3    vehicle was deceased, I ceased being in
4    investigator mode.  I'm a criminal
5    investigator.
6    Q.   And I believe that you said once you got
7        there and you saw that Morris was deceased
8        that you decided that it was not a criminal
9        investigation?
10   A.   It was obvious to me that Mr. Morris had
11       caused this crash, therefore, there was no
12       one to prosecute.
13   Q.   Okay.  Let me go back and look at the
14       Defendant's Exhibit 1 and see if you can
15       help me with this.  On the front of
16       Defendant's Exhibit 1, there appears to be
17       a box that says prime contributing
18       circumstances.  Is that what it says?
19   A.   Yes, sir.
20   Q.   And it says 27.  Do you know what 27 is?
21   A.   Yes, sir.  It's at the bottom left of your
22       report.
23   Q.   I can't read it it's so small.  Can you

July 10, 2006

Page 93

1    tell me what it is?
2    A.  Driver not in control.
3    Q.  So -- And when it says driver not in
4    control, what did you take that to mean?
5    Which one of the --
6    A.  It refers to unit number one.
7    Q.  And that was Mr. Morris; right?
8    A.  Yes.
9    Q.  Now, do you have any evidence that would
10   tell you why Morris went off the roadway
11   and came back up on the roadway?
12   A.  I did not continue to investigate this
13   crash, therefore, I did not develop any
14   evidence.  Whether any existed or not, I
15   don't know.
16   Q.  Do you know what the concept of the term
17   contributory negligence means?
18   A.  In general terms, yes.
19   Q.  Do you know of anything that would tell you
20   that Morris was guilty of contributory
21   negligence when his vehicle went off the
22   road and onto the road?
23   A.  Perhaps in the general terms that I

Page 94

1    understand contributory negligence.
2    Q.  Well, let me ask you this question.
3    MR. BROUGHTON:  Let him finish his
4    answer.
5    Q.  I thought he needed clarification, but he
6    doesn't.  Go on, then.
7    A.  In the terms that I understand contributory
8    negligence, I understand that to mean that
9    someone has done something but you have
10   done something that has enhanced the
11   results of that or made them worse.  In
12   this case, I do not believe any negligence
13   existed other than on the part of
14   Mr. Morris, therefore, it couldn't be
15   contributory.  It was the sole negligence.
16   Q.  Now, do you know what negligence Mr. Morris
17   engaged in?
18   A.  He has a duty to maintain control of his
19   vehicle.  He ran off the roadway into the
20   median.  In an attempt to re-enter the
21   roadway, he blocked the northbound lanes
22   and came to rest in an uncontrolled fashion
23   in the northbound lanes.  That circumstance

Page 95

1    led to Mr. Thompson being unable to avoid
2    striking him.
3    Q.  Do you know whether or not another vehicle
4    had run Mr. Morris off the road?
5    A.  No.  Have no idea.
6    Q.  But if another vehicle ran Mr. Morris off
7    the road that wouldn't be negligence on his
8    part, would it?
9    MR. BROUGHTON:  Object to the
10   form.  Assumes facts not in
11   evidence.
12   A.  If a vehicle ran him off the road, he's
13   faced with options.
14   Q.  But my question, though, is if another
15   vehicle ran Mr. Morris off the road that
16   wouldn't be negligence on his part, would
17   it?
18   MR. BROUGHTON:  Object to the
19   form.  I don't think you're
20   giving him enough facts.  Not
21   enough facts, no predicate and
22   it assumes facts that aren't
23   in evidence.

Page 96

1    Q.  Hypothetically.
2    A.  If someone -- If Mr. Morris was passing a
3    vehicle on the left and that vehicle you're
4    saying came left and forced him into the
5    median --
6    Q.  Yeah.
7    A.  -- that would be a causative factor for him
8    to do that.  He'd be faced with a choice of
9    maintaining a position and having contact
10   with this encroaching vehicle or going into
11   a dark unknown median.  And he would be
12   faced with which of those two bad events he
13   wanted to occur.  Of course, the primary
14   cause would be the person who encroached
15   into his lane, had established control of
16   that left lane.  But that is purely
17   speculative and a made up circumstance that
18   I have no evidence or reason to believe
19   occurred.
20   Q.  That's my question.  Do you know whether or
21   not anybody forced him off the road?
22   A.  No one knows.
23   Q.  Do you know?

