# DEPOSITION OF EDWARD L. ROBINSON

## June 22, 2006

## Pages 1 through 276

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

EXHIBIT I



Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2     FOR THE MIDDLE DISTRICT OF ALABAMA
 3                EASTERN DIVISION
 4
 5   LORI ANN MORRIS,
 6       Plaintiff,
 7   Vs.              CIVIL ACTION NO.
                      3:02-CV-962-T
 8   FLORIDA TRANSFORMER,
     EDWARD NEAL THOMPSON,
 9   et al.,
10       Defendants.
11
12
13
           * * * * * * * * * * * * *
14
15       DEPOSITION OF EDWARD L. ROBINSON, taken
16   pursuant to stipulation and agreement before
17   Haley A. Phillips, Certified Shorthand Reporter,
18   and Commissioner for the State of Alabama at Large,
19   in the Law Offices of Henry L. Penick, 319 17th
20   Street, Birmingham, Alabama, on Thursday, June 22,
21   2006, commencing at approximately 10:05 a.m.
22
23         * * * * * * * * * * * * *
```

Page 2

```
 1         APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Henry L. Penick, Esq.
     Attorney at Law
 5   Post Office Box 967
     Birmingham, Alabama 35201
 6
     FOR THE DEFENDANT:
 7
     W. Evans Brittain, Esq.
 8   Richard E. Broughton, Esq.
     Ball, Ball, Matthews & Novak
 9   Attorneys at Law
     Suite 204
10   2000 Interstate Park Drive
     Montgomery, Alabama 36109
11
12       * * * * * * * * * * * * *
13       EXAMINATION INDEX
14   BY MR. BROUGHTON . . . . . . . . . 5
     BY MR. PENICK . . . . . . . . . 272
15   BY MR. BROUGHTON . . . . . . . . 273
16
17       DEFENDANT'S EXHIBIT INDEX
     1   File of Robinson & Associates      6
18
     2   Field notes           74
19
     3   Field notes           74
20
     4   Photograph            97
21
     5   Handwritten calculations      132
22
     6   Handwritten calculations      132
23
```

Page 3

```
 1       DEFENDANT'S EXHIBIT INDEX (cont'd)
 2   8   Alabama Uniform Traffic Accident Report   181
 3   9   Map                    204
 4   10  Map                    206
 5   11  Sworn affidavit of Mr. Robinson       244
 6   12  Report by Robinson & Associates       244
 7   13  Preliminary report number one        257
 8   14  Preliminary report number two        257
 9   15  Preliminary report number three       257
10   16  Preliminary report number two        261
11   17  Fax to Mr. Messerschmidt from Attorney   263
         Robinson dated March 3, 2005
12
     18  Fax to Mr. Robinson from Mr.         259
13       Messerschmidt dated March 3, 2005
14   19  Fax to Mr. Robinson from Mr.         273
         Messerschmidt dated March 10, 2005
15
         PLAINTIFF'S EXHIBIT INDEX
16
     1   Curriculum Vitae            274
17
18
         * * * * * * * * * * * * *
19
20
21
22
23
```

Page 4

```
 1            STIPULATION
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of EDWARD L. ROBINSON is taken pursuant
 5   to the Federal Rules of Civil Procedure and that
 6   said deposition may be taken before Haley A.
 7   Phillips, Certified Shorthand Reporter, and
 8   Commissioner for the State of Alabama at Large,
 9   without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

Deposition of Edward L. Robinson                                                                    June 22, 2006

Page 13

1    not aware of any classes anywhere that were
2    specifically accident reconstruction. And
3    I don't know of anybody that gives a
4    degree -- an academic degree in it now.
5    It's being talked around several places.
6    And right now it's all short courses and
7    seminars and that sort of thing.
8    Q.   Well, you learned your accident
9    reconstruction knowledge through on-the-job
10   training and seminars?
11   A.   Right.
12   Q.   Did you go to the Northwestern School?
13   A.   No. I haven't been to Northwestern. I've
14   been to a number of the IPTM seminars. And
15   back in the '80s a number of people started
16   forming professional groups, professional
17   organizations in accident reconstruction.
18   I'm a member of seven or eight of those.
19   And most of those have at least annual, if
20   not more frequently, meetings with seminars
21   attached to the meetings. And I've been to
22   I don't know how many of those, 60 or 70
23   or ...

Page 14

1    Q.   What does IPTM stand for?
2    A.   That's International Police Technology --
3    Institute of Police.
4    Q.   What's the M stand --
5    A.   Institute of Police Technology and
6    Management. It's a part of the University
7    of North Florida in Jacksonville.
8    Q.   Have you ever been a law enforcement
9    officer?
10   A.   No.
11   Q.   Have you had any training or experience in
12   visual perception?
13   A.   Not formal training.
14   Q.   Do you consider yourself an expert in
15   visual perception?
16   A.   No.
17   Q.   If you need expert opinions in a case
18   regarding visual perception, do you farm
19   that out or do you associate somebody?
20   A.   It depends on what's involved. I have used
21   Dr. Michael Loop at the School of Optometry
22   several times in problems relating to
23   visual perception.

Page 15

1    Q.   Did you use Dr. Loop in this case?
2    A.   No, I did not.
3    Q.   And define what you mean by visual
4    perception.
5    A.   Being able to see something and realize
6    that you're seeing it. In the case of
7    visual perception, many times we want to
8    try to give court exhibits that are
9    representative of what a person saw or
10   didn't see. And Dr. Loop has been helpful
11   in doing light-level measurements and
12   taking photographs that were representative
13   of what people would or wouldn't see at
14   accident sites.
15   Q.   Have you ever testified on behalf of a
16   party with or without the use of Dr. Loop
17   that a particular object or vehicle could
18   not have been seen by the -- by the party
19   or by one of the parties in time to avoid
20   an accident?
21   A.   I'm sorry. Repeat that, now. I'm thinking
22   back over 40 years, so ...
23   Q.   Yeah. Have you ever testified on behalf of

Page 16

1    a party involved in a motor vehicle
2    accident that the other vehicle or object
3    involved in the accident was not
4    discernible or that party could not have
5    seen that object or vehicle in time to
6    avoid an accident?
7    A.   Yeah. I seem to remember a case. I was
8    working on defense for the truck that had
9    hit a pedestrian that was intoxicated and
10   somewhat into the road in dark clothing at
11   night. And I don't remember the details of
12   it. I just remember that general feature
13   of it.
14   Q.   Do you happen to remember the parties or
15   the attorneys involved or the --
16   A.   (Witness shakes head.)
17   Q.   Could you find it on your list of --
18   A.   It was further back than my list of
19   testimony goes. It was probably 15 years
20   ago or more. I can't really remember any
21   of the parties now.
22   Q.   Was it a case that went to trial?
23   A.   No.

Page 17

1   Q.  Do you have any medical training?
2   A.  No, not formal medical training.  I've been
3        involved in paramedical sort of stuff, like
4        radiation safety and been raised in safety
5        officer at UAB, but I wasn't involved in
6        the day-to-day surveys.  It was more
7        administrative.  And I've taught courses
8        in -- a licensure course for ...
9   Q.  Well, you're not a medical doctor?
10  A.  No, I'm not.
11  Q.  You don't hold yourself out as an expert in
12       this case being able to determine cause of
13       death?
14  A.  Oh, no.  No.  One thing that you were
15       asking about formal education, I would go
16       to experience also.  At one point I had a
17       joint appointment in the forensic science
18       department from the justice program, a
19       graduate program.  And I did for a period
20       of time give lectures in one of their
21       introductory graduate courses, a couple
22       hours lecture on accident reconstruction.
23          I didn't try to make an accident

Page 18

1        reconstructionist out of people in two
2        hours, but I tried to show them the
3        physical basis of it and show them more or
4        less what could or couldn't be done, so
5        they would know when to yield for a
6        reconstruction and when it wasn't going to
7        be applicable.
8   Q.  Do you have any training in biomechanics?
9   A.  No.
10  Q.  So you don't hold yourself out in this case
11       as an expert in biomechanics?
12  A.  No.
13  Q.  You're not holding yourself out as an
14       expert in this case on what specific
15       injuries might have caused the death of
16       Mr. Morris in this case?
17  A.  No.
18  Q.  Do you hold yourself out as an expert on
19       what -- in this case on what specific
20       objects caused any specific injuries to
21       Mr. Morris?
22  A.  Well, in the sense of discerning between
23       the most likely result of the truck

Page 19

1        overturn versus the impact by the other
2        truck, I think that we can make some
3        separation on that.
4   Q.  Well, wouldn't a biomechanic --
5        biomechanical expert be the proper person
6        qualified to determine what physical
7        injuries on Mr. Morris' body were caused by
8        what particular objects during the accident
9        sequence?
10  A.  I'm not trying to do that.
11  Q.  All right, sir.
12  A.  My general experience in overturned trucks
13       is that the injuries that Mr. Morris
14       received -- the very serious injuries I've
15       never seen before in an overturned truck
16       accident, so I would think it highly
17       unlikely that these injuries would have
18       been associated with the overturn.  On the
19       other hand, impact by another vehicle of
20       comparable mass at 70 miles an hour or 60
21       miles an hour would be expected to cause
22       some very serious injuries.
23  Q.  But you're not testifying as to any

Page 20

1        specific injuries on Mr. Morris' body were
2        caused by any specific objects during the
3        accident sequence?
4   A.  I'm not trying to bring it down to that
5        point, no.
6   Q.  You're not going to give any opinions on
7        that?
8   A.  I'm just going to say that I think his
9        serious injuries were due to the impact,
10       not the overturn.
11  Q.  While we're on that, what -- at what
12       speed -- Did you calculate a speed of
13       the -- And I'm going to call for purposes
14       of this deposition -- And we're going to
15       get this confused I'm sure, because I
16       confuse it in my mind.  I'm going to try to
17       differentiate between Mr. Morris' vehicle
18       by calling it the Kenworth vehicle and the
19       vehicle driven by Mr. Thompson by calling
20       it the Peterbilt vehicle.  Now, we both
21       know that that's just referring to the
22       tractor -- or the truck part of the rig,
23       not the trailer?

Deposition of Edward L. Robinson                                      June 22, 2006

Page 29

1  A.  No.  He has a degree in forensic science.
2  Q.  Okay.  He doesn't have -- He does not have
3      a college degree in mechanical engineering?
4  A.  But he has completed all of the courses for
5      the bachelor's in mechanical engineering so
6      that the UAB graduate program admitted him
7      to the master's of mechanical engineering
8      program.
9  Q.  So as of what date was he admitted to the
10     master's program?
11 A.  As of this summer.
12 Q.  2006?
13 A.  Yeah.
14 Q.  Did either -- Did Mr. Johnson do any
15     compilation of data or calculations to
16     determine the speed of the Kenworth as it
17     left I-85?
18 A.  I don't recall.  I don't believe he did.  I
19     think he was in this case just involved in
20     the site mapping and drawing -- using the
21     CAD program to draw the site map.
22 Q.  Just data collection and employing the CAD
23     for the map?

Page 30

1  A.  Right.
2  Q.  Did either Mr. Johnson or Mr. Messerschmidt
3      retrieve any black box data or
4      equivalent-type data from the Kenworth?
5  A.  These are too old to have it.  '98, '95.
6  Q.  Neither the Kenworth nor the Peterbilt had
7      any black box data?
8  A.  Well, we never saw the Kenworth.  We don't
9      know.
10 Q.  The Kenworth?
11 A.  The Kenworth, we never were able to see
12     that.
13 Q.  Kenworth is Morris' vehicle?
14 A.  I'm sorry.  I've gotten -- Now I've done
15     it, reversed them.
16         The Peterbilt, we never saw.  We saw
17     only the cab portion of Morris' truck that
18     had been knocked off the frame.  When we
19     went to -- or they -- I didn't go with
20     them.  When they went to the site where it
21     was stored, the remainder of the truck, the
22     frame and motor and transmission had all
23     been parted out and the frame cut up, so

Page 31

1      there was nothing to see except the cab
2      itself and the seat and the remains of
3      that.
4  Q.  The -- In the Kenworth, the cab portion
5      that Johnson and Messerschmidt inspected --
6      Did they both inspect it?
7  A.  I don't think so.  I think only
8      Messerschmidt went.  I can't recall whether
9      Johnson went or not.
10 Q.  On that inspection, did Messerschmidt look
11     for any equipment or instruments in the cab
12     of the Kenworth that might have had data
13     equivalent to the kind of data you get from
14     what we're calling the black box or a CDR?
15 A.  I'm sure he did.  But the boxes we're
16     talking about are always mounted on the
17     motors in trucks.  The only -- There's one
18     small after-market unit that is mounted in
19     the cab, although I think it's connected to
20     the unit on the motor.  They were not very
21     common in the middle and late '90s.  But if
22     that unit were there, they would have noted
23     that and tried to download it --

Page 32

1  Q.  I'm with you.  Let me make sure I
2      understand completely.  The only part of
3      the -- what I'm calling the Kenworth
4      tractor or truck portion of Mr. Morris' rig
5      that was physically inspected by anyone on
6      your behalf in this case was the cab part,
7      the occupant part that was separated at
8      some point during the accident sequence
9      from the frame of the tractor?
10 A.  That's correct.
11 Q.  Neither you nor anyone on your behalf has
12     physically inspected the engine, the motor,
13     that part of the Kenworth tractor?
14 A.  That's correct.
15 Q.  What about the framework underneath?
16 A.  That had been cut up too.  I think there
17     was nothing left of it -- any of that.
18 Q.  What about the trailer that was being
19     pulled by the Kenworth?
20 A.  We did not see that either.
21 Q.  Did either you or anyone on your behalf for
22     purposes of this case have an opportunity
23     to inspect any of the braking -- any parts

8 (Pages 29 to 32)

