IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

\* \* \* \* \* \* \* \*
LORI ANN MORRIS                    \*
                                   \*
VERSUS                             \* No. 3:05-CV-962-T
                                   \*
EDWARD NEAL THOMPSON AND           \*
FLORIDA TRANSFORMER                \*
\* \* \* \* \* \* \* \*

The deposition of ANDRE E. LeBLEU, P.E., 17474 Opportunity Avenue, Baton Rouge, Louisiana, 70814-7470, taken by counsel for the Defendant at the Office of Edward A. Robinson III, Esq., 600 North Foster Drive, Baton Rouge, Louisiana, commencing at

10:36 a.m. on July 26, 2006.

**CERTIFIED COPY**

Reported by:   Kelly G. Young, CCR
               Registered Professional Reporter

**EXHIBIT J**

Page 22

1  retained by anybody to testify?
2     A.  That's correct.
3     Q.  And who was it that first contacted you
4  about testifying in this case?
5     A.  We received a call from Dr. Robinson, I
6  believe.
7     Q.  All right. Let me ask you this. Through
8  the course of -- how long have you been an engineer?
9     A.  Since 1987.
10    Q.  All right. Let me just kind of go through
11 your resume here. You've been -- LAPTEC has been in
12 existence since 1999?
13    A.  It probably started a few years before
14 then.
15    Q.  Were you one of the founders of LAPTEC?
16    A.  I got in after it was founded.
17    Q.  Have you held the same position as
18 vice-president the entire time you've been there?
19    A.  That's correct.
20    Q.  And in your dealings at LAPTEC, have you
21 ever investigated any electrical systems for 18
22 wheelers?
23    A.  No.
24    Q.  Have you ever done it in your experience
25 ever?

Page 23

1     A.  No.
2     Q.  I'm not going to go -- what did you do at
3  Power and Control Systems in Baton Rouge?
4     A.  Basically the same things I've done for
5  LAPTEC.
6     Q.  Okay. And what about Bertrand Engineers?
7     A.  All of these except the beginning ones,
8  FAA, was basically -- we were working more with
9  radar systems instead of commercial industrial
10 electrical systems.
11    Q.  Tell me generally what you concentrate on.
12 Do you work on buildings?
13    A.  I work primarily on electrical systems,
14 protection of electrical systems. We're considered
15 to be experts on every aspect of electrical systems.
16    Q.  You said protection of electrical systems.
17 Would that be like from power surges or lightning
18 strikes?
19    A.  That would be that, that's correct.
20    Q.  What percentage do you think of your work
21 is devoted towards protection of electrical systems?
22    A.  I would say 50 percent at least.
23    Q.  All right. So that's your primary focus.
24 Is that correct?
25    A.  That's what we attempt to do.

Page 24

1     Q.  And tell me, kind of break down what else
2  you do. I don't know much about electrical
3  engineering.
4     A.  Beyond that we do designs, which we
5  implement in whatever facilities that we're
6  contracted to do so. We develop a design which
7  specifies every part and piece that goes with the
8  electrical system. Not the major parts. We'll tell
9  them the wire, how to install the wire, how to
10 connect it, the equipment that's going to connect
11 it, all the breakers, the protective devices in the
12 breakers, down to the motors. We look at how it's
13 going to be loaded, so forth. Do you need more
14 detail?
15    A.  That's plenty right there.
16    Q.  What are you doing these designs for? Is
17 it buildings; is it computers; is it cars?
18    A.  We basically provide power for buildings,
19 industrial systems. That's pretty much it. We
20 analyze systems, also, for various electrical
21 properties to make sure they operate within safe
22 applications.
23    Q.  Any of your design work, has that ever been
24 done for 18 wheelers?
25    A.  No.

Page 25

1     Q.  What about any kind of vehicles or
2  automotive equipment?
3     A.  No.
4     Q.  Anything other than buildings?
5     A.  It's basically going to be power systems
6  that we've done for whatever, motors that supply
7  power to motors or devices or something within a
8  facility.
9     Q.  When you say motors, is that kind of like
10 if you were in a plant --
11    A.  That's right.
12    Q.  -- and they've got a big old generator or
13 something running, that's what you're talking about?
14    A.  Yes. I'm going to get electrical power to
15 power motors or lights or any types of things that
16 require electrical service.
17    Q.  You started with FAA, and then you moved
18 back to Baton Rouge and have been here ever since
19 doing that same kind of work?
20    A.  That's correct.
21    Q.  When were you born?
22    A.  Nineteen sixty-four.
23    Q.  And where did you go to college?
24    A.  I went to the University -- it's now
25 University of Louisiana at Lafayette.

## Page 26

1  Q. And what did you major in there?
2  A. Electrical engineering.
3  Q. Have you received any further education
4  since then?
5  A. We do have to take basically continuing
6  education units every year, which is 15 hours a year
7  basically, and I continue to do that.
8  Q. Have you received any master's degree or
9  anything like that?
10  A. No.
11  Q. I'm pretty sure I know the answer to this
12  question, but I've got to ask just to make sure I
13  cover all my bases. You haven't investigated any
14  trucking accidents or you wouldn't have investigated
15  any trucking accidents where an 18 wheeler rolled
16  over. Is that correct?
17  A. That's correct.
18  Q. Who actually typed this affidavit?
19  A. Dr. Robinson's office typed it.
20  Q. And then sent it to you?
21  A. That's right.
22  Q. For your review?
23  A. That's right.
24  Q. Did you make any changes to it between the
25  time that you first saw it and its final form?

## Page 27

1  A. Yes, I have.
2  Q. You have those in your file?
3  A. Yes.
4  Q. Could I see those, please?
5  A. (Tendering document.)
6  Q. This appears to be a fax dated March 30th,
7  '05. Tell me, was this -- was this a fax that was
8  prepared by Dr. Robinson, faxed to you that you
9  reviewed, made changes to, sent back to him, and
10  then what I've marked as Exhibit 2 was the final
11  result after that?
12  A. That's correct.
13      MR. BRITTAIN:
14      Can I get a copy of that, a separate
15  copy of that?
16      DR. ROBINSON:
17      Okay. We were going to make copies of
18  the whole book for you.
19      MR. BRITTAIN:
20      That right there I want to attach as
21  an exhibit.
22      (Off-the-record.)
23  BY MR. BRITTAIN:
24  Q. We'll mark what you provided me right here
25  as Exhibit 3. This is your rate sheet for LAPTEC's

## Page 28

1  litigation fees.
2  A. That would be the Class 1 forensic
3  services.
4  Q. That's what we're dealing with here?
5  A. That's right.
6  Q. Straight time hourly rates?
7  A. We have a minimum four hour call out.
8  Q. What's overtime?
9  A. Anything unplanned or anything after eight
10  hours.
11  Q. All right. Anything over eight hours a
12  day?
13  A. That's right.
14  Q. And then premium rates, what does that
15  include?
16  A. That means if you call me out at two or
17  three in the morning and you want me to come out
18  now.
19  Q. I don't blame you. What about depositions?
20  A. We're going to keep it on straight time.
21  Q. What about trial testimony?
22  A. What's that?
23  Q. Trial testimony?
24  A. Straight time.
25      DR. ROBINSON:

