# FREEDOM COURT REPORTING

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3               EASTERN DIVISION
4
5   LORI ANN MORRIS,        )
6           Plaintiff,   )
7   vs.                 ) CASE NUMBER:
8   FLORIDA TRANSFORMER,   ) 3:05-CV-962-T
9   EDWARD NEAL THOMPSON,   )
10  et al.,           )
11          Defendants.   )
12
13      DEPOSITION OF FRANKLIN SCOTT SEAY
14      In accordance with Rule 5(d) of
15  The Alabama Rules of Civil Procedure, as
16  Amended, effective May 15, 1988, I, Cindy
17  Weldon, am hereby delivering to Henry L.
18  Penick, the original transcript of the oral
19  testimony taken on the 17th day of July,
20  2006, along with exhibits.
21      Please be advised that this is the
22  same and not retained by the Court Reporter,
23  nor filed with the Court.
```

**Page 2**

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3               EASTERN DIVISION
4
5   LORI ANN MORRIS,        )
6       Plaintiff,       )
7   vs.               ) CASE NUMBER:
8                   ) 3:05-CV-962-T
9   FLORIDA TRANSFORMER,   )
10  EDWARD NEAL THOMPSON,   )
11  et al.,           )
12      Defendants.       )
13
14      S T I P U L A T I O N
15      IT IS STIPULATED AND AGREED, by
16  and between the parties through their
17  respective counsel, that the deposition of
18  FRANKLIN SCOTT SEAY, may be taken before
19  Cindy Weldon, Certified Shorthand Reporter,
20  Commissioner and Notary Public, at 732 North
21  9th Street, DeFuniak Springs, Florida, on
22  July the 17th, 2006 at 10:50 a.m.
23      IT IS FURTHER STIPULATED AND
```

**Page 3**

```
1       AGREED that the signature to and the reading
2   of the deposition by the witness is waived,
3   the deposition to have the same force and
4   effect as if full compliance had been had
5   with all laws and rules of Court relating to
6   the taking of depositions.
7           IT IS FURTHER STIPULATED AND
8   AGREED that it shall not be necessary for
9   any objections to be made by counsel to any
10  questions, except as to form or leading
11  questions, and that counsel for the parties
12  may make objections and assign grounds at
13  the time of trial, or at the time said
14  deposition is offered in evidence, or prior
15  thereto.
16          IT IS FURTHER STIPULATED AND
17  AGREED that notice of filing of the
18  deposition by the Commissioner is waived.
19
20
21
22
23
```

**Page 4**

```
1       A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       MR. HENRY L. PENICK
5       THE PENICK BUILDING
6       319 - 17TH STREET NORTH, SUITE 200
7       BIRMINGHAM, ALABAMA  35203
8
9   FOR THE DEFENDANT:
10      MR. RICHARD BROUGHTON
11      2000 INTERSTATE PARK DRIVE
12      SUITE 204
13      MONTGOMERY, ALABAMA  36109
14
15
16
17
18
19
20
21      EXHIBIT K
22
23
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 13

1  bit more than that.
2      Q.  About a fourth then?  Okay.  Any
3  other -- And you can show that he made a
4  gesture.
5      A.  Sorry about that.
6      Q.  That was an okay, I guess?
7      A.  Okay.
8      Q.  Was there any other seminar or
9  classroom or any kind of training that you
10  went through to familiarize yourself with
11  DOT regulations or Federal Motor Carrier
12  Safety regulations?
13      A.  Well, the primary training was --
14  As I said, we had Roland Brown come down and
15  I met with him, he and some of our other
16  management team.
17          We spent, I don't know, four,
18  maybe more than four hours in a conference
19  with him discussing DOT and our DOT program.
20      Q.  Other than that, then that's all
21  the training you've had on DOT regulations;
22  is that correct?
23      A.  That's correct.

Page 14

1      Q.  Among the persons you hired, one
2  of them was Neal Thompson; is that right?
3      A.  That is correct.
4      Q.  Let me show you what we'll mark as
5  Plaintiff's Exhibit 1 to your deposition.
6      (Whereupon, Plaintiff's Exhibit
7  No. 1 was marked for identification.)
8      Q.  Can you tell me what's marked for
9  identification as Plaintiff's Exhibit 1?
10      A.  Edward Neal Thompson's application
11  for employment.
12      Q.  All right.  And the date of this
13  application is?
14      A.  August 6, 2004.
15      Q.  Okay.  And is this one of the
16  forms that you got from Trans Products or is
17  this a separate form?
18      A.  This is our application for
19  employment that's been in place for some
20  time.
21      Q.  Do you know how long this
22  application has been in place?
23      A.  I do not.  It was in place when I

Page 15

1  came with the company.
2      Q.  Do you know whether or not it has
3  gone through any modifications?
4      A.  None that I'm aware of.
5      Q.  When you say when you first came
6  with the company, that would be in --
7      A.  February of 2006 -- I mean, 2001.
8      Q.  All right.  Did you review this
9  application before hiring?
10      A.  Yes, I did.
11      Q.  And then on the employers, if I'm
12  reading it correctly, did it say list below
13  the last three employers?
14      A.  That's correct.
15      Q.  Did Mr. Thompson list his last
16  three employers?
17      A.  Apparently he did not.
18      Q.  Did he list his last employers for
19  -- Well, in this exhibit, what period of
20  time is covered by the two employers that he
21  did list?
22      A.  Starting in 2000, January, 2000
23  until October 2003 with McLane and it looks

Page 16

1  like November of '03 -- but I can't tell.
2  It's not very legible -- until the present
3  time of the application with Dart.
4      Q.  All right.  What period of time
5  then, the total time covered is from --
6  starting with McLane through Dart, is that
7  2003 through 2000 what?
8      A.  I'm sorry?
9      Q.  What period of time is covered by
10  these two employments?
11      A.  Well, since I can't absolutely
12  make out what Dart -- the date he has there,
13  it appears January of 2000 through August
14  2004.  But I'm not sure about exactly what
15  that date is, the beginning date with Dart.
16      Q.  Would that be about a four year
17  period?
18      A.  Correct.
19      Q.  Does it list his employers for the
20  past seven years?
21      A.  No, sir.
22      Q.  We were talking before about the
23  kind of truck that Mr. Thompson was

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 17

1  driving. And I will show again what we've
2  marked as the accident report. We'll call
3  this Plaintiff's Exhibit No. 2 to your
4  deposition.
5       (Whereupon, Plaintiff's Exhibit
6  No. 2 was marked for identification.)
7       Q. On the fifth page of that -- Well,
8  let's go to the sixth page. I think it
9  describes the truck that Thompson was
10  driving at the time; is that right?
11       Does it describe the gross weight
12  of the tractor and trailer that he was
13  driving at that time in the upper left?
14       A. I see that. I'm just making sure
15  this is the information for the Florida
16  Transformer vehicle. Yes.
17       Q. Okay. And is the gross weight of
18  that vehicle seventy-two thousand pounds?
19       A. That's what's on the report.
20       Q. Do you have an idea what the
21  weight of that vehicle is when it's not
22  loaded, the tractor and trailer portion?
23       A. I do not.

Page 18

1       Q. Okay. You also had -- Did you
2  have him to list his -- or ask for him to
3  give you his driving record?
4       A. We did. He signed a release form,
5  the standardized form for the State of
6  Alabama. And we requested him to obtain his
7  three year driving history.
8       Q. Did you seek -- Well, let me just
9  show what we'll mark as Plaintiff's Exhibit
10  3 to your deposition.
