IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF  ALABAMA
EASTERN DIVISION

LORI ANN MORRIS,                          }
                                          }
              Plaintiff,                   }
                                          }
vs.                                       }   CIVIL ACTION NO.3:05cv962-T
                                          }
FLORIDA TRANSFORMER, EDWARD               }
NEAL THOMPSON, et al.,                    }
                                          }
              Defendants.                  }

### DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AND BRIEF IN SUPPORT OF AMENDED MOTION

COME NOW the Defendants, Edward Neal Thompson ("Thompson") and

Florida Transformer, Inc. ("FTI") (collectively referred to as "Defendants"), and submit

this Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary

Judgment and Brief in Support of Amended Motion ("Defendants' Reply") which

contains the following: I. Background; II. Supplemental Statement of Facts; and III. Brief

in Reply and in Support of Amended Motion for Summary Judgment ("Brief in Reply")

as follows:

### I.  BACKGROUND

### A.  PROCEDURAL BACKGROUND

In compliance with the dispositive motion deadline in the Court's Scheduling

Order for this case, the Defendants filed on 6/7/06 their Motion for Summary

Judgment on behalf of all Defendants and Brief in Support of Motion ("Original

Motion") supported by the affidavits of Thompson and William Earl Tidwell

("Tidwell"), and excerpts from the Alabama Uniform Traffic Accident Report of 9/2/04 ("Accident Report"). Discovery had just begun, no depositions had been taken at that time, and Defendants' Motion for Continuance of the dispositive motion deadline had been denied by the Court. Therefore, no deposition testimony was available as of 6/7/06, the date of the filing of the Original Motion.

Since that time, the depositions of Thompson, Tidwell and Scott Seay ("Seay") (a corporate representative of FTI) have been taken, as well as the depositions of Sergeant James D. Patterson, Plaintiff, Lori Ann Morris, and her experts, Edward L. Robinson and Andre LeBleu. (Transcripts have just recently been received so that excerpts could be submitted with Defendants' Reply). Testimony from these depositions has provided additional facts, and has clarified and confirmed other facts, that further support Defendants' position that they are entitled to summary judgment as a matter of law.

Defendants also assume that the Court has allowed Plaintiff's Amended Complaint, which contains over 30 allegations of Federal Motor Carrier Safety Regulations ("FMCSR") violations.[1] Although there were a few clerical and technical errors committed by Thompson and FTI in complying with the FMCSR's, Plaintiff has presented no admissible evidence or expert testimony that such errors were in fact substantive violations at all, or in any way constituted a proximate or contributory

---

[1] See Amended Complaint, ¶¶ 14 (a-n), 17, 18, 19, 20, 21, 22, 23, 26 (a-l), and 30. Although Defendants submit herein that they are entitled to summary judgment on all of the FMCSR claims as well, they do reaffirm their Motion that this Amended Complaint should be stricken from the record and not allowed because it was filed after the deadline for filing amended pleadings and more than 5 months after the 12/21/05 deadline imposed by the Court for filing a more definite statement. See Original Motion, footnote 2.

cause of the damages alleged herein. Defendants are, therefore, entitled to summary judgment on these claims as well.

### B. SUMMARY OF FACTS AND ARGUMENTS

This case involves an accident which occurred on I-85 between Macon County Road 30 and Macon County Road 93 on 9/2/04 at 3:25 a.m. There were actually two accidents. The first accident occurred when the Kenworth tractor trailer rig ("Morris' Vehicle") operated by Plaintiff's decedent, Vernell B. Morris ("Morris"), ran off the left side of the northbound lanes of I-85, went down into the median, and then, while trying to come out of the median back onto I-85, overturned on the driver's side blocking both northbound lanes of I-85 and part of the right side emergency lane, with only the dark colored bottom of the undercarriage facing oncoming traffic. This first accident will be referred to herein as the "Rollover Accident" or the "Rollover."

The second accident occurred when Thompson (and his passenger Tidwell) approached in the right northbound lane of I-85 in a Peterbilt tractor trailer rig ("Thompson's Vehicle"), and the front of Thompson's Vehicle collided with the underside of Morris' Vehicle, because Thompson was unable to see Morris' Vehicle in time to avoid the collision. (See, generally, the Original Motion). This second accident will be referred to herein as the "Collision Accident" or "Collision" between the two vehicles.

It is undisputed that Thompson's Vehicle was <u>not</u> involved in the Rollover Accident.

Although Plaintiff argues that no one knows why Morris ran his vehicle off I-85 into the median, the most likely causes were that he was drowsy or fell asleep. But even if Morris' conduct was not the only cause of his vehicle leaving I-85, the undisputed evidence and common sense prove that Morris' negligence in attempting to re-enter I-85 at the speed and at the angle which caused it to overturn and block the I-85 northbound lanes, was either the sole cause of the Collision Accident, or at the very least, contributory negligence as a matter of law.

Thompson and Tidwell offered testimony in their affidavits filed with the Original Motion, and have both since testified and confirmed, that it was a dark night, they were traveling 65 to 70 mph (the speed limit was 70 mph), that they saw no lights or reflectors on Morris' Vehicle as they approached, and only saw the underside of Morris' Vehicle in their headlights shortly before the impact, such that when Thompson slammed on this brakes, he was unable to stop in time to avoid the collision. Thompson had no warning that Morris' Rollover Accident had occurred. His first notice was when he saw in his headlights what appeared to be trailer tires, and he immediately applied his brakes and tried to avoid the collision. Thompson and Tidwell clarified in their depositions that the initial impact of Thompson's Vehicle with Morris' Vehicle occurred in the right northbound lane and that Morris' Vehicle was not only blocking both travel lanes, but also part of the emergency lane on the right side of the right northbound lane.

Trooper Patterson, an accident reconstructionist, who investigated and took photographs that night shortly after the accident, confirmed in his deposition with the physical evidence in his photographs, that the impact between Thompson's Vehicle and

Morris' Vehicle occurred in the right northbound lane, and that Thompson's Vehicle left a skid mark (visible in his photographs) created by the left side tires. Trooper Patterson also confirmed that it was likely that the lights on Morris' Vehicle were knocked out during the Rollover Accident, but that even if one or more of these lights were still functioning after the rollover, they would not have been visible to oncoming traffic because of the configuration of Morris' Vehicle on its side and across the two northbound lanes of traffic. Therefore, the undisputed testimony of both Thompson and Tidwell that they saw no lights or reflectors on Morris' Vehicle as they approached, is also corroborated by the physical evidence observed by Trooper Patterson at the scene shortly after the accident.

Plaintiff's Response to Defendants' Motion for Summary Judgment ("Plaintiff's Response"), relies on the erroneous facts that the point of impact was in the left lane, Thompson's vehicle left no skid marks, Thompson's tractor came to rest in the left lane, the right lane was not completely blocked and the emergency lane was not blocked at all by Morris' overturned vehicle. (Plaintiff's Response, pp. 3, 5, 6 and 15). Plaintiff's expert, Edward Robinson ("Robinson"), also relied on these erroneous facts to support his equally erroneous opinions that because there were no skid marks, either Thompson made no effort to stop and avoid the collision or his brakes were not in proper adjustment, that the impact speed was 70 mph, and that Thompson could have avoided the collision by steering his vehicle out into the emergency lane. (Plaintiff's Response, pp. 5, 6, 15). Curiously, Robinson's own associates prepared a site drawing depicting Morris' vehicle completely blocking both the left and right northbound lanes of traffic

5

and part of the emergency lane. Robinson, himself, did not ever visit the site of this accident, and his associates that did, produced a site drawing that corroborates the fact that the emergency lane was partially blocked.

Robinson and Plaintiff's other expert, Andre LeBleu ("LeBleu") have also offered the opinions that the lights on the Morris Vehicle likely survived the Rollover Accident, and could have been seen by Thompson as he approached in time for him to have perceived, reacted and stopped or otherwise avoided the accident. (Plaintiff's Response, Exhs. 2 and 5). However, Robinson and LeBleu admitted in their depositions that even if any lights were still illuminated after the Rollover Accident, they cannot say the lights could have been seen by Thompson as he approached. Also curious is the fact that neither Robinson nor LeBleu, nor anyone on their behalf, ever inspected the lights or wiring on Morris' Vehicle after the accident and therefore, they have no admissible facts or evidence to support opinions that any lights were still illuminated after the rollover. Any such opinions are really just theories based upon pure speculation and conjecture and are not admissible. (See Brief in Reply below, and authorities cited therein).

