# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LORI ANN MORRIS, )
Plaintiff, )
vs. ) CASE NUMBER:
FLORIDA TRANSFORMER, ) 3:05-CV-962-T
EDWARD NEAL THOMPSON, )
et al., )
Defendants. )

DEPOSITION OF EDWARD NEAL THOMPSON

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to Henry L. Penick, the original transcript of the oral testimony taken on the 14th day of July, 2006, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

LORI ANN MORRIS, )
Plaintiff, )
vs. ) CASE NUMBER:
) 3:05-CV-962-T
FLORIDA TRANSFORMER, )
EDWARD NEAL THOMPSON, )
et al., )
Defendants. )

STIPULATION

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of EDWARD NEAL THOMPSON, may be taken before Cindy Weldon, Certified Shorthand Reporter, Commissioner and Notary Public, at 732 North 9th Street, DeFuniak Springs, Florida, on July the 14th, 2006 at 1:15 p.m.

IT IS FURTHER STIPULATED AND

AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

APPEARANCES

FOR THE PLAINTIFF:
MR. HENRY L. PENICK
THE PENICK BUILDING
319 - 17TH STREET NORTH, SUITE 200
BIRMINGHAM, ALABAMA 35203

FOR THE DEFENDANT:
MR. RICHARD BROUGHTON
2000 INTERSTATE PARK DRIVE
SUITE 204
MONTGOMERY, ALABAMA 36109

ALSO PRESENT:
MR. FRANKLIN SCOTT SEAY

Page 33

anything about that one.
Q. Okay. Is there anything on your report that's incomplete or incorrect?
MR. BROUGHTON: You mean does he dispute any of the information on that report?
Q. Or is there anything that's omitted from this report that you know about?
A. To the best of my knowledge, that's -- The wreck I had with Dart is not on here.
Q. Okay. Let's talk about that. Was Dart the next place you went after McLane's?
A. Yes, sir.
Q. Just so we can make sure about McLane's before moving on, you didn't have any accidents or infractions?
A. No, sir.
Q. Nobody asked you to leave?
A. No, sir.
Q. Then tell me about your next episode with Dart.

Page 34

A. Went to work with Dart sometime in -- I can't remember exactly. I think it was 2004, the first part of 2004. I went to work to -- right in August of 2004.
MR. BROUGHTON: 2003 or 2004?
THE WITNESS: 2004.
A. When I left McLane's there, I didn't do much of nothing there for a while after I left them until I went to Dart.
Q. Okay. Well, let's talk about when you left Dart. And I think we can put it in perspective. Do you recall when you left Dart?
A. Yes, sir.
Q. When was that?
A. Right at August of 2004.
Q. All right. So when did you start with Dart?
A. The first -- January of -- sometime in 2004.
Q. So you were with them that last time for about eight months?
A. Yes, sir.

Page 35

Q. All right. Where were you being dispatched out of?
A. Minneapolis, Minnesota.
Q. Did they have a physical location here that you operated under at all?
A. No, sir. Just satellite. Tell you where to go to get your next load at.
Q. Okay. And then you said that sometime while driving for them, you got in an accident?
A. It was in -- let's see. I believe it was -- may have been June 2004.
Q. What do you recall about that accident?
A. I was in Nashville, Tennessee coming across Interstate 40 and they was -- you get on the ramp where cars get back on the interstate, and there was two cars coming back out to the interstate.
I slowed down to let them get ahead of me. The first car pulled over in front of me. The second car went around the first car and speeded up.

Page 36

So we were building our speed back up to forty-five mile an hour. And then that car in front that went around the first car slammed on brakes and there wasn't nothing I could do.
I went into the back of the other car. And it was road rage is what we found it ended up to be.
Q. It was road rage between the first -- the two cars ahead of you?
A. Yes.
Q. And that's why the person ahead slammed on the brakes?
A. Yes, sir.
Q. Caused --
A. And after we slammed on brakes and I hit the car, he took off.
Q. Okay.
A. I went to court in Nashville. And everything that happened -- you know, with it being road rage, to have it kept off my record.
Q. And what did they decide in

Page 37

Nashville to do?
A. It's not supposed to be on my record. It was something that I couldn't help. Completely unavoidable. The judge said it shouldn't have been wrote up like that.
Q. Let me show you what's mark as Plaintiff's Exhibit 2 to your deposition.
(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification.)
A. Yes, sir.
Q. Is this the -- Did Dart write this up?
A. Yes, sir.
Q. And what did they do, mail it to you?
A. No. I think they faxed it to Scott.
Q. But you reported it to them; right?
A. Yes, sir.
Q. Was anybody injured in that accident?

Page 38

A. No, sir.
Q. Did anybody have to be taken to the hospital?
A. No.
Q. Was any vehicle towed after the accident?
A. Yes, sir.
Q. Whose vehicle was towed?
A. The car that I ran into.
Q. I noticed that on Plaintiff's Exhibit 2, it asked whether or not you had -- did you take any test after the accident. Did you take any?
A. Supposed -- They didn't tell me I had to. I asked them that. They told me no, there wasn't any injuries; so I didn't have to take -- because that's the first question I asked them.
Q. Okay.
A. Where did I need to go to do it, so, you know, I could follow the federal guidelines.
Q. And they told you you didn't have

Page 39

to; right?
A. Yes, sir.
Q. And that was somebody at Dart?
A. Yes, sir. In the safety department.
Q. Did you have any other accidents or infraction or anything while you were at Dart?
A. No, sir.
Q. Any other tickets or anything?
A. No, sir.
Q. Did you leave voluntarily?
A. Yes, sir.
Q. Did anyone ask you to leave?
A. No, sir.
Q. That was an independent contracting situation, also, wasn't it?
A. Yes, sir.
Q. What did you do after that?
A. I came to work at Florida Transformer.
Q. How did you hear about the job at Florida Transformer?

Page 40

A. A friend of the family. And I came down and --
Q. Which one was the friend of the family?
A. His name is Mr. Collins.
Q. Does he work for FTI?
A. Yes, sir.
Q. What's Mr. Collins' first name?
A. I'm trying to think of what his -- Carl Collins.
Q. What did he tell you?
A. He just said that they were looking for a driver. I was tired of being gone all the time and they was looking for a driver and I came down and talked to Scott, got application and filled it out.
Q. What did he tell you would be required of you to drive for Florida Transformer?
A. Deliver transformers and deliver ones out they refurbishd and bring back some to be redone.
Q. What was the pay arrangement?