Page 101

1  Q. Isn't that what you just said?
2  A. I said that I don't know whether I would
3     call that negligence. By legal definition,
4     it may be. However, I'm not going to fault
5     the man for having a heart attack.
6  Q. Okay.
7  A. Again, if -- But I have no evidence that
8     something like that occurred.
9  Q. So you don't have any evidence as to
10    whether or not Mr. Morris was negligent
11    then; right?
12          MR. BROUGHTON: Object to the
13    form.
14  A. Yes, sir, I do have considerable evidence
15    that Mr. Morris was negligent in that he
16    caused this crash. Why he caused this
17    crash I cannot answer for you, because I
18    don't have any evidence to give me that.
19    However, Mr. Morris was -- had the primary
20    responsibility for maintaining control of
21    his vehicle and not causing a wreck. In
22    this case for some reason that I don't
23    know, he drove off into the median at

Page 102

1     three -- approximately 3:25 a.m., over
2     corrected his vehicle in an attempt to come
3     out of the median, lost control of it and
4     put it into the pathway of those vehicles
5     that were legally proceeding on I-85
6     northbound.
7  Q. I promise you this will be my last time
8     asking this question.
9  A. Well, we've rehashed that issue repeatedly.
10  Q. But if someone forced him off the road and
11    he laid his vehicle down, you wouldn't
12    consider that to be negligent, would you?
13          MR. BROUGHTON: Same objection as
14    before.
15  A. There is absolutely no evidence to
16    indicate --
17  Q. I understand.
18  A. Please let me answer if you ask the
19    question, Mr. Penick.
20  Q. Continue.
21  A. There is no evidence that I saw at this
22    scene to indicate that Mr. Morris was
23    forced off the roadway. If was forced

Page 103

1     off the roadway, he has a duty to maintain
2     control of his vehicle as best he can. He
3     could have stayed in the median. His
4     mistake was made when he attempted to
5     re-enter the roadway at too sharp an angle
6     causing his vehicle to go out of control
7     and overturn where it laid down in the path
8     of vehicles that were just proceeding down
9     a dark road.
10          He put the unlit, unreflectorized
11    portion of his vehicle into the path of
12    this -- of Mr. Thompson's vehicle.
13    Mr. Thompson due to that dark night,
14    unreflectorized surface was unable to see
15    it and collided into it, unable to see it
16    until it was too late for him to be able to
17    stop his truck and do anything about it.
18          So you're asking me if there's
19    contributory negligence on the part of
20    Mr. Morris. Mr. Morris caused this crash.
21    Why he caused this crash I cannot answer
22    for you. But had he maintained control of
23    his vehicle either before it went in the

Page 104

1     median or while it was in the median and
2     not attempted to come out in a too abrupt
3     fashion this crash would not have occurred.
4  Q. Let me ask you this question. It indicates
5     on this picture -- I believe you said that
6     you saw some skid marks but you couldn't
7     tell for certain whether or not those skid
8     marks go along with the Peterbilt driven by
9     Thompson. Is that what you said?
10  A. No, sir, that's not what I said.
11  Q. Well, I think you said you couldn't say for
12    sure that those skid marks go with the
13    Peterbilt.
14  A. Again, that's not what I said.
15  Q. Okay. Well, could you tell us what you
16    said about that?
17  A. If you're referring to Exhibit Number
18    P-3 -- correction -- Exhibit P-2, the tire
19    marks on the right side of the right-hand
20    lane are from the Peterbilt. I cannot be
21    certain whether they are from the trailer
22    or the tractor, but they are from that
23    vehicle.