Page 33

1      of the brake system or the electrical or
2      light system on the Kenworth tractor or
3      trailer?
4   A.  No.
5   Q.  When did -- When did Messerschmidt
6      inspect -- And I apologize for just
7      referring to him by last name, but that
8      will short-circuit some of this. When did
9      Messerschmidt inspect the cab of the
10     Kenworth?
11        Those blue pages that you're looking
12     at, do we have a copy of that?
13   A.  Yes. They're in the file.
14   Q.  That's just a chronology of events?
15   A.  That's actually an invoice to the client
16     which includes that.
17        Oh, that was the first thing that was
18     done. That was October 7, '04. Went to
19     Kerns Truck Parts. And I believe one of
20     the -- met there was someone named Don
21     Glenn. He may be from Rimkus. I'm not
22     sure. I think there was another expert
23     there at the time he inspected it. There

Page 34

1     was some other party there that was not
2     part of our organization.
3   Q.  And that was on October 7, '04?
4   A.  Right.
5   Q.  By your understanding at October -- as of
6     October 7, '04, the tractor framework
7     portion, engine portion of the Kenworth
8     unit had already been cut up and disposed
9     of?
10   A.  Yes. That's what they told Messerschmidt,
11     that they had parted out the engine and
12     transmission and cut up the frame.
13   Q.  Where -- Do you know where the batteries
14     were located on that Kenworth?
15   A.  No, not exactly. The usual location is on
16     the left side of the frame about the back
17     of the cab.
18   Q.  Sitting here today, you can't testify on
19     that Kenworth whether the -- where the
20     battery was located?
21   A.  That's correct.
22   Q.  No one on your behalf was able to inspect
23     the electrical system that existed in the

Page 35

1     tractor portion and engine area to
2     determine if there were any defects or
3     deficiencies that might have existed in
4     that system prior to this accident?
5   A.  Yes. For both trucks, yes, we did not.
6   Q.  Do you know a person named LeBleu --
7   A.  I don't.
8   Q.  -- who's involved in the case?
9   A.  No, I don't.
10   Q.  Do you know if or when he was able to
11     inspect any part of the Kenworth?
12   A.  No, I don't.
13   Q.  So any opinions that you would have or that
14     your people would have regarding the
15     electrical system on this Kenworth would be
16     based on something other than an actual
17     physical inspection of that system?
18   A.  Right. We did not inspect the system. We
19     did not have an opportunity to.
20   Q.  And wouldn't it be fair to categorize any
21     opinions that you would give on the
22     electrical system for that very reason as
23     speculative?

Page 36

1        MR. PENICK: Object to the form of
2     the question.
3   Q.  Wouldn't that be a fair characterization?
4   A.  We haven't turned our attention to any
5     problems with the electrical system. The
6     only question that's come up was could the
7     lights of the truck have remained on after
8     it overturned.
9   Q.  Well -- And it could.
10   A.  That's the only specific question.
11   Q.  And any opinion that you would give or that
12     Messerschmidt or Johnson would give as
13     to -- as to whether the lights on the
14     Kenworth could have been on either before
15     or after the rollover would have to be
16     speculation and conjecture since you had no
17     opportunity to inspect that system either
18     before that -- this accident or after the
19     accident?
20        MR. PENICK: Object to the form of
21     the question.
22   A.  Well, I hate to call it conjecture to
23     assume that a truck would be driving down

Deposition of Edward L. Robinson                                                                    June 22, 2006

---

Page 41

1    Q.  Well, let me ask you this. We don't know
2         sitting here today, June 22, 2006 -- We do
3         not know what caused the Kenworth vehicle
4         to leave I-85 and go into the median?
5    A.  I don't.
6    Q.  And we don't have -- you don't have any
7         information, hard information from any
8         source as to what caused that, do you?
9    A.  That's correct.
10   Q.  We don't know whether there was a
11        mechanical failure or a defect on the
12        Kenworth tractor or trailer that caused
13        that, do we?
14   A.  That's correct. We weren't able to inspect
15        that.
16   Q.  And we don't know if at any time before
17        that vehicle -- the Kenworth vehicle left
18        the pavement -- I-85 pavement, we don't
19        know whether Mr. Morris applied any brakes?
20   A.  I don't know that.
21   Q.  All right. And the -- Does the absence of
22        any -- And I'm talking about the Kenworth
23        now. Does the absence of any tire markings

---

Page 42

1         or what the jury may refer to as skid marks
2         on I-85 tell you that Mr. Morris at no time
3         applied his brakes before leaving I-85?
4    A.  No.
5    Q.  So he could apply his brakes, hard braking
6         without locking his brakes and without
7         leaving skid marks?
8    A.  It could be done.
9    Q.  And that same -- that same thing is true of
10        the Peterbilt --
11            MR. PENICK:  Let me -- Let me
12              object to the question,
13              because I'm not so sure. Are
14              you talking about skid marks
15              on the pavement or --
16            MR. BROUGHTON:  Yes.
17            MR. PENICK:  -- skid marks within
18              the median? If he went off
19              the median, you must be
20              talking about skid marks --
21            MR. BROUGHTON:  Mr. Robinson knows
22              what I'm talking about.
23   Q.  And the same thing is true of the

---

Page 43

1         Peterbilt. The fact that you don't find
2         skid marks behind a loaded eighteen-wheeler
3         does not mean that the driver does not
4         apply hard braking. It just means that for
5         whatever reason you didn't have a locking
6         of the brakes; correct?
7    A.  There can be a lot of reasons for failure
8         to lock the brake. It can be improperly
9         adjusted brakes. It can be failure to
10        apply maximum brakes. It could be that you
11        had ABS, which you wouldn't have on these
12        trucks, and in which case you normally get
13        skip skids or faint skip skids. But most
14        commonly once you apply brakes hard,
15        emergency braking, hard maximum braking, a
16        vehicle has to have time for the wheels to
17        slow down and lock up and then the contact
18        patch of the rubber and the pavement to get
19        hot enough to start leaving visible traces
20        of rubber. So, normally, vehicles will
21        lose eight or ten percent of their speed
22        before the skid marks start after emergency
23        brake application.

---

Page 44

1    Q.  How many seconds are we talking about does
2         it take for the -- And I'm just talking
3         about after the driver has realized that
4         there's a need for what you were calling
5         hard braking. How many seconds does it
6         then take for that message to get to his
7         foot, to get to the brake pedal, to get
8         into the system and to, as you've put it,
9         eventually cause the tires to heat up
10        enough to cause a mark?
11   A.  Well, that's a complex question, but let me
12        go back to the start. You're asking first
13        about perception-reaction.
14   Q.  No. No.
15   A.  Yes, you were. You said from when the
16        driver sees the object in the road.
17   Q.  No. No. I'm past that.
18   A.  All right.
19   Q.  And what I'm doing is -- He's made the
20        decision that he's going to have to apply
21        some hard braking.
22   A.  Uh-huh (positive response).
23   Q.  He's already perceived. He's already

---

Deposition of Edward L. Robinson                                                    June 22, 2006

Page 45

1    started his reaction. And what I'm saying
2    is right now -- All I'm asking you right
3    now is from the time he starts his
4    application of hard braking on the pedal to
5    the time it leaves or heats up the pavement
6    enough to start leaving a -- what you would
7    call a tire mark or a skid mark, what's the
8    range? I know it's not -- there's nothing
9    exact about that.
10   A.  Sure.
11   Q.  What's the minimum and what's the maximum
12   time?
13   A.  Well, it's going to be dependent on the
14   speed for time and also for distance. When
15   you press the brake pedal on a truck,
16   that's really an air valve.
17   Q.  Right.
18   A.  And this puts the air into the air lines on
19   the truck, which may have something of the
20   order of a tenth of a second to get to the
21   drive wheels of the tractor, and they have
22   two-tenths or a three-tenths of a second
23   delay to get to the trailer wheels. And it

Page 46

1    depends on the plumbing and the length of
2    the lines and so on, what's their
3    diameter.
4        So the full truck brake system comes on
5    in parts. You might say it takes a couple
6    tenths of a second for you to have full
7    braking. If he's going 70 miles an hour,
8    as I believe your driver testified, which
9    is a little over 100 feet per second, then
10   he would travel 20 feet or 30 feet during
11   that time.
12       Now, if it takes another ten percent
13   speed loss to get the wheels to sloughing
14   off enough rubber to be visible, then he
15   would have dropped from 70 to 63. So
16   you're looking at an average speed of
17   somewhere around 66 miles per hour, which
18   would be in the ballpark of 90 feet per
19   second. Well, that would be easiest to do
20   with a kinematic equation to say two times
21   the deceleration times the distance equals
22   the difference in the square of the initial
23   and final speeds. And I think that --

Page 47

1    Seems like I punched that through on a
2    calculator and it turns out to be 60 or 70
3    feet, another 20 feet for the delay. So
4    we're talking about maybe 80 feet he would
5    travel from the time he stomps the brake
6    pedal until he starts leaving visible skid
7    marks. Could be less than that; could be
8    more than that.
9    Q.  What do the books say -- And by books, what
10   are the -- what are the authoritative texts
11   or treatises that you would go to for
12   information on perception-reaction times
13   for a driver?
14   A.  Well, right now I think the best
15   compilation of that is a program called
16   Drive 3. It's in the library of
17   reconstruction programs called REC-TEC.
18   Q.  Drive 3, is that --
19   A.  That's one of the programs in --
20   Q.  I know. But the three -- Is the three a
21   numeral three or a roman numeral three
22   or ...
23   A.  No. Just number three.

Page 48

1    Q.  Okay. Drive 3, is that --
2    A.  That was written by Jeff Muttart, who's
3    probably now the best known and best
4    qualified in human factors reconstruction.
5    Q.  M-U-T --
6    A.  M-U-T-T-A-R-T, I believe. He's now working
7    on his Ph.D. in -- I'm not sure what
8    department -- psychology, criminal
9    psychology or -- Anyway, it's on human
10   factors. And I believe that it's at the
11   University of Massachusetts.
12   Q.  How do I -- Do I access that on the
13   Internet?
14   A.  He does have an address, but I don't know
15   it right off. I'm sure I have it.
16   Q.  Well, all I'm looking for is Drive 3.
17   A.  Oh. That, you can get from the REC-TEC
18   company.
19   Q.  W-R-E-C-K?
20   A.  No. It's R-E-C, dash, T-E-C. And I think
21   that's just REC-TEC dot com. They'll let
22   you download an examination copy of it.
23   Their entire program is a few thousand

Deposition of Edward L. Robinson                                                                    June 22, 2006

Page 49

1    dollars. In fact, I just talked to George
2    Bonnett this morning, and he was telling me
3    about some new parts he put in the
4    program. He's the author of that program.
5  Q.  You're not a human factors expert?
6  A.  I have some experience with human factors,
7    but that's not my main area of expertise.
8    I refer to the literature.
9  Q.  You're not offering yourself as a human
10    factors expert --
11  A.  No.
12  Q.  -- in the case?
13  A.  No. But I'm saying that I know what the
14    literature says about perception-reaction.
15  Q.  Right. But you're not offering any
16    opinions as a human factors expert in this
17    case?
18  A.  No. No.
19  Q.  The Drive 3, does -- Is the information on
20    perception-reaction time similar in the
21    Drive 3 program to what is reported in the
22    Northwestern accident reconstruction
23    manuals and books?

Page 50

1  A.  It will vary, because what Drive 3
2    attempted to do is to take the results of a
3    lot of experimental results and weight the
4    various factors in. I'm not sure -- I've
5    looked at the program. I have not run it
6    myself. But I know that it has a number of
7    factors that go into the program, like
8    whether it's daylight or dark, whether the
9    driver is fatigued or not. I don't know
10    what all goes in. But it'll give you a
11    range of values of perception-reaction time
12    that it operates from.
13  Q.  What is the perception -- What is that
14    range of values for perception-reaction
15    time?
16  A.  Like I said, I didn't run the Drive 3
17    program on this. But the literature ranges
18    that I would use as the normal
19    perception-reaction time most defaulted to
20    one and a half seconds. And I would say
21    that's a lower range, because this is at
22    night. And I would think two seconds
23    should be an upper limit for a professional

Page 51

1    driver.
2  Q.  Do you -- Are you familiar with or have you
3    ever seen any studies of
4    perception-reaction times of reasonable
5    truckdrivers faced with darkness and
6    another overturned vehicle like the
7    Kenworth in this case where nothing but the
8    underside of the vehicle is facing that
9    oncoming driver?
10  A.  I have not duplicated this. No, I don't
11    have an example that duplicates this.
12  Q.  Wouldn't it be fair to say that whether
13    the -- whether any of the lights on that
14    Kenworth were still operable after the
15    rollover or not that that would be -- this
16    would fit in the very complex area for
17    perception-reaction times?
18  A.  You're going to have to define for me that
19    questionable phrase, would it be fair to
20    say. Do you mean is it correct, is it
21    approximately correct, is it --
22  Q.  Wouldn't it be reasonable for the jury to
23    conclude in this case that with what

Page 52

1    this -- the way this Kenworth was laying
2    out there in the highway with nothing but
3    the underside of that truck facing oncoming
4    traffic, that that would be what the
5    literature in the Drive 3 and the
6    Northwestern books would classify as a
7    complex situation for a truckdriver to
8    assimilate, perceive and react to?
9  A.  I usually associate complex with a lot of
10    vehicles and a lot of different movement.
11    I will say I think this would come in the
12    upper range of perception-reaction time,
13    because the -- recognizing what's in front
14    of you is -- it's an unusual thing to see
15    in front of you.
16  Q.  Nobody -- No driver -- No driver even of an
17    eighteen-wheeler is going to expect to see
18    another eighteen-wheeler rig overturned
19    blocking the highway as this one -- as this
20    Kenworth was at the time of this accident?
21        MR. PENICK:  Object to the form of
22        the question. It requires
23        speculation.