## Page 29

1      Could I just indicate that there is
2      preparation time that he had. He'd be
3      happy to answer that.
4  BY MR. BRITTAIN:
5  Q. Have you kept up with the time you've got
6  in this case?
7  A. I can -- yes, I have to some extent.
8  Q. Do you have that with you today?
9  A. I do not.
10  Q. What I'd ask you to do - how do you keep up
11  with your time?
12  A. I normally have a time sheet. Being this
13  is the first time I've done this I've been less than
14  stringent about keeping up with that. I've been
15  actually pretty relaxed about it.
16  Q. Can you get me a copy of that?
17  A. Well, I kind of think that it would
18  probably not be real observant of what I've done
19  because, you know, I try not to -- at this point I
20  didn't know what was going on so I was putting out
21  no overhead. I was having to make up my other
22  hours. I didn't know how this was going to go. So
23  I said, well, I'm going to put just an hour or two
24  here, and then I'm going to cover my lost time with
25  other jobs. I think we can talk about it, and I can

LEBLEU

**Page 38**

1  I'm going to take that in -- I'm going to read this
2  and say okay, and then I'm going to go look at the
3  Kenworth data and take that, and I'm going to look
4  at pictures and say does that make sense, and from
5  there that's where I came up with this. To say that
6  this influences exactly what I'm going to say I can
7  say no.
8      Q.  That didn't have any influence on your
9  opinion?
10     A.  It may have some influence on my opinion
11 from the fact that I read this, but the final
12 opinion, no.
13     Q.  Now, you've looked at the accident report.
14 Have you ever picked up the phone and called either
15 one of the state troopers?
16     A.  I did not.
17     Q.  Have you ever talked to anybody that was
18 involved in this accident?
19     A.  I did not.
20     Q.  All right. You reviewed the photographs
21 that the state troopers took. Is that right?
22     A.  That is correct.
23     Q.  Did you review the photographs that Dr.
24 Robinson -- I'm going to call Dr. Robinson the
25 expert -- I'm going to call him Dr. Robinson. I'm

**Page 39**

1  going to call you Attorney Robinson. All right?
2          DR. ROBINSON:
3          That's fine.
4      A.  Yes.
5  BY MR. BRITTAIN:
6      Q.  Did you review those photographs?
7      A.  I did.
8      Q.  Looks like you reviewed aerial photos of
9  the accident scene?
10     A.  Yes.
11     Q.  And reviewed a forensic map created by Dr.
12 Robinson?
13     A.  Yes.
14     Q.  There's a couple of forensic maps that have
15 been created. Whichever one you looked at, is that
16 going to be in your book?
17     A.  Yes.
18     Q.  You've not been to the accident scene. Is
19 that correct?
20     A.  I have not.
21     Q.  Do you -- why haven't you gone out there?
22     A.  I've only been told to look at the
23 electrical system and I asked -- I'm not sure who I
24 asked, one of the Robinsons, if we could view the
25 truck, and when I became involved apparently the

**Page 40**

1  truck was no longer available to be looked at.
2      Q.  Do you know why the truck is no longer
3  available to be looked at?
4      A.  I do not know.
5      Q.  Correct me if I'm wrong, and I'm not going
6  to get in depth in your opinions right now, but one
7  of the opinions that you're going to offer generally
8  is the lights were on and they were visible and
9  should have been visible to my client?
10     A.  More probable than not. Hold on. Let me
11 say this. More probable than not that the lights
12 were on. Were they visible to your client, I cannot
13 say because I'm not an accident reconstructionist.
14     Q.  So as far -- you don't know where the trees
15 are on the side of the interstate, do you?
16     A.  Where the what?
17     Q.  Whether there are any trees on the side of
18 the interstate right here?
19     A.  From the pictures that I saw I didn't see
20 any trees.
21     Q.  That's based on the pictures, right?
22     A.  That's correct.
23     Q.  So you have not taken any measurements as
24 far as where the embankment is or anything like that
25 at the accident scene. Is that correct?

**Page 41**

1      A.  No.
2      Q.  You're not aware of any kind of curvature
3  there is of the road other than what you might have
4  seen from photographs. Is that correct?
5      A.  From this data right here that's what I
6  have.
7      Q.  You've not inspected the Kenworth that Mr.
8  Morris was driving at the time of this accident.
9  That's correct?
10     A.  That's correct.
11         DR. ROBINSON:
12         Other than the pictures?
13     A.  That's correct.
14 BY MR. BRITTAIN:
15     Q.  You went out and looked at a Kenworth a
16 couple of days ago it sounds like or earlier this
17 week or last week. Is that correct?
18     A.  Last couple of weeks.
19     Q.  And then you saw one other Kenworth
20 sometime before you prepared this report. Is that
21 correct?
22     A.  I wouldn't say just one. We've looked at a
23 number of them, but in depth I looked at one.
24     Q.  And where was this done? Where was it done
25 that you looked at it before you prepared the

```
                                                    46
 1  that went out there and investigated this accident.
 2  We've taken the depositions of both Mr. Thompson who
 3  was driving the Florida Transformer 18 wheeler and
 4  the deposition of Mr. Tidwell who was a passenger in
 5  there at the time. Have you reviewed any of those
 6  depositions?
 7      A. I've seen the depositions of the two
 8  drivers of the Florida Transformer truck.
 9      Q. And who provided those to you?
10      A. Dr. --
11          MR. ROBINSON:
12          Mr. Penick.
13  BY MR. BRITTAIN:
14      Q. Mr. Penick?
15      A. Yes.
16      Q. He did not provide you with the deposition
17  of Sergeant Patterson?
18      A. No.
19      Q. And he did not provide you with the
20  deposition of Dr. Edward Robinson?
21      A. That's correct.
22      Q. Have you asked to be allowed to see those?
23      A. I didn't know about the one from the
24  sergeant, and Dr. Robinson, I felt like that was --
25  I didn't ask because he was going to be talking
```

```
                                                    47
 1  about things separate than the electrical.
 2      Q. In your report here you said you've
 3  reviewed things from Dr. Robinson?
 4      A. That's right.
 5      Q. All right. But you don't think it would be
 6  good to see exactly what he had to say?
 7          DR. ROBINSON:
 8          We'll object to the form, Counsel,
 9          because he's indicated that this report was
10          written prior to any deposition of Dr.
11          Robinson. The date of his report and his
12          affidavit is there for you to see. It was
13          back in March of 2005, and I think Dr.
14          Robinson's deposition was just only taken
15          within last few weeks here. Subject to
16          that.
17  BY MR. BRITTAIN:
18      Q. You can answer. He's got to put that on
19  the record. You've done work since you've done this
20  report, right?
21      A. That's right.
22      Q. Okay. Do you think it would be helpful for
23  you to review Dr. Robinson's deposition in order to
24  get a better understanding of what all is going on
25  here?
```

```
                                                    48
 1      A. Certainly it would be fine to look at that.
 2  Do I think it would affect what I say? I can't say
 3  that it would really affect it, but until I read it
 4  I wouldn't know.
 5      Q. Hard to say until you know what's in there,
 6  right?
 7      A. That's right.
 8      Q. Maybe it would, maybe it wouldn't?
 9      A. Right.
10      Q. You're here today, if I understand
11  correctly, to offer -- you tell me, what are you
12  going to offer opinions on?
13      A. I'm going to offer the opinion that more
14  probably than not that the electrical system was
15  operating and the lights were more probably than not
16  on.
17      Q. You're not here to offer any opinion as to
18  compliance with or violation of Federal Motor
19  Carrier Safety Regulations?
20      A. That's correct.
21      Q. And you're not qualified to render any
22  opinion on --
23      A. That's correct.
24      Q. You're not going to offer any opinions on
25  cause of death. Is that correct?
```

```
                                                    49
 1      A. That's correct.
 2      Q. And, again, you're not qualified to render
 3  any of those opinions?
 4      A. That's correct.
 5      Q. Are you familiar with any cases involving
 6  rollovers?
 7      A. No.
 8      Q. This is your very first one?
 9      A. That's correct.
10      Q. And you stated this earlier. I want to
11  make sure I understand. You're not here to offer
12  any opinions as it relates to any kind of accident
13  reconstruction?
14      A. That's correct.
15      Q. Again, you're not qualified to render those
16  opinions?
17      A. That's correct.
18      Q. Along with that, that encompasses a lot of
19  things, but you're not qualified to render any
20  opinions on the speed of the vehicles, either the
21  Kenworth when it rolled over or the Peterbilt as it
22  approached?
23      A. No.
24      Q. And you're not qualified to render any
25  opinions as to perception reaction time. Is that
```