11       Q. Can you tell me what's marked as
12  Plaintiff's Exhibit 3?
13       A. The Alabama Department of Public
14  Safety driver's license abstract on Edward
15  Neal Thompson.
16       Q. So when Mr. Thompson applied, did
17  he list for you any -- on any document his
18  violations --
19       MR. BROUGHTON: Henry, the one you
20  gave me is September the 12th, 2005.
21       MR. PENICK: You're right.
22       MR. BROUGHTON: I don't know if
23  that's the one you meant to mark.

Page 19

1       MR. PENICK: No, that's not the
2  one I meant to mark. Let me withdraw 3.
3       Q. But when you got his -- When you
4  sent for his driving history, did he
5  independently give you a list of his
6  violations other than signing -- or just
7  signing a form for you to get his driver's
8  record?
9       A. We got the DOT required previous
10  twelve month violations form.
11       Q. Do you know whether or not DOT
12  requires only a list of violations for the
13  past twelve months?
14       A. It's my understanding incumbent
15  drivers you are suppose to annually have
16  them give you a list of violations for the
17  previous twelve months.
18       Q. What do you mean by incumbent
19  drivers?
20       A. Drivers who are already working
21  for you.
22       Q. I'm going back to the hiring
23  process of Edward Thompson. When he wasn't

Page 20

1  already driving for you when he applied, did
2  you -- I think you said you sought his
3  previous three year driving history; right?
4       A. Correct.
5       Q. And what I'm asking is, did he
6  independently fill out any form telling you
7  what his driving history was?
8       A. He did not independently fill out
9  a form saying what it was. But he filled
10  out the form granting us access to his three
11  year driving history.
12       Q. Did he sign a form granting you
13  access to a three year driving history or
14  did he just sign a form granting you access
15  to his driving history?
16       A. Signed a form granting us access
17  to his driving history.
18       Q. And then when you sent it off to
19  the State of Alabama, what did they return
20  to you?
21       A. They returned what appeared to be
22  his three year driving history.
23       Q. Do you know whether or not the

5  (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 21

1   Federal Motor Carrier Safety regulations
2   require more than three years driving
3   history?
4       A.  Not to my knowledge.
5       Q.  The Florida Transformer, I think
6   you said, it hauls transformers; is that
7   right?
8       A.  Yes, sir.
9       Q.  Is that considered hazardous
10  material?
11      A.  The repaired transformers that we
12  have refurbished would not be considered
13  hazardous material.  They are only refilled
14  with mineral oil.
15          There is some old equipment out
16  there that carries PCB's, that if they are
17  known PCB's could be considered or could --
18  placarding would be required.  But on new
19  transformers, they are not hazardous.
20      Q.  Okay.  But you all also haul old
21  transformers back as well as haul out new
22  ones; right?
23      A.  Correct.

Page 22

1       Q.  Or refurbished ones?
2       A.  Correct.
3       Q.  And when you're hauling those old
4   ones that need to be refurbished, do they
5   sometimes contain hazardous material?
6       A.  Sometimes they may contain PCB's.
7   But at that stage, it's very complicated
8   between DOT and EPA regulations.
9           But if you're bringing in the
10  equipment for repair, then it's not
11  considered hazardous material if you get it
12  to your shop and you then discover there's
13  some level of PCB's.
14          If you pick up known PCB's, it
15  would be -- when we say hazardous, that
16  means we would have to placard.
17      Q.  All right.  Let me show you what
18  we'll mark as Plaintiff's Exhibit -- we'll
19  substitute the new 3 to your deposition.
20          (Whereupon, Plaintiff's Exhibit
21  No. 3 was marked for identification.)
22      Q.  Tell me what's marked for
23  identification as Plaintiff's 3.

Page 23

1       A.  A statement of violations on
2   Edward Neal Thompson dated 8-13, 2004.
3       Q.  And for what period of time does
4   this cover?
5       A.  The previous twelve months, past
6   twelve months.
7       Q.  Are you aware of any DOT
8   regulation or either Federal Motor Carrier
9   Safety regulation that requires a list of
10  violations greater than twelve months?
11      A.  Would you repeat the question,
12  please.
13      Q.  Are you aware of any Federal Motor
14  Carrier Safety regulation or DOT regulation
15  that requires an applicant to list his
16  violations for a period longer than twelve
17  months?
18      A.  I'm familiar with the hiring of a
19  new driver of obtaining the three year
20  driving history, yes.
21      Q.  And does it -- Do you ever require
22  the drivers themselves to list for you his
23  three year driving history?

Page 24

1       A.  I haven't, no.
2       Q.  And is this a standard form you
3   use when employing drivers, that you only
4   require them to list their violations for
5   twelve months?
6       A.  Correct.
7       Q.  Did you ask him to list for you
8   whether or not he had had any suspensions?
9       A.  No, sir.
10      Q.  When he came to you, did he
11  already have a driving certificate or a
12  certificate to show that he had completed
13  the driver's test?
14      A.  I'm not aware of an independent
15  certificate.  He certainly presented us a
16  valid driver's license.
17      Q.  Okay.  All right.  When he came,
18  did you administer to him a driver's test?
19      A.  Yes, we did.
20      Q.  All right.  And when did you
21  administer that test?
22      A.  The formal test began on September
23  2nd of 2004 and was completed on -- I

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 25

1 believe the date was September 7th, 2004.
2     Q. Let me show you what we've marked
3 as Plaintiff's Exhibit 4 to your
4 deposition.
5         (Whereupon, Plaintiff's Exhibit
6 No. 4 was marked for identification.)
7     Q. Can you tell me what Plaintiff's
8 Exhibit 4 is?
9     A. Driver road test for driver Neal
10 Thompson.
11    Q. And what is the date of that
12 certificate?
13    A. September 2nd, '04.
14    Q. Was it completed on September the
15 2nd, '04?
16    A. To the best of my knowledge, it
17 was not.
18    Q. Did Thompson have this
19 certification on September the 2nd when he
20 had this accident that we're here about
21 today?
22    A. He did not have a complete driver
23 road test on September the 2nd.

Page 26

1     Q. Is it the policy of Florida
2 Transformer to give a driver a road test
3 before allowing him to drive?
4     A. Before allowing him to drive
5 independently on his own, yes.
6     Q. Okay. And on September the 2nd,
7 was Thompson engaged in a road test when he
8 had this accident?
9     A. He was.
10    Q. Did he complete the road test on
11 September the 2nd?
12    A. No, he did not.
13    Q. When did he complete the road
14 test?
15    A. I believe the date is September
16 the 7th.
17    Q. And that was after this accident?
18    A. That was after the accident.
19    Q. Did you get a report -- First of
20 all, did you hire an independent
21 investigative firm to investigate Thompson's
22 driving history or his employment history?
23 Did you engage in --

Page 27

1     A. Did I use a third party?
2     Q. Yes.
3     A. No.
4     Q. Okay. Did you -- Did it come to
5 your attention that Thompson had been
6 involved in an accident?
7     A. I'm sorry. Can I go back to the
8 last point?
9     Q. Yes.
10    A. I did -- I don't know if you would
11 call this an independent or third party.
12 His driving -- excuse me. Our worker's comp
13 carrier did run his MVR to give me notice of
14 whether he was qualified or disqualified
15 under their standards.
16    Q. Did the worker's comp carrier
17 bring to your attention the fact that
18 Thompson had been involved in an accident?
19    A. My understanding, because of
20 privacy issues, they don't give me any
21 specific details. But they will tell me
22 whether by worker's comp standards the
23 driver is or is not eligible to drive.

Page 28

1     Q. Did Thompson bring to your
2 attention when he was hired the fact that he
3 had been involved in an accident while
4 driving for Dart Transit Company on June 14,
5 2004, only three -- less than three months
6 before this accident?