Although considerable discussion above and below is focused on establishing the undisputed facts that the point of impact for the Collision Accident was in the right lane, and that the emergency lane was partially blocked by Morris' tractor, even if the impact had occurred in the left lane, and if the emergency lane was clear, it does not change the fact, as noted by Trooper Patterson, that Thompson did not have sufficient time and distance to react and maneuver over into the emergency lane without risking

the same or worse results after losing control of his vehicle and having the trailer jackknife and cause the very damage Thompson was trying to avoid. There is simply no admissible evidence to support any suggestion that Thompson could have avoided the collision by moving over into the emergency lane. The only conclusion that can be made from the admissible evidence is that Thompson, faced with this sudden emergency, acted reasonably under the existing circumstances in locking his brakes and trying to stop to avoid the accident.

Plaintiff has also failed to present any admissible evidence in this case as to which accident, the Rollover or the Collision, caused the fatal injuries to Morris. Although expert Robinson has offered his speculation and conjecture that perhaps the Collision between Thompson's Vehicle and Morris' Vehicle caused the fatal injuries (Plaintiff's Response, Exh. 2), he is not qualified to offer such an opinion and has no admissible physical evidence to support such an opinion in any event. Plaintiff has offered no other evidence that the Collision caused Morris' fatal injuries. Trooper Patterson testified that the most common cause of fatalities in one-vehicle accidents involving commercial vehicles is a rollover accident, just like the one involving Morris' Vehicle in this case. Therefore, even if Thompson had somehow contributed to causing the Collision with Morris' Vehicle, there is no proof that that Collision was the proximate cause of Morris' fatal injuries. In the absence of substantial evidence to prove medical causation, there is insufficient evidence to submit this case to a jury on that basis alone.

## C. <u>FMCSR VIOLATION CLAIMS</u>

Plaintiff has generally asserted in her untimely Amended Complaint, a plethora of FMCSR violations by both Thompson and FTI  (See Footnote 1, supra), but has failed to establish how any of these alleged violations are relevant to any liability issues in this case.   All claims in the Amended Complaint are based either upon the alleged negligence/wantonness of Thompson in the operation of his vehicle, or the bald assertion (unsupported by any admissible evidence) that there was a defect in Thompson's Vehicle due to improper maintenance.  If the Court agrees that Plaintiff has not presented substantial evidence of either negligence/wantonness on the part of Thompson in the operation of his vehicle at the time of this accident, or a defect in that vehicle, then all FMCSR violation allegations against both Defendants are moot anyway.  All such claims are equally without merit because of the sudden emergency created by the Rollover Accident, which presented Thompson with a situation where he had insufficient time and distance to avoid the collision.

Although 30 or more violations of FMCSR violations are alleged in the Amended Complaint, only those argued in Plaintiff's Response (Part IV, p. 7), will be addressed below. Those covered are 49 CFR §§ 392.7 and 396.3 dealing with pre-trip inspections (Plaintiff's Response, p. 5, 10); 49 CFR §§ 391.41(b)(3) and .64 dealing with medical qualifications for diabetics (Plaintiff's Response, p. 8); 49 CFR § 383.51 dealing with alleged "serious" driving offenses by Thompson; 49 CFR § 391.31 dealing with a road test for Thompson (Plaintiff's Response, p. 9); 49 CFR § 391.27 dealing with disclosure of

Thompson's 3-year driving history; and 49 CFR § 382 dealing with post-accident drug tests (Plaintiff's Response, p. 10).

There is no admissible evidence to support any of these FMCSR allegations, and there is no admissible evidence to establish that either Thompson's Vehicle or Thompson were in any way impaired prior to this accident in any way that caused or contributed to causing the Collision Accident. As will be demonstrated below, the Thompson Vehicle was properly maintained, there were no defects in either the tractor or the trailer, Thompson and Tidwell performed pre-trip inspections, Thompson's non-insulin controlled diabetes does not disqualify him from driving, Thompson's 3-year driving history was disclosed and he did <u>not</u> have 3 serious violations, Thompson was being road tested at the time of this accident, and Thompson, himself, while at Tallassee Hospital, where he was transported by ambulance after this accident, requested all required DOT and Federal tests for drugs and alcohol.

Furthermore, Plaintiff has presented no evidence or expert testimony to establish any of the above violations or any claim, if there is such a claim, that any of the alleged violations in any way proximately caused the Collision or Morris' fatal injuries. As will be demonstrated below, Defendants Thompson and FTI are both entitled to summary judgment as a matter of law, and all claims against them are due to be dismissed.

## II.  SUPPLEMENTAL STATEMENT OF FACTS

### A.    Area of Impact and Skid Mark from Thompson's Tractor Trailer in the Right-Hand Lane.

Thompson and Tidwell confirmed that the impact between the front of the Peterbilt tractor driven by Thompson and the underside of the overturned Kenworth tractor driven by Morris occurred in the right-hand northbound lane of I-85. (Thompson 112/9–112/18) (Tidwell 47/10-47/15; 49/9-49/21).[2]  Thompson and Tidwell also confirmed that as soon as Thompson saw the Morris Vehicle blocking his path, he locked his brakes (which as shown below left at least one skid mark, also in the right-hand lane).  (Thompson 90/8-92/6) (Tidwell 45/11–47/9; 51/6–51/11).

One of the Alabama State Troopers who inspected the accident scene shortly after the accident, Sgt. James D. Patterson ("Patterson"), confirmed that the physical evidence proved conclusively that the area of impact was in the right lane.  (Patterson 27/2–27/23; 38/2–38/6; 118/15-120/6).  There had been some confusion over the point of impact, apparently shown in the left-hand lane, in Trooper Huntley's "not to scale" drawing in the Accident Report.  (Patterson, DX P-1, p. 3).  Patterson explained that Trooper Huntley's diagram was prepared "not to scale" and that it did not accurately depict the point of impact or the final rest positions of the vehicles, and in fact failed to include the skid mark left by Thompson's vehicle, as Thompson tried to stop and avoid the accident.  (Patterson, 34/22–37/11).

---

[2] Citations to deposition testimony will be abbreviated by referencing the last name of the deponent and then the page and line where the testimony begins, separated by a slash, then a dash, and the page and line where the testimony ends, also separated by a slash.  For example, the first citation to the deposition of Thompson occurs at page 112 beginning at line 9 and ends at page 112, line 18.  It is abbreviated as shown above "Thompson, 112/9 - 112/18."

Sgt. Patterson is a member of the Headquarters Highway Patrol Staff assigned as Commander of the Traffic Homicide Unit.  (Patterson, 7/15–8/17).  He arrived between 4:00 and 5:00 a.m. the night of the accident and "walked through the scene to form an opinion as to how the crash occurred and why the crash had occurred by inspecting the vehicles, the marks on the roadway, [and] the final rest positions of the vehicles," and he also photographed the scene.  (Patterson, 10/1–10/15).  Patterson has reconstructed truck accidents for the Alabama State Troopers since 1993, and is trained as an accident reconstructionist.  (Patterson, 17/21–18/11).[3]  Patterson has also testified in civil and criminal cases as an accident reconstructionist in both state and federal courts in Alabama.  (Patterson, 18/18–19/1).  Patterson was not hired by any party in this case. He is an independent witness, whose sole purpose in investigating this accident was to determine the accurate facts and circumstances involved.

Patterson has taken over 20 courses at the Institute of Police Techology and Management ("IPTM"), all dealing in some respects with traffic investigation involving fatalities.  (Patterson, 78/17–79/19 and PX-1).  He attends annual conferences devoted to crash investigation, some of which have dealt with live crash testing and analysis,

---

[3] Patterson first started investigating traffic accidents in 1988 as a patrolman with the Guntersville, Alabama Police Department, attended courses in advanced traffic accident investigation, investigated numerous crashes, and was later placed in command of the "Fatal Accident Response Team."  (Patterson, 13/23 – 15/20).  In 1993, he was hired by the Alabama State Troopers, where he received 80 hours of training in crash investigation, attended traffic homicide investigation school, received commercial safety inspector training, attended advanced traffic homicide investigation at the University of North Florida, attended advanced accident investigation at the Institute of Police Technology and Management ("IPTM"), and attended several traffic accident reconstruction courses, including a 40-hour course called Special Problems in Accident Reconstruction at IPTM, advanced traffic accident reconstruction with the use of microcomputers also at IPTM.  He has been trained in forensic laser mapping of crash scenes, interviewing and interrogation for the traffic crash investigator, commercial vehicle accident investigation and has taken applied physics for accident reconstruction.  He took a course involving photography for the traffic crash investigator, re-attended an update of a traffic crash reconstruction course in 2003 and is certified by the Alabama Peace Officers Standards and Training Commission as an instructor in the field of traffic accident investigation. (Patterson, 15/21 – 17/20).

and his whole career has evolved around crash investigation. (Patterson, 79/20 –
84/19). He is trained in human factors, which deals with conspicuity issues and how
the human eye reacts to various lighting conditions, including a course in human
factors and motor crash investigation dealing "almost exclusively with conspicuity and
perception/reaction time of drivers faced with varying circumstances." (Patterson,
84/20 – 85/12). In fact, most of the crash investigation courses Patterson has taken
through the years have dealt with some form of driver perception and conspicuity
factors. (Patterson, 122/1 – 122/22).