Deposition of Edward L. Robinson                                                                      June 22, 2006

Page 57

1   A.   Actually that one would probably be
2        easier.  When you do a speed calculation in
3        parts like this, you start at the rest part
4        and work backwards.  And to make an
5        estimate of a drag factor with the truck
6        overturned would probably be more reliable
7        than with wheels in the mud.  So to find
8        out where -- what his speed was at the time
9        he overturned would probably be more
10       reliable than the speed at which he left
11       the road.
12  Q.   But that has not been done up to this
13       point?
14  A.   If it's been done, I didn't do it.
15       Messerschmidt may have done it and not put
16       it in the file.  I don't know.
17  Q.   On what occasions would you have somebody
18       working on a case in litigation to do
19       calculations and not put them in a file?
20  A.   I've done it myself.  If I'm just looking
21       at a rough calculation to determine whether
22       something is a go or no go and determine
23       that and then move on and never put it in

Page 58

1        the file.
2   Q.   Did Messerschmidt ever tell you what speed
3        the vehicle -- the Kenworth vehicle was
4        going when it came back up onto I-85?
5   A.   I think the answer that I gave you on that
6        a while ago was that he indicated to me
7        that there wasn't evidence of excess speed
8        and if he ever said what he thought the
9        speed was, I don't recall it.
10  Q.   Excess speed in your vernacular, if I heard
11       you earlier, means he wasn't going 90 miles
12       an hour when he left I-85?
13            MR. PENICK:  Object to the form of
14            the question.
15  A.   Well, that was a number that I picked out
16       to say he wasn't doing that fast.  No, I
17       couldn't say that he wasn't going 71 or 72
18       or something like that.  I don't know.
19       But --
20  Q.   Or 75?
21  A.   I don't know.  The thing that we run
22       into -- I have not gone back and reviewed
23       the data and the calculations on that.

Page 59

1        What you run into with speed is that the
2        total stop distance tells us the square of
3        the speed.  So if you go up ten percent in
4        speed, you're going up 20 percent in stop
5        distance.  So if you take a look at
6        distance traveled and you put in a
7        reasonable drag factor and it indicates
8        that you're not going at excessive speed,
9        then that's about as good as you can do.
10  Q.   Well, a legal speed for I-85 in your
11       opinion or testimony -- and I guess
12       Messerschmidt's opinion or testimony is the
13       posted speed limit, 70 miles per hour or
14       anything within, say, ten percent of that
15       up to 77?  That would be a legal -- Would
16       that be a legal speed?
17  A.   I didn't say that.
18  Q.   Well, do you -- How do you know that -- How
19       do you know that the Morris -- the Kenworth
20       vehicle was traveling under 75 miles an
21       hour?
22  A.   I didn't do the calculations, so all I can
23       say is that the indications were that there

Page 60

1        was no evidence of excess speed.  I
2        can't --
3   Q.   Well, you also said that it was your
4        determination that Morris was -- Morris'
5        vehicle was traveling at a legal speed.
6   A.   Which would mean 70 or below.  That was the
7        information that I was given from the
8        preliminary calculations, and that's as far
9        as I can go with it for now.  I mean, I can
10       sit down and do some more calculations if
11       you'd like me to.  But I haven't done them,
12       and so I just --
13  Q.   Did you do -- Did you do any
14       calculations -- you or anyone on your
15       behalf do any calculations to determine the
16       speed of the Kenworth vehicle at the
17       instant of rollover?
18  A.   No.
19  Q.   Do you -- Did you or anyone on your behalf
20       do any calculations to determine how far
21       the Kenworth tractor or trailer moved or
22       slid after the instant of rollover?
23  A.   I don't see indications of the start of the

Deposition of Edward L. Robinson                                                                          June 22, 2006

Page 61

1    slide on the site map. I'm not aware at
2    this point that that's been done. And,
3    again, there may be site photos that would
4    give us information on that. I don't know
5    sitting here today.
6    Q.  Sitting here today you cannot state how far
7    the Kenworth vehicle, either the tractor or
8    the trailer, slid on -- after the rollover
9    to its final rest --
10   A.  That's --
11   Q.  -- before impact with the Peterbilt?
12   A.  Yes. That's what I just said.
13   Q.  That's correct?
14   A.  Yeah.
15   Q.  One comment I think you made -- And I don't
16   know if this is -- I can't remember exactly
17   which report it's in, but the comment was
18   made, I think, by you in a report -- in one
19   of your reports that you and your -- and
20   Mr., I guess -- Was there anybody involved
21   besides Messerschmidt or Johnson?
22   A.  No.
23   Q.  And the report, I think, was made that

Page 62

1    neither you nor anyone on your behalf could
2    determine the precise location of the
3    Kenworth relative to the roadway after the
4    overturn and before the collision by the
5    Peterbilt. Is that correct?
6    A.  I believe that's right.
7    Q.  All right. So -- And this may be saying
8    the same thing. You do not know the exact
9    location sitting here today of the Kenworth
10   vehicle when it was impacted by the
11   Peterbilt?
12   A.  That's correct.
13   Q.  Is it true -- And I heard you say this
14   earlier. And I'm assuming -- Which I know
15   it's bad to do, but you will correct me if
16   I'm wrong. I'm assuming that the speed of
17   the Peterbilt -- Now, I'm going to the
18   Peterbilt that was driven by my client,
19   Mr. Thompson. You're using his speed
20   before any braking or slowing or impact at
21   70 miles per hour based on what you
22   understand to be his statement of his speed
23   coming along I-85; correct?

Page 63

1    A.  Right.
2    Q.  And that -- And I know you're not a law
3    enforcement officer, but that would
4    constitute what you earlier characterized
5    as a legal speed?
6    A.  Yes.
7    Q.  You don't have any -- Do you have any
8    evidence whatsoever to support any opinion
9    that the Peterbilt was traveling in excess
10   of 70 miles per hour?
11   A.  No.
12   Q.  Have you as part of your work had an
13   opportunity to review the affidavits filed
14   by -- that we filed by Mr. Thompson and
15   Mr. Tidwell?
16   A.  I believe I saw Mr. Johnson's yesterday.
17   I'm not sure I saw Mr. Tidwell's. I guess
18   I believe I did. I think he's the one that
19   said 65 to 70.
20   Q.  Do you have --
21   A.  Mr. Thompson said 70.
22   Q.  Do you have any information or was there
23   anything stated in either one of those

Page 64

1    affidavits that you disagree with or have
2    any physical evidence to prove is incorrect
3    or inconsistent?
4    A.  The speeds?
5    Q.  Anything they stated in their affidavits.
6    A.  No. No.
7                MR. PENICK:  Let me object to the
8             form of the question. The
9             question is too broad for him
10            to respond to anything he said
11            in the affidavit. I ask that
12            the question be more specific
13            as to what part of the
14            affidavit that you're asking
15            about.
16   Q.  Was there anything that you read in the
17   affidavit that you took exception to, in
18   either Mr. Thompson's or Mr. Tidwell's
19   affidavits?
20               MR. PENICK:  Let me object to the
21            form of the question until
22            he's shown the affidavits. He
23            doesn't have a photographic

Page 65

1      memory to remember everything
2      that they said in their
3      affidavits.
4  Q.  Do you remember anything that you took
5      exception to?
6      You read them yesterday?
7  A.  Yeah.
8      No, I don't remember anything that I
9      think is misstated or wrong. There may or
10     may not be. He could have been going more
11     than 70. He could have been going 65. But
12     I think Mr. Thompson himself said that he
13     was outrunning his lights, because he said
14     I couldn't see the truck in time to stop.
15     And if you're driving too fast for the
16     range of your lights, regardless of what's
17     in the road, you're outrunning your lights.
18 Q.  Are you an --
19 A.  He made that statement.
20 Q.  Are you an expert on the range of
21     headlights from a Peterbilt?
22 A.  No.
23 Q.  Have you done any investigation, research

Page 66

1      in this case to determine the range of the
2      headlights on the Peterbilt?
3  A.  No. But he said he was outrunning them.
4  Q.  Where in his affidavit did he say -- You're
5      talking about his statement that he could
6      not see the truck in time to avoid the
7      collision. You've interpreted that to mean
8      he's saying he was, quote, outrunning his
9      lights?
10 A.  Right.
11 Q.  Have you done -- In this case, have you
12     done any work to determine at what distance
13     away from the Kenworth vehicle that vehicle
14     would have been visible to an oncoming
15     driver of --
16 A.  No.
17 Q.  -- a Peterbilt truck?
18 A.  No, not -- not for a driver of a Peterbilt
19     nor for this specific overturned truck
20     case.
21 Q.  It's your opinion -- Is it your opinion
22     today that any person who fails to avoid
23     hitting an object in the highway at night

Page 67

1      is outrunning their lights?
2  A.  For a stationary object in the highway in
3      front of them, yes, I would say they are.
4  Q.  Is there anybody else that shares that
5      opinion?
6  A.  Not based on the way they drive. But the
7      statements in the literature, Paul Olson's
8      book, for example, the Alabama statute all
9      say that you have your vehicle under
10     control so that you can avoid or stop for
11     objects within the range of your lights.
12 Q.  Have you ever testified in any other cases
13     to the contrary?
14 A.  I don't recall. I know that we talked
15     earlier about a truck case with a man who
16     was wearing dark clothing. But he stepped
17     out in front of the truck as I recall, so
18     it wasn't a matter of something that was in
19     the road and there as a stationary object.
20 Q.  Are you aware of any studies or tests done
21     by anyone with facts similar to this case
22     to determine the perception-reaction and
23     avoidability of an accident of this type?

Page 68

1  A.  I'm not familiar with specific pieces of
2      data in the literature. I'm sure that
3      Muttart's Drive 3 has some data with some
4      similarity to this. Since there are
5      hundreds of data points in his research, if
6      not thousands -- I think it's in the
7      thousands. No, I don't -- I don't know
8      that somebody has put an upside down truck
9      or an overturned truck on a test strip and
10     tried to look for perception-reaction on an
11     overturned truck.
12 Q.  When were you first contacted in this case?
13 A.  In September '04. September 22, '04.
14 Q.  By whom?
15 A.  By Attorney Ed Robinson in Louisiana.
16 Q.  What was said during that initial contact?
17 A.  I can't give you a verbatim. He -- We
18     discussed back and forth. He gave me
19     general information.
20 Q.  What information did he give you?
21 A.  Well, that the name of the client/driver
22     was Vernell Morris, that the defendant
23     company was Florida Transformer, that his

Deposition of Edward L. Robinson                                                                June 22, 2006

Page 69

1    name was Edward A. Robinson, that it was a
2    plaintiff's civil case, the location of the
3    litigation would be in Macon County, the
4    incident happened on I-85, the two pieces
5    of equipment involved were tractor-trailer
6    rigs and that the accident report named
7    Trooper Huntley as an investigating
8    officer, that Mr. Robinson's phone number
9    was this and his cell number and his fax
10   was the other and his second office
11   was another number. I can give you those
12   numbers if you want them. His mailing
13   address, 600 North Foster Drive, Baton
14   Rouge, Louisiana 70806.
15   Q.  What did he ask you to do?
16   A.  To -- The most specific assignment, he just
17   asked me to look at the case and get back
18   with him and see what -- what could we find
19   out.
20   Q.  What did you do next?
21   A.  Well, the next thing that we did that was
22   billable time -- I know I probably shuffled
23   some things around looking up some material

Page 70

1    like -- Well, we told him what we needed in
2    terms of materials and waited on accident
3    reports and so forth. Made arrangements
4    for the mapping team to go down and map the
5    site, locate the truck and find out when we
6    could go see it.
7    Q.  Kenworth?
8    A.  Mr. Morris' truck, the remains of it. And
9    that was the first thing that -- The first
10   billable time entry is the one I told you
11   about before is on October 7, '04, that
12   Mr. Messerschmidt went down to Kerns Truck
13   Parts and examined the remains of the
14   tractor, the cab of the tractor. The next
15   thing was a phone conference with Attorney
16   Robinson. We --
17   Q.  When was that? This was your second?
18   A.  Yeah. This was February 4, '05. We --
19   Q.  Okay. Hold on. Hold on. Let me slow you
20   down just a second there. You had -- After
21   the September 22, '04 conversation, the
22   next recorded entry is October the what?
23   A.  February 4, '05.

Page 71

1    Q.  Well, no. But after your first
2    conversation with Robinson, then you --
3    somebody --
4    A.  The site inspect -- The vehicle inspection
5    was October 7, '04.
6    Q.  That's the vehicle inspection?
7    A.  Right.
8    Q.  That's not the site inspection?
9    A.  Right.
10   Q.  All right. And after the vehicle
11   inspection of October 7, '04, your next
12   recorded entry is a phone conversation on
13   February 4, '05?
14   A.  Plus obtaining site photos from
15   Photographic Services of Alabama DOT.
16   Actually, we got proof sheets to pick the
17   photos we wanted.
18   Q.  Those are expensive, aren't they?
19   A.  Yeah.
20   Q.  The February 4th conversation with
21   Mr. Robinson, what was the substance of
22   that conversation?
23   A.  I don't take notes on the phone

Page 72

1    conversations unless there's specific
2    things he wants. And in this case, he
3    requests copies of the -- requested copies
4    of the site photos. And we agreed to get
5    them.
6    Q.  All right. Up to February 4, 2005, neither
7    you nor anyone on your behalf had been to
8    the site?
9    A.  That's correct.
10   Q.  When was the first site visit by any of
11   your people?
12   A.  On February 23, '05, the photographs that
13   we furnished you were taken and the map of
14   the site was made or the data was taken
15   with a total station.
16   Q.  The only -- You did not attend the site
17   inspection?
18   A.  Neither the site nor the truck cab
19   inspection.
20   Q.  The truck cab inspection was attended by
21   Messerschmidt and Johnson?
22   A.  No. Just Messerschmidt. And there was
23   someone there named Don Glenn. And I don't

Page 85

1     belt.
2   Q.  Are you aware of any studies that have been
3     done to determine injuries received from
4     seat belts?
5   A.  No.
6   Q.  You're not testifying today either way as
7     to whether or not the fatal injuries to
8     Mr. Morris were caused by the seat belt?
9   A.  I don't know. It's certainly possible in
10    the kind of impact that he got that just
11    the inertia forces and the weight of his
12    body could have done significant damage
13    like breaking bones.
14  Q.  Have you ever worked in a case for either
15    side where there was a fatality in a
16    rollover?
17  A.  I'm sure I have. I can't put my finger on
18    one right now. But, yeah, it's not
19    uncommon for fatalities in rollovers with
20    cars.
21  Q.  Well, you're not ruling out the fact that
22    Mr. Morris could have been fatally injured
23    during the rollover in this case?