**Page 50**

1  correct?
2      A.  That's correct.
3      Q.  All right.  Back to your report or your
4  affidavit.  Is this the only thing -- you don't have
5  a report, do you?
6      A.  I've got a very short report that I
7  presented earlier.
8          DR. ROBINSON:
9          That was the project note.
10         MR. BRITTAIN:
11         I'm going to mark that as Exhibit 6.
12         DR. ROBINSON:
13         What was No. 5?  Was that the
14     affidavit?
15         MR. BRITTAIN:
16         Five is that fax.
17         DR. ROBINSON:
18         Okay.
19         MR. BRITTAIN:
20         Four is the book.
21         DR. ROBINSON:
22         And this is Exhibit No. 6 then, and
23     this is the project note.
24         MR. BRITTAIN:
25         Right.

**Page 51**

1  BY MR. BRITTAIN:
2      Q.  Other than the affidavit and the project
3  note, are there any other reports, or affidavits, or
4  anything else that you plan on using or that you
5  developed?
6      A.  I plan on using the brochures that were --
7  that I had.
8      Q.  I'm going to get to that in a second.
9  Other than what you've generated.  I'm just talking
10 about what you've generated.
11     A.  No, that's it.
12         DR. ROBINSON:
13         Attorney Brittain, could I just ask
14     you did you give an exhibit number to the
15     affidavit yet?  I didn't get that.
16         MR. BRITTAIN:
17         Number 2.
18 BY MR. BRITTAIN:
19     Q.  Do you have a copy of -- you just mentioned
20 some Kenworth materials?
21     A.  That's correct.
22     Q.  Do you have a copy of those?
23     A.  Yes, I do.
24     Q.  Is that in your book?
25     A.  I took them out.  These were provided to me

**Page 52**

1  by Dr. Robinson.
2      Q.  Let me see what you've got there.
3      A.  Some general brochures.  One of them is for
4  a W900 Kenworth, and one is for a T800 Kenworth.  Is
5  that right?
6      A.  That's correct.
7      Q.  These were provided to you by Dr. Robinson?
8      A.  That's correct.
9      Q.  Dr. Robinson or Attorney Robinson?
10         DR. ROBINSON:
11         Attorney Robinson.
12 BY MR. BRITTAIN:
13     Q.  And then you have another one in your blue
14 book right there.  Is that right?
15     A.  That's correct.
16     Q.  And what is that for?
17     A.  Interiors and sleepers.  I didn't really
18 use that.
19     Q.  What did you say, this was a T600 involved
20 in this accident?
21     A.  From what I understand it was a T600.
22     Q.  When did you get these two provided by
23 Attorney Robinson?
24     A.  I got them when I got this right here.
25     Q.  Will you stick these in that book, too, and

**Page 53**

1  let's get a copy of those?
2      A.  (Complied with request.)
3      Q.  In your affidavit you state that your
4  opinions and conclusions are based upon standard
5  methodologies accepted and utilized throughout the
6  electrical engineering profession.  What standard
7  methodologies are we talking about?
8      A.  We're going to talk about -- we're going to
9  examine the way the wires are mounted in the truck.
10 We're going to just go look at things about
11 batteries.  We're going to try to look at everything
12 that's in there, that kind of thing.
13     Q.  Okay.  Standard methodology, I know like
14 for accountants they have the generally accepted
15 accounting principles.  Is there anything like that
16 in the electrical engineering field?
17     A.  We have the National Electric Code.  That's
18 just something we just go through to make sure
19 everything is done safely.  Trucking industry is
20 going to put that in.  They're going to do that.
21 They're going to meet all those qualifications.
22 Being that I don't have the truck to look at, I'm
23 going to go and make sure those things are met,
24 which the trucking industry is going to meet, and
25 then I'm going to use my own experience and go

Page 62

1  think after the Peterbilt hit it I've got to guess
2  that everything is -- all bases are off after the,
3  you know, after it got hit by the truck.
4      Q.  What do you mean by that?
5      A.  I don't know what affect that would have on
6  the switches.
7      Q.  Do you know what affect that a rollover
8  would have on those switches?
9      A.  I would tend to think at this point that
10 the switches were pretty sticky.
11     Q.  Now, you think that an impact would have I
12 guess messed everything up so bad that you can't
13 really tell anything, but a rollover would not have
14 that affect?
15     A.  I can't say that.
16     Q.  I'm trying to understand what you just told
17 me though.
18     A.  This is what I have to -- from what I
19 understand the impact tore the cab off the truck.
20     Q.  How did you come to that understanding?
21     A.  I got that off -- I read that someplace.
22     Q.  Do you remember where you read that?
23     A.  I must have read it off the Dr. Robinson
24 report.  Then all bets are off on what state the
25 switches were or anything at that point.

Page 63

1      Q.  What's your understanding -- so I guess
2  based on the force of the impact between the
3  Peterbilt and the Kenworth, is that what you're
4  telling me?
5      A.  From the cab being torn off the trailer
6  from what I understand.  From what I understand.  I
7  don't know exactly where I got that from right at
8  this point.  I can't say what happened after that.
9      Q.  But you've never investigated an 18 wheeler
10 that's rolled over before, have you?
11     A.  That's correct.
12     Q.  You don't know what kind of force is
13 involved in a rollover event, do you?
14     A.  I do not know.
15     Q.  Are you aware of the fact that many times
16 people are killed in a rollover when a truck rolls
17 over?  Are you aware of that?
18     A.  You're telling it to me.
19     Q.  Did you know that that happens?
20     A.  I can't say that I knew that or don't know
21 that.
22     Q.  I'll represent to you that when we took
23 Trooper Patterson's deposition he said that is the
24 most common cause of fatalities in trucking wrecks
25 is rollovers.  Were you aware of that?