7     A. No, sir.
8     Q. He didn't put it on his
9 application form, did he?
10    A. He did not.
11    Q. Okay. And when you hired him, you
12 didn't know about his accident with Dart
13 Transportation, did you?
14    A. No, I did not.
15    Q. Let me show you what we've marked
16 for identification as Plaintiff's Exhibit 5.
17        (Whereupon, Plaintiff's Exhibit
18 No. 5 was marked for identification.)
19    Q. Can you tell me what's Exhibit 5?
20    A. This is a form from Dart Transit
21 listing Mr. Thompson's driving history with
22 them, accidents and looks like substance
23 abuse requirements.

7 (Pages 25 to 28)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    Q. Okay. And does it indicate that
2 this accident occurred on June 14, 2004?
3    A. It does.
4    Q. And what description does it give
5 of the accident?
6    A. Number one struck number two in
7 rear.
8    Q. Did it indicate whether or not it
9 was DOT recordable?
10    A. It says yes.
11    Q. Did you learn later that Thompson
12 was vehicle number one that struck number
13 two in the rear?
14    A. I learned later of the details of
15 the accident. And I guess I would have
16 deduced that he was number one.
17    Q. Okay. Did he in his application
18 process list this accident as being the
19 accident that he had been involved in, in
20 the past twelve months?
21    A. No, sir.
22    Q. Was it listed among the accidents
23 he was involved in, in the past three years?

Page 30

1    A. No, sir.
2    Q. He didn't tell you about it?
3    A. No, sir.
4    Q. Thompson didn't?
5    A. No, sir.
6    Q. When did it come to your attention
7 about this accident?
8    A. It would have been sometime
9 shortly after the date of this form, which
10 is 9-9-04. I don't remember exactly.
11    Q. And so you learned of the Dart
12 accident after Thompson had had the accident
13 with Morris?
14    A. Correct.
15    Q. When you received a three year
16 history on Morris -- I mean -- sorry -- on
17 Thompson, on that three year history, did it
18 include an accident -- I'm sorry -- did it
19 include a speeding ticket on May 9, 2003?
20    A. That sounds correct. I do
21 remember there was one speeding violation.
22 But I don't remember the specifics.
23    Q. Did it give you the information

Page 31

1 that it was a sixty-nine in a forty-five
2 mile per hour zone?
3    A. That sounds correct. Again, I
4 don't recall the specifics of it.
5    Q. Is there anything significant
6 about doing sixty-nine in a forty-five mile
7 per hour zone?
8    A. Could you clarify significant?
9    Q. Is there anything significant to
10 you about doing sixty-nine in a forty-five
11 mile per hour zone?
12    A. It's breaking the speed limit.
13    Q. Let me show you what we've marked
14 for identification as Plaintiff's Exhibit 6.
15    (Whereupon, Plaintiff's Exhibit
16 No. 6 was marked for identification.)
17    Q. Can you tell me what this document
18 is?
19    A. Driver history abstract as of
20 11-22, 2005. It looks like driver Edward
21 Neal Thompson.
22    Q. When you got your driver's
23 abstract on Thompson as we just discussed,

Page 32

1 you do recall having the sixty-nine in a
2 forty-five mile per hour zone on your
3 report?
4    A. I recall a speeding violation.
5    Q. Do you know whether or not this
6 other speeding violation of May 25th, 1999
7 was on the report?
8    A. I do not recall that one.
9    Q. Okay. I take it then that since
10 you got a three year history in 2004, that
11 the August 29, 2002 accident was on that
12 report; right?
13    A. Would you repeat that.
14    Q. Well, was the August 29, 2002
15 accident report on your three year driving
16 history?
17    A. There was an accident report cited
18 on that driving history. But I don't
19 remember the date.
20    Q. Did you do any independent
21 examination of the accident that occurred on
22 August 29, 2002 that Thompson was involved
23 in? It says Dothan, Houston County.

8 (Pages 29 to 32)

## FREEDOM COURT REPORTING

Page 33

1    A.  If that is the one that showed up
2  on our three year accident -- excuse me --
3  our three year MVR that we had on Thompson,
4  I'm quite sure it was discussed.
5            I do know the details of it.  But
6  I cannot tell you exactly the conversation
7  that transpired whenever we were reviewing
8  his MVR.
9      Q.  And you didn't have that
10  information at the time you hired him, did
11  you?
12    A.  I had his MVR when we hired him,
13  yes.
14    Q.  Did that MVR come back to you
15  after the date of hire?
16    A.  Not to my knowledge.
17    Q.  Okay.  Did you do any independent
18  investigation about his driving record other
19  than just sent off for his three year
20  driving history?
21    A.  As previously stated, with the
22  worker's comp carrier.
23    Q.  But the worker's comp carrier was

Page 34

1  done after he was hired; is that right?
2      A.  No.
3      Q.  Well, wouldn't the worker's comp
4  carrier get involved only if you were going
5  to take him on as an employee?
6      A.  Correct.  That is one of the
7  conditions of employment, that he be
8  eligible through our worker's comp.  If he's
9  not eligible with worker's comp, he's not
10  eligible to drive.
11          So he gives them -- I have a slip
12  that he signs, our drivers sign giving the
13  worker's comp carrier authorization to do
14  the MVR.
15    Q.  And do you know whether or not
16  that investigation was completed before you
17  hired him?
18    A.  Yes.
19    Q.  Did the worker's comp carrier tell
20  you about any disqualifying reason for not
21  hiring Thompson?
22    A.  No, sir.  As previously stated --
23  and they have told me in the past -- it's

Page 35

1  because of privacy issues.  They basically
2  give me an eligible or not eligible ruling
3  on each driver applicant.
4      Q.  Okay.  So other than the order the
5  driver's history and the investigation done
6  by worker's comp, you didn't do any other
7  independent investigation of his driving
8  history, did you?
9      A.  No, sir.
10    Q.  Did he ever tell you that he had
11  been disqualified for driving in August of
12  -- I'm sorry.  That was in April of 2004,
13  within a year of his -- I mean, within five
14  months of his hiring at Florida Transformer?
15    A.  Disqualified on what basis?
16    Q.  Medical basis.
17    A.  I am familiar with his medical
18  history and the medical examination of April
19  2004.
20    Q.  Let me show you what we'll mark
21  for identification as Plaintiff's Exhibit 7
22  to your deposition.
23          (Whereupon, Plaintiff's Exhibit

Page 36

1  No. 7 was marked for identification.)
2      Q.  Can you tell me what's Plaintiff's
3  Exhibit 7?
4      A.  This is the medical examiner's
5  certificate in long form, DOT medical
6  information report on Edward Neal Thompson
7  from April of 2004.
8      Q.  All right.  When did you -- Did
9  you ever see these documents before hiring
10  him?
11    A.  Yes.  These hiring is -- offer of
12  employment is conditional on having a valid
13  medical certificate.
14    Q.  When did you get these documents?
15    A.  I don't remember the specific
16  date.  But it would have been prior to
17  employment.
18    Q.  And did you know or did you review
19  these documents before hiring him?
20    A.  I did.
21    Q.  Did you look at his -- page four
22  of that document where he was temporarily
23  disqualified from driving?

9  (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 37

1    A.  I was familiar with that.
2    Q.  Did you have any discussion with
3  Mr. Thompson prior to hiring?
4    A.  As I recall, he explained, as he
5  has explained in his previous deposition,
6  that he was not real diligent with his
7  medications and he had an elevated blood
8  sugar.
9        And he reported back a couple of
10  days later and his blood sugar was within
11  range and he was given a one year medical
12  certificate.