Through the years, Patterson has been to the scene of hundreds of accidents
involving fatalities. While with the Guntersville Police Department, he was called to
investigate all serious injury and fatality accidents because of his experience in accident
investigation. As a state trooper assigned to the Opelika post, Lee County, from 1993 to
1999, he investigated a lot of accidents involving fatalities, and after his promotion in
1999 to Assistant Commander of the Traffic Homicide Unit, he reviewed every single
fatality crash that happened within the State of Alabama, including every single traffic
homicide investigation conducted by the 80 investigators in his unit (approximately 330
to 340 such cases per year from 1999 until 2003) and he still investigates some crashes in
his position as Commander of the Homicide Unit. (Patterson, 58/13 – 64/10). Very
often Patterson is asked to review evidence collected by his investigators and then to
prepare an accident reconstruction, or complete an investigation. (Patterson, 64/11 –
66/11). Patterson explained that traffic fatality investigation has been his primary

assigned duty since 1999 and was a significant part of his duties from 1988 until 1999. (Patterson, 70/21 – 71/14).

Patterson explained that Trooper Huntley's erroneous drawing in the Accident Report was apparently never reviewed, because the reviewing supervisor would have compared the drawing to Patterson's photographs and would have caught the fact that the drawing did not match the physical evidence at the scene. (Patterson, 67/14 – 68/21).

Neither of the vehicles had been moved prior to Patterson's arrival at the scene of this accident. (Patterson, 26/11 – 26/14; 32/18 – 33/1). Patterson took photographs that night, including those marked as DXs P-2 through P-6, which fairly and accurately depict the scene of the accident at that time, except for the fact that the flash on his camera made the vehicles and other objects considerably more visible than they would have been to an oncoming driver, such as Thompson. (Patterson, 26/3 – 26/10; 52/5 – 53/18, DX's P-2 through P-6).

In DX P-2, Patterson identified the trailer of Thompson's Vehicle in its final rest position with the right side trailer wheels just outside the fog line on the right side of the roadway, extending into the emergency lane on the right side of the right northbound lane (Patterson, 26/15 – 27/1) and the braking tire marks (skid marks made by the tractor and/or trailer of Thompson's rig) leading directly up to the left rear tires of the trailer, further confirming that Thompson's vehicle was not only in the right-hand lane as it approached Morris' overturned vehicle, but was over toward the right

side of that lane when Thompson, in an effort to avoid a collision, locked his brakes and left skid marks.  (Patterson, 31/1 – 31/12; 32/18 – 34/4).

Patterson marked for illustrative purposes on DX P-3 the hash marks that separate the right-hand and left-hand northbound lanes of I-85 by circling them and initialing them with green ink.  (Patterson, 41/7 – 42/7).  He identified (and marked it in green with the letter "A" on DX P-3) the "trapezoid" shaped scrape marks made by the top left corner of Morris' trailer after it had rolled over on its left side and slid to a stop before impact by Thompson's Vehicle and explained that the top left portion of that trailer then slid generally north along the centerline and over into the right-hand lane (which meant that Morris' Kenworth tractor was even further over across the right-hand lane).  (Patterson, 46/21 – 49/11).  Patterson then marked in green with the letter "B", the scrape marks made by that same portion of the top left of that trailer after the impact by Thompson's Vehicle, which caused Morris' Vehicle to then move in a counterclockwise direction and curve from the point of impact in the right lane over across the left lane to its final rest position.  (Patterson, 49/12 – 50/14).  Patterson also explained that the front of Thompson's tractor was "engaged with" Morris' overturned tractor, as it slid counterclockwise, which pulled Thompson's tractor toward the left lane, causing it to jackknife and come to rest perpendicular to and straddling the travel lanes.  (Patterson, 117/1 – 117/20).

**B.    Morris' Vehicle Blocked Both Northbound Lanes and Part of the Right Side Emergency Lane.**

Thompson and Tidwell testified that Morris' tractor was not only blocking both northbound lanes of traffic, but also extended out across the right fog line into the emergency lane. (Thompson, 99/9 - 100/5).  (Tidwell, 39/11 - 40/9).  This testimony is corroborated by the site-drawing prepared for Plaintiff's expert, Robinson, by one of his associates.  (Robinson, 212/15 - 217/2, DX-10).[4]

**C.    Underside of Morris' Vehicle Facing Thompson Not Visible in Time to Avoid Accident.**

Thompson and Tidwell testified that because they had been passing southbound traffic on I-85, Thompson was using the low beams on his headlights as he unknowingly approached Morris' overturned rig.  They testified that they saw no lights or reflections of any kind coming from the Morris Vehicle.  The first thing Thompson saw was the trailer tires illuminated by Thompson's headlights.   That is when Thompson applied the brakes but was unable to stop in time to avoid the accident. (Thompson, 88/7 - 92/6; 93/18 – 94/11; 95/18 – 97/5; 98/7 – 100/5; 102/17 – 104/11). (Tidwell, 37/4 - 40/9; 45/6 – 47/15; 88/4 – 91/16; 92/13 – 93/7).

Patterson testified that **this crash was not avoidable by Thompson** because the night of 9/2/04 was a very dark, overcast night with no moonlight visible, the accident occurred on an unlit portion of I-85, and there was no way for Thompson to have

---

[4] Defendants have moved the Court to strike most of the opinions of Robinson on the grounds stated herein and in Defendants' Motion to Strike all the inadmissible evidence offered in Plaintiff's Response. However, this site drawing fairly depicts how Morris' Vehicle was configured across the interstate, including the fact that the Kenworth tractor extended into the emergency lane.

perceived the vehicle in his path in time to avoid the collision. (Patterson, 11/15 – 12/22). Specifically, Patterson testified as follows:

A.    I believe that the crash was not avoidable by Mr. Thompson, the driver of the 1995 Peterbilt.

Q.    And what was the basis of that opinion?

A.    The night of September 2, 2004 – this crash occurred at approximately 3:25 a.m. on an unlit highway. It was very dark that night. No moon. An overcast night. And due to visibility issues, there was no way, in my opinion, for Mr. Thompson to perceive the vehicle in his path prior to striking it.

Q.    What was it about the vehicle in its path that made it imperceiveable, if that's a word? …

A.    The vehicle – the Morris vehicle had been involved in a crash and had come to rest in the – come out of the median, come to rest in the northbound lanes of I-85. It was unlit at the time of the crash. The Thompson vehicle's driver would not have been able to perceive it in his pathway until it was too late for him to avoid striking it. (Patterson, 12/3 – 12/22).

. . .

A.    It's my opinion that it was not possible for Mr. Thompson to avoid this crash faced with the circumstances that he was.

Q.    And that opinion is based on a reasonable degree of accident reconstruction certainly based on your investigation of this accident? …

A.    My opinion is based on the existing lighting conditions, the alignment of the vehicles just prior to impact, and my knowledge of the visibility allowed by the headlights of vehicles, yes, sir, in similar circumstances. (Patterson, 20/6 – 21/8).

. . .

Q.    Any one of your classes had to do with lighting, the physics of lighting?

A.      Yes, sir.  I'm trained in human factors which is – deals a great deal with conspicuity issues, how the human eye reacts to various lighting conditions.   There is a course in human factors and motor crash investigation which deals almost exclusively with conspicuity and perception-reaction time of drivers faced with varying circumstances.

Q.      Where and when did you take that course?

A.      I took that course in 2002.  It was taught at our academy by instructors from the Institute of Police Technology and Management. (Patterson, 84/20 – 86/14).

…

A.      He [Morris] put the unlit, unreflectorized portion of his vehicle into the path of this – of Mr. Thompson's vehicle.  Mr. Thompson due to that dark night, unreflectorized surface was unable to see it and collided into it, unable to see it until it was too late for him to be able to stop his truck and do anything about it.  (Patterson, 103/10 – 103/17).

Patterson testified that at 70 miles per hour from the time Thompson "touched the brake pedal to where the vehicle would come to a stop," the vehicle would have traveled approximately 305 to 310 feet, but that this does not take into account the time it would have taken for Thompson to perceive and react to the event.  (Patterson, 106/4 – 107/12).  As to the skid marks shown in Defendant's Exhibit P-2, he stated that they were not likely 275 feet long prior to the impact because Thompson would not have been able to perceive a reason to lock up his brakes far enough back to leave skid marks that long.  Thompson would not have known that far back that there was a hazard. (Patterson, 108/14 – 109/4).  As to how far Thompson's vehicle's lights would have illuminated the underside of Morris' overturned vehicle, Patterson stated as follows.