Page 86

1   A.  In my own mind, yes. Because the nature of
2    the injuries is not such that would be on
3    the left side of his body. I mean, he
4    would have bilateral injuries. And that's
5    not going to happen when he -- from that
6    rollover.
7   Q.  But you don't know what injuries caused his
8    death?
9   A.  I haven't -- All I've done is look at the
10    autopsy report. I haven't tried to make
11    any determination beyond that.
12  Q.  And it would be fair to say that Mr. Morris
13    could have received fatal injuries in this
14    case during the rollover?
15  A.  I don't believe that. Because he's belted
16    in, and I don't believe he would have
17    ejected from the simple rollover with his
18    seat belt on.
19  Q.  We don't know -- You don't know -- Because
20    you're not a medical expert, you don't know
21    whether or not he received fatal injuries
22    before ejection, do you?
23  A.  Well, I don't think a medical expert could

Page 87

1    necessarily tell you that. He could tell
2    you what the -- what injuries were
3    associated with the fatality. But I don't
4    think you've got the kinds of forces
5    involved with the rollover by a factor of
6    ten or 100 to cause the kind of injuries
7    that you can get from these impacts.
8   Q.  But that -- that -- And I understand -- I
9    understand you want to give your personal
10    opinion, observation that you think it was
11    more like -- that you think it was more
12    likely in your personal opinion that the
13    impact forces or that injuries received
14    after the impact with the Peterbilt could
15    have caused Mr. Morris' death. But what
16    I'm getting at is you don't have a
17    professional opinion because you're not a
18    medical -- you're not a medical expert,
19    you're not a biomechanical expert, you
20    haven't determined what specific injuries
21    were caused by what specific objects or
22    forces in this case, so you can't give an
23    opinion to any degree of reasonable medical

Page 88

1    certainty as to what caused Mr. Morris'
2    death in this case?
3   A.  No, I can't give a medical opinion or a
4    biomedical (sic) engineering opinion. I'm
5    just basing it on experience looking at
6    other vehicle wrecks over the last 40 years
7    as to what kind of forces won't cause what
8    kind of injuries.
9   Q.  But you do agree that people have been
10    fatally injured in rollover accidents?
11  A.  They have.
12  Q.  The next comment on Defendant's Exhibit 2
13    says no evidence the belt was slash
14    something?
15  A.  Was not worn.
16  Q.  No evidence the belt was not worn except
17    the belt locked fully.
18  A.  Uh-huh (positive response). In extended
19    position.
20  Q.  What does that mean?
21  A.  Well, belt locked fully extended.
22  Q.  Belt locked fully extended.
23  A.  Right.

Deposition of Edward L. Robinson                                      June 22, 2006

Page 113

1       in trailers, and I've seen evidence to
2       indicate that some materials are weakened
3       by extended exposure to sunlight and the
4       extensive strength deteriorates. It's
5       pretty rare to see a broken seat belt. In
6       fact, it's not common to see them
7       stretched. The forces that we see in -- a
8       lot of accidents in the 30, 40, 50 mile an
9       hour range, there's not enough forces to
10      stretch seat belts --
11  Q.  You've done -- I'm sorry. Go ahead.
12  A.   -- in automobiles that I've seen more of
13      than trucks.
14  Q.  You've not done any testing on this belt to
15      determine what forces on this belt and --
16      you know, in its condition at about the
17      time of this accident would cause a pucker?
18  A.  No.
19  Q.  You've not done any testing or examination
20      of this belt to see if there were any
21      manufactured defects or glitches in it that
22      could have caused stretching or puckering
23      with less force than you're usually

Page 114

1       familiar with?
2  A.  I haven't looked for it, because I've never
3      seen a pucker like that that wasn't caused
4      by an excessive force on the belt from
5      either a wreck or from laboratory-induced
6      stretching.
7  Q.  How many puckers have you seen from wrecks,
8      from actual wrecks?
9  A.  Probably a few dozen.
10  Q.  How many puckers have you seen from
11      eighteen-wheeler accidents?
12  A.  I can't separate in my own mind what would
13      be cars and what would be
14      eighteen-wheelers.
15  Q.  Most of your experience has been cars?
16  A.  There are more cars than trucks, but over
17      40 years there have been a lot of trucks.
18  Q.  How many times have you seen a pucker in a
19      seat belt after an accident of this type
20      where you had an impact due to rollover and
21      then a subsequent impact from another
22      vehicle?
23  A.  I've never seen that kind of accident

Page 115

1       before.
2  Q.  So you've never seen a pucker from this
3      kind of an accident before?
4  A.  That's right.
5  Q.  Did anyone from your office ever actually
6      weigh the -- any portion of the Kenworth
7      vehicle?
8  A.  No.
9  Q.  On Defendant's Exhibit 2, there's some --
10      up in the top right-hand corner, there is a
11      statement, chassis weighed 16,290. What is
12      that measurement in?
13  A.  It would be in pounds. And I don't know if
14      that's a gross vehicle weight rating or if
15      that's an actual cab weight. That's about
16      right for the tractor weight of that sort
17      of vehicle.
18  Q.  What does --
19  A.  Usually --
20  Q.  I'm sorry.
21  A.  Usually, they stamp gross vehicle weight
22      rating on these things. They don't give
23      you the actual weight. Model number, I

Page 116

1       don't know what that means. Just model
2      T600 on a label that's on the remaining
3      part of the cab. Chassis number, some
4      number on a label that's stamped there.
5      There's your -- Your gross vehicle weight
6      rating is 48,000 pounds.
7  Q.  For what?
8  A.  It has to be the cab -- the tractor because
9      the trailer is not there.
10  Q.  Did you or Messerschmidt or Johnson ever
11      get any size, length or weight information
12      on the trailer that the Kenworth was
13      pulling?
14  A.  Weight information. The accident report
15      said that he had 22 containers of titanium
16      dioxide that weighed 2,000 pounds each, so
17      he had a 44,000 pound load. Other than
18      that, I -- Usual trailer weight with
19      tractor weight is going to run between 25
20      and 30,000 pounds. So he was somewhere
21      from, say, 77,000 pounds down to maybe 72,
22      maybe another thousand or so down in gross
23      weight of the whole vehicle.

Deposition of Edward L. Robinson                                                          June 22, 2006

Page 117

1    Q.   Did you use any information -- any weight,
2         length, size or measurements of the
3         Kenworth tractor or trailer in any
4         calculations to support any of your
5         opinions?
6    A.   Qualitatively just to understand that the
7         other truck was also loaded and that the
8         two trucks involved would have comparable
9         weights as opposed to a car and a truck
10        where your weight disparity is 15 or 20 to
11        one.
12   Q.   But you didn't do any -- you didn't do any
13        speed calculations in the case?
14   A.   That's right.
15   Q.   And Messerschmidt didn't do any speed
16        calculations?
17   A.   Well, none that was written down, no.
18   Q.   What does -- On Defendant's Exhibit 3,
19        which is dated 10/7/04 at the top -- And
20        this is part of Messerschmidt's notes at
21        the time of his inspection; right?
22   A.   Yes.
23   Q.   At the top it says -- the first line talks

Page 118

1         about Don Glenn.  I understand that.  And
2         the inspection was at Kerns Truck Stop or
3         Truck Parts; right?
4    A.   Right.
5    Q.   And then it says, motor gone.  Do you see
6         that?
7    A.   Right.
8    Q.   Frame gone and cut up; right?
9    A.   Right.
10   Q.   Only cab left to inspect; right?
11   A.   Right.
12   Q.   And we've already discussed that.  The next
13        thing says, P slash S door and seat removed
14        by Bill of KTP.  What does that mean?
15   A.   Passenger's side door and seat was removed
16        by Bill of Kerns Truck Parts.
17   Q.   That's talking about the passenger's side
18        seat was removed?
19   A.   Right.
20   Q.   Do we know if there was any damage to the
21        passenger's side seat in the Kenworth?
22   A.   None was mentioned.  I don't know.
23   Q.   Do we know if the passenger's side seat was

Page 119

1         knocked forward and up?
2    A.   I don't know that.
3    Q.   Would that be of any use in your analysis?
4    A.   Not that I can think of at this point.
5    Q.   Do we know if the passenger's side -- Would
6         there have been -- Was there a lap
7         belt/shoulder harness seat belt on the
8         passenger's side?
9    A.   I don't know.  I would assume there would
10        be because it's required.
11   Q.   Do you know if there were any stretch,
12        scrape or pucker marks in the passenger's
13        side seat belt?
14   A.   I would be very surprised if there was,
15        because my understanding was there wasn't a
16        passenger in the vehicle.
17   Q.   But y'all didn't -- you didn't inspect
18        that?
19   A.   They probably -- He probably took a look at
20        it, but there's no photographs, no records
21        of it.
22   Q.   No information in here as to whether or not
23        the passenger's side seat belt had any

Page 120

1         pucker or stretch?
2    A.   I think he would have certainly noted that,
3         because that would have indicated some
4         loading on that belt.  And that would have
5         given a very big question as to who was in
6         the truck with him and where did they go.
7    Q.   You don't know if he even inspected the
8         passenger's side seat belt?
9    A.   You're asking me things like do I know did
10        he brush his teeth before he left that
11        morning.  If he had seen something that was
12        noteworthy on that seat belt, he would have
13        recorded it or at least reported it
14        verbally to me, and nothing was ever said
15        about that.  When you look at a car or when
16        you inspect a vehicle, you look at many
17        things that you don't record, things that
18        are unremarkable.  You just don't record
19        them.  You record the unusual data or the
20        things that may be useful in potential
21        calculations such as weights or things like
22        that.
23   Q.   Do you know when the chassis and motor were

Page 133

1    understand. I know we spent some time on
2    the seat belt and the buckle and the reel
3    or the locking mechanism and the fabric.
4    Is there anything else about the driver's
5    seat belt system on this Kenworth truck
6    other than what we've already discussed
7    that is evidence to you that the seat belt
8    was or was not in use during this accident
9    sequence?
10   A.   Any evidence on the truck?
11   Q.   No. On the seat belt or the --
12   A.   Oh, the seat belt.
13   Q.   -- seat belt mechanism or the buckle or the
14   reel that we haven't already discussed that
15   was -- supports evidence that it -- that
16   this particular belt was either in use or
17   not in use at the time of the accident?
18   A.   I can't remember anything else. It seems
19   to me we covered everything several times.
20   Q.   And where -- Do you have an understanding
21   as to where Mr. Morris was when everything
22   came to a rest after -- you know, after the
23   whole entire accident sequence?

Page 134

1    A.   I don't right now. I suppose somebody
2    indicated that somewhere along the line,
3    but I don't know.
4    Q.   Was he still in the driver's seat of the
5    cab?
6    A.   My recollection is he was not.
7    Q.   Did you or Messerschmidt or Johnson form
8    any kind of conclusions, opinions or
9    observations as to why he was not or how he
10   got from the seat to where he was when
11   everything came to rest?
12   A.   Got hit about 70 miles an hour with a
13   40-ton truck.
14   Q.   Sitting here today, you don't know what the
15   impact speed of the Peterbilt was; correct?
16   A.   Not to within two or three miles an hour,
17   no. I'm just using the testimony of your
18   truckdriver.
19   Q.   The maximum speed of the impact would have
20   been 70 miles per hour if there was no
21   braking or deceleration of any type prior
22   to impact?
23   A.   Right. Well, that's what I've assumed from

Page 135

1    his testimony.
2    Q.   And you've done no calculation -- You've
3    done no calculation -- calculations to
4    determine the Delta-V or impact speed of
5    the Peterbilt?
6    A.   There's no way from the damage pattern to
7    do it. There's no such things as stiffness
8    coefficients for crashes on trucks. The
9    only calculation that I could do on that is
10   to know that in the vicinity of ten percent
11   of speed is lost between emergency brake
12   application and the start of brake skid
13   marks, visible skid marks. And assuming
14   that he did maximum braking and there were
15   no skid marks left, then I would assume
16   that he wouldn't be below the lower 60s at
17   impact.
18   Q.   You never saw any -- or you did not --
19   Neither you nor Messerschmidt nor Johnson
20   inspected the chassis of the Kenworth
21   tractor or the trailer that it was pulling;
22   correct?
23   A.   Yeah. A number of times we've said that

Page 136

1    all was left was the cab.
2    Q.   You don't -- Sitting here today, you don't
3    have an opinion or any information as to
4    the points of impact between the Peterbilt
5    and the Kenworth?
6    A.   All we know is somewhere in the bottom of
7    the cab.
8    Q.   Why do you know that?
9    A.   Because the floorboard is buckled up.
10   Q.   Of what floorboard?
11   A.   Of the Kenworth tractor.
12   Q.   The part of the cab that Messerschmidt
13   inspected --
14   A.   Yes.
15   Q.   -- shows some -- the floorboard? What part
16   of the floorboard?
17   A.   I didn't -- All I can do is see the same
18   things that are in the pictures. I didn't
19   see the cab itself, but ...
20   Q.   Were there any measurements taken as --
21   from back to forth -- back to front or side
22   to side to -- as to where that buckling was
23   in the floorboard?