Page 64

1      A.  No.
2      Q.  Would you agree with me that that would
3  tend to indicate that there was some pretty
4  significant force going on on this rollover
5  collision if that's the number one cause of
6  death --
7      A.  I don't know that --
8          DR. ROBINSON:
9          Object.  You're asking questions
10     outside of his expertise, Counsel.  Calls
11     for speculation.
12 BY MR. BRITTAIN:
13     Q.  Let me make sure I understand.  You're
14 saying that the photograph of the dashboard control
15 panels, you're not as concerned with that any more
16 because the destruction that would have been caused
17 by the impact would have been so severe that it
18 wouldn't be helpful?
19     A.  Yes.  Nobody can say what the impact would
20 have done to the switches.
21     Q.  And I guess the same could be said with
22 respect to the rollover, too.  Is that right?
23     A.  I don't know.
24     Q.  Number 3 here says, Were the lights turned
25 off by anyone at the scene?  Why is that important?

Page 65

1      A.  I just want to know.  Clearly that would
2  indicate that the lights were on.
3      Q.  Number 4, What was the position of the key
4  in the ignition at the scene.  What does that mean?
5      A.  We were just -- at that point we didn't
6  quite know everything involved so we wanted to know
7  was the truck running, was it not running?  Now we
8  know that with the truck off it doesn't have any
9  affect on the lights.
10     Q.  So No. 4 doesn't matter?
11     A.  That's right.
12     Q.  Number 5, What is the condition of the
13 lights on the truck and trailer now?  Do the lights
14 appear to be intact and functional?  Tell me why
15 that's important.
16     A.  Obviously, that's going to affect if the
17 lights can be used or not after the impact or
18 whatever.  This is our initial question trying to
19 find out what went on so we could formulate our
20 opinion.
21     Q.  Is that still something that you think as
22 we sit here today is pretty important to know?
23     A.  It would be nice to know.
24     Q.  Number 6, What is the type and manufacture
25 of each battery?  Tell me why you need to know that.

**Page 78**

1  copy of this back?
2       DR. ROBINSON:
3       Let us make a copy of it first, and
4  then you can mark it.
5       (Off-the-record.)
6  BY MR. BRITTAIN:
7  Q.  I'm going to mark this as 11. I want you
8  to take my pen and draw on here the wire that you
9  were just talking about that was the most...
10 A.  (Complied with request.)
11 Q.  And what does that wire run from and to?
12 A.  I don't know.
13 Q.  Do you even know if it has anything to do
14 with the lights?
15 A.  No, I don't know if it has anything to do
16 with that. My contention is that on the rollover
17 this right here is usually going to be one of the
18 things that impacts the ground. And even after
19 getting hit by the Peterbilt, this right here, which
20 was probably one of the points rubbing on the
21 ground, seems to me that it would have, by all of
22 this damage right here that this is still in good
23 shape.
24 Q.  What you're saying is that one way for the
25 wiring to be destroyed or the lights would be if the

**Page 79**

1  truck slid along its side and the contact between
2  the wire and the pavement basically destroyed the
3  connection?
4  A.  What I'm saying is if the wire, the wire is
5  held securely in the truck and being -- it would
6  stay there. Being this was at a point where it
7  would be most apt from what I can see to be in
8  contact with the ground, it was protected enough
9  that any other wiring within the truck would
10 probably not be damaged from this exhibit right
11 here for lack of a better word.
12 Q.  There wasn't any wiring at all damaged in
13 the truck is what you're saying?
14 A.  I don't know that.
15 Q.  The wiring that you and I just went over
16 that's -- tell me what model we were looking at.
17 A.  We were talking about a T800.
18 Q.  That's not the tractor that was involved in
19 this accident, is it?
20 A.  No, that's not it.
21 Q.  Do you know whether the tractor that was
22 involved in this is wired the same way as that
23 tractor?
24 A.  I don't know that. I assume so.
25 Q.  Is there any reason why you haven't gotten

**Page 80**

1  the model T600 brochure?
2  A.  I did get a T600 brochure off the internet.
3  Q.  Does that have the schematics of the
4  wiring?
5  A.  No. I think it's got the same pictures.
6       DR. ROBINSON:
7       The same schematic.
8       MR. BRITTAIN:
9       If you will, will you -- I'm going to
10 need a copy of that, too.
11      DR. ROBINSON:
12      Could we do -- all of these or just
13 the pertinent pages?
14      MR. BRITTAIN:
15      I do want the whole thing.
16      DR. ROBINSON:
17      Let me go and make the whole thing
18 then.
19      (Off-the-record.)
20 BY MR. BRITTAIN:
21 Q.  The schematic that you're showing me there,
22 that's the connection of the --
23 A.  This is the way they -- the wiring and all
24 of their devices are contained within the C beam.
25 Q.  In the trailer?

**Page 81**

1  A.  That's right.
2  Q.  What about in the tractor?
3  A.  The tractor, I know that it's got, from
4  what I can remember from just looking, it's got all
5  of the wiring contained within basically the metal
6  parts within the trailer protected from the
7  environment, things like that. It also has kind of
8  a bungie cord type attachment with some locked hubs.
9  Q.  And that's based on you opening up the hood
10 of some of these tractor trailers?
11 A.  Just looking at them.
12 Q.  Would that be I guess early on when you
13 would look at the ones that would pull up where you
14 all were, or is that from your inspection of the
15 Kenworths at the Kenworth dealership?
16 A.  It would be early on.
17 Q.  And you don't know whether on the tractors
18 you had been looking at there whether any changes
19 had been made to that, do you, to those tractors?
20 A.  I can't say specifically about the tractor
21 that Mr. Morris was driving.
22 Q.  You have no idea what the wiring was like
23 in the tractor of Mr. Morris?
24 A.  No, that is correct.
25      DR. ROBINSON:

|  |  |
|---|---|
| 102<br>1  inner side lights.<br>2      Q. You're talking about these two things right<br>3  here on the last page?<br>4      A. Right.<br>5      Q. So you say, based on the fact that the<br>6  filaments were intact on these looks like overhead<br>7  lights inside the cab, you think the filaments in<br>8  the headlights, taillights and everything else would<br>9  not have been damaged or would still remain intact?<br>10     A. More probable than not.<br>11        DR. ROBINSON:<br>12          Note, too, that he pointed to a<br>13        headlight there in answer to your question<br>14        earlier.<br>15  BY MR. BRITTAIN:<br>16     Q. Do you have any earthly idea on the<br>17  difference in the amount of force that would have<br>18  been applied to the interior lights versus the<br>19  amount of force that will be applied to the exterior<br>20  lights in the course of a rollover?<br>21     A. No, I would -- I'm not going to go there.<br>22     Q. And there is a certain amount of force --<br>23  there's only a certain amount of force that a<br>24  filament is going to withstand before it's going to<br>25  break, right? | 104<br>1  filaments.<br>2      A. We can't say that. I don't know that.<br>3      Q. I know you don't, but assume that there was<br>4  for purposes of this question. I get to ask you<br>5  hypothetical questions.<br>6        DR. ROBINSON:<br>7          At what point in time? Are you<br>8        talking about at the time of the --<br>9  BY MR. BRITTAIN:<br>10     Q. Is there ever a point in time, is there a<br>11  situation where the exterior force on the filaments<br>12  on the exterior lights would be greater than the<br>13  force on the interior -- interior light filament<br>14  that that situation could happen?<br>15     A. I can't say as a mechanical. I'm not a<br>16  mechanical. If I hit a vehicle, or a structure or<br>17  something like that I'm hitting it with a certain<br>18  amount of force. So everything that I'm hitting is<br>19  going to be exposed to that force whether it's<br>20  contained inside or outside. I'm confused by the<br>21  question. I don't know how to respond.<br>22        If you said that I have two bulbs and I hit<br>23  them with a different amount of force I could say,<br>24  yes, the one that's hit with the more force the<br>25  filaments probably would be, you know, assuming we |
| 103<br>1      A. Yes.<br>2      Q. So if the force applied to the exterior<br>3  lights was much greater than the force applied to<br>4  the interior light, it's very likely that those<br>5  lights would have gone out and the interior lights<br>6  or at least the filaments would not be damaged. Is<br>7  that fair to say?<br>8      A. Please restate the question.<br>9      Q. If the force that was exerted on the<br>10  exterior light filaments was much greater than the<br>11  force exerted on the interior light filaments, is it<br>12  likely that the exterior light filaments would be<br>13  damaged while the interior light filaments would<br>14  remain intact?<br>15     A. Well, I don't think that's a question that<br>16  we can answer because we don't know the difference<br>17  between the force. How can you say there's a<br>18  difference in force?<br>19     Q. Just assume for purposes of my question<br>20  that there is.<br>21     A. There could be a difference in how the<br>22  filament would withstand it. Answering the question<br>23  that you are asking.<br>24     Q. Assuming that there was a difference in<br>25  force on the interior filaments and the exterior | 105<br>1  damaged both of them, this one would be more<br>2  damaged. If I hit this one with more force would<br>3  there be a better chance the one hit with more force<br>4  would break more than the other one with less? Yes.<br>5      Q. The lights on this tractor trailer, they<br>6  could go out for numerous different reasons. Isn't<br>7  that right?<br>8      A. That's correct.<br>9      Q. One would be like if you went up to them<br>10  with a baseball bat and busted them all out. That's<br>11  one way, right?<br>12     A. Right.<br>13     Q. Or the damage that would be put on the<br>14  actual light and the filament itself from either the<br>15  rollover or the collision. Is that right?<br>16     A. That's correct.<br>17     Q. Another way would be if a wire was severed<br>18  or cut and the electricity could no longer get to<br>19  it. Is that correct?<br>20     A. Absolutely.<br>21     Q. And that could also happen either in a<br>22  rollover or from impact. Is that correct?<br>23     A. Yes.<br>24     Q. And another way I guess would be for the<br>25  battery to malfunction? |

## Page 106

1  A. That's right.
2  Q. Are there any other ways that you could
3  conceive of that the lights could go out?
4  A. I think we've touched on them all.
5  Q. What if the alternator goes out?
6  A. Alternator -- admittedly I'm going to be
7  weak on this one. The alternator is basically a
8  means for the engine to convert electricity to DC to
9  feed it into the system. I think if you still had
10 the batteries then the lights would come on.
11 Q. I've been driving down the road one time,
12 my alternator went out and I was --
13 A. You were dead.
14 Q. Right.
15 A. I can't accurately state on this truck what
16 would happen. The alternator, from what I
17 understand, is a means to convert to DC.
18 Q. Do you know whether or not the alternator
19 went out on this tractor trailer as he was riding
20 down the road, and his lights went off, and he was
21 stuck there with no lights at 2:30 in the morning?
22 A. I don't know.
23 Q. Is that a possibility?
24 A. I don't know.
25 Q. You can't say that didn't happen, can you?

## Page 107

1  A. I cannot say that didn't happen.
2  Q. We went through the electrical system here.
3  Have you ever -- are you aware of the fact that
4  there are times where electrical systems are
5  designed improperly?
6  A. Yes, that's true. However, these trucks
7  are, you know, obviously we're sitting here for
8  liability reasons, and truck and car manufacturers
9  are going to do the things they have to do to make
10 sure their electrical system is insulated and so
11 forth so they can't be subject to those liabilities.
12 These are not for the most part -- and I can't say
13 if Mr. Morris has done anything or anybody else, but
14 these are not custom systems. This is we designed
15 this system for this truck, or a truck, or a series
16 of trucks.
17 Q. You're familiar though with vehicles -- I'm
18 limited just to vehicles, that there are design
19 defects in electrical systems in vehicles. You're
20 aware of that, aren't you?
21 A. There are design defects in all kind of
22 electrical systems.
23 Q. I've got a Chevy Trail Blazer. It's a 2004
24 I think, and I had to go in there because my
25 taillights went out two months after I bought it.

## Page 108

1  So you're aware that does happen, aren't you?
2  A. Yes.
3  Q. All right. Were you able to rule out any
4  kind of design defect in this particular instance?
5  A. When did this -- this accident happened
6  like what time, what year?
7  Q. This accident we're here about today?
8  A. I think it happened in 2003.
9  Q. Two thousand four.
10 A. Two thousand four and he's got a '98.
11 That's the only thing -- from what we understand he
12 has I believe a '98 Kenworth. So if at that point
13 he was having some electrical problems certainly he
14 would have known about them or somebody would have
15 known about them.
16 Q. You would think?
17 A. Yes. That's the only thing I can say.
18 Q. What about with respect to batteries, are
19 you aware of batteries being designed defectively?
20 A. Yes, batteries are defective. My
21 experience with batteries is if you have a defective
22 battery you know about it very quickly. A defective
23 battery usually doesn't last any period of time.
24 Once you get a battery that operates generally it's
25 okay for whatever period that it's going to last.

## Page 109

1  Q. You don't know, this battery could have
2  been put in two hours before he got on the road?
3  A. Certainly.
4  Q. So you're not able to rule out the
5  possibility of a battery design defect, are you?
6  A. I can't say anything about the battery. I
7  have no idea about them in this case.
8  Q. You cannot rule it out. You're not saying
9  that that's what caused it, but you can't rule it
10 out either?
11 A. Certainly.
12 Q. And you don't know what kind of battery it
13 was? You don't know how old it was? You don't know
14 who manufactured it or anything like that?
15 A. No.
16 Q. What about manufacturing defects, are you
17 familiar that manufacturing defects are present
18 within electrical systems in vehicles?
19 A. Again, that's just like saying anything.
20 Being he had a '98 and this accident occurred in
21 2003 --
22       DR. ROBINSON:
23       September 12, 2004.
24 A. That would have become obvious to someone.
25 BY MR. BRITTAIN:

LEBLEU

**Page 110**

1  Q. When I talk about manufacturing defects --
2  do you understand the difference between a
3  manufacturing defect and a design defect?
4  A. Yes. If there was a mistake -- go ahead.
5  Q. But you understand that the materials that
6  are used can oftentimes be different between the
7  same even make and model of vehicles; you get a bad
8  batch of something. You understand what I'm talking
9  about?
10  A. Right.
11  Q. Do you know whether that was the case here
12  with respect to anything in the electrical system?
13  A. I can't specifically say that. I know that
14  from electrical systems there's things that you have
15  to do to test them to make sure that they're going
16  to be okay.
17  Q. But the wiring eventually is going to wear
18  out and everything. Is that fair to say?
19  A. Insulation can fail. But they've got to
20  the point where this insulation lasts countless
21  years. It depends on -- there's things he could
22  have done to the truck that would have done
23  something. But, you know, from what I've seen in
24  our applications wiring is good to go for sometimes
25  20, 30 years if it's kept in a manner that it