13    Q.  Did you do any independent
14  verification of this information contained
15  in these medical records identified as
16  Plaintiff's Exhibit 7?
17    A.  No independent verification.
18    Q.  Did you do anything to confirm
19  whether he was back on medication?
20    A.  No, I didn't.
21    Q.  Did you check with his doctor to
22  see whether or not he was, in fact, taking
23  his medication?

Page 38

1    A.  I did not.  I'm not sure that the
2  Americans with Disabilities Act would allow
3  me to do that.  But no, I didn't.
4    Q.  And the pre -- Did you do a
5  pre-hiring physical with Mr. Thompson?
6    A.  He did a pre-employment drug
7  screen.
8    Q.  Did he do a pre-employment
9  physical?
10    A.  No, sir.
11    Q.  I believe you said the other day
12  that he was -- at least Mr. Thompson said
13  the other day that he was sent to -- I think
14  he said Dr. Gonzalez?
15    A.  Garcia.
16    Q.  Garcia.  Did Dr. Garcia do a
17  pre-employment physical?
18    A.  Dr. Garcia did a pre -- or Dr.
19  Garcia's office did a pre-employment drug
20  screen.  Mr. Thompson's subsequent physical
21  with Florida Transformer, which would have
22  been around the time of the expiration on
23  the one he brought us, was done by Dr.

Page 39

1  Garcia.
2    Q.  Okay.  But what I'm asking you is,
3  when you first was hiring him, did you ask
4  him to submit to a pre-employment physical?
5    A.  No, sir.
6    Q.  Do you have any idea what was
7  Thompson's physical condition on September
8  the 2nd, 2004?
9    A.  No, sir.  I did not see Mr.
10  Thompson.  I'm not sure that I saw him at
11  any point on September the 2nd.  It may have
12  been the 3rd.  But if it was the 2nd, it was
13  late in the day.
14    Q.  Do you have any idea what was his
15  medical condition on September the 2nd,
16  2004?
17    A.  No, sir.  I'm not qualified to
18  speak to that.
19    Q.  And your testimony is -- Is it
20  your testimony here today that you had been
21  informed by the medical records identified
22  in Plaintiff's Exhibit 7 that Mr. Thompson
23  had been temporarily disqualified due to his

Page 40

1  diabetes in April of 2004 and that when you
2  hired him in September of 2004, you did not
3  do a pre-employment physical examination of
4  him?
5    A.  Correct.
6    Q.  Do you know the consequence --
7  Well, first of all, I guess you can tell
8  from -- can you tell from looking at
9  Plaintiff's Exhibit 7 that diabetes can be a
10  disqualifying factor?
11    A.  Yes, sir.
12    Q.  Do you know why that is so?
13    A.  I can't speak to that
14  specifically.  I mean, obviously diabetes is
15  a health issue.  For those reasons, the
16  Department of Transportation does put
17  limitations on it.  But I don't know the
18  effects or consequences of diabetes.
19    Q.  Have you seen anybody -- the
20  physiological effects of anybody whose blood
21  sugar is out of whack?
22    A.  I can't say that I have knowingly
23  observed that.

10  (Pages 37 to 40)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 41

1    Q.  Do you know that when a person's
2  blood sugar is out of whack, it can produce
3  a condition that's very similar to
4  intoxication?
5    A.  I did not know it could produce an
6  intoxicating effect, no.
7    Q.  In terms of the person's reaction
8  time, his speech, his ability to maintain
9  his equilibrium equal, all of those things?
10  Did you know that?
11    A.  I didn't know that.  I would not
12  be surprised if it had those kinds of
13  effects.  But I can't speak from experience.
14    Q.  Is there any kind of medical
15  precautions or safety guards you took to
16  confirm with Mr. Thompson that he was taking
17  his medication on a regular basis?
18    A.  Other than Mr. Thompson explaining
19  his disqualification in April and that he
20  was taking his medication, no.
21    Q.  And you just accepted his
22  representation that he was taking his
23  medication, you didn't do any independent of

Page 42

1  that; right?
2    A.  His representation and his
3  authorization from Ms. Barbara Elliott.
4    Q.  Do you know that Barbara Elliott
5  is an RN?
6    A.  She is not.
7    Q.  She's not?
8    A.  No, sir.
9    Q.  Well, do you know that she is what
10  they call a nurse practitioner?
11    A.  Correct.
12    Q.  And that her highest degree of
13  obtaining, other than being a nurse
14  practitioner, is that of an RN?
15    A.  Could you repeat that.
16    Q.  Other than being a nurse
17  practitioner, her highest degree of
18  obtaining is an RN?
19    A.  No, I did not know that an RN and
20  a nurse practitioner were equivalent.
21    Q.  Let's put it this way.  For sure,
22  you do know that Barbara Elliott is not a
23  licensed practicing medical doctor?

Page 43

1    A.  She is not a M.D. or a D.O.
2    Q.  Okay.  And for sure, she's not an
3  endocrinologist; right?
4    A.  Probably not.
5    Q.  Okay.  Does Florida Transformer
6  have a health insurance plan?
7    A.  We do.
8    Q.  And who is it administered
9  through?
10    A.  Blue Cross Blue Shield of Florida.
11    Q.  And does it include a provision to
12  pay for medicines?
13    A.  The current plan that we have has
14  four levels of coverage.  And three of the
15  four do have prescription co-pays.
16    Q.  And once hired by Florida
17  Transformer, how soon after employment did
18  Mr. Thompson receive a medical insurance
19  card?
20    A.  He would have been eligible for
21  health insurance after he completed the
22  ninety day probationary period.  Then the
23  beginning the first day of the month

Page 44

1  following completion of his ninety day
2  probationary period.
3    Q.  And what date would you say was
4  his date of hire?
5    A.  His date of hire was I believe
6  August 30th, 2004.  It was late August.  I
7  believe the 30th was the date.  But if I'm
8  missing it a day or two, I stand corrected.
9    Q.  Let me show you what we'll mark as
10  Plaintiff's Exhibit 8.
11      (Whereupon, Plaintiff's Exhibit
12  No. 8 was marked for identification.)
13    Q.  Let me show you what we've marked
14  as Plaintiff's Exhibit 8 to your
15  deposition.  Does that refresh your
16  recollection as his date of hire?
17    A.  I would say that confirms his date
18  of hire as August 30th, 2004.
19    Q.  And so he would have been eligible
20  then for medical insurance on what date?
21    A.  It appears he would have been
22  eligible on December 1st, 2004 if I'm adding
23  forward correctly.

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 69

1  licensed or authorized disposal company
2  comes by and picks it up.
3      Q.   Do you know whether or not any
4  transformers that Thompson was hauling on
5  this occasion had any PCB oil on it?
6      A.   Conclusively that they did not.
7      Q.   Is Florida Transformer
8  incorporated?
9      A.   Yes, sir.
10      Q.   Are you aware of any period of
11  time that it was dissolved?
12      A.   I'm not aware of any period of
13  time it was dissolved.  I can answer your
14  question this way.  As I understand it, the
15  history on Florida Transformer, the company
16  was actually started around 1975 I believe
17  on a very small limited scale.
18      An individual -- and I do not
19  recall his name.  But our current owner came
20  on board I believe around 1980 and the
21  company was incorporated at that point in
22  time.
23      Our current owner and this other

Page 70

1  guy whose name escapes me were partners.
2  And I believe it was around 1984 that Mr.
3  Bodie, our current owner, bought out his
4  partner and he has been the owner since.
5      Q.   You're not aware of any report of
6  dissolution with the Secretary of State of
7  Florida then; right?
8      A.   I'm not aware.
9      Q.   All right.  Is there anything you
10  know about this accident that we haven't
11  talked about yet?