Q.      Do you know whether or not his lights would show 275 feet into the distance?

17

A.    You know, lights – what lights would show is a very difficult question to answer.  If I'm looking at a dirty, dark underside of a truck, that might – it might blend into the background.  (Patterson, 109/5 – 109/11).

Q.    I hear what you're saying, but the only thing I asked you is did you have any knowledge about Peterbilt headlights.  That's what I'm asking.

A.    My knowledge –

Q.    I think that's a yes or no.

A.    My knowledge is that they are just like every other headlight.  They beam light energy ahead and it goes on forever unless reflected back to the human eye, which is its purpose.  The distance that it will shine and reflect something back is totally dependent on the reflectivity of the object that it is bouncing off.  That's as clear as I can be.  (Patterson, 111/6 – 111/20).

Patterson concurred with Trooper Huntley's opinion as shown in the accident report that Thompson did nothing wrong to contribute to this accident.  (Patterson, 113/8 – 114/5).  He stated that Thompson would have to have been able to see Morris' overturned vehicle at least 500 feet away to have been able to avoid this accident due to visibility problems, normal perception-reaction times, and the lag time for brakes in a commercial vehicle to engage and stop a vehicle.  Specifically, he testified as follows:

A.    No.  He must first see it, identify it as a hazard, formulate a plan as to what he needs to do, and then initiate a physical reaction and then carry out that physical reaction.  All that takes time.  In other words, reaction time.

Q.    Okay.

A.    There's something – You're driving down a roadway at night.  You see something in your path.  First, you have to say what is that and then decide that it – whether it is or is not a hazard to you and then you have to decide what to do about it.  All that takes time.  If he's going 70 miles per hour, then he's traveling at, what, 105 feet per second approximately and

every second that goes by he's covering up 105 feet of this space that he has available to initiate his plan to get around this hazard.

Q.    I think you told us earlier that it takes four-tenths of a second reaction time –

A.    No, sir.  That's not what I said.  I said there's a brake lag in a commercial vehicle typically of four-tenths of a second. …

Q.    All right.  But assuming he has perception and after getting that perception from the time he acts, hit his brake to the time that the vehicle stops I think you said would have been 310 feet?

A.    That's from the time his foot hits the brake pedal until the vehicle comes to a stop he's covering 310 feet.  That does not include any of the distance he covered from perception until reaction.  The perception-reaction time is not included in that.  And I would expect that to be in the area of an additional 150 to 200 feet.  So he's well more than 500 – if he sees it at 500 feet away, he might be able to stop if his braking system is in perfect condition.

Q.    But as for that second option of slowing the vehicle enough to go around it –

A.    He's got to be pretty slow to do that.  When you swerve and articulate a vehicle at any significant speed, you engage in the risk of overturning and you also engage in the risk of a trailer swing which would cause your trailer to go out and collide with the object that you intended to avoid anyway.

Q.    Well, you know, you hear about these accident avoidance maneuvers that truckers do.  Wouldn't this be one that he could do, just kind of slow it – maintain control, go around it to the emergency lane?

A.    If this had happened in the daylight, I feel certain that he would have been able to do that.  This – He was too close to this hazard before he had time – he didn't have time left to do – time or distance left to do something like that by the time he could see this hazard.  (Patterson, 123/18 – 126/15).

19

When asked if he knew whether Morris' lights were on after his vehicle rolled over on its side and before the collision by Thompson's Vehicle, Patterson stated as follows:

> A.      No, I don't.  However, I do know that in his position had they been, they weren't directed toward the direction that Mr. Thompson's vehicle was coming from.  **It's unlikely**, but it is possible that some lights remained on.  But even so, they wouldn't have been facing in a direction that was visible to Mr. Thompson.  (Patterson, 128/8 – 128/21). (emphasis added).

### D.    Rollover Accident Most Common Cause of Fatalities in Commercial Vehicles.

Patterson has investigated many fatalities in one-vehicle rollover accidents involving a commercial vehicle, like the initial Rollover of Morris' Vehicle in this case, and testified that those type accidents are "the most common cause of fatalities in commercial vehicle crashes."  (Patterson, 54/6 – 56/21).

### E.    Morris' Failure to Control His Vehicle was the Sole Cause of this Accident.

Patterson testified that based on his investigation at the scene shortly after the accident, he concluded that there was no need for a criminal investigation because "[i]t was obvious to me that Mr. Morris had caused this crash, therefore, there was no one to prosecute."  (Patterson, 92/6 – 92/12).  During cross-examination by Plaintiff's attorney, Patterson explained as follows:

> Q.      Do you know of anything that would tell you that Morris was guilty of contributory negligence when his vehicle went off the road and onto the road? …
>
> A.      In the terms that I understand contributory negligence, and I understand that to mean that someone has done something but you have done something that has enhanced the results of that or made them worse.

In this case, I do not believe any negligence existed other than on the part of Mr. Morris, therefore, it couldn't be contributory. It was the sole negligence.

Q.    Now, do you know what negligence Mr. Morris engaged in?

A.    He has a duty to maintain control of his vehicle. He ran off the roadway into the median. In an attempt to re-enter the roadway, he blocked the northbound lanes and came to rest in an uncontrolled fashion in the northbound lanes. That circumstance led to Mr. Thompson being unable to avoid striking him. (Patterson, 93/19 – 95/2).

…

Q.    So you don't have any evidence as to whether or not Mr. Morris was negligent then; right? …

A.    Yes, sir, I do have considerable evidence that Mr. Morris was negligent in that he caused this crash. Why he caused this crash I cannot answer for you, because I don't have any evidence to give me that. However, Mr. Morris was – had the primary responsibility for maintaining control of his vehicle and not causing a wreck. In this case for some reason that I don't know, he drove off into the median at 3 – approximately 3:25 a.m., overcorrected his vehicle in an attempt to come out of the median, lost control of it and put it in the pathway of those vehicles that were legally proceeding on I-85 Northbound.

…

A.    There is no evidence that I saw at this scene to indicate that Mr. Morris was forced off the roadway. If he was forced off the roadway, he has a duty to maintain control of his vehicle as best he can. He could have stayed in the median. **His mistake was made when he attempted to re-enter the roadway at too sharp an angle causing his vehicle to go out of control and overturn where it laid down in the path of vehicles that were just proceeding down a dark road. He put the unlit, unreflectorized portion of his vehicle into the path of this – of Mr. Thompson's vehicle. Mr. Thompson due to that dark night, unreflectorized surface was unable to see it and collided into it, unable to see it until it was too late for him to be able to stop his truck and do anything about it.** So you're asking me if there's contributory negligence on the part of Mr. Morris. Mr. Morris caused this crash. Why he caused this crash I cannot answer for you. But had he maintained control of his vehicle either before it went in the median or while it was in the median

and not attempted to come out in a too-abrupt fashion, this crash would not have occurred.  (Patterson, 101/9 – 104/3). (emphasis added).

Patterson further explained that there was no evidence to indicate that the Morris Vehicle had been forced off the road by some other vehicle and based on his training and experience in traffic crash investigation and the obvious movements of the Morris Vehicle into the median, and the time of night, the most likely cause was Morris' "drowsiness or being asleep."  (Patterson, 130/8 – 131/3).

**F.    No Evidence of Any FMCSR Violations that Proximately Caused this Accident.**

Although Plaintiff has alleged a plethora of FMCSR violations related to driver disqualifications of Defendant Thompson, the condition of Thompson's tractor-trailer at the time of the accident, and errors made by Thompson and FTI in the application and hiring process, Plaintiff has presented no evidence whatsoever that any of these allegations in any way proximately contributed to this accident.

Thompson and Tidwell testified that they both performed a pre-trip inspection of their tractor and trailer prior to leaving DeFuniak Springs that evening (as is reported in the log book inspection report), and there were no defects in the brakes or headlights. (Thompson, 76/1 – 77/12; 79/1 – 79/22, PX 8).  (Tidwell, 28/1 – 29/16).  The tractor had no defects during an annual inspection on 12/29/03, had been used sparingly (about 5,000 miles) during 2004 prior to this accident, and had not come up for another preventative maintenance (P.M.) inspection before this accident.  (Seay, 72/1 – 73/21; 75/17 – 76/8; 92/11 – 98/20; PX 10).  Plaintiff has not presented substantial evidence of any defect in the tractor or trailer that proximately caused or contributed to this

accident. Therefore, there is no factual basis for Plaintiff's allegations of violations of 49 CFR §§ 392.7 and 396.3.