Deposition of Edward L. Robinson

June 22, 2006

Page 137

1    A.   No. Not that I'm aware of. You have
2       measurements in the field notes section.
3    Q.   Did you or Messerschmidt or Johnson inspect
4       the Peterbilt?
5    A.   As I've mentioned several times before, it
6       was never made available to us. We did not
7       see that.
8    Q.   What do you mean?
9    A.   Neither the Peterbilt nor the tractor nor
10      the trailer nor the trailer of the
11      Kenworth.
12    Q.   When you say it was never made available,
13      did you ask to inspect the Peterbilt or the
14      trailer that it was pulling?
15    A.   I'm sure we did. I don't have a written
16      note of it, but it's routine to ask to look
17      at all of the vehicles involved in an
18      accident.
19    Q.   Who did you ask?
20    A.   It would have been Attorney Robinson.
21    Q.   Did anyone from -- Did you understand that
22      Mr. Morris' employer at the time of this
23      accident was Panther Trucking. What's

Page 138

1      the -- Do you know the full name of
2      Panther? Do you? I mean, do you know who
3      his employer was?
4    A.   I've seen the word "Panther Trucking", but
5      that's all I know about it.
6    Q.   Did --
7    A.   Panther II Transportation, Incorporated.
8      That's all I know. It's on the accident
9      report.
10    Q.   Did you ever speak to anyone with Panther
11      or anyone associated with their insurance
12      carrier?
13    A.   No.
14    Q.   Did Mr. -- Did Attorney Robinson ever speak
15      to you about Panther or anybody associated
16      with their insurance carrier?
17    A.   No.
18    Q.   Do you know who paid the -- for the
19      property damage to the Kenworth and the
20      Kenworth trailer?
21    A.   I don't know.
22    Q.   Have you spoken with anyone during your
23      investigation of this case who suggested to

Page 139

1      you that the accident was not caused by any
2      conduct of my driver, Mr. Thompson?
3         MR. PENICK: Let me object to the
4         form of the question. Could
5         you rephrase that?
6    A.   I don't remember anybody suggesting that or
7      saying that.
8    Q.   Have you spoken with anyone during your
9      work on this case who suggested that this
10      accident was caused by Mr. Morris in the --
11      in the operation of his vehicle?
12    A.   No. The only people I've talked to about
13      this case is Attorney Robinson,
14      Mr. Messerschmidt, Mr. Johnson and
15      Mr. Penick. I haven't spoken to anyone
16      else about the case.
17    Q.   Were you asked to offer an opinion as to
18      whether or not Mr. Morris' conduct and the
19      manner in which he operated his vehicle
20      contributed at all to causing this
21      accident?
22    A.   No.
23    Q.   Were you asked to offer an opinion as to

Page 140

1      whether Mr. Thompson, my client's conduct
2      contributed to causing this accident?
3    A.   Yes.
4    Q.   But you weren't asked to evaluate whether
5      Mr. Morris' conduct contributed to causing
6      this accident?
7    A.   That was the previous question.
8    Q.   Right.
9    A.   Yeah. That's -- Same answer.
10    Q.   So you don't have an opinion as to whether
11      Mr. Morris' conduct contributed to causing
12      this accident?
13         MR. PENICK: Object to the form of
14         the question.
15    A.   I haven't considered it.
16    Q.   What is -- In Defendant's Exhibit 5, what
17      is this calculation that we're looking at?
18    A.   There is the calculation of stopping
19      distances for different drag factors for a
20      vehicle going 70 miles an hour. And it's
21      calculated -- Well, the first thing I did
22      was just start off with conservation of
23      energy and get the speed and distance

Page 141

1  equations relating to speed distance,
2  coefficient of friction and gravitational
3  constant and looked at the stopping
4  distance for different drag factors; .4, .5
5  and .6.
6      The trucks that I have done
7  instrumented skid tests in that had
8  properly adjusted brakes were usually about
9  .6 for their drag factor. And using that
10 value, I made another calculation on the
11 following sheet. If we assume that the
12 perception-reaction time of Mr. Thompson is
13 two seconds in this instance and that his
14 lights will illuminate something 350 feet
15 down the road on high beam, then that says
16 that from the time he can see it and
17 perceive it and react that he's traveled
18 205 feet or he has about a 144.7 feet more
19 to go before impact.
20     So if we'd start him off at 70 miles an
21 hour and decelerate him at .6 G for a 144
22 feet -- 144.7 feet, what's his final
23 speed. And it turns out to be about 23.8,

Page 142

1   24 miles an hour. The damage to the
2  vehicle is to the -- to the Morrison (sic)
3  vehicle is very much inconsistent with that
4  kind of collision speed.
5  Q.  On Defendant's Exhibit 5, this is stopping
6      distance from what point to what point --
7  A.  Brake application to stop.
8  Q.  -- and time?
9      And with what weight?
10 A.  Doesn't matter about the weight. It's
11     independent of the weight.
12 Q.  Why is that?
13 A.  Because the frictional force is equal to
14     the weight times the coefficient of
15     friction, and so the weight cancels out.
16     If you look up in that top line, there's an
17     equation that says the one half mv squared,
18     which is the initial kinetic energy, is
19     equal to mg mu X. Mg is the mass times the
20     gravitational constant which would be the
21     weight. So it's the weight times the
22     coefficient of friction times the distance
23     to stop. Well, the mass cancels out of

Page 143

1   that equation on both sides. And then I
2  just solve for V for final speed. Well,
3  that's not what I want. I really want
4  stopping distance, so I solve for the
5  stopping distance. And that turns out to
6  be V squared over 2 G mu. Where mu is the
7  drag factor or coefficient of friction of
8  friction for locked tires.
9      So the 70 miles an hour -- of course,
10 that's to be converted to feet per seconds.
11 102 and two-thirds feet per second divided
12 by two G times mu and then plug mu in as
13 .4, .5 and .6 and get the stopping
14 distances from brake application to stop.
15 Q.  And for the comparison here or for your
16     purposes, you chose the drag factor that
17     gave you the shortest stopping distance?
18 A.  No, I didn't. I chose the drag factor that
19     I have measured personally in instrumented
20     trucks in emergency brake application.
21 Q.  When did you measure the drag factor on
22     I-85 in the vicinity of this accident?
23 A.  I didn't.

Page 144

1  Q.  You did not?
2  A.  No.
3  Q.  Did Messerschmidt or Johnson ever measure a
4      drag factor at the site of this accident?
5  A.  No.
6  Q.  Do you know that the drag factors change
7      depending upon the highway condition and
8      the surface?
9  A.  Yes, sir. I've written an essay paper on
10     it a few years ago.
11 Q.  What's the name of that paper?
12 A.  Well, let's see. What's the exact title?
13     Let me see the CV there.
14     Analysis of Accelerometer Data for Use
15     in Skid-Stop Calculations. And it's SAE
16     paper number 949108. It was incorporated
17     in the book called Accident
18     Reconstruction: Technology and Animation
19     IV.
20 Q.  What page are you on on that resume? I
21     want to make sure I'm --
22 A.  Page four.
23 Q.  Page four. All right. Give it to me

Deposition of Edward L. Robinson                                                      June 22, 2006

Page 149

1   Q.  Is it your opinion that the load -- the
2       amount of load or the weight that the
3       Peterbilt and trailer were hauling at the
4       time of this accident has no effect on the
5       stopping distance?
6   A.  If the brakes are properly adjusted and you
7       can get maximum braking, no, it wouldn't.
8       If the brakes are not fully adjusted, yes,
9       it would.
10  Q.  And if the -- if you used  -- Well, let me
11      ask you this.  Maybe I didn't understand
12      it.  How does the stopping distance
13      calculated on Defendant's Exhibit 5 fit
14      into the equation on Defendant's Exhibit 6?
15  A.  Well, I'm saying that -- It doesn't
16      really.  It just says that that stopping
17      distance is less than the -- less than the
18      distance to impact the truck, that the
19      distance I've subtracted off over here is
20      the distance that you actually travel in
21      his perception-reaction time with no
22      braking for 205 feet.  I'm just looking
23      here to see if we had wet, slick pavement

Page 150

1       and slick tires or very mild-adjusted
2       brakes and we had coefficient of friction
3       of .4.  Even if he had put on his brakes at
4       350 feet away, he couldn't have avoided the
5       collision.  He could have only slowed
6       down.
7           If we had had a .5 and he can see 350
8       feet and he put on his brakes at 350 feet,
9       he could have stopped.  But he's got to
10      have time to respond to perceive and to
11      react.  And so really this -- this is
12      independent of that.  It's just that I'm
13      seeing what are the stopping distances for
14      coefficient of friction.  Over here I'm
15      looking and saying, okay, if he can see 350
16      feet ahead of him and he sees the truck,
17      then he's got to realize that that presents
18      a hazard and move his foot from the
19      accelerator to the brake and that takes him
20      two seconds, then he's traveled 144 feet.
21      So he then has the remainder of -- I'm
22      sorry.  He's traveled 205 feet.  So that
23      leaves him another 144.7 feet for braking.

Page 151

1       Well, he's still going to hit the truck,
2       but he's going to be going slower when he
3       hits the truck.  If he brakes for 144.7
4       feet and he starts off braking at 70 miles
5       an hour, then he's going to be going in the
6       low 20s when he impacts.
7   Q.  By your calculations -- If I'm
8       understanding you correctly, by your
9       calculations in Defendant's Exhibit 5 and
10      Defendant's Exhibit 6 assuming optimum
11      conditions of braking efficiency and
12      perception-reaction, the Peterbilt is still
13      going to hit the Kenworth at 23 miles an
14      hour?
15  A.  Right.  If he doesn't steer off the main
16      part of the road onto the shoulder.
17  Q.  Right.  So there's no way to avoid --
18      There's no way that Mr. Thompson could have
19      avoided this collision?
20          MR. PENICK:  Object to the form of
21              the question.
22  Q.  Correct?
23  A.  No.  That's incorrect.  One, at that speed

Page 152

1       he should have been able to steer off.
2       And, two, if the coefficient -- If the
3       braking efficiency is a little higher or he
4       reacts a little faster, he can still manage
5       to stop in time to not hit the truck.
6   Q.  How's he going to do that?  Show me -- Show
7       me your calculation where he avoids --
8       where he's able to stop?
9           No.  The one you've already done.
10  A.  Oh, it's not in there.
11  Q.  You haven't done a calculation?
12  A.  I told you I had done a number of
13      calculations and that this was one example
14      of the calculations.  And if you want me to
15      do a calculation to see what would be
16      involved if he stops, I can do this.  It's
17      not on this page right here.
18  Q.  Have you done a calculation using -- What
19      would his speed be -- What would the speed
20      at impact be if you used the .5 drag factor
21      on Defendant's Exhibit 5?
22  A.  Do you want me to calculate it?
23  Q.  Please.

Deposition of Edward L. Robinson                                          June 22, 2006

Page 153

```
 1    A.  Okay.
 2            I think I've got an error in that
 3        calculation.  It's higher speed than that.
 4        It's 48 miles an hour at .6 for 144.7.  For
 5        .5, it would be 52.
 6    Q.  And what about for .6 -- I mean for .4?
 7    A.  Well, that's not an applicable case on
 8        rainy slick tires and so forth.  But if you
 9        use a .4 times -- It would be 56.
10    Q.  So it -- At best using your calculation
11        with a .6 drag factor, the Peterbilt would
12        have still hit the Kenworth at 48 miles an
13        hour?
14            MR. PENICK:  Object to the form of
15                the question.  He said it
16                would be traveling at that
17                speed when he got to the
18                Kenworth, not that it would
19                hit the Kenworth.
20            THE WITNESS:  Right.
21    Q.  But it still impacts at 48 miles an hour?
22            MR. PENICK:  Object to the form of
23                the question.  He didn't say
```

Page 154

```
 1            that.
 2    A.  If he doesn't steer away.  Certainly if
 3        he --
 4    Q.  Where -- All right.  Where would you have
 5        suggested a couple seconds of
 6        perception-reaction time at 3 a.m. in the
 7        morning on September 2, 2004 -- where would
 8        you have suggested Mr. Thompson steer his
 9        vehicle to avoid this accident?
10    A.  Onto the shoulder.
11    Q.  Which way, right or left?
12    A.  Right.
13    Q.  And how --
14    A.  Because the trailer is on the left.
15    Q.  And do you know what's over there on the
16        right side of that highway?
17    A.  I believe we do.  All I see in that
18        vicinity is a paved shoulder.
19    Q.  How many seconds did it take you to find
20        that information?
21    A.  I didn't time it.
22    Q.  Well, I did.  Would you know it took you 15
23        seconds to find out that there was a paved
```

Page 155

```
 1        shoulder over there on the right side of
 2        I-85?
 3            MR. PENICK:  I'm going to object
 4                to the form of the question.
 5    A.  Might well have taken me two or three --
 6        Well, it might have taken me an hour if I
 7        had gone back to the computer and pulled
 8        that file down again.
 9    Q.  Do you know how far the drop-off is from
10        that shoulder down to the bottom of the
11        ravine over on that side of the road?
12            MR. PENICK:  Objection to the
13                assumption that there's a
14                ravine on that side of the
15                road.
16    A.  I don't see one.
17    Q.  It's your testimony that there's no
18        drop-off --
19    A.  No, I'm not.
20    Q.  -- on that side of the road?
21    A.  I'm saying I don't see a ravine in that
22        area of the road in the aerial photograph.
23    Q.  But that's going to be your testimony to
```