**Page 111**

1  doesn't move and things like that.
2  Q. As long as it's maintained properly?
3  A. Correct.
4  Q. And as long as there's no defect in the
5  actual I guess the wiring or the insulation?
6  A. It would be the insulation.
7  Q. And you're not able to rule out the
8  possibility of improper maintenance or improper
9  insulation?
10  A. I cannot say anything about those two. If
11  those did occur that's something I can't verify or
12  not verify.
13  Q. All right. Tell me this. Do you have any
14  idea where the Kenworth tractor was pointing prior
15  to impact?
16  A. All I have on where it was going was the
17  reports I have from the Robinsons.
18  Q. Let me ask you this. So if Dr. Robinson
19  doesn't have any earthly idea where the tractor was
20  located, therefore, you would have no idea either,
21  would you?
22  A. That's right.
23  Q. And do you have -- are you offering any
24  opinion as to how far back Mr. Thompson or Mr.
25  Tidwell should have been able to see these lights,

**Page 112**

1  assuming were on, as they were coming towards this
2  Kenworth?
3  A. No, I cannot. The one thing I can say is I
4  know that -- and I made it a point to look at that
5  quite a bit. I don't know if there's a specific
6  rule, and this is just from me looking on the
7  highway, that there's a light situated in the middle
8  of a trailer, and I'm pretty sure that most trucks
9  have to have them. I got that when I was talking to
10  a trucker earlier in the last couple of weeks, that
11  there's a light situated in the middle of the
12  trailer that has to be on.
13  Q. Where on the trailer are you talking about?
14  A. It's situated -- it's probably somewhere in
15  the middle of the trailer.
16  Q. Are you talking about underneath the
17  trailer?
18  A. On both sides of the trailer.
19  Q. All right.
20  A. So that when I drive by the trailer, that
21  light, I can look out the side of my vehicle and see
22  it. It's a yellow light.
23  Q. Do you know whether that was on this
24  particular trailer?
25  A. From what I understand I cannot -- I was

**Page 113**

1  not able to locate it on here because the pictures
2  we took don't show that, but that light should have
3  been -- you just can't see it because of the way the
4  thing is, but there should have been a light
5  somewhere in the middle of the trailer.
6      DR. ROBINSON:
7      Do you think that was federally
8      mandated?
9  A. I can go look that up but, you know, when
10  you walk outside look for a tractor trailer and see
11  if one passes by. I'd have to find out that.
12  BY MR. BRITTAIN:
13  Q. But on this one you don't know whether it
14  was ever installed on the trailer?
15  A. I tried to say that. That's correct.
16  Q. Let me ask you this. You were talking
17  about the wiring systems as they relate to the
18  Kenworth in that book you had, the wiring showed
19  going through that trailer, do you know whether that
20  was the same trailer, whether it was a Kenworth
21  trailer that was on this tractor?
22  A. Say again, if that was the same --
23  Q. Trailer that was originally on this
24  tractor?
25  A. No, I can't say that.

LEBLEU

**Page 114**

1  Q. Back to the light. You don't know whether
2  it was ever put on there to begin with, and you
3  don't know whether even if was it had been removed
4  by the time this accident happened?
5  A. I can't say whether the light was on or
6  off. I think that is probably something we have to
7  find out about. That's something that Panther, too,
8  would know about.
9  Q. Did you call them to find that out?
10  A. I did not do that.
11  Q. Now, are you aware that there was some
12  damage done to the trailer, it was bent up during
13  the rollover?
14  A. No, I wasn't specifically aware of that.
15  Q. Do you know whether there was any?
16  A. No. I did see them going through the
17  median and all that.
18  Q. You're aware it drove through a median I
19  think about 150 feet or 150 yards, I can't remember,
20  before coming back up and rolling over?
21  A. I saw the reconstruction map, yes.
22  Q. Do you know whether when it went through
23  that median then whether that light could have been
24  knocked off or disabled, assuming it was even on
25  there?

**Page 115**

1  A. I can't say whether it was or not.
2  Q. Back to what they could or could not see
3  then. Are you able to tell me that, you know, 300
4  feet from this overturned Kenworth they should have
5  been able to see it based on -- assuming the lights
6  were on?
7  A. No, I cannot say that.
8  Q. So even if the lights were on, you're not
9  able to say one way or the other whether or not they
10  could have even seen the lights?
11  A. I can't say that.
12  Q. It's possible that these lights were on,
13  that the headlights would be pointed out into the
14  trees, assuming there were even any trees there, and
15  they never would have been able to see them?
16      DR. ROBINSON:
17          I'm going to object because anything
18          is possible. We have to ask questions on
19          the basis of the actual facts, and I think
20          those questions are not in line with the
21          factual scenario actually presented.
22  BY MR. BRITTAIN:
23  Q. Let me ask you this. This is a
24  hypothetical. Assume that the tractor was laying
25  over on its side and the lights were still on, and I

**Page 116**

1  think your general understanding is that there are
2  no trees there. If you've got lights shining off
3  into nothing and there's nothing to reflect the
4  light back, are you going to be able to see that?
5      DR. ROBINSON:
6          Are you asking him who could see, him
7          or the driver, Mr. Thompson or his
8          passenger could see? Are you asking him to
9          give an opinion on what they saw or didn't
10          see?
11  BY MR. BRITTAIN:
12  Q. Let me ask you this. How far out do those
13  headlights usually work on a tractor trailer?
14  A. I don't know.
15  Q. You don't know if you are driving it
16  regular how far down the road you could see?
17  A. I don't -- I can't say.
18  Q. You don't know the power, however you want
19  to call it, illumination of the headlights or
20  anything like that?
21  A. I don't know that.
22  Q. You tell me whether you're familiar with
23  lights to the extent of how far away people can see
24  them, why you're able to see a light, whether it be
25  reflection or something like that. Is that

**Page 117**

1  something you're qualified to give expert testimony
2  on?
3  A. Not at this time.
4  Q. You said not at his time. Have you signed
5  up for any classes to learn how to become --
6  A. We do lighting and we have to -- there's
7  things that we have to apply, but I don't know
8  specifically anything about vehicle lighting, and
9  then it's been such a long time since I've done
10  anything with lighting that I would have to go
11  refresh myself on that situation.
12  Q. Well, tell me if you can answer this
13  question or if you can't, but if you take a
14  headlight of an 18 wheeler, and you shine it off
15  into nothing, just dark, are you going to be able to
16  see the light if you're standing behind it?
17  A. If I'm standing behind it? It depends.
18  How is the beam deflected? Does he have his low
19  beams or high beams on, those kind of things, you
20  know.
21  Q. Either one. You tell me with low beams.
22  A. He had the low beam on and I'm standing
23  behind him, certainly that's -- I'm not trying to
24  give any expert opinion on what happened here, but
25  if I'm standing behind a truck and it's shining a