12      A.   I think we've covered it.
13      Q.   Did you write up any reports about
14  this accident?
15      A.   We filed I believe it was a Form
16  SR-13 that's required by the State.
17      Q.   Anything other than that?
18      A.   I believe there was just an
19  accident report on Thompson for the worker's
20  comp that was sent to them just describing
21  basically that he had had the automobile
22  accident and what parts of his body was
23  hurting.

Page 71

1      Q.   You didn't take any pictures or
2  any recorded statements or anything, did
3  you?
4      A.   I'm not aware of any recorded
5  statements.  Scotty Carol did take some
6  pictures, Scotty Carol and Neal.  Scotty
7  carried the camera.  I'm not sure exactly
8  who took the pictures.
9      MR. PENICK:  Are those the
10  pictures that we have already, Richard?
11      MR. BROUGHTON:  I think so.  I
12  assume we produced them to you.  Check and
13  see.  If we didn't, we certainly can.
14      Q.   We've got some pictures.  I just
15  want to know are those the ones that Scotty
16  Carol took?
17      A.   Yes.  That's the only pictures I
18  have.
19      Q.   Do you participate at all in the
20  annual -- Well, first of all, do you inspect
21  the vehicles annually?
22      A.   When you say do you, do you mean
23  Florida Transformer?

Page 72

1      Q.   Does Florida Transformer inspect
2  its vehicles annually?
3      A.   Correct.
4      Q.   Do you participate in that in any
5  way?
6      A.   Not really.
7      Q.   Who's the person that would be
8  most responsible for that?
9      A.   Don Carol would be the primary
10  person overseeing the maintenance.
11      Q.   Do you know when this truck number
12  11 was last inspected before this accident?
13      A.   I believe the last annual was the
14  end of 2003.
15      (Whereupon, Plaintiff's Exhibit
16  No. 10 was marked for identification.)
17      Q.   Let me show you what we'll mark as
18  Plaintiff's Exhibit 10 to your deposition.
19  Can you tell me what that is?
20      A.   Annual vehicle inspection report
21  on truck number 11 dated 12-29, 2003.
22      Q.   And this would have been nine
23  months then before the accident?

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1    A.   Correct.
2    Q.   Do you see any defects with this
3    truck listed on Plaintiff's Exhibit 10?
4    A.   Just a quick scanning of it,
5    nothing jumps out at me.
6    Q.   Do you know whether or not there
7    have been any subsequent maintenance -- or
8    any maintenance done on the vehicle since
9    that report?
10   A.   I think there had been some
11   routine type stuff done to the truck.  But
12   the truck was used very sparingly after the
13   annual and before the wreck.
14        And as I recall, it had not
15   reached the mileage level for an additional
16   PM.
17   Q.   Why was it used so sparingly?
18   A.   Well, we were -- As I recall, we
19   were basically what we'd call down a driver
20   for most of that period of time.  And this
21   truck was just not being utilized.
22   Q.   Would it be a fair statement that
23   if you're going to have one truck out of

Page 74

1    service, that it's not going to be your best
2    truck?
3         MR. BROUGHTON:  Object to the
4    form.
5    Q.   Is that a fair statement?
6    A.   No, sir, that would not be a fair
7    statement in our case.  Our trucks -- It
8    would not be our best trucks.  It would be
9    yard trucks.
10   Q.   But if you had one truck that you
11   were going to take out of service, you
12   wouldn't take your best truck out of
13   service, would you?
14   A.   Wouldn't take our best truck.
15   But, you know, describe best.  I'm sure that
16   -- This was not our newest truck, no.
17   Q.   Do you know -- I think it says in
18   the accident report this was a 1995
19   Peterbilt; is that right?
20   A.   Correct.
21   Q.   You don't know how many miles it
22   had on it during the time of the annual
23   inspection on December the 29th, 2003, do

Page 75

1    you?
2    A.   Not off the top of my head, no.
3    Q.   Wouldn't that be an important item
4    to list on your annual inspection?
5    A.   It probably should be noted on
6    here.
7    Q.   Let me show you what I have marked
8    for identification as Plaintiff's Exhibit
9    11.
10        (Whereupon, Plaintiff's Exhibit
11   No. 11 was marked for identification.)
12   Q.   Can you tell me what we've marked
13   for identification as Plaintiff's 11?
14   A.   A service history, number 11
15   truck.  I believe this is an internal
16   document that we generate.
17   Q.   And how long had this truck been
18   out of service or used sparingly as you
19   described it?
20   A.   Well, again, just to clarify, the
21   truck was never out of service.  It was just
22   used sparingly.  It appears that sometime
23   around late 2003 probably up to August 2004

Page 76

1    that it was used sparingly.
2    Q.   Up to what time now?
3    A.   Around August 2004.
4    Q.   I know.  From when to when,
5    though, again?
6    A.   From approximately -- and I'm
7    guessing -- but the fall of '03 through
8    August 2004.
9    Q.   Let's look at the document that I
10   have marked as Plaintiff's 11.  And I think
11   that apparently this report was generated on
12   September the 7th, 2004; is that right?
13   A.   That's when it's dated, yes, sir.
14   Q.   Okay.  You don't have any reason
15   to disagree with that, do you?
16   A.   No, sir.
17   Q.   All right.  And then the first
18   item on here says service items from October
19   the 21st, 2003 to July 25th, 2004.
20   A.   Correct.
21   Q.   Okay.  And is that the period of
22   time covered by this diagram on this summary
23   that's over to the right?

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 89

1    Q.   Now, of all of the entries that we
2 have right now, which, if any, of the
3 entries involved either brakes or lights?
4    A.   You're referring to the entries on
5 Exhibit 11?
6    Q.   The service history and including
7 15, which is not on the service history.
8 Which, if any, includes brakes or lights
9 repair?
10    MR. BROUGHTON:  Including the
11 annual inspection?
12    MR. PENICK:  Well, I'll let him
13 answer that.  I don't know if the annual
14 inspection was any repair at all.
15    MR. BROUGHTON:  Oh, you're asking
16 him what was repaired, not what was checked
17 or inspected.
18    A.   According to these records, brake
19 work was done on the 10-21-03 servicing.
20 Left rear wheel seal work was done on the
21 7-25-04 servicing.  Then the annual
22 inspection, I am very confident does address
23 brakes.

Page 90

1    Q.   Well, we're talking about repairs
2 now.  You don't see any repairs on the
3 annual inspection; right?
4    A.   I do not see any repairs, no.
5    Q.   And then on the July 25th, '04
6 where the left rear wheel seal was replaced,
7 that did not include any brake work; right?
8    A.   I do not know.
9    Q.   All right.  But on that -- on July
10 25th, it did include some repair to the
11 light; right?
12    A.   Yes.
13    Q.   And you don't know what that
14 repair was, do you?
15    A.   I do not know, no.
16    Q.   Does Plaintiff's 14 shed any light
17 in terms of what kind of repair was done to
18 the lights?
19    A.   This is entirely speculation.  But
20 on Exhibit 14 it said the parts for a total
21 of forty-seven dollars and thirty-five
22 cents.  And if he's replacing left rear
23 wheel seal, with my limited knowledge of the

Page 91

1 cost of parts and all, it's hard to imagine
2 that that would have left a big bill for the
3 lights.
4    Perhaps this answers it here.  If
5 this is a breakdown of his parts, it looks
6 like he's got six dollars and ninety cent
7 for a light and a dollar sixty-eight.  I
8 would only assume those must be some sort of
9 bulb.  But I'd --
10    Q.   I'm sorry.  Go ahead.
11    A.   I'd just say perhaps a cab light.
12    Q.   Do you see the word lights on
13 Plaintiff's 14?
14    A.   I do.
15    Q.   And do you know what kind of
16 lights those were right there?