Thompson is a diabetic, but controls his diabetes with non-insulin tablets. (Thompson, 43/13 – 45/2; 56/14 – 56/18). In April 2004, while working for a prior employer, DART, during a random physical, Thompson had a high sugar count because he had not been taking his medication regularly. He was asked to get back on his medication, not to drive for two days, and to come back in for retesting. When he was retested, he was cleared to drive and was issued a one-year medical certificate on 4/28/04 by an advanced practice nurse or physician's assistant at a clinic. He has been medically certified to drive ever since. (Thompson, 46/17 – 53/15; 56/19 – 57/11). The FMCSR's provide that a person is physically qualified to drive a commercial vehicle if he/she has no medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control, and a medical certificate (49 CFR §§ 391.41(b)(3) and 391.43(a)) issued by a "medical examiner", defined as including, but "not limited to," physician assistants and advanced practice nurses, among others. (49 CFR § 390.5). Thompson's diabetes has never required insulin for control, and Plaintiff has presented no evidence of any violations of any medical qualifications for Thompson to drive.

Plaintiff has presented no evidence, whatsoever, that Thompson suffered from any physical condition, drugs, or alcohol that impaired his ability to operate a commercial vehicle at the time of this accident. Thompson testified that he had had no drugs or alcohol prior to the accident, and that after being transported to Tallassee Hospital by ambulance, before he left the hospital, he "told them [he] needed the

Federal DOT tests done.  (Thompson, 82/11 – 83/18; 119/5 – 122/21, PX 11).  PX 11 contains the results of the drug tests, which were all negative.  There is no factual support for any violation of 49 CFR § 382.

Thompson had over 17 years of experience driving large trucks and tractor trailer rigs like the one he was driving at the time of this accident, and had obtained his CDL license before he was hired by FTI on 8/30/04.   (Tidwell, 24/22 – 25/6).  Nevertheless, FTI had Tidwell riding with Thompson at the time of the accident to administer a road test, which was cut short due to this accident.  Thompson did not drive again after this accident until 9/7/04, at which time Tidwell again rode with him and completed the road test.  (Tidwell, 93/21 – 104/1; PX 3).  PX 3 to Tidwell's deposition is the Certificate of Road Test completed by Tidwell, certifying that Thompson was an excellent driver and had successfully completed his road test.  Tidwell had started that paperwork on 9/2/04, but forgot to change the date on the paperwork to include the 9/7/04 date as the completion date for the road test.  (Tidwell, 93/21 – 104/1).  Except for this clerical/technical error, the road test required by FTI was properly administered. Although 49 CFR § 391.31 prescribes a road test for new drivers, 49 CFR § 391.33(a)(1) provides that FTI could have accepted Thompson's CDL, as the equivalent of a road test.

Prior to the date of hire, FTI obtained through a brokerage service the 3-year driving history required by the FMCSR's, and Scott Seay reviewed the two events listed therein, namely, an 8/29/02 accident without injury in a commercial vehicle, where Thompson was rear-ended at low speed, and a 2/21/03 speeding ticket in Thompson's

personal vehicle. The 8/29/02 accident was not an "at-fault" accident for Thompson. FTI was not aware of any other traffic violations or accidents involving Thompson prior to the date of our accident. Thompson had driven on another trip for FTI on 8/31/04 without incident. There is no evidence of any incompetency on the part of Thompson that had manifested itself to FTI prior to our accident. (Thompson, 25/16 – 27/3; 30/5 – 31/16; 39/22 – 42/10; 68/14 – 71/2; 74/8 – 77/12, PX 3) (Seay, 14/1 – 15/10; 18/1 – 21/4; 22/17 – 43/4, PX's 1, 3).

FTI did learn after the 9/2/04 accident of another accident in which Thompson was involved while working at DART, that had occurred on or about 6/14/04, but which was only reported to FTI on 9/9/04. (Seay, 28/15 – 30/14). Thompson explained that the 6/14/04 accident occurred due to road rage between two other drivers, and that when he appeared in court for that accident, the judge told him that it was not his fault and that it would not appear on his driving record, and it did not appear on his driving record. (Thompson, 34/17 – 37/6). While it is true that under 49 CFR § 383.51(c), a driver can be disqualified for serious traffic violations, § 383.5 defines "serious traffic violations" as convictions for speeding in excess of 15 mph above the posted speed limit "when operating a commercial vehicle." By definition, none of the 3 events, the speeding in his personal vehicle, or the 2 accidents that were not his fault, constituted "serious traffic violations." Therefore, there is no evidence of violations of 49 CFR §§ 383.51 or 392.27.

No evidence has been presented by the Plaintiff of anything other than minor technical FMCSR violations, and no evidence has been presented to support any alleged

incompetence on the part of Thompson that in any way constituted a proximate cause of this 9/2/04 accident.

G.    **Plaintiff's Inadmissible Evidence.**[5]

Plaintiff has offered as an exhibit in this case Thompson's lifetime driving record abstract, showing other prior driving infractions and accidents back to 1983.  These prior infractions are not admissible as evidence against Thompson to prove any alleged negligence/wantonness on his part that might have contributed to this accident.  Nor are they admissible against FTI on any of the allegations of negligence entrustment/hiring/supervision, etc., because FTI had no knowledge of these prior violations in any event.

Plaintiff has offered an expert report from purported expert Robinson, and page 3 of the Huntley Accident Report, which are both inadmissible as presented because they contain inadmissible hearsay, and do not fit any hearsay exception.

Plaintiff has also submitted by way of affidavit and by way of deposition testimony a number of purported expert opinions by Robinson and LeBleu, that are inadmissible either because they are outside the areas of expertise of Robinson and LeBleu, or because there is no factual basis to support anything other than speculation and conjecture on the part of these witnesses, as has been partially explained above and will be further explained in the Brief in Reply that follows.

---

[5] Defendants are filing contemporaneously with this Defendants' Reply, a Motion to Strike Inadmissible Evidence offered in Plaintiff's Response, to further specify why such evidence should be excluded and/or disregarded.

The Defendants, respectfully, request that the Court strike and/or disregard as evidence any information contained in the above-referenced driving record abstract, the expert report by Robinson, and the Accident Report.    In addition, Defendants, respectfully, request the Court to strike and/or disregard any and all purported expert opinions offered by Robinson and LeBleu in their affidavits and depositions on the grounds that will be further explained below, that such purported opinions are either outside the areas of expertise of these experts, or are unsupported by any admissible evidence, or both.

### III.  BRIEF IN REPLY AND IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendants in this case are entitled to summary judgment as a matter of law as to all claims alleged against them in both the original Complaint and the Amended Complaint, because Plaintiff has not presented substantial evidence that the Collision Accident caused Morris' death, there is no evidence, whatsoever, of any negligence on the part of either Defendant that proximately caused the Collision Accident, and because the undisputed facts establish that Plaintiff's decedent, Mr. Morris, was himself guilty of either negligence or contributory negligence as a matter of law.

### A.    No Evidence to Establish that the Collision Accident Caused Morris' Death.

Sgt. Patterson, one of the most experienced traffic fatality investigators and reconstructionists in Alabama, testified that the most common cause of fatalities in one-vehicle accidents involving commercial vehicles is the impact due to the rollover of a tractor trailer rig.  In this case, Morris had a very serious Rollover Accident wherein

Morris' Vehicle not only rolled over on the driver's side onto the asphalt pavement of I-85, but also slid on its side for some distance before coming to rest, prior to the impact by Thompson's Vehicle.  For aught that appears, Morris' fatal injuries occurred during this Rollover Accident.   Thompson's Vehicle was not involved in that Rollover Accident.

Plaintiff has submitted an opinion from expert Robinson, stating that he had reviewed the autopsy and toxicological report of the Alabama Department of Forensic Sciences and that Morris "was alive at the time that his 1998 Kenworth tractor trailer was struck by the 1995 Peterbilt tractor driven by" Thompson.  (Plaintiff's Response, Exh. 2, ¶¶6 and 9).  However, in his deposition, Robinson admitted that he is not a medical doctor, that he has no formal medical training, that he is not a cause of death expert, that he has no training in, and is not an expert in biomechanics, that he does not hold himself out as an expert on what specific injuries caused Morris' death in this case, that he has not tried to determine what injuries to Morris' body were caused by what particular object during the accident sequence, that he does not know if Morris' fatal injuries occurred before or after his ejection from the cab, and that he has no opinion to a reasonable degree of medical/biomechanical engineering certainty as to what caused Morris' death.  (Robinson, 17/1 – 17/14; 18/8 – 18/17; 19/4 – 19/10; 19/23 – 20/5; 85/6 – 88/11).  Robinson stated that all he was going to say was that "I **think** his serious injuries were due to the impact, not the overturn."  (Robinson, 20/6 – 20/10) (emphasis added).