Page 156

```
 1        the jury, that with the time and the
 2        situation facing Mr. Thompson he should
 3        have driven his eighteen-wheeler with
 4        transformers on the back of it off the side
 5        of that highway?
 6    A.  Onto the shoulder, yeah.
 7    Q.  Did you -- Have you given that opinion
 8        before today?
 9    A.  No.  Nobody has asked me where would he
10        steer before today.
11    Q.  If he's trying to stop his vehicle in the
12        highway, the best he can do according to
13        your calculations is hit that Kenworth at
14        48 miles an hour; correct?
15            MR. PENICK:  Objection to the form
16                of the question.
17    A.  No, that's not correct.  As we've said,
18        these are -- this is one example of the
19        calculations.  If he had responded quicker
20        or if he could see further, then that speed
21        would be lower.
22    Q.  The -- And the speed is higher at a .4 drag
23        factor.  And what's the maximum speed that
```

Deposition of Edward L. Robinson                                              June 22, 2006

Page 169

1    would be imprudent not to have them on the
2    high beam.
3    Q.  Do you know if Mr. Thompson was meeting
4       traffic coming from the opposite direction
5       at or about the time of this accident?
6    A.  If he had, he would have seen the truck
7       outlined in front of him.
8    Q.  How do you know that?
9    A.  Because if there's a car coming to meet him
10      and the truck is across the road and he's
11      here, he's going to see that truck
12      outlined.
13   Q.  How do you know where the truck was in
14      relationship to the oncoming -- to any
15      oncoming traffic?
16   A.  Well, I don't know where --
17   Q.  You're just speculating; right?
18   A.  I don't know --
19       MR. PENICK:  I object to the
20          question.  Because the
21          question speculates that
22          oncoming traffic was coming.
23       MR. BROUGHTON:  Well, aren't we

Page 170

1       all speculating.
2    Q.  You have no idea --
3        MR. PENICK:  But you can't object
4           to him speculating if the
5           question is speculating.
6    Q.  Let me ask you this.  Did you or
7       Mr. Messerschmidt make any tests or
8       examinations of the -- any of the bulbs in
9       the headlights of the Peterbilt to
10      determine if the high beams or the low
11      beams were illuminated at the time of this
12      accident?
13   A.  The headlights didn't survive according to
14      the photographs I've seen of the
15      Peterbilt.  We did not examine the
16      Peterbilt.
17   Q.  Did you or Mr. Messerschmidt ever examine
18      the headlights or taillights or running
19      lights on the Kenworth to determine if any
20      of those lights were illuminated at any
21      point?
22   A.  None of those lights were there at the
23      cab.  There were no lights that survived

Page 171

1       the scrapping of the materials.  So we
2       haven't seen any lights of any truck.
3    Q.  I thought I saw some light bulbs in your
4       photographs?
5    A.  I don't know where those came from.  There
6       may be some bulbs in there.  Perhaps you
7       saw some in the vicinity of the truck.
8        MR. PENICK:  The question is
9           speaking of headlights and
10          running lights; right?
11       MR. BROUGHTON:  Headlights,
12          running lights or taillights.
13   A.  I see a picture of two bulbs that are
14      coated inside with tungsten.  And I see a
15      single bulb in a container, so I suppose I
16      misspoke when I said none of the bulbs
17      survived.
18   Q.  Do you have any idea where those bulbs came
19      from?
20   A.  No, I don't.
21   Q.  Did those bulbs or the examination of those
22      bulbs have anything to do with any of your
23      opinions in your case?

Page 172

1    A.  No.
2    Q.  Did you find -- You don't have any physical
3       evidence to verify that any of the --
4    A.  This would be the headliner bulbs, the --
5    Q.  Interior bulbs --
6    A.  Yeah.
7    Q.  -- to the cab?
8    A.  Yeah.
9    Q.  So that doesn't have anything to do with
10      anything that could have been seen by
11      Mr. Thompson as he approached that
12      vehicle?
13   A.  No.  And I wouldn't expect those to be on
14      at the time of the accident.  They're
15      interior bulbs.
16   Q.  You don't have any physical evidence to
17      establish that any of the lights,
18      headlights, taillights, running lights,
19      were on the Kenworth tractor or trailer
20      at -- after the rollover and at the time
21      Mr. Thompson approached in his vehicle?
22   A.  I don't have the bulbs.  And if I had the
23      bulbs, it wouldn't -- it wouldn't show you

Page 173

1    that they were on. Because unless the
2    impact is very near the bulb, you don't get
3    hot set.
4    Q.    So you don't have any evidence to --
5    A.    I don't have any evidence.
6    Q.    -- to prove any of those lights were on --
7    A.    No.
8    Q.    -- at the time Mr. Thompson approached?
9    A.    No.
10   Q.    You don't have any physical evidence that
11         even had they been on -- had any of those
12         headlights, taillights, running lights on
13         the Kenworth been on that they would have
14         been visible to Mr. Thompson approaching in
15         that Peterbilt?
16   A.    I don't have any physical evidence of it,
17         no.
18   Q.    The running lights -- We can agree, can't
19         we, that the running lights, if any, that
20         were illuminated by bulbs or light bulbs on
21         the left side of the tractor or the trailer
22         would have been down on the ground between
23         the ground and the tractor and trailer;

Page 174

1    right?
2    A.    Right.
3    Q.    Those would not have been visible to
4         Mr. Thompson; correct?
5    A.    Not likely.
6    Q.    The -- Any running lights on the topside --
7         I mean on the right side of the tractor and
8         the trailer after it rolled over had they
9         been on would have been -- would not have
10        been visible by Mr. Thompson as he
11        approached? They would have been vertical;
12        correct?
13   A.    Well, they would be up eight feet off the
14        ground. For a trailer in the usual
15        driver's eye height in a cab is about nine
16        and a half feet. So he would have been
17        on -- slightly above eye level of the
18        trailer marker lights. And the trailer end
19        that's lower in the median, he would have
20        been several -- two or three feet higher.
21        Those lights he probably could have seen.
22   Q.    Have you done -- Have you done any tests or
23        studies with exemplars to determine whether

Page 175

1    that's the case, whether any of those
2    lights would have been visible on the side
3    of the Kenworth?
4    A.    Yeah. If -- Those are measurement
5         distances I've done on a lot of trucks.
6         And that's a typical eye height of a driver
7         in a cab of a truck, eighteen-wheeler. And
8         eight feet is a typical width or, I don't
9         know, maybe they make some nine feet now.
10        But eight or nine feet width of the trailer
11        with the lower end of the trailer down in
12        the median, it would have been below his
13        eye height or the upper one at his eye
14        height.
15   Q.    And then you did a test or a study of an
16        exemplar vehicle in this case?
17   A.    No.
18   Q.    You've never inspected the trailer that the
19        Kenworth was pulling at the time of the
20        accident; right?
21   A.    I'm -- We've said that about 15 times. No,
22        sir, I did not inspect the trailer of the
23        Kenworth, the Peterbilt nor the Peterbilt

Page 176

1    tractor nor anything except the remaining
2    cab of the Kenworth.
3    Q.    Doesn't that limit your ability to give any
4         opinions in this case, Mr. Robinson?
5    A.    If you -- You are asking me about could he
6         see it. I'm telling you that the geometry
7         of his line of sight is that he could have
8         had a line of sight to those bulbs. No, if
9         he's looking somewhere else he wouldn't
10        have seen those bulbs. If he's
11        inattentive, he wouldn't have seen those
12        bulbs.
13   Q.    Doesn't the fact that you have not had an
14        opportunity to inspect the Kenworth
15        tractor, chassis, trailer or the Peterbilt,
16        anything on the Peterbilt -- doesn't that
17        severely hamper your ability to render any
18        opinions in this case?
19   A.    It would be more favorable if I could have
20        seen them, yes.
21   Q.    I mean, this is not your typical
22        investigation and assimilation of evidence
23        to support any expert opinions in the cases

Deposition of Edward L. Robinson                                    June 22, 2006

---

Page 177

1    you normally handle, is it?
2         MR. PENICK:  Object to the form of
3         the question.
4    A.  We've had remains of vehicles to examine on
5    a number of occasions before, yeah.  We
6    don't have the whole vehicles.  Many times
7    we don't have the adverse vehicle.
8    Q.  You don't really believe that any of these
9    opinions you've written down in this case
10   are to any degree of reasonable accident
11   reconstruction certainty, do you?
12   A.  Yes, I do.  I wouldn't have submitted if I
13   hadn't.
14   Q.  Well, you don't believe that you've done a
15   complete investigation and examination of
16   the vehicles that would be required -- or
17   any of the site or the evidence that would
18   normally be required to render any opinions
19   of that type, do you?
20        MR. PENICK:  Object to the form of
21        the question.
22   A.  I'm sorry.
23        MR. PENICK:  It assumes facts.

---

Page 178

1    A.  I'm sorry.  I disagree with that.  We have
2    examined all that was available to us to
3    examine.  I did not go to the site.  I did
4    not see the vehicle.  It was our intention
5    that Mr. Messerschmidt would do the
6    testimony, so he went to the site and the
7    vehicle.
8    Q.  So it's your normal practice even if you
9    don't have the opportunity to do the
10   investigation required to support opinions
11   to give opinions anyway?
12   A.  Not at all.  I think that I can support the
13   opinions that I've given.  And I'm agreeing
14   that there are some things that we can't
15   say.  We can't say anything about the
16   Peterbilt headlights.  They're gone.  But I
17   would assume that his lights were on when
18   he was going down the road or he would have
19   stopped driving.
20   Q.  But you can't say whether any of the lights
21   were on that Kenworth, the tractor or the
22   trailer after the rollover, can you?
23   A.  I don't have the bulbs to -- Well, no, I

---

Page 179

1    can't.  No, I can't.
2    Q.  Did you ever talk with or interview
3    directly or by telephone -- and by you I'm
4    including Mr. Messerschmidt and
5    Mr. Johnson -- either of the troopers
6    involved in investigating this accident?
7    A.  I'm not aware that they did.  I did not.
8    Q.  Did you ever question or inquire about any
9    of the information reported on the Alabama
10   Uniform Accident Report that you reviewed
11   at part of your work in this case?
12   A.  I don't recall asking any questions about
13   it, no.
14   Q.  Was there anything in the Alabama Uniform
15   Accident Report that you found to be
16   inaccurate?
17   A.  I don't recall anything.
18   Q.  You've got in your book as something you
19   relied on your review of the -- that
20   accident report in this case, didn't you?
21   A.  Yeah.  There's no -- Where it happened.
22   Q.  All I would like to do -- All I would like
23   to do -- And this is the copy that we have

---

Page 180

1    and I'm willing to use our copy.  Excuse me
2    for this.  I'm going mark this as
3    Exhibit --
4         MR. BROUGHTON:  And, Henry, if
5         I've got -- which I know I
6         do.  I'm going to ask the
7         court reporter to take off any
8         highlighting on my copy.  If
9         you've got a clean copy, we
10        can use that.  I mean, there
11        are just a couple of little
12        highlight marks.  But I want
13        to mark this as Defendant's
14        Exhibit 8.  We can use -- If
15        you've got a clean copy, could
16        we use your clean copy and get
17        you a copy back?
18        MR. PENICK:  There's a copy in the
19        stack there.
20        MR. BROUGHTON:  Oh, let's use
21        that.  There you go.
22        MR. BRITTAIN:  Just, you know,
23        make a note that this is in

---

Page 201

1    locate or ever inspect the switch -- the
2    dashboard switches in the Kenworth to
3    determine what position they were in at the
4    time of this accident?
5  A.  The discussion I recall on that was that
6    that wasn't given any credibility, because
7    the cab had been handled and a lot of
8    people had been around the cab. The switch
9    may have been turned from off to on or off
10   to on. And I don't recall what position if
11   he recorded it that Messerschmidt said that
12   the switch was in.
13 Q.  Do you know what kind of switch it was?
14 A.  A truck light switch.
15 Q.  I'm not familiar with Kenworth's, but I
16   know I've had vehicle -- car vehicles
17   sometimes where the light is on the -- what
18   usually is a windshield wiper arm.
19   Sometimes you have to pull the lights on
20   and off. Sometimes they're automatic.
21   Sometimes when -- you know, where you have
22   to turn the lights on and off. Do you have
23   any idea which switch was involved in this

Page 202

1    case?
2  A.  No, I don't.
3  Q.  And we don't know whether at the time of
4    the -- that the Peterbilt was approaching
5    that Kenworth whether that -- whether the
6    light switch was on or off?
7  A.  No.
8  Q.  And nobody was able to test the Kenworth
9    tractor cab after this accident to
10   determine if any of those electrical
11   systems were still operative after the
12   impact?
13 A.  Well, not after the impact. They were
14   destroyed in the impact. And, again, I
15   think we've been over that two or three
16   times, that nobody examined the electrical
17   system.
18 Q.  Don't know whether it was damaged during
19   the rollover?
20 A.  That's the same answer.
21 Q.  The -- Do -- Did Messerschmidt or you or
22   Johnson -- I guess this could be any one of
23   the three of you -- ever match any of the

Page 203

1    marks in the median that Messerschmidt and
2    Johnson found on their site inspection with
3    any of the tires or parts of the Kenworth
4    vehicle?
5  A.  You mean specifically which tire made which
6    mark?
7  Q.  Or which part of the vehicle made which
8    mark.
9  A.  I don't recall that that was done.
10 Q.  And, in fact, in reality you don't know --
11   you don't know at what point that the
12   trailer started rolling or at what point
13   the tractor -- Kenworth tractor started
14   rolling over to its left side?
15 A.  No.
16 Q.  And you don't know how far the Kenworth
17   tractor chassis or trailer moved after the
18   impact with the -- from the Peterbilt?
19 A.  No.
20 Q.  Did the-- Were there any markings on the
21   pavement when -- you know, from any part of
22   this accident sequence when Messerschmidt
23   and Johnson made their site inspection in

Page 204

1    late February of '05?
2  A.  That's the map.
3  Q.  All right. The map -- Yeah. The map
4    you've produced we've got -- I'm going
5    to -- We've got two copies of that. The
6    first -- Is this the one that you just
7    produced?
8  A.  Yes, it is.
9  Q.  And that's exactly like -- And that's the
10   final map that you used to support any of
11   your opinions in this case?
12 A.  Yes.
13 Q.  And we're going to mark that as Defendant's
14   Exhibit 9.
15     (Defendant's Exhibit 9 was marked
16     for identification.)
17     (Off-the-Record discussion.)
18 Q.  Do you know when this particular version of
19   this map was completed?
20 A.  Well, the --
21 Q.  The date?
22 A.  The site map was done at the date I told
23   you before, which was February 23, '05.