**Page 122**

1  A.  These photos, and basically these are the
2  only ones that I actually needed.
3  Q.  You're talking about the ones in your book
4  and the ones that we've already marked?
5  A.  They gave me a whole slew of these, but I
6  just took and printed out the ones that are relevant
7  to me.
8  Q.  We've marked that as whatever exhibit
9  number that is, the five, six pictures?
10  A.  Yes.
11  Q.  And you went through that disk and pulled
12  out all of the ones that are relevant to the issues
13  that you're looking at?
14  A.  That's correct.
15  Q.  Do you plan on doing any kind of
16  reconstruction film or any kind of drawings or
17  anything like that?
18  A.  No.
19  Q.  Again, just to make sure I've asked this,
20  even assuming the lights are on you don't know
21  whether it would be visible to anyone driving down
22  the road that night?
23  A.  Yes. I can't give an opinion on that
24  either way.
25  Q.  Going through your project notes, which is

**Page 123**

1  Exhibit 6, I believe, this kind of sums up your
2  opinions. Is that right?
3  A.  Yes.
4  Q.  We've talked about your opinions. You've
5  got four bullets down there. The batteries in this
6  type trailer are mechanically held in place so as to
7  prevent movement. We've gone over all of that,
8  haven't we?
9  A.  Yes.
10  Q.  Then you say, Assuming the battery
11  structures were maintained. We've talked about
12  that, right?
13  A.  Yes.
14  Q.  And the wiring was still connected to the
15  power source.
16  A.  That's right.
17  Q.  What are some ways that the wiring could
18  become unconnected to the power source?
19  A.  They could physically be torn off.
20  Q.  So bullet No. 2, we've gone over all of
21  that, haven't we?
22  A.  From what I understand, yes.
23  Q.  The same with three, we've gone over
24  everything?
25  A.  Yes.

**Page 124**

1  Q.  It says that it's assumed that light
2  switches were in the on position. Do you know
3  whether -- what that switch is like, whether it's a
4  push in, pull out, flip up, flip down?
5  A.  Flip up, flip down.
6  Q.  Do you know whether that switch was hit or
7  in any way knocked down in the rollover?
8  A.  No.
9  Q.  Is it possible that it could have been hit
10  and flipped down in the rollover and turned out
11  every single light on this 18 wheeler?
12  A.  There's a number of -- from what I
13  understand there's a number of these switches, two
14  or three or more. And I can't say that if it would
15  hit one that it would turn off all the lights. I
16  don't think so.
17  Q.  Do you know how many switches there are?
18  A.  It appears -- well, we can look at that. I
19  don't know right off. We can look at the schematic
20  and get some view of what that would be.
21  Q.  Yes, I need to do that.
22  A.  We've got -- we show some switches for the
23  headlights, which would be one set of switches for
24  the headlights. We show some switches for the
25  dimmer switch. Other than that that's all they

**Page 125**

1  show. They have some other switches. I don't think
2  that's the lights.
3  Q.  What is a dimmer switch? Is that where
4  when you ride down sometimes the lights will go --
5  you see them passing sometimes, and they'll say
6  thank you by flipping the switch and the lights will
7  go from bright to dim?
8  A.  It shows this switch right here. It says a
9  number of things below it. It says dimmer switch
10  standard position, push button in turn signal
11  switch, optional position, mounted in floor. So
12  that would be something -- that might be to select
13  the high beam, low beam.
14  Q.  So from what you see there though there's
15  one switch that would control all the lights and
16  then a dimmer switch?
17  A.  No. They're only showing one switch for
18  the headlights. They're not showing where the other
19  switches are for the other lights. The way -- from
20  what I understand, the way it works is there's a
21  number of basically you have power, and these lights
22  go out. There's a switch that goes out to a relay.
23  Basically this device enables this device which
24  turns on the lights from what I understand. That's
25  kind of illustrated by this.

126

1  They'll have a flood lamp relay, a sign
2  lamp relay, a tail and park relay, dimmer relay, a
3  number of relays here that goes -- from what I
4  understand these are wired out to an instrument
5  panel harness that's going to go over to these
6  switches. So it's kind of tough for me to know how
7  many switches he has or what the switches were for
8  because he's got a whole rack of switches right
9  here. There appear to be four to eight that could
10 have been used.
11     There was a conversation we had somewhere
12 along the line that these things could be changed.
13 They could be wired a different way, all that kind
14 of stuff. So I can't accurately -- I cannot show
15 the switches on these schematics, but these right
16 here where they -- they're shown in this picture
17 right in here. I would tend to think they would be
18 the ones on the top, which they have four switches,
19 and then there's I think four switches on the
20 bottom. What they're applied for, I don't know.
21     Q. You don't know whether those four switches,
22 whether those have anything to do with actually
23 turning on and off lights?
24     A. That's right.
25     Q. And, again, you don't know whether anything

127

1  could have been changed from the time of this
2  accident through the time of the manufacture
3  according to that schematic?
4     A. Correct.
5     Q. Let me ask you this. Both Mr. Thompson and
6  Mr. Tidwell testified in their deposition that they
7  were driving down the road going 70 miles an hour,
8  and they were looking straight ahead paying
9  attention where they were going, and they never saw
10 any lights on this tractor trailer. If that's their
11 testimony, would you disagree with that testimony?
12     A. I can't -- I wouldn't be able to comment on
13 their testimony.
14     Q. All right. Well, are you so sure of your
15 opinions that you feel like that they should have
16 seen some lights?
17     A. I think they should have seen something,
18 yes.
19     Q. You don't know at what point that should
20 have been though?
21     A. I can't say that.
22     Q. It could have just been 50 feet ahead of
23 it?
24     A. I can't say that.
25     Q. Let me -- Dr. Robinson --

128

1     DR. ROBINSON:
2     The expert, not the attorney.
3     MR. BRITTAIN:
4     Right.
5  BY MR. BRITTAIN:
6     Q. I'll let you read -- I'm going to draw a
7  line here. What I'm doing is I'm circling pages
8  178, line 20 through 179, line 6. If you'll look at
9  that.
10    A. (Examining document.) Okay.
11    Q. All right. Is the fact that -- would you
12 agree with me in that testimony right there Dr.
13 Robinson is saying he can't tell whether they were
14 on after rollover or not?
15    A. Yes.
16    DR. ROBINSON:
17    Are you asking him what now?
18 BY MR. BRITTAIN:
19    Q. According to that testimony right there Dr.
20 Robinson is saying he doesn't know whether the
21 lights were on after the rollover or not. Is that a
22 fair summary of that testimony?
23    DR. ROBINSON:
24    Well, I think his testimony is what it
25 is.

129

1     A. He just says, no, I can't. From reading
2  here he says, no, I can't; no, I can't.
3     Q. Does that have any affect on your opinion?
4     A. No.
5     Q. Let me ask you about this fax we've marked
6  as Exhibit 5. There were portions of this that you
7  marked out I assume because you were not able to
8  give an opinion, you couldn't provide that opinion.
9  Is that fair to say?
10    A. That's right.
11    Q. One of the things you marked out is that
12 there wasn't wasn't any skid mark data. You don't
13 know whether there were skid marks or not, do you?
14    A. I mean I'm an electrical engineer. I don't
15 know anything about skid marks.
16    Q. That's not your deal?
17    A. Yes.
18    Q. The Morris tractor trailer was duly
19 equipped with all lighting and reflector assemblies
20 mandated by the US DOT. You aren't able to say
21 that, are you?
22    A. No, I can't say anything.
23    Q. We don't know whether this thing was
24 properly equipped with the proper lights or not, do
25 we? Or can you say that?