17    A.   I do not.
18    Q.   Okay.  But for certain, the only
19 brake work you show is brake work that
20 occurred on October 21st, 2003; right?
21    A.   That's the only brake work I see
22 on this exhibit.
23    Q.   And that's about over ten months

Page 92

1 prior to the accident; right?
2    A.   Yes, sir.
3    Q.   More like eleven months; is that
4 right?  Wouldn't that be about eleven months
5 prior to the accident?
6    A.   Between ten and eleven.
7    Q.   Okay.  Are you aware of any
8 adjustment to the brakes after October the
9 21st, 2003?
10    A.   I'm not aware of any.
11    Q.   Sitting here today, do you know
12 how many miles was put on the truck from the
13 date the brakes were last replaced on the
14 rear drive axle or the rear tires up through
15 the date of the accident?
16    A.   To best of my knowledge, that's
17 going to be a figure around five thousand
18 miles.
19    Q.   And how do you come to that
20 figure?
21    A.   From review of some previous fuel
22 logs and mileage on the truck.
23    Q.   What fuel logs or mileage tells

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  you that there was only five thousand miles
2  on the truck from October the 21st, 2003 to
3  September the 4th, 2004?
4      A.  Those should be reflected in the
5  logs that you were just given.  This would
6  have been the mileage -- this was the last
7  known fueling of that truck before the
8  annual PM.
9      Q.  All right.  Let's go over this
10  then.  You were pointing to Plaintiff's 16.
11  And is this the -- Is this for -- Well, what
12  date is reflected on Plaintiff's 16?
13      A.  On 11-21, 2004.
14      MR. BROUGHTON:  2000 what?
15      A.  Excuse me.  2003.
16      Q.  How do you know that that's 2003?
17      A.  Because it was pulled from the
18  2003 records.
19      Q.  How do you know that?
20      A.  Because I pulled them.
21      Q.  Is there anything on here to
22  indicate that this is 2003?
23      A.  I do not see that.

Page 94

1      Q.  It says the driver is Ray Wiggins?
2      A.  Correct.
3      Q.  Was Ray Wiggins there in 2004?
4      A.  Probably.  Ray Wiggins is no
5  longer with the company.  And the reason
6  we're sure, he left before Thompson was
7  employed.  He probably didn't work over into
8  2004.  I'm not sure exactly when he left.
9      Q.  Okay.  Is there anything about
10  this document that you can say definitively
11  that this is a 2003 report rather than a
12  2004 report?
13      MR. BROUGHTON:  On the document
14  itself.  He's already testified how he knows
15  that it's a 2003 document.  You're asking on
16  the document?
17      MR. PENICK:  Yes.
18      A.  Not on the document itself, no.
19      Q.  But your testimony here today is
20  that you pulled this out of the 2003
21  reports?
22      A.  Correct.
23      Q.  All right.  And so on October the

Page 95

1  21st, 2003, according to your testimony, the
2  truck had eight hundred and --
3      MR. BROUGHTON:  November the 21st.
4      Q.  I'm sorry.  November the 21st,
5  2003, according to your testimony, the truck
6  had eight hundred and eighty-three thousand
7  six hundred and fifty-seven miles on it?
8      A.  I think that would actually be six
9  seventy-two.
10      Q.  Okay.  Eight hundred and
11  eighty-three thousand six seventy-two.  Is
12  that right?
13      A.  At the time it was fueled, yes, it
14  appears when he turned in this log.  And I
15  can only assume this was after he made his
16  trip.  The ending reading was eight eight
17  three six seventy-two.  That's the same.
18  I'm sorry.  That's the same figure, yes,
19  sir.
20      Q.  Do you know what the mileage was
21  that Thompson indicated was on the truck at
22  the time of the accident?
23      A.  I don't remember specifically.  It

Page 96

1  is on the same form as this that you have
2  where he fueled it.  I believe it was on
3  September the 1st.
4      MR. BROUGHTON:  Did you mark that
5  as an exhibit?  I can't remember if you did
6  or not.
7      MR. PENICK:  Yes, we did.
8      Q.  And what mileage do you recall
9  being on the truck at that time?
10      A.  I don't recall specifically.  But
11  it would be a mileage approximately five
12  thousand miles greater than the last mileage
13  that Mr. Ray Wiggins logged on November 21st
14  of '03.
15      Q.  How often do you have brakes
16  repaired, how many miles, if you know?
17      A.  I'm not sure.  But I think the
18  answer to that question is brakes are
19  repaired as needed.
20      Q.  How long would the brake shoes
21  last before they had to be replaced?
22      A.  I'm not sure.
23      Q.  Okay.  Do you see any adjustment

24  (Pages  93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  -- Well, first of all, do you know whether
2  or not the brakes are adjusted at the time
3  the brakes shoes are put on?
4      A.  I don't know.  But that would
5  certainly be a reasonable assumption.
6      Q.  Okay.  Do you know whether or not
7  there was any other adjustment of the brakes
8  after October 21st, 2003?
9      A.  I'm not aware of any.
10     Q.  Do you know whether or not any
11 driver of truck 11 had reported to you any
12 problems with that truck?
13     A.  I have no knowledge of any
14 reported problems.
15     Q.  Are you aware of whether or not
16 that truck has ever been cited for any
17 safety violations?
18     A.  I'm not aware of any.
19     Q.  Do you know whether or not the
20 truck was in compliance with DOT regulations
21 with regard to its reflectors and lights?
22     A.  Would you restate that again.
23     Q.  Do you know whether or not truck

Page 98

1  11 was in compliance with DOT regulations
2  with respect to what is called constituity
3  (spelled phonetically) of the taping and the
4  lights, reflectors and so forth?
5      A.  I have no reason to believe that
6  it was not in compliance.
7      Q.  Do you know whether or not it was
8  in compliance with respect to its lighting?
9      A.  I have no reason to believe that
10 it was not in compliance.
11     Q.  Anybody report to you any problem
12 with the lights other than what we've
13 discussed so far on the July 5th, 2004
14 repair?
15     A.  Not to my recollection.
16     Q.  Are you aware of any other
17 maintenance on this vehicle other than what
18 we've talked about that occurred within a
19 year of this accident?
20     A.  None that I can recall.
21     Q.  Let me make sure we've got this
22 last question correct.  You don't have any
23 knowledge about the accident itself except

Page 99

1  for what was referred back to you from
2  Scotty Carol and Neal Thompson and Bill
3  Tidwell?
4      A.  Do I have knowledge --
5          MR. BROUGHTON:  He's not asking
6  you for any knowledge you got from any
7  discussion with your attorney.  That's
8  privileged.
9      A.  From -- Regarding knowledge from
10 the accident scene, I believe that pretty
11 much pinpoints -- I don't recall of anybody
12 outside that group you mentioned.
13     Q.  And I'm speaking in terms of some
14 insurance people, the worker's comp
15 insurance person and the liability insurance
16 person.  Have you talked to them about it?
17     A.  The worker's comp, a very limited
18 -- Certainly the only aspect of this that
19 they're -- were really concerned about was
20 the claims that were filed on worker's comp
21 filed by Thompson and Tidwell.
22         So as far as speaking directly
23 with them about the accident, you know, I do

Page 100

1  recall representatives from the insurance
2  company shortly after coming and gathering
3  facts and documents and that sort of thing.
4      Q.  Did they -- Are you aware of any
5  report that the -- that your liability
6  insurance carrier has written?
7      A.  I'm not familiar with what they
8  put in the file.
9      Q.  Are you aware of any photographs
10 that the liability insurance carrier may
11 have taken?