It is clear from the above testimony that Robinson is not qualified as an expert to give any opinions as to the cause of Morris' death in this case. Even if he was qualified, his opinion is based on nothing more than speculation and conjecture, which is not a proper basis for admissible testimony. Robinson's purported testimony as to Morris' cause of death is improper, unreliable, and irrelevant under <u>Federal Rules of Evidence</u>, Rule 702, and the guidelines established by <u>Daubert v. Merrill-Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), <u>Kumho Tire Company, LTD. v. Carmichael</u>, 119 S. Ct. 1167 (1999), and <u>Browder v. General Motors Corp.</u>, 5 F. Supp. 2d 1267, 1282 (M.D. Ala. 1998). Rule 702 grants expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. See <u>Kumho Tire</u>, *id.* Rule 702 imposes a special obligation on the trial judge to "insure that any and all scientific testimony … is not only relevant, but reliable." <u>Kumho Tire</u>, *id.* (citing <u>Daubert</u>).

> For a witness' opinion and testimony to be admissible under Rule 702:
>
> "… A witness must have such knowledge, skill, experience, or education that his or her opinion will aid the tryer of fact in understanding the evidence." <u>Browder</u>, 5 F. Supp. 2 at 1281.

The burden of laying a proper foundation for the admission of expert testimony is on the party offering such testimony, and the admissibility of the expert's testimony must be established by a preponderance of the evidence. <u>Daubert</u>, 509 U.S. 579, 592 Note 10 (1993). Once an expert is qualified, the Court is to consider whether the opinion proferred by the expert is within the witness' field of expertise. If not, the opinion is to be excluded. See, for example, <u>Montgomery v. Noga</u>, 168 F. 3d 1282 (11th

Cir. 1999) (excluding an expert's opinion because the issues to which the expert testified were distinct from his area of expertise).

In order for an expert's testimony to be admissible, the expert's opinion must also have been shown to be both reliable and relevant. See <u>Daubert</u>, 509 U.S. at 593-94. To be considered reliable, it must be established that an expert's opinion is based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation. Without such an underlying basis of support, an opinion is merely one of many possible theories and interpretations of the facts at issue and is no more or less helpful than the tryer of fact's own reading of the evidence. As was discussed in detail in <u>Browder</u>, 5 F. Supp. 2d at 1283:

> "An expert's testimony must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." (citations omitted). Without an underlying basis of support, the "expert's" opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the tryer of fact's own reading of the evidence." …

> "While an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible into evidence, Fed. R. Evid. 703, "[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert … are [not] entitled to any weight when raised in opposition to a motion for summary judgment." (citation omitted) It is well established that "a party may not avoid summary judgment on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." (citation omitted) "Conclusory allegations without specific supporting facts have no probative value." (citations omitted) **Finally, when causation is the issue being addressed, 'courts are particularly wary of unfounded expert opinion.'** " (citations omitted) (emphasis added)

Robinson's speculation and conjecture as to which impact caused Morris' death is clearly inadmissible because by his own admission he is not qualified to offer a cause of death opinion, and because he has no factual basis or admissible evidence to support his speculation and conjecture as opposed to other possible theories as to the cause of Morris' death. This is especially true in light of Patterson's testimony that one vehicle rollover accidents are the most common cause of fatalities in commercial vehicles.

In the absence of admissible evidence that Morris' death was the proximate result of the Collision Accident (as opposed to Morris' own Rollover Accident), there is no evidence to prove the damages element of any of the claims against either of the Defendants in this case, even if Plaintiff were able to establish that some act of negligence/wantonness on the part of Thompson or FTI contributed to causing the Collision Accident. For this reason alone, the Defendants are entitled to summary judgment as to all claims. See, Kyser v. Harrison, 908 So. 2d 914 (Ala. 2005); Daniels v. Twin Oaks Nursing Home, 692 F. 2d 1321 (11th Cir. 1983).

### B.   No Negligence/Wantonness by Thompson Because He Had Insufficient Perception/Reaction Time to Avoid the Accident.

#### 1.   Thompson's Conduct Reasonable in Face of Sudden Emergency.

Thompson and Tidwell have both testified that they were traveling in the right northbound lane of I-85 at or below the posted speed limit of 70 mph at the time of the accident, when all of a sudden, at about the same time, they both saw some of the tires on Morris' overturned vehicle, and that prior to that, there were no lights or reflectors of any kind on Morris' vehicle to give them any warning that his tractor/trailer rig was

stretched out across both lanes of traffic, and into the right side emergency lane, as well. (Affidavits of Thompson and Tidwell), (Thompson, 88/7 – 92/6; 93/18 – 94/11; 95/18 – 97/15; 99/9 – 100/5; 102/17 – 104/11; 112/9 – 112/18) (Tidwell, 37/4 – 40/9; 39/11 – 40/9; 45/6 – 47/15; 47/10 – 47/15; 49/9 – 49/21; 92/13 – 93/9).   Immediately upon seeing the tires on Morris' overturned vehicle, Thompson slammed on the brakes, but was unable to stop in time to avoid the accident.  (Affidavits of Thompson and Tidwell) (Thompson, 90/18 – 92/6) (Tidwell, 45/11 – 47/9; 51/6 – 51/11)

Trooper Patterson confirmed that the speed limit in the area of the accident at the time of the accident was 70 mph.  (Patterson, 24/16-24/18).  As noted in detail above, Patterson went even further stating that in his opinion it was not possible for Thompson to have avoided this collision, faced with the circumstances as they were.  (Patterson, 12/5-13/22, 19/22-20/12).  As previously argued in detail at pps. 5-11 of Defendants' Original Motion, this is a classic case for the application of the sudden emergency doctrine where a motorist, confronted with a sudden emergency, is not "required to exercise the same presence of mind as would a prudent person under more deliberate circumstances."  See, <u>Baker v. Helms</u>, 521 So.2d 1241, 1244 (Ala. 1988).  The evidence in our case is overwhelming and undisputed that Thompson did everything a reasonable and prudent driver would have done, faced with the sudden emergency that manifested itself only when his headlights revealed something Thompson certainly could not have anticipated, namely Morris' overturned vehicle blocking not only both lanes of northbound traffic, but also part of the right side emergency lane.  Thompson was, therefore, neither negligent nor wanton, because he did not have a reasonable

opportunity and the necessary time and distance to avoid the accident.  Plenkers v.
Chappelle, 420 So.2d 41, 43 (Ala. 1982).  See also, Martin v. Arnold, 643 So.2d 564, 567
(Ala. 1994); Shows v. Donald Trucking Co., 631 So.2d 1010, 1012 (Ala. 1994); Latham v.
Redding, 628 So.2d 490, 494 (Ala. 1993); Eason v. Comfort, 561 So.2d 1068, 1071 (Ala.
1990); Baker v. Helms, Supra; and Sharp v. Evans, 646 So.2d 134, 135 (Ala.Civ.App.
1994).

Plaintiff's suggestions and expert Robinson's opinions based upon Trooper
Huntley's erroneous drawing in the accident report that the "point of impact was in the
left lane", and that "Thompson left no skid marks before colliding with the tractor
portion of Morris' Vehicle" are simply wrong and are unsupported by any admissible
evidence.  Unauthenticated hearsay conclusions from Trooper Huntley's accident report
are not admissible. Stevens v. Stanford, 766 So. 2d 849 (Ala. Civ. App. 2000).  Trooper
Patterson testified with certainty that both of these alleged facts were incorrect, that the
area of impact was clearly in the right northbound lane, and Thompson's vehicle did
leave skid marks.

Even if it were true that the initial impact was in the left lane, and that
Thompson's rig had not left skid marks, it would not change the fact that Thompson
had insufficient time and distance to avoid this accident.  As Patterson testified, the
perception-reaction time for Thompson to have perceived something in the road, to
have analyzed it and then to have decided to apply the brakes, when added to the lag

time it takes the brakes on a commercial vehicle to engage would likely have required over 200 feet before the initiation of any skid marks.[6]

Robinson's opinion that either Thompson did not apply his brakes, or that the brakes failed to work "because they were adjusted improperly or suffered some significant mechanical or design defect" is also based on the erroneous allegation that the Thompson Vehicle left no skidmarks. As noted above, Trooper Patterson identified in his photographs taken the night of the accident, the actual skid mark left by the Thompson vehicle, proving the undisputed facts that Thompson applied the brakes and that the brakes worked and left skid marks. Plaintiff has offered no other evidence of any defects in the Thompson Vehicle.

In the same section of Plaintiff's Response, Plaintiff suggested that Thompson had not done a pre-trip inspection of the brakes on his vehicle and that FTI had not properly maintained that vehicle. Again, there is no admissible evidence to support either of these allegations, and in fact the admissible evidence proves to the contrary. Thompson and Tidwell both performed pre-trip inspections on the brakes and the headlights of Thompson's Vehicle, the brakes and the headlights were working properly at the time of the accident, and the Peterbilt tractor had only been driven about 5,000 miles since its last annual inspection on 12/29/03. (Thompson, 76/1 –

---

[6] Even Robinson, Plaintiff's own expert, testified that at 70 mph, both the Morris rig and the Thompson rig could have had hard braking without locking the brakes, and that it could take 80 feet after the brakes were applied for the brakes to engage and for the tires to heat up on the pavement and leave a skid mark. (Robinson, 41/23-47/8.) Robinson also suggested that Thompson would have to have had time to perceive Morris' vehicle in the road in front of them and then to react, which would take two seconds and another 205 feet. (Robinson 150/7-150/22). So by Robinson's estimate, Thompson could have traveled at least 285 feet after first being able to see Morris' overturned rig and before leaving any skid marks.