Page 205

1    When it was actually rendered onto paper
2    was a couple of days later. As far as I
3    know, it was the next day. When this
4    specific copy was made, I don't know.
5    There's no way to tell this.
6  Q.  Well, there were -- there were earlier
7    versions or drafts of this map; correct?
8  A.  No. There are other maps that -- One shows
9    typical headlight pattern.
10  Q.  That's the one I want to look at.
11  A.  And there's one that doesn't show the
12    trucks at all. It just shows the marks on
13    the road and then the road.
14  Q.  I understand. This -- The one that --
15  A.  This is another one that shows just the
16    road and the markings.
17  Q.  Right.
18    Show me the one that's got the
19    headlight positions of the Kenworth.
20  A.  Well, we don't know what the Kenworth's
21    tractor position was. But the
22    representations of what the headlight
23    pattern might have been for different

Page 206

1    positions of the tractor are shown in, I
2    think, that map you're holding.
3  Q.  This is the one I want to look at. I want
4    to mark this one, but I'd rather mark your
5    copy because it's in color. I don't have a
6    copy that's in color. And we can -- Our
7    court reporter will get you your original
8    back if you need it, but she can, I think,
9    copy these in color.
10    MR. BROUGHTON: Can't you?
11    COURT REPORTER: Yes.
12  Q.  So that we'll all have a color copy. Henry
13    may have a color copy, but I don't. It's
14    this one right here. That's it. I'm
15    marking Exhibit 10.
16    (Defendant's Exhibit 10 was marked
17    for identification.)
18  Q.  This was one of the maps. Was this map
19    done -- Do you know -- Do you show what
20    date that map was done?
21  A.  No, it doesn't show.
22  Q.  Was it before or after the one we marked as
23    Defendant's Exhibit 9?

Page 207

1  A.  I don't know.
2  Q.  Who prepared this?
3  A.  Gary Johnson.
4  Q.  And only Gary?
5  A.  Yes.
6  Q.  Was he the only one that had any input on
7    this map?
8  A.  He's the one that used the CAD program to
9    download the data from the total station
10    and complete the map from that data.
11  Q.  All right. And on Defendant's Exhibit --
12    Gary Johnson was at the site; right? He
13    actually did a site inspection; correct?
14  A.  It takes two people in most cases to do a
15    mapping of the site. We have a total
16    station that will measure with laser
17    sighting to points on the highway up to
18    about 600 feet. But once you get beyond
19    that, you have to have a reflector coil.
20    And if the curvature of the road obscures
21    the points you want to measure, you've got
22    to have a second man there, so we always
23    send at least two guys to do a site map.

Page 208

1  Q.  Did Gary Johnson make an effort to put the
2    information on Defendant's Exhibit 10 as
3    accurately as possible based on what he had
4    to work with?
5  A.  Yes, sir. The measured points that are
6    used to delineate road edges and fog line
7    marks and that sort of thing -- the total
8    station measures those to within a small
9    fraction of an inch.
10  Q.  On this particular Defendant's Exhibit 10,
11    there's a -- there's a line in green in the
12    middle of the page above the scale. At the
13    bottom of the page, it says headlight
14    illumination 250 feet, MacInnis SAE.
15  A.  That's low beam.
16  Q.  Did you participate -- Did you help
17    Mr. Johnson obtain that bit of data?
18  A.  No, I didn't.
19  Q.  But your opinion is that's low beam?
20  A.  Yes.
21  Q.  Do you know why Mr. Johnson used low beam?
22  A.  I don't know.
23  Q.  Do you know if he's referring to the

Page 209

1      headlights on the Kenworth or on the
2      Peterbilt?
3   A.   Neither one.
4   Q.   The next line underneath there says PRT
5      distance. What's PRT distance?
6   A.   Perception-reaction time.
7   Q.   All right. He used 153 feet and one and a
8      half seconds.
9   A.   Okay.
10   Q.   Do you know why he used that information?
11   A.   No. That's a typical default value for
12      perception-reaction time.
13   Q.   Did you consult with him on that?
14   A.   I don't recall doing so.
15   Q.   Do you know why he was putting the
16      headlight illumination in this
17      perception-reaction distance on this
18      particular map?
19   A.   No, I don't.
20   Q.   The next line says stopping distance, .5
21      drag, 70 miles per hour, 326 feet.
22   A.   Right.
23   Q.   Did I state that correctly?

Page 210

1   A.   Yeah.
2   Q.   And that's something that you or Gary
3      Johnson put on that map?
4   A.   He put it on the map. I'm sure he
5      calculated it. That's -- I think that's
6      the figure I got a while ago for the skid
7      distance, wasn't it, for 70 miles an hour
8      at .5?
9   Q.   Do you know why he used .5?
10   A.   That's within the range of trucks. If
11      they've got a wheel or two out of
12      adjustment, then it's lower than .5.
13   Q.   Do you know why he used -- Do you know why
14      he used .5 on this particular case?
15   A.   No, I don't.
16   Q.   But .5 is certainly reasonable and
17      acceptable?
18   A.   It is. You find that on a lot of trucks,
19      because they don't all keep their brake
20      adjustment within specifications all the
21      time.
22   Q.   And at the .5 drag factor that we
23      calculated before with the high beams on

Page 211

1      and illuminating 350 feet as you have
2      assumed they would, the impact speed of the
3      Peterbilt and the Kenworth would have been
4      fifty -- something in the 52 mile an hour
5      range; correct?
6   A.   Yes.
7   Q.   And without going through the calculations,
8      if the headlight illumination on the
9      Peterbilt is less than 350 or if he had his
10      low beams on and it gets even down in the
11      250 range, we can only assume that the
12      impact speed is going to be even higher?
13   A.   Yeah. If we assume his brakes are out of
14      adjustment, it's going to be even higher
15      than that.
16   Q.   Even doing -- Even with Mr. Thompson doing
17      everything a reasonable truckdriver would
18      do at the time of this accident?
19      MR. PENICK: Object to the form of
20      the question.
21   A.   We've been through that before. Yes, that
22      is correct.
23   Q.   All right. Now, on this map, is there any

Page 212

1      part of this depiction on Defendant's
2      Exhibit 10 --
3      MR. PENICK: Well, let me object
4      to -- add to my objection on
5      that last question, because it
6      presupposes an impact. And
7      the calculation was what would
8      be the speed at the time he
9      reached the point where the
10      truck was, not whether or not
11      it would actually impact with
12      the truck --
13   Q.   On Defendant's --
14      MR. PENICK: -- the Kenworth.
15   Q.   On Defendant's Exhibit 10, is there
16      anything on there that in your opinion
17      Mr. Johnson has depicted inaccurately or
18      incorrectly?
19   A.   No. 1.5 is an accepted part of the range
20      of perception-reaction time. .5 is within
21      what we observe on trucks actually on the
22      road, as well as .6, below .5 for wet
23      roads.

Deposition of Edward L. Robinson

June 22, 2006

Page 213

1    Q.  Do you know the distance from the
2       windshield of the Kenworth to the front
3       bumper of the Kenworth?
4    A.  I don't recall that number, but it's
5       probably somewhere in the literature. I
6       don't see a vehicle data. I thought we had
7       a vehicle data section that gave
8       the published truck data. I don't see it
9       right now. It's -- a digital truck index
10      would normally pull that up and put it in
11      the file.
12   Q.  Eight to ten feet?
13   A.  From the windshield to the front of the
14      truck?
15   Q.  To the front bumper.
16   A.  In that ballpark.
17       Oh, here's what I'm looking for.
18   Q.  What section was that in?
19   A.  I don't know. It's in here somewhere. But
20      it's a copy of the Kenworth model T600.
21      Distance from the front axle to the front
22      bumper, 46 inches; to the back of the cab
23      from the front axle, 74 inches. All we

Page 214

1      could do is sort of scale it. It doesn't
2      give that particular dimension. And I
3      don't know how authentic that drawing is
4      from a scale of factors other than the ones
5      they give. It looks like it's just over
6      about five feet, about five feet two inches
7      from the front of the hood to the base of
8      the windshield.
9   Q.  All right. And the -- Do you know what the
10     terrain looked like off the right side of
11     I-85 going north towards Atlanta at the
12     point where the Kenworth rolled over?
13   A.  All I have is the aerial photographs. I
14     can see the shoulder -- paved shoulder of
15     the road. I don't see in that
16     photograph -- Okay.
17   Q.  If the Kenworth headlights were on, do you
18     know what they -- after the rollover, do
19     you know what, if anything, they would have
20     illuminated out in that direction?
21   A.  Well, the trees and bushes and such.
22   Q.  Do you know if there were any trees and
23     bushes and such in the direction that the

Page 215

1      headlights were pointed?
2   A.  I don't know exactly where the headlights
3      were pointed or exactly where along in
4      these photographs the general point of rest
5      was, so I -- I don't know whether there
6      were trees or bushes out there. All I know
7      is the embankments that are there.
8   Q.  Does Defendant's Exhibit 10 show three
9      possible -- show three possible
10     configurations of the Kenworth cab after
11     the rollover?
12   A.  Yes.
13   Q.  You just don't know what terrain, if any,
14     there was, bushes, trees and such out in
15     front of any of those headlight positions?
16   A.  I haven't attempted to locate that point
17     with respect to these pictures.
18   Q.  Right. The drawing -- I know it's not --
19     Y'all were not able to tell the precise
20     final resting place of the Kenworth and the
21     trailer after the rollover. But the
22     depiction in Defendant's Exhibit 10 that
23     Mr. Johnson did at your direction shows the

Page 216

1      cab of the Kenworth from the windshield out
2      to the bumper over the right fog line,
3      correct, in one of those depictions?
4   A.  Yes.
5   Q.  So that would have put the front of the
6      Kenworth five or six feet out into that
7      right shoulder; correct?
8   A.  That's true.
9   Q.  And isn't it fair -- And I'm just talking
10     about being fair and reasonable. Isn't it
11     fair and reasonable that a driver in this
12     Peterbilt at 70 miles per hour in the dark
13     of night under these circumstances would
14     not be held to a decision to steer his
15     vehicle off the right side of that highway
16     as you earlier had testified you thought he
17     should have done?
18   A.  Well, as you've hypothesized in so many
19     questions, we don't know that that's the
20     exact position before impact, so I don't
21     know that that's -- that that was blocking
22     the shoulder.
23   Q.  And we don't know that the Kenworth wasn't

54 (Pages 213 to 216)

Deposition of Edward L. Robinson                                           June 22, 2006

Page 217

1    blocking more of the shoulder, do we?
2  A.  No.
3  Q.  And you and your people have had months to
4      study that situation and even map it with
5      computers and still couldn't decide whether
6      there's enough room over there on that
7      shoulder for an eighteen-wheeler to get
8      by.  And you're expecting Mr. Thompson to
9      make that decision in, what, one and a half
10     seconds?
11           MR. PENICK:  Let me object to the
12                 form of the question.  He
13                 didn't say there wasn't enough
14                 room to get by.  The question
15                 assumes facts not in
16                 evidence.
17  Q.  My question is, you had -- you and your
18     associates using computers had two and a
19     half months to try to determine the final
20     resting place and location of that
21     Kenworth.  Mr. Thompson had one and half
22     seconds.  Do you think it's fair and
23     reasonable to put the burden on him of

Page 218

1      driving his -- steering his vehicle off the
2      side -- right side of that highway at 70
3      miles per hour?
4            MR. PENICK:  Object to the form of
5                 the question.  Assumes facts
6                 in evidence that he was still
7                 going 70 miles an hour when he
8                 got to the vehicle -- to the
9                 Kenworth.
10 Q.  Do you have an answer to my question, or
11     can you answer my question?
12 A.  Well, your question assumes that the truck
13     on its side was blocking the shoulder.  If
14     that's the case, no.  But we don't know
15     that that's the case.
16 Q.  And what's -- what's a reasonable
17     truckdriver at 70 miles an hour with one
18     and a half seconds of perception-reaction
19     time -- what kind of bar do you set for him
20     to make those decisions?
21 A.  Well, I think a truckdriver is obligated to
22     be more alert than a passenger car driver
23     and that he should have been able to

Page 219

1      perceive there's something in the road at a
2      distance far enough to slow down to keep
3      this from being an accident of that
4      severity.
5  Q.  You don't really believe that he should
6      have steered his vehicle off the right side
7      of the highway at 70 miles an hour, do you?
8            MR. PENICK:  Object to the form of
9                 the question.  Assuming that
10                he would be traveling 70 miles
11                an hour when he got to the
12                Kenworth.  And the testimony
13                has been that he would not.
14                If he had applied his brakes,
15                he wouldn't have been going 70
16                miles an hour.
17 A.  I've already answered your questions.
18 Q.  At what speed, in your opinion, would it
19     have been reasonable for him to drive his
20     eighteen-wheeler off that I-85 in the
21     middle of the night without knowing what's
22     over there?
23 A.  He's got headlights, hasn't he, or does he