Page 130

1  A. I can't say anything about the truck, you
2  know. All I can give you is my opinions like I've
3  given you.
4  Q. And so you can't give an opinion or you
5  can't state as a fact that it was properly equipped
6  with the proper lighting?
7  A. I cannot do that. That's right.
8  Q. Another thing crossed out here, There was
9  no evidence that the Morris tractor trailer suffered
10 any electrical malfunctions prior to the collision
11 with the Thompson vehicle. You're unable to provide
12 that opinion. Is that correct?
13 A. That's correct.
14 Q. Right here under No. 8, is that your
15 handwriting?
16 A. Yes.
17 Q. Read that into the record if you will,
18 please.
19 A. The police report says nothing about
20 lights. It is only stated in Robinson's report as
21 an assumption.
22 Q. What are you referring to there?
23 A. I think they made some comments about the
24 lights being on, and I was just saying I can't say
25 that. As an aside, I did note in the police report

Page 131

1  that when they talked to the guys they were only
2  able to say that they were advised that the lights
3  were not on from those guys, from the drivers of the
4  other truck.
5  Q. Would it change -- let me tell you,
6  Sergeant Patterson, the fellow whose deposition
7  we've taken, I'm going to represent to you without
8  going through every bit of his deposition that he is
9  the head of traffic homicide out of the Montgomery
10 office for the State of alabama. He is as high as
11 it gets on that. He has investigated hundreds of
12 traffic homicides. That's what he does. That's
13 what he has done for about fifteen years, almost
14 fifteen years now.
15    In his opinion, he thinks it's more likely
16 than not the lights were knocked off as a result of
17 the rollover and that he has seen many rollovers.
18 That's based on his investigation of many rollovers.
19 Knowing that, would that have any affect on your
20 opinion?
21 A. I'd have to know the sergeant.
22 Q. What now?
23 A. I'd have to know the fellow.
24 Q. Well, would you agree with me, based on the
25 representations I've just made to you, that he would

Page 132

1  be more qualified to offer that opinion than you
2  would?
3     DR. ROBINSON:
4     He's not an electrical engineer, is
5     he?
6     MR. BRITTAIN:
7     That's not my question.
8  A. From his experience --
9     DR. ROBINSON:
10    I'm going to object on the grounds
11    this witness as an expert in electrical
12    engineering doesn't have to defer to
13    somebody who is not even in his specialty.
14    Did you say he's a sergeant?
15    MR. BRITTAIN:
16    Sergeant.
17    DR. ROBINSON:
18    A sergeant with the Alabama State
19    Police, with all due deference, he's not an
20    electrical engineer and he hasn't had the
21    training that this witness has had. So he
22    has no obligation to defer to him in any
23    shape or fashion. Subject to the objection
24    you can answer. Plus, he wasn't even
25    there. This witness that you're referring

Page 133

1     to, this sergeant, wasn't there at the time
2     of the accident. Subject to that you may
3     answer.
4  BY MR. BRITTAIN:
5  Q. Do you want me to repeat the question?
6  A. I can't answer that.
7  Q. You weren't there at the accident either,
8  were you?
9  A. That's correct.
10 Q. You have investigated. You've done these
11 tests and looked at some brochures, and you've come
12 to your conclusion based on that, right?
13 A. That's right.
14 Q. Why can't you tell me whether you would
15 defer to Sergeant Patterson who has investigated
16 numerous rollovers, hundreds of homicides? Do you
17 feel that you're more qualified than he is?
18 A. I can't say that.
19 Q. For the record, No. 9 here is a letter to
20 you from Attorney Robinson asking you to looks like
21 put something on a CD?
22 A. Yes. I did not have anything except -- I
23 think I did have a CD.
24    DR. ROBINSON:
25    Did you say you did or did not?

158
1  already asked how much you charge an hour so we just
2  need to quantify.
3      A.  I think it's -- just from the time we spent
4  I think eight hours is reasonable.
5      Q.  And then for the time today if we started
6  -- what time did we start, Madame Reporter?
7          COURT REPORTER:
8          10:38.
9  BY DR. ROBINSON:
10     Q.  At 10:38 and the deposition was scheduled
11 at 10:30. We started about eight minutes later.
12 And here it is now almost seven minutes before two.
13 What would that be, 10:30, 11:30, 12:30, 1:30, about
14 three and a half hours -- three hours and fifteen
15 minutes. You haven't received a check yet from Mr.
16 Brittain yet, have you?
17     A.  No.
18     Q.  So the total hours, the eight hours plus
19 the three of the deposition, or did you mean the
20 three to be part of the deposition, the preparation
21 hours and the deposition?
22     A.  That's included.
23     Q.  Just eight hours?
24     A.  Yes.
25         DR. ROBINSON:

159
1          That's considerate of you. I'm sure
2      Attorney Brittain appreciates it, too. It
3      shows that you're a fair person, and we
4      appreciate it. But, again, I thank you so
5      very much, and these documents that you
6      have reviewed and everything, we thank you
7      for making them available to Attorney
8      Brittain so we could accommodate him. I
9      have no questions unless Attorney Brittain
10     has some.
11         (Off-the-record discussion.)
12         MR. BRITTAIN:
13         There were two Exhibit 11s.
14         DR. ROBINSON:
15         That would be most confusing. Thank
16     you for catching that.
17         MR. BRITTAIN:
18         I'm going to mark the March 28 fax
19     11A, and I'll make these pictures that you
20     drew for me 11B.
21         DR. ROBINSON:
22         11B and 11?
23         MR. BRITTAIN:
24         11A and 11B.
25 EXAMINATION BY MR. BRITTAIN:

160
1      Q.  And then one thing I think when you all
2  were reading that affidavit a little while ago, if I
3  understood your earlier testimony, you don't know
4  whether the lights, even if they were on, would have
5  been visible to Thompson and Tidwell. Is that
6  right?
7      A.  That is true.
8      Q.  And you don't know whether the tractor was
9  attached to the trailer at the time of impact with
10 the Peterbilt, do you?
11     A.  I don't know that.
12         MR. BRITTAIN:
13         Thank you. That's all I've got.
14     (DEPOSITION CONCLUDED AT 1:49 P.M.)

161
STATE OF LOUISIANA:
PARISH OF EAST BATON ROUGE:
    This certification is valid only for a
transcript accompanied by my original signature and
original blue stamp on this page.
    I, Kelly G. Young, Certified Court Reporter in
and for the State of Louisiana, as the officer
before whom this testimony was taken, do hereby
certify that the witness to whom oath was
administered, after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
hereinbefore set forth in the foregoing pages; that
this testimony was reported by me in the stenotype
reporting method, was prepared and transcribed by me
or under my personal direction and supervision, and
is a true and correct transcript to the best of my
ability and understanding; that I am not related to
counsel or to the parties herein, nor am I otherwise
interested in the outcome of this matter.
    Baton Rouge, Louisiana, on this date,
_____, 2006.

_____
KELLY G. YOUNG, RPR, CCR
Certificate No. 91025
State of Louisiana