12     A.  I'm aware that photographs were
13 made on the cargo.  The trailer involved, a
14 representative of the carrier for the cargo
15 insurance came on site.  And I don't believe
16 I was in the shop that day.  And I believe
17 he made photographs.  But I don't have them.
18     Q.  When you said came on site --
19     A.  He came to look at the trailer.
20 It was in our yard.
21     Q.  Was the trailer still loaded at
22 the time he saw it?
23     A.  No, sir.  I don't think anything

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# APPLICATION FOR EMPLOYMENT
**(PRE-EMPLOYMENT QUESTIONNAIRE) (AN EQUAL OPPORTUNITY EMPLOYER)**

## PERSONAL INFORMATION

DATE _8-6-4_

NAME _Thompson_ _Edward_ _Neal_
LAST FIRST MIDDLE

SOCIAL SECURITY NUMBER _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_

PRESENT ADDRESS _3033 St Hwy 85_ _Geneva_ _Al_ _36340_
STREET CITY STATE ZIP

PERMANENT ADDRESS
STREET CITY STATE ZIP

PHONE NO. _(334) 684-3945_     ARE YOU 18 YEARS OR OLDER? Yes ☑ No ☐

ARE YOU PREVENTED FROM LAWFULLY BECOMING EMPLOYED
IN THIS COUNTRY BECAUSE OF VISA OR IMMIGRATION STATUS? Yes ☐     No ☑

## EMPLOYMENT DESIRED

POSITION _Track Driver_     DATE YOU CAN START _9-7-4_     SALARY DESIRED

ARE YOU EMPLOYED NOW? _Yes_     IF SO MAY WE INQUIRE OF YOUR PRESENT EMPLOYER? _not yet_

EVER APPLIED TO THIS COMPANY BEFORE? _no_     WHERE?     WHEN?

REFERRED BY:

| EDUCATION | NAME AND LOCATION OF SCHOOL | *NO OF YEARS ATTENDED | *DID YOU GRADUATE? | SUBJECTS STUDIED |
|---|---|---|---|---|
| GRAMMAR SCHOOL | James H mulkey Geneva | 6 | yes |  |
| HIGH SCHOOL | Geneva High Geneva Al | 5 | no |  |
| COLLEGE |  |  |  |  |
| TRADE, BUSINESS OR CORRESPONDENCE SCHOOL |  |  |  |  |

## GENERAL
SUBJECTS OF SPECIAL STUDY OR RESEARCH WORK

SPECIAL SKILLS

ACTIVITIES: (CIVIC, ATHLETIC, ETC.) _Hunting Fishing_
EXCLUDE ORGANIZATIONS, THE NAME OF WHICH INDICATES THE RACE, CREED, SEX, AGE, MARITAL STATUS, COLOR OR NATION OF ORIGIN OF ITS MEMBERS.

U.S. MILITARY OR NAVAL SERVICE _no_     RANK     PRESENT MEMBERSHIP IN NATIONAL GUARD OR RESERVES

*This form has been revised to comply with the provisions of the Americans with Disabilities Act
and the final regulations and interpretive guidance promulgated by the EEOC on July 26, 1991.

TOPS. FORM 3285 (92-8)     [CONTINUED ON OTHER SIDE]     **PLAINTIFF'S EXHIBIT**     23 FTI MADE IN U.S.A.

**FORMER EMPLOYERS** (LIST BELOW LAST THREE EMPLOYERS, STARTING WITH LAST ONE FIRST)

| MONTH AND YEAR | NAME AND ADDRESS OF EMPLOYER | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| FROM 14-?| Dart Transit Eagan Mn | mileage | Truck Driver | Be home more |
| TO present | | | | |
| FROM 1-2000 | McLane Dothan Al | around 900.00 wk | Truck Driver | personal |
| TO 10-2003 | | | | |
| FROM | | | | |
| TO | | | | |
| FROM | | | | |
| TO | | | | |

WHICH OF THESE JOBS DID YOU LIKE BEST? _McLane_

WHAT DID YOU LIKE MOST ABOUT THIS JOB? _Being home_

**REFERENCES:** GIVE THE NAMES OF THREE PERSONS NOT RELATED TO YOU, WHOM YOU HAVE KNOWN AT LEAST ONE YEAR.

| | NAME | ADDRESS | BUSINESS | YEARS ACQUAINTED |
|---|---|---|---|---|
| 1 | Jimmie Shiver | Geneva Al | Self employed | 41 |
| 2 | Clovett C Thompson | Geneva Al | Self employed | 41 |
| 3 | Buster Shiver | Geneva Al | Self employed | 30 |

THE FOLLOWING STATEMENT APPLIES IN: MARYLAND & MASSACHUSETTS. (Fill in name of state)
IT IS UNLAWFUL IN THE STATE OF _____ TO REQUIRE OR ADMINISTER A LIE DETECTOR TEST AS A CONDITION OF EMPLOYMENT OR CONTINUED EMPLOYMENT. AN EMPLOYER WHO VIOLATES THIS LAW SHALL BE SUBJECT TO CRIMINAL PENALTIES AND CIVIL LIABILITY.

Signature of Applicant _Edward Neal Thompson_

IN CASE OF EMERGENCY NOTIFY _Clovette Thompson_   _Geneva Al_   (334) 684-3945
　　　　　　　　　　　　　　　NAME　　　　　　　ADDRESS　　　　PHONE NO.

"I CERTIFY THAT ALL THE INFORMATION SUBMITTED BY ME ON THIS APPLICATION IS TRUE AND COMPLETE, AND I UNDERSTAND THAT IF ANY FALSE INFORMATION, OMISSIONS, OR MISREPRESENTATIONS ARE DISCOVERED, MY APPLICATION MAY BE REJECTED AND, IF I AM EMPLOYED, MY EMPLOYMENT MAY BE TERMINATED AT ANY TIME. IN CONSIDERATION OF MY EMPLOYMENT, I AGREE TO CONFORM TO THE COMPANY'S RULES AND REGULATIONS, AND I AGREE THAT MY EMPLOYMENT AND COMPENSATION CAN BE TERMINATED, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE, AT ANY TIME, AT EITHER MY OR THE COMPANY'S OPTION. I ALSO UNDERSTAND AND AGREE THAT THE TERMS AND CONDITIONS OF MY EMPLOYMENT MAY BE CHANGED, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE, AT ANY TIME BY THE COMPANY. I UNDERSTAND THAT NO COMPANY REPRESENTATIVE, OTHER THAN IT'S PRESIDENT, AND THEN ONLY WHEN IN WRITING AND SIGNED BY THE PRESIDENT, HAS ANY AUTHORITY TO ENTER INTO ANY AGREEMENT FOR EMPLOYMENT FOR ANY SPECIFIC PERIOD OF TIME, OR TO MAKE ANY AGREEMENT CONTRARY TO THE FOREGOING."

DATE _8-6-4_   SIGNATURE _Edward Neal Thompson_

---

**DO NOT WRITE BELOW THIS LINE**

INTERVIEWED BY _____   DATE _____

REMARKS: _____

NEATNESS _____   ABILITY _____

HIRED: ☐ Yes ☐ No   POSITION _____   DEPT. _____

SALARY/WAGE _____   DATE REPORTING TO WORK _____

APPROVED: 1. _____   2. _____   3. _____
EMPLOYMENT MANAGER   DEPT. HEAD   GENERAL MANAGER

This form has been designed to strictly comply with State and Federal fair employment practice laws prohibiting employment discrimination. This Application for Employment Form is sold for general use throughout the United States. TOPS assumes no responsibility for the inclusion in said form of any questions which, when asked by the Employer of the Job Applicant, may violate State and/or Federal Law.