77/12 – 79/1 – 79/22, PX 8)  (Tidwell, 28/1 – 29/16) (Seay, 72/1 – 73/21; 75/17 – 76/8; 92/11 – 98/20, PX 10).  Therefore, Plaintiff's Response provides no admissible evidence to support allegations that either Thompson acted unreasonably in failing to apply his brakes, or that the brakes failed to respond properly due to improper maintenance.

Robinson also stated that "It is more probable than not the Peterbilt driver was traveling at least 70 mph at the moment he collided with the Kenworth tractor". (Plaintiff's Response, Exh. 2).  This statement should be disregarded and/or stricken from the record, because there is no admissible evidence to support such an opinion. Although Robinson might have the qualifications to testify as an accident reconstructionist, he did not reconstruct this accident or make calculations to determine impact speeds.  He never personally inspected the accident site or either one of the vehicles involved in this accident, and no one on  his behalf inspected either of the vehicles, other than the cab portion of Morris' Vehicle that had separated from the frame or chassis of that tractor.  (Robinson, 30/2 - 31/3; 32/1 - 33/4; 34/13 - 35/19; 72/6 - 72/19; 137/3 - 137/11; 144/3 - 144/5; 170/6 - 171/2; 172/16 - 173/17; 175/15 - 176/2; 202/3  - 203/19.)

Robinson did have his associates examine the site and prepare site drawings (DX 10 to Robinson's deposition) (Robinson 204/13-205/4; 206/12-207/5; 208/1-208/9.) Robinson testified that there was nothing on DX 10 that is depicted inaccurately. (Robinson, 212/15-212/19).  The site drawing prepared for Robinson by his associates confirms Thompson's and Tidwell's testimony that the front portion of Morris' tractor extended over the right fog line some five or six feet into that right side emergency lane.

(Robinson, 215/18-216/8).  Robinson admitted that neither he nor any of his associates were able to determine the point of impact or an area of impact for the Collision Accident (Robinson, 252/3- 252/12), and he would therefore have to rely on the testimony of the investigating troopers to explain their drawing and its accuracy. (Robinson, 247/22-248/5).  Trooper Patterson confirmed Thompson's and Tidwell's testimony that the area of impact was indeed in the right hand lane.

Neither Robinson nor any of his associates were able to determine the speed of Morris' Vehicle, the distance Morris' Vehicle slid on I-85 after the Rollover before any impact by the Peterbilt, or the exact location of Morris' Vehicle in the roadway after the Rollover and before the Collision Accident.  (Robinson, 60/13- 62/12).  Robinson has done no research or any reconstruction to determine at what distance away from Morris' Vehicle that Thompson could have seen it.  (Robinson 66/11-66/20).  Nor is he aware of any studies or tests done to determine the perception-reaction and avoidability of an accident of this type.  (Robinson, 67/20- 68/11).  Robinson did not perform any speed calculations for this case and is not aware of any such calculations performed by his associates.  (Robinson, 117/12-117/17).  Robinson is simply stating that because Thompson was traveling at 70 mph, that the maximum speed at impact could have been 70 mph if there was no braking or other deceleration prior to impact.  (Robinson 134/14-134/23).

Although Robinson prior to his deposition had not performed any calculations to show the avoidability of this accident on the part of Thompson, during his deposition he performed calculations showing that at 70 mph with normal and reasonable

36

perception and reaction times and braking efficiencies, the speed at impact for Thompson's Vehicle would have been between 48 and 56 mph even if Thompson reacted reasonably. (Robinson, 153/6-153/3).

Robinson for the first time during his deposition gave the opinion that, if he could not stop his vehicle and avoid this accident, Thompson should have steered his tractor/trailer rig at 70 mph off onto the right shoulder in the right emergency lane. (Robinson, 154/2-156/10). But he agreed that if Morris' Vehicle was blocking the emergency lane, then it would not have been reasonable to require Thompson to try to avoid that vehicle by steering into the emergency lane. (Robinson, 217/17-218/15). Robinson offered the opinion that Thompson was outrunning his headlights, if he was unable to avoid the accident after first seeing Morris' overturned vehicle in his headlights, but Robinson agreed that at the time of the accident 70 mph was a legal speed, and there was no evidence that Thompson was traveling greater than 70 mph. (Robinson, 62/13-63/11). He also stated that he had reviewed the Thompson and Tidwell Affidavits and none of their testimony was inconsistent with his opinions or any of the physical evidence in this case. (Robinson, 63/22-64/6).

Finally, Robinson admitted that he had never investigated this type of accident before, where there was one impact due to a rollover, and then a subsequent impact from another vehicle. (Robinson, 114/18-115/1).

It is clear from the above that even if Robinson is a qualified accident reconstructionist, he did not perform the necessary inspections of the vehicles or the site to perform a reliable accident reconstruction in this case. He in fact did not perform a

reliable reconstruction of this accident, and none of his opinions offered in support of any of the Plaintiff's claims and allegations in this case meet the reliability standards of Rule 702, Browder, supra, or Daubert, supra.   Robinson's purported opinions that Thompson was outrunning his headlights, or that he could have avoided the accident by steering his vehicle out into the right side emergency lane are pure speculation and conjecture and are, therefore, inadmissible.  See Browder, supra.

Plaintiff also raises issues concerning whether or not the lights on Morris' Vehicle were still illuminated after the Rollover.  This is a moot factual point in this case, because the evidence is undisputed that Thompson and Tidwell saw no lights visible on Morris' Vehicle after the accident.  Patterson testified that it was not likely that any lights remained on after the Rollover, but if they did, they would not have been pointed in a direction such that they could have been seen by Thompson as he approached. Experts Robinson and LeBleu agreed in their depositions that they cannot state with any degree of engineering/accident reconstruction certainty whether or not any lights could have been seen by Thompson as he approached, and neither have inspected Morris' Vehicle and, consequently, do not have any reliable evidence to support an opinion that any of the lights on Morris' vehicle would still have been illuminated after the Rollover.  (Robinson, 170/17–171/2; 172/16–173/17; 178/20–179/1) (LeBleu, 39/18–41/10; 81/17-81/24; 105/5-107/1; 111/13-112/3; 115/2-115/11; 122/19-122/24; 124/1-131/4; 160/1-160/11).  LeBleu admitted that, although he is an electrical engineer by training, this is the first truck accident case that he has ever investigated, that he has never investigated a rollover accident before and that he does not "know specifically

anything about vehicle lighting, and then it's been such a long time since I've done anything with lighting … ."  (LeBleu, 22/20-23/1; 24/23-25/3; 26/11-26/17; 49/2-50/2; 63/9-64/7; 116/12-117/11).   Neither Robinson, nor LeBleu, are qualified to offer opinions as to whether or not the lights on Morris' vehicle survived the Rollover Accident, and even if they were, neither of them have any physical evidence to support an opinion/theory that the lights did survive.  The opinions offered by Robinson and LeBleu in their affidavits and in their testimony concerning this issue are nothing more than pure speculation and conjecture, and as such, are inadmissible in this case.  See <u>Browder</u>, supra.

Robinson admitted that he is not an expert on visual perception, that he is not offering any opinions as a human factors expert, that he is aware of no studies of perception/reaction times of drivers at night faced with an overturned truck with only the underside facing the driver, that he is not an expert on the range of Peterbilt headlights and has conducted no effective research to determine the range of Thompson's Vehicle's headlights, and that he is aware of no studies on perception/reaction times and avoidability of accidents similar to our accident. (Robinson, 14/11 – 14/16, 49/5 -  49/18, 51/2 – 51/11, 67/20 – 68/11, 228/3 – 228/14, 231/4 – 231/23).

Any purported opinions on the part of Robinson or LeBleu with respect to any perception/reaction times of Thompson, and/or his ability to have perceived and reacted to Morris' overturned vehicle in time to have avoided this accident, are not within their areas of expertise, and are not supported by any admissible evidence in this

case. Therefore, they are not reliable, and are mere speculation and conjecture. See, Browder, supra.

Plaintiff has failed to provide any evidence whatsoever that Thompson's conduct was unreasonable under the circumstances of this case and in any way constituted either negligence or wantonness.[7] Therefore, Defendants are entitled to Summary Judgment as a matter of law as to all claims, in all counts of the Amended Complaint.