Page 220

1      have them off?  I can't answer that
2      question.  I don't know what his -- You
3      know, just to pull a number out of the hat,
4      I don't know.
5  Q.  Is there such a thing as a minimum legal
6      braking deceleration rate for
7      tractor-trailers?
8  A.  There is.
9  Q.  What is that?
10 A.  I don't recall.  It's in the federal
11     regulations.
12 Q.  If -- At that minimum legal braking
13     deceleration rate, would a tractor-trailer
14     rig leave skid marks?
15 A.  No.  It wouldn't have the brakes adjusted
16     enough to do that.  And to get to a value
17     that low, the pushrod travel on several of
18     the brakes would have to be in excess of
19     out-of-service criteria.
20 Q.  And, again, you have no information on that
21     because you didn't have -- you have not
22     inspected the Peterbilt or its trailer?
23 A.  No.  I know basically that the minimum

Deposition of Edward L. Robinson                                              June 22, 2006

Page 225

1    times of an oncoming truckdriver; correct?
2         MR. PENICK:  Asked and answered.
3         He said --
4    Q.  Correct?
5         MR. PENICK:  -- your driver didn't
6              say anything about dust being
7              kicked up, so he assumed that
8              it wasn't.
9    Q.  You haven't talked to my driver, have you?
10        MR. PENICK:  In his affidavit he
11             said it.
12   A.  No, I haven't.  I read his affidavit, but I
13        haven't talked to him.
14   Q.  Well, would that change your opinions?
15        Would it change your opinions if dust was
16        kicked up to some extent by that Kenworth
17        either going through the median or coming
18        back up onto the surface?
19   A.  And it's still there when the Peterbilt
20        gets there?
21   Q.  Yes.
22   A.  Yeah.  I think the Peterbilt driver would
23        be very foolish not to say something is

Page 226

1    going on with dust in the road and start
2    slowing down and looking for what's causing
3    that dust.
4    Q.  So it would affect your opinions?  Is
5    that --
6    A.  Yeah.
7    Q.  Would that mean you're going to have to
8    reformulate all of your opinions in this
9    case if you get some additional facts?
10   A.  No.  Well, if additional facts come in, but
11        that's certainly not a fact.  That's just
12        another speculation.
13   Q.  Well, you're speculating that there was no
14        dust kicked up by the --
15   A.  I assume that there was not a significant
16        amount of dust kicked up.  The Peterbilt
17        driver should have noticed that and would
18        have, I think, under reasonable
19        circumstances --
20   Q.  At a certain point --
21   A.  -- said something about it in his
22        statement.
23   Q.  Well, he could have mis -- he could have

Page 227

1    misidentified any cloud as being fog;
2    correct?
3    A.  Not a cloud of dust.  He could have
4        misidentified that truck as being something
5        in the road, which apparently he did.  He
6        didn't stop for it.
7    Q.  You're saying under certain conditions that
8        the dust -- a dust kicked up cannot give
9        the appearance of going through a wisp of
10       fog?
11   A.  I haven't seen any like that, no.
12   Q.  Have you ever driven an eighteen-wheeler?
13   A.  Yeah.
14   Q.  Have you ever driven behind an
15       eighteen-wheeler that went through the
16       median like Mr. Morris did?
17   A.  No, I don't believe I have.
18   Q.  And you've never seen a dust cloud kicked
19       up by an eighteen-wheeler?
20   A.  I have.
21   Q.  At night?
22   A.  I probably have.  Not as a driver behind --
23       Not in a -- Not driving an

Page 228

1    eighteen-wheeler, but I've seen them kick
2    up dust clouds running off the road.
3    Q.  Is there any test data or literature data
4        or studies or reports that you're aware of
5        on this type condition about the
6        perception-reaction time of a -- of an
7        approaching truck or automobile driver to a
8        vehicle overturned in front of them with
9        just the bottom facing oncoming traffic?
10   A.  I don't know of any.
11   Q.  So we really don't know how difficult that
12       would be to perceive and react to by
13       anybody's study or reported studies?
14   A.  I don't know of any test data.
15   Q.  The -- We talked about, I think, the
16       running lights and the headlights and the
17       taillights.  Have you done any testing or
18       studying or are you familiar with any
19       literature that would support an opinion
20       that any of the non-illuminated reflectors
21       or reflector tape on that Kenworth would
22       have been visible to Mr. Thompson as he
23       approached?



Page 229

1  MR. PENICK: Are you asking about
2  nonreflecting tape or
3  reflecting tape?
4  MR. BROUGHTON: No. No.
5  A.  The light lenses?
6  Q.  Yeah. There's some -- Aren't there some --
7  Aren't there some reflectors --
8  A.  There are reflectors --
9  Q.  -- used that don't -- And I don't know if
10  they were on this truck or not. You don't
11  either, because you didn't get a chance to
12  look at it. I understand that. But
13  there -- Some trucks have reflector tape.
14  Some trucks have as I understand it glass
15  reflectors that don't have a light bulb
16  illuminating. Am I wrong about that?
17  A.  I don't know. I'm aware that they need --
18  they're required by the federal regulations
19  to have a marker light at the front rear
20  corners and midway on the trailer. And
21  normally those little lights extend an inch
22  or so above the surface of the trailer.
23  They are highly reflective even if the

Page 230

1  lights aren't on.
2  One of the tricks I use or techniques I
3  use to locate and identify those lights in
4  broad daylight is the use of a flash. If
5  you use a flashgun, it looks like those
6  lights are spotlights shining back at you.
7  So they do reflect a lot of light when you
8  shine a light on them.
9  Q.  What does the bottom of one of those look
10  like eight feet up in the air after a
11  vehicle has overturned?
12  A.  Well, it's not eight feet up in the air to
13  the driver of the Peterbilt, because he's
14  nine and a half feet up in the air. The
15  ones that I have -- that I recall have some
16  sort of pattern in the plastic cover all
17  the way inside around the surface of
18  the lens.
19  Q.  Have you ever rolled a vehicle and looked
20  at the bottom of those reflector lights
21  eight feet off the ground to see what you
22  could or couldn't see?
23  A.  Well, the bottom of those lights would look

Page 231

1  the same eight feet off the ground as they
2  do when I have them on my desk looking at
3  them from the bottom.
4  Q.  Those don't -- lights don't pick up road
5  debris and road dirt and grime?
6  A.  They may do that.
7  Q.  So you have no idea what those would look
8  like, do you, to an on -- to an approaching
9  Peterbilt?
10  MR. PENICK: Are you talking about
11  the bottom of the reflector
12  lights?
13  THE WITNESS: Yeah.
14  MR. BROUGHTON: Which is the part
15  that he would be seeing as
16  he's coming up on that
17  vehicle.
18  A.  I don't know how much light they would
19  reflect. I would expect them to reflect
20  some, but I don't know how much.
21  Q.  We don't have any tests or studies to
22  verify what would be --
23  A.  I haven't looked up test data on that, no.

Page 232

1  (Off-the-Record discussion.)
2  (Brief recess was taken.)
3  Q.  And I apologize if I've asked this, but
4  I've got to know if I haven't asked it --
5  if you haven't answered this. Do you know
6  why Morris' vehicle left I-85 down -- and
7  went down into the median?
8  A.  Yeah, I've answered it. I don't know.
9  Q.  You don't know.
10  And we don't know if he had an
11  equipment problem or fell asleep or had a
12  medical emergency or any of the above?
13  A.  Well, that's covered in the answer I don't
14  know.
15  Q.  Okay. You know, I've had plenty of experts
16  that don't know in the deposition that
17  later know something at trial and that's
18  why I have to keep -- make sure I've got
19  your answer on that.
20  A.  So you ask it --
21  Q.  Does Messerschmidt or Johnson -- Do either
22  one of those guys know why the vehicle left
23  the highway?

58 (Pages 229 to 232)

Deposition of Edward L. Robinson                                                    June 22, 2006

Page 245

1    that is from the Peterbilt driver applying
2    his brakes and slowing and steering to the
3    right shoulder.  As the accident report
4    diagram indicates, the initial collision
5    was in the left inside lane and since this
6    is underneath the cab of the truck would
7    indicate that the drawing that shows the
8    light patterns doesn't accurately represent
9    the position of the Morris truck when it
10   came to rest after sliding before it was
11   hit by Peterbilt truck.
12        And, in fact, we've said a number of
13   times in there that we don't know -- and, I
14   mean, we've covered it a dozen or more
15   times in here -- that we don't know exactly
16   where the Morris truck stopped after it
17   overturned.  It's just absolutely
18   unreasonable to assume that it was over in
19   the right lane when it was hit when all of
20   the markings and debris are shown in the
21   left lane and in the median.  So there
22   should have been opportunity for the
23   Peterbilt driver to slow and steer right

Page 246

1    and go around Morris' truck.
2    Q.  When did you formulate that opinion?
3    A.  I don't have a date tabbed on that.  I
4    don't know.
5    Q.  Where did you write down that opinion?
6    A.  I didn't.
7    Q.  You --
8    A.  That's implicit in these other things.
9    Q.  So that makes -- that makes Johnson and
10   Messerschmidt's map drawings totally
11   inaccurate; correct?
12   A.  It makes them diagrammatic of one factor,
13   which doesn't represent, as we've said over
14   and over and over, where the truck came to
15   rest after it overturned.  I think you'd be
16   very hard pressed to find any accuracy in
17   the road dimensions, the location of the
18   strike marks, the location of the 70 mile
19   per hour marks, any of the other things
20   that are in the diagram.  And we said we
21   don't know exactly where the truck ends
22   up.
23   Q.  Where does it show in the accident report

Page 247

1    that --
2    A.  On the diagram.
3    Q.  Where does it show in the accident report
4    where the front bumper of the Morris
5    tractor was at impact?
6    A.  It shows a point of impact in the left lane
7    of the trooper's diagram.  And if that
8    impact was underneath the driver's
9    position, then the front of the truck would
10   have been some seven or eight feet maximum
11   beyond that point which would have not even
12   completely blocked the right lane.
13   Q.  Where does it show in that accident report
14   where the front bumper of the Morris --
15   A.  It shows --
16   Q.  -- Kenworth tractor was?
17   A.  -- where the point of impact was.  And we
18   have to deduce that from the dimensions of
19   the truck.  He doesn't try to show the
20   position of the truck after it comes to
21   stop from the slide.
22   Q.  And -- Well, let me ask you this.  Will you
23   rely on the testimony of the investigating

Page 248

1    troopers as to explaining their drawing and
2    diagram and rely on their accuracy when we
3    get their testimony?
4    A.  I will have to, because this diagram is the
5    only thing we have on site.
6    Q.  And after -- Today is June 22, 2006;
7    correct?
8    A.  As far as I know.
9    Q.  And you first rendered your opinions --
10   your sworn opinions under oath, an
11   affidavit in March of 2004; correct -- or
12   2005; correct?
13   A.  I'm -- Yeah.
14   Q.  And that was after your thorough
15   investigation that was using all the
16   methodologies used by accident
17   reconstructionists and after a careful
18   review of the Alabama Uniform Accident
19   Report; right?
20   A.  Yeah.
21   Q.  And there's nothing in that sworn affidavit
22   or report issued back in March of 2005 that
23   mentions anything about an impact in the

Page 249

1     left lane, is there?
2  A.  No.
3  Q.  So now you're changing your opinion as to
4     where the impact was?
5        MR. PENICK:  Objection --
6        Objection to that question.
7        If he --
8  Q.  Is that something you missed --
9        MR. PENICK:  Let me object.  Let
10       me put my objection.
11 Q.  -- in the year --
12       MR. PENICK:  Let me put my
13       objection.  If he didn't
14       mention it --
15       MR. BROUGHTON:  Protect your
16       witness any way you want to.
17       MR. PENICK:  If he didn't
18       mention it one way or the
19       other --
20       MR. BROUGHTON:  You can offer what
21       he's supposed to testify to if
22       you want to.
23       MR. PENICK:  I'm just trying to

Page 250

1     get my objection --
2        MR. BROUGHTON:  If you're going to
3        coach him, you might as well
4        just tell him what you want
5        him to say.
6        MR. PENICK:  Just trying to get my
7        objection in.  That's all.
8  Q.  Let me ask you this.
9        MR. PENICK:  Let me get my
10       objection -- Whoa.  Whoa.
11       Whoa.  Let me get my objection
12       in.  Hold up.  Hold up.
13       If he didn't say in the
14       report, as your question
15       supposes -- he didn't say
16       whether the point of impact
17       was in the left lane or the
18       right lane, how could he be
19       changing it now if he
20       hadn't -- didn't mention it at
21       all?
22       So my objection is that
23       the question is assuming facts

Page 251

1     that's not in evidence because
2     he didn't say one way or the
3     other.
4  Q.  Well, I take it, then, that the point of
5     impact is not a critical or important or
6     significant item in the accident
7     reconstruction business; is that correct?
8  A.  If -- You can take it that way if you want
9     to.
10 Q.  Well, is it or isn't it?
11 A.  Well, impact is an important point, yes.
12 Q.  It's very critical, isn't it?
13 A.  I believe I said, yes, it's an important
14    point.
15 Q.  Is it a critical point or just an important
16    point?
17 A.  Well, you have to define --
18       MR. PENICK:  You're picking.
19       Objection.
20 Q.  Well, what's the difference --
21       MR. PENICK:  Wait.  Wait.  We're
22       wasting time.  You're arguing
23       and quibbling about words.

Page 252

1     Let's try to go on with the
2     question.
3  Q.  Well, let me ask you this -- We'll accept
4     your -- It's an important point; right --
5     the point of impact; correct?
6  A.  That's right.
7  Q.  And you testified earlier today that
8     neither you nor Mr. Johnson nor
9     Mr. Messerschmidt ever determined the point
10    of impact or an area of impact in this
11    case; correct?
12 A.  We could not from the marks on the site.
13    But we also said in the statement and in
14    the report that we made use of the ATAP --
15    AUTAR many times over.  And that's the part
16    of the -- part of the accident report, that
17    diagram.
18 Q.  And --
19       MR. PENICK:  Let me clear up his
20       testimony.  The AUTAR, is that
21       the Alabama Uniform Traffic
22       Accident Report?
23       THE WITNESS:  Yeah.