FTI

# STATEMENT OF VIOLATIONS

§§391.25, 391.27

This form is to be completed at least once every 12 months.

DRIVER'S NAME _Edward Neal Thompson_

I certify that the following is a true and complete list of traffic violations (other than parking violations) for which I have been convicted or forfeited bond or collateral during the past 12 months. (If no violations, put NONE in the offense column.)

| DATE OF CONVICTION | OFFENSE | LOCATION | COMMERCIAL MOTOR VEHICLE OR AUTOMOBILE |
|---|---|---|---|
| | None | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If no violations are listed above, I certify that I have not been convicted or forfeited bond or collateral on account of any violation required to be listed during the past 12 months.

_Edward Neal Thompson_
DRIVER'S SIGNATURE

_8/13/04_
DATE

NAME OF MOTOR CARRIER _Florida Transformer, Inc._

ADDRESS _P.O. Box 507_    _DeFuniak Springs_    _FL_    _32435_
                            CITY                STATE   ZIP

_Scott Leary_
REVIEWED BY: SIGNATURE

_HR MGR_
TITLE

## ———— Certificate of Review ————

To be certified by a motor carrier supervisor.

I have hereby reviewed the driving record of _____
                                              DRIVER'S NAME

in accordance with §391.25 and find that he/she:

____  Meets minimum requirements for safe driving.

____  Is disqualified to drive a commercial motor vehicle pursuant to §391.15.

Reason for disqualification: _____

PLAINTIFF'S
EXHIBIT

3

_____
SUPERVISOR'S SIGNATURE                    DATE

79
FTI

Distribution of Copy:  Driver Qualification File with a copy of Motor Vehicle Driving Record attached.

No. 1091    Copyright © 2/02    Reorder from Trans Products    1-800-367-9100    PO Box 898 Milford, DE 19963

# ANNUAL VEHICLE INSPECTION REPORT

| REPORT NUMBER | FLEET UNIT NUMBER |
|---|---|
| | 11 |

DATE  12-29-03

| MOTOR CARRIER OPERATOR | INSPECTOR'S NAME (PRINT OR TYPE) |
|---|---|
| Florida TRANSFormer | Chads Truck RePair |
| ADDRESS 4509 Hwy 83 North | THIS INSPECTOR MEETS THE QUALIFICATION REQUIREMENTS IN SECTION 396.19. ☒YES |
| CITY, STATE, ZIP CODE DeFuniak SPrings Fl 32433 | VEHICLE IDENTIFICATION (✓) AND COMPLETE ☐ LIC. PLATE NO. ☒VIN ☐ OTHER  1XP-5D89X-0-SN376286 |
| VEHICLE TYPE ☒TRACTOR ☐ TRAILER ☐ TRUCK ☐ (OTHER) | INSPECTION AGENCY/LOCATION (OPTIONAL) |

## VEHICLE COMPONENTS INSPECTED

| OK | NEEDS REPAIR | REPAIRED DATE | ITEM | OK | NEEDS REPAIR | REPAIRED DATE | ITEM | OK | NEEDS REPAIR | REPAIRED DATE | ITEM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **1. BRAKE SYSTEM** | | | | **4. FUEL SYSTEM** | | | | **9. FRAME** |
| ✓ | | | a. Service Brakes | ✓ | | | a. Visible leak | ✓ | | | a. Frame Members |
| ✓ | | | b. Parking Brake System | ✓ | | | b. Fuel tank filler cap missing | | | | b. Tire and Wheel Clearance |
| ✓ | | | c. Brake Drums or Rotors | ✓ | | | c. Fuel tank securely attached | | | | c. Adjustable Axle Assemblies (Sliding Subframes) |
| ✓ | | | d. Brake Hose | | | | **5. LIGHTING DEVICES** | | | | **10. TIRES** |
| ✓ | | | e. Brake Tubing | | | | All lighting devices and reflectors required by Section 393 shall be operable. | | | | a. Tires on any steering axle of a power unit. |
| ✓ | | | f. Low Pressure Warning Device | | | | | | | | b. All other tires. |
| ✓ | | | g. Tractor Protection Valve | | | | **6. SAFE LOADING** | | | | **11. WHEELS AND RIMS** |
| ✓ | | | h. Air Compressor | N/A | | | a. Part(s) of vehicle or condition of loading such that the spare tire or any part of the load or dunnage can fall onto the roadway. | N/A | | | a. Lock or Side Ring |
| N/A | | | i. Electric Brakes | | | | | ✓ | | | b. Wheels and Rims |
| N/A | | | j. Hydraulic Brakes | | | | | ✓ | | | c. Fasteners |
| N/A | | | k. Vacuum Systems | | | | | ✓ | | | d. Welds |
| | | | | | | | b. Protection against shifting cargo | | | | **12. WINDSHIELD GLAZING** |
| | | | **2. COUPLING DEVICES** | | | | | | | | Requirements and exceptions as stated pertaining to any crack, discoloration or vision reducing matter (reference 393.60 for exceptions) |
| ✓ | | | a. Fifth Wheels | | | | **7. STEERING MECHANISM** | | | | |
| N/A | | | b. Pintle Hooks | | | | a. Steering Wheel Free Play | | | | |
| N/A | | | c. Drawbar/Towbar Eye | ✓ | | | b. Steering Column | | | | |
| | | | d. Drawbar/Towbar Tongue | ✓ | | | c. Front Axle Beam and All Steering Components Other Than Steering Column | | | | **13. WINDSHIELD WIPERS** |
| | | | e. Safety Devices | | | | | ✓ | | | Any power unit that has an inoperative wiper, or missing or damaged parts that render it ineffective. |
| ✓ | | | f. Saddle-Mounts | ✓ | | | d. Steering Gear Box | | | | |
| | | | | ✓ | | | e. Pitman Arm | | | | List any other condition which may prevent safe operation of this vehicle. |
| | | | **3. EXHAUST SYSTEM** | ✓ | | | f. Power Steering | | | | |
| | | | a. Any exhaust system determined to be leaking at a point forward of or directly below the driver/sleeper compartment. | ✓ | | | g. Ball and Socket Joints | | | | |
| | | | | ✓ | | | h. Tie Rods and Drag Links | | | | |
| | | | | ✓ | | | i. Nuts | | | | |
| N/A | | | b. A bus exhaust system leaking or discharging to the atmosphere in violation of standards (1), (2) or (3). | ✓ | | | j. Steering System | | | | |
| | | | | | | | **8. SUSPENSION** | | | | |
| ✓ | | | c. No part of the exhaust system of any motor vehicle shall be so located as would be likely to result in burning, charring, or damaging the electrical wiring, the fuel supply, or any combustible part of the motor vehicle. | ✓ | | | a. Any U-bolt(s), spring hanger(s), or other axle positioning part(s) cracked, broken, loose or missing resulting in shifting of an axle from its normal position. | | | | |
| | | | | ✓ | | | b. Spring Assembly | | | | |
| | | | | ✓ | | | c. Torque, Radius or Tracking Components. | | | | |

INSTRUCTIONS: MARK COLUMN ENTRIES TO VERIFY INSPECTION:  X  OK.  X  NEEDS REPAIR.  NA  IF ITEMS DO NOT APPLY.  _____  REPAIRED.

CERTIFICATION: THIS VEHICLE HAS PASSED ALL THE INSPECTION ITEMS FOR THE ANNUAL VEHICLE INSPECTION REPORT IN ACCORDANCE WITH 49 CFR 396.

PLAINTIFF'S EXHIBIT

10