## 2. No Violations of FMCSR's Proximately Caused Collision.

Although Plaintiff has raised possible technical violations of FMCSR's related to Thompson's diabetes, his medical examiner's certificate issued by a nurse rather than a doctor, three alleged serious violations within a three-year period prior to hire by FTI, a road test not completed before the date of the accident, an alleged failure to disclose his three-year history of traffic violations, an alleged failure to make a pre-trip inspection of the vehicle, and an alleged failure by FTI to properly hire, supervise, or entrust the vehicle to, Thompson, at the time of his accident, these allegations would only be actionable if Thompson's conduct was negligent/wanton, and proximately contributed to causing Plaintiff's damages. (Compare, Parker v. R & L Carriers, 253 Ga. App. 628, 56 S.E. 2d 114 (2002); and Moore v. State, 258 Ga. App. 293, 574 S.E. 2d 372 (2002).

---

[7] Although Plaintiff spent considerable time in Plaintiff's Response (Part V, p. 14) arguing that there is evidence in this case of wantonness, it is clear that Plaintiff's cited cases are distinguishable, except for Ex parte Anderson, 682 So. 2d 467 (Ala. 1996), which held that here was no evidence of wantonness. This Court's opinion in Monroe v. Brown, 307 F. Supp. 2d 1268 (M.D. Ala. 2004) analyzed Alabama's defintion of wantonness, "the conscious doing of some act …, while knowing of the existing conditions and being conscious that … injury will likely or probably result" and held that there was evidence of wantonness where the defendant accelerated through an intersection to beat a yellow light. Thompson's conduct in our case, like that in the cases distinguished in Monroe (Wang v. Bolivia Lumber Co., 516 So. 2d 521, and Hughes v. Southern Haulers, Inc., 379 So. 2d 601) was not wanton because he was faced with an emergency, not of his making, and tried his best to stop. See, Beshears v. Greyhound Lines, Inc., 2006

Therefore, because Thompson is entitled to summary judgment on the claims of negligence or wantonness, FTI is also entitled to summary judgment on these claims.

Furthermore, the facts noted above make it clear that Thompson's diabetes was not regulated by insulin, and that it was proper for a nurse practitioner to issue his medical certificate. The facts further demonstrate that FTI learned of Thompson's three-year driving history prior to the date of hire, and that "three serious traffic violations" did not exist, because neither of the two accidents within that three-year period were Thompson's fault, and the violation for speeding was in his personal vehicle, not a commercial vehicle. Thompson was being road tested at the time of the accident, and that road test was properly completed after the accident, despite a clerical error in dating that road test certificate. Thompson and Tidwell both made pre-trip inspections of the vehicle, and they both submitted themselves for drug and alcohol testing after this accident at Tallassee Hospital. There is simply no evidentiary support for any of the alleged FMCSR violations.

### 3.    FTI Not Guilty of Negligent Entrustment-Hiring-Training-Supervision-Retention

As for the negligent entrustment/hiring/training/supervision/retention claims, in addition to first showing that Thompson was incompetent and that the cause of his incompetency caused Plaintiff's damages, the Plaintiff must provide substantial evidence that FTI had knowledge of Thompson's alleged incompetency and/or that that alleged incompetency had manifested itself to FTI. Armstrong Business Services,

---

W.L. 224032 (M.D. Ala. 2006) (summary judgment granted because there was no evidence of wantonness).

Inc. v. AmSouth Bank, 817 So. 2d 665 (Ala. 2001); Pryor v. Brown & Root USA, Inc., 674 So. 2d 45, 51 (Ala. 1995).  Pryor set out the basic elements for these type claims as follows: (1) entrustment; (2) incompetence; (3) with knowledge that he [or she] is incompetent; (4) proximate cause; and (5) damages.

In all such cases, there must be manifestations of the alleged incompetence of the driver as a basic requirement of the negligent entrustment-type action.  Mason v. New, 475 So. 2d 854, 856 (Ala. 1985).  Absent proximate cause, there can be no cause of action for negligent entrustment-related claims.  See Keller v. Kiedinger, 389 So. 2d 129, 131 (Ala. 1980); and Rush v. McDonald, 241 Ala. 51, 106 So. 178 (Ala. 1925).  In our case, FTI had knowledge prior to the accident trip of only two driving incidents involving Thompson, a 2/21/03 speeding ticket in his personal vehicle, and an 8/29/02 accident that was not his fault and did not involve any property damages or injuries to the other driver.  These incidents did not manifest to FTI any alleged incompetency on the part of Thompson and his driving on the 8/31/04 trip, and the accident trip, as witnessed by other FTI drivers was well done.  Nor is there any evidence to support any allegation that any alleged incompetence on the part of Thompson caused or contributed to causing this Collision with Morris.  In fact, the overwhelming and undisputed evidence is that the Collision was Morris' fault.  Therefore, all these claims against FTI are due to be dismissed as a matter of law.

C.    **Morris' Negligence Was the Sole Cause of this Accident, or in the Alternative, Morris was Guilty of Contributory Negligence as a Matter of Law.**

Although no one can state with certainty why Morris' vehicle left I-85 and took its excursion into the median, Patterson testified that based on his years of experience in investigating traffic fatalities, it is most likely that Morris simply got drowsy and/or fell asleep and drifted into the median.  Plaintiff's expert Robinson testified that he does not know why Morris' vehicle left I-85 and went into the median, and that he has no opinion as to whether Morris' conduct contributed to causing the accident.  (Robinson, 139/17 – 139/22, 232/3 – 232/14).

Patterson testified that even if wrongful conduct by Morris was not the cause of his vehicle leaving I-85 and going into the median, it was definitely wrongful conduct by Morris in trying to re-enter I-85 at too great an angle, and at too great a speed that caused his vehicle to overturn and block both lanes of I-85 with only the underside of the vehicle facing oncoming traffic, and it was that conduct that caused the collision. Whether Morris' conduct constitutes the sole cause of this accident and is the only negligence involved in this case, or whether it is considered contributory negligence, the result should be the same, namely summary judgment in favor of Defendants Thompson and FTI.

Although negligence and contributory negligence are generally issues for a jury to resolve, where "the only reasonable inference that can be drawn from the evidence is that [a plaintiff's] tragic death was the result of [his] own failure to exercise reasonable care," and "the undisputed facts [are] such that all reasonable people would logically

have to draw the same conclusion," then a finding of contributory negligence as a matter of law is appropriate and summary judgment is warranted.  Buchanan v. Mitchell, 741 So. 2d 1055, 1056 (Ala. 1999).  Ridgeway v. CSX Transportation, Inc., 723 So. 2d 600, 606 (Ala. 1998).  In Ridgeway, the plaintiff failed to stop, look and listen at a railroad crossing and drove into the path of a train.  Ridgeway held that the defendants had the burden of proving: (1) that Ms. Ridgeway failed to exercise reasonable care for her own safety; and (2) that such failure was a proximate cause of her accident.  The undisputed evidence established that Ridgeway had a clear view of the approaching train, but failed to look and drove right into its path.

In our case, although we do not know the reasons why Morris left I-85 initially and went down into the median, we do know as a matter of undisputed fact that it was his own unreasonable and negligent conduct, the attempt to drive his tractor trailer rig back onto I-85 at a speed and at such an angle that it rolled over, that caused his death. This conduct on the part of  Morris constituted either negligence, as the sole cause of this accident, or at the very least, contributory negligence as a matter of law.  Ridgeway, supra; Serio v. Merrell, Inc., _____ So. 2d _____, 2006 WL 1195880 (Ala. 2006).

## IV.  CONCLUSION

Plaintiff has failed to establish by substantial evidence that Morris' death was the proximate result of any conduct of the Defendants, or that any wrongful conduct by the Defendants caused the Collision Accident.   Alternatively, the evidence proves that Morris' negligence was the sole cause of his death, or that he was guilty of contributory negligence as a matter of law.  For any or all of these reasons, Thompson and FTI are

entitled to summary judgment as a matter of law.  The Defendants, respectfully, move the Court to grant summary judgment to both Defendants and to dismiss all claims against them.

Respectfully submitted,


/s/ Richard E. Broughton
Richard E. Broughton

/s/ W. Evans Brittain
W. Evans Brittain

Attorneys for Edward Neal Thompson
and Florida Transformer

OF COUNSEL:
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Drive
Suite #204 [36109-5413]
P.O. Box 2148
Montgomery, Alabama  36102-2148
Telephone (334) 387-7680
Telefax (334) 387-3222
rbroughton@ball-ball.com
ebrittain@ball-ball.com

CERTIFICATE OF SERVICE

I hereby certify that on this August 15, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Henry Lee Penickhlpenick@bham.rr.com
hlpenick@penickandassoc.com

Manual Notice List

Edward A. Robinson, III
600 North Foster Street
P O Box 3131
Baton Rouge, LA 70821

/s/ Richard E. Broughton
OF COUNSEL