# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

\* \* \* \* \* \* \* \*
LORI ANN MORRIS
VERSUS                                          No. 3:05-CV-962-T

EDWARD NEAL THOMPSON AND
FLORIDA TRANSFORMER
\* \* \* \* \* \* \* \*

The deposition of ANDRE E. LeBLEU, P.E., 17474 Opportunity Avenue, Baton Rouge, Louisiana, 70814-7470, taken by counsel for the Defendant at the Office of Edward A. Robinson III, Esq., 600 North Foster Drive, Baton Rouge, Louisiana, commencing at

10:36 a.m. on July 26, 2006.



Reported by: Kelly G. Young, CCR
Registered Professional Reporter

LEBLEU

**Page 22**

1  retained by anybody to testify?
2     A.  That's correct.
3     Q.  And who was it that first contacted you
4  about testifying in this case?
5     A.  We received a call from Dr. Robinson, I
6  believe.
7     Q.  All right. Let me ask you this. Through
8  the course of -- how long have you been an engineer?
9     A.  Since 1987.
10    Q.  All right. Let me just kind of go through
11 your resume here. You've been -- LAPTEC has been in
12 existence since 1999?
13    A.  It probably started a few years before
14 then.
15    Q.  Were you one of the founders of LAPTEC?
16    A.  I got in after it was founded.
17    Q.  Have you held the same position as
18 vice-president the entire time you've been there?
19    A.  That's correct.
20    Q.  And in your dealings at LAPTEC, have you
21 ever investigated any electrical systems for 18
22 wheelers?
23    A.  No.
24    Q.  Have you ever done it in your experience
25 ever?

**Page 23**

1     A.  No.
2     Q.  I'm not going to go -- what did you do at
3  Power and Control Systems in Baton Rouge?
4     A.  Basically the same things I've done for
5  LAPTEC.
6     Q.  Okay. And what about Bertrand Engineers?
7     A.  All of these except the beginning ones,
8  FAA, was basically -- we were working more with
9  radar systems instead of commercial industrial
10 electrical systems.
11    Q.  Tell me generally what you concentrate on.
12 Do you work on buildings?
13    A.  I work primarily on electrical systems,
14 protection of electrical systems. We're considered
15 to be experts on every aspect of electrical systems.
16    Q.  You said protection of electrical systems.
17 Would that be like from power surges or lightning
18 strikes?
19    A.  That would be that, that's correct.
20    Q.  What percentage do you think of your work
21 is devoted towards protection of electrical systems?
22    A.  I would say 50 percent at least.
23    Q.  All right. So that's your primary focus.
24 Is that correct?
25    A.  That's what we attempt to do.

**Page 24**

1     Q.  And tell me, kind of break down what else
2  you do. I don't know much about electrical
3  engineering.
4     A.  Beyond that we do designs, which we
5  implement in whatever facilities that we're
6  contracted to do so. We develop a design which
7  specifies every part and piece that goes with the
8  electrical system. Not the major parts. We'll tell
9  them the wire, how to install the wire, how to
10 connect it, the equipment that's going to connect
11 it, all the breakers, the protective devices in the
12 breakers, down to the motors. We look at how it's
13 going to be loaded, so forth. Do you need more
14 detail?
15    A.  That's plenty right there.
16    Q.  What are you doing these designs for? Is
17 it buildings; is it computers; is it cars?
18    A.  We basically provide power for buildings,
19 industrial systems. That's pretty much it. We
20 analyze systems, also, for various electrical
21 properties to make sure they operate within safe
22 applications.
23    Q.  Any of your design work, has that ever been
24 done for 18 wheelers?
25    A.  No.

**Page 25**

1     Q.  What about any kind of vehicles or
2  automotive equipment?
3     A.  No.
4     Q.  Anything other than buildings?
5     A.  It's basically going to be power systems
6  that we've done for whatever, motors that supply
7  power to motors or devices or something within a
8  facility.
9     Q.  When you say motors, is that kind of like
10 if you were in a plant --
11    A.  That's right.
12    Q.  -- and they've got a big old generator or
13 something running, that's what you're talking about?
14    A.  Yes. I'm going to get electrical power to
15 power motors or lights or any types of things that
16 require electrical service.
17    Q.  You started with FAA, and then you moved
18 back to Baton Rouge and have been here ever since
19 doing that same kind of work?
20    A.  That's correct.
21    Q.  When were you born?
22    A.  Nineteen sixty-four.
23    Q.  And where did you go to college?
24    A.  I went to the University -- it's now
25 University of Louisiana at Lafayette.

LEBLEU

**Page 30**

1 figure out some real things if you'd like.
2 Q. Let's do that. Do you remember what date
3 it was that you were first contacted about this
4 case?
5 A. About this case right here?
6 Q. Yes.
7 A. I do not remember that date.
8 Q. The accident happened September 2nd of '04.
9 Obviously, it would have been after that. Do you
10 remember whether it was in the year 2004 or whether
11 it was in the year 2005?
12 A. I couldn't tell you that.
13 Q. We've got -- this fax from Dr. Robinson is
14 March of '05. Obviously, it would have been
15 sometime before then.
16 A. That's right.
17 Q. Does that help you put it in perspective as
18 far as how soon before this fax was sent that you
19 were first contacted about this?
20 A. I got to assume it was maybe a week or two
21 before.
22 Q. You received a phone call. Did you receive
23 any documents?
24 A. I think this is the thing we received after
25 that.

**Page 31**

1 Q. You said this thing. I'm going to mark
2 that. That will be Exhibit 4 do your deposition.
3 That's your blue binder that's got everything in it.
4 A. That's correct.
5 Q. I'm going to mark as Exhibit 5 this fax,
6 this March 30 fax. All right. So the first thing
7 you do is you get the blue binder, and then what did
8 you do? Did you review that?
9 A. I did review that.
10 Q. And between the time you reviewed that and
11 the time you got this fax, did anything take place?
12 A. We developed a sheet, you know, we went
13 through that, and then we developed a sheet right
14 here, did some research, tried to find out as much
15 as we could about the situation.
16     DR. ROBINSON:
17         When you say research, please tell the
18         counsel in detail what you mean by
19         research, whether it was computer or what
20         did you do?
21 A. We looked at trucks or I looked at trucks.
22 I had some brochures I had from Dr. Robinson, and
23 looking at things on the internet, and talked to --
24 we happened to have at the time a loading dock
25 behind us and talked to truckers and went out there

**Page 32**

1 and looked at the wiring, looked at things. We have
2 pictures here. I looked at the pictures and all the
3 stuff that was in this binder that Dr. Robinson gave
4 me, and I was able to come up with these findings
5 right here.
6     DR. ROBINSON:
7         When he says pictures, these are not
8         pictures I took. These are pictures
9         provided by Dr. Robinson, the other Dr.
10        Robinson.
11 BY MR. BRITTAIN:
12 Q. I'm going to go through those in just a
13 little bit with you. You all had discussions about
14 that, and I guess in the interim between you
15 receiving that blue notebook and the time that
16 Defendant's Exhibit 5 was generated, that's when you
17 did all that you were telling me about right there?
18 A. That's correct.
19 Q. And then you received this fax right here.
20 I guess you reviewed this fax and made whatever
21 changes are on it. Is that correct?
22 A. That's correct.
23 Q. And then did you fax it back to Dr.
24 Robinson?
25 A. I must have.

**Page 33**

1 Q. And then did he or his office make the
2 changes that resulted in what we've marked as
3 Exhibit 2?
4 A. That's correct.
5 Q. You got any other time in this case other
6 than that in preparing for your deposition?
7 A. I know that after this, just because it had
8 been a while, I went through and, you know, I spent
9 some time in the last couple of days, last couple of
10 weeks just going around refreshing myself on the
11 situation. Again going to the Kenworth dealer and
12 looking at some trucks, looking at the battery
13 systems, the wiring, getting some data together, you
14 know, looking at this stuff.
15 Q. Going to the Kenworth dealer and all that,
16 that was done after you prepared your report, No. 2?
17 A. That's right.
18 Q. Did you ever do that before you prepared
19 your report?
20 A. I did not go to the Kenworth dealer, but I
21 did talk to truckers and looked at trucks.
22 Q. Do you remember what kind of trucks it was
23 you looked at?
24 A. I looked at a T600. I looked at Volvo
25 trucks and Freightliners, the other various brands

LEBLEU

Page 50

1  correct?
2      A.  That's correct.
3      Q.  All right.  Back to your report or your
4  affidavit.  Is this the only thing -- you don't have
5  a report, do you?
6      A.  I've got a very short report that I
7  presented earlier.
8          DR. ROBINSON:
9              That was the project note.
10         MR. BRITTAIN:
11             I'm going to mark that as Exhibit 6.
12         DR. ROBINSON:
13             What was No. 5?  Was that the
14     affidavit?
15         MR. BRITTAIN:
16             Five is that fax.
17         DR. ROBINSON:
18             Okay.
19         MR. BRITTAIN:
20             Four is the book.
21         DR. ROBINSON:
22             And this is Exhibit No. 6 then, and
23     this is the project note.
24         MR. BRITTAIN:
25             Right.

Page 51

1  BY MR. BRITTAIN:
2      Q.  Other than the affidavit and the project
3  note, are there any other reports, or affidavits, or
4  anything else that you plan on using or that you
5  developed?
6      A.  I plan on using the brochures that were --
7  that I had.
8      Q.  I'm going to get to that in a second.
9  Other than what you've generated.  I'm just talking
10 about what you've generated.
11     A.  No, that's it.
12         DR. ROBINSON:
13             Attorney Brittain, could I just ask
14     you did you give an exhibit number to the
15     affidavit yet?  I didn't get that.
16         MR. BRITTAIN:
17             Number 2.
18 BY MR. BRITTAIN:
19     Q.  Do you have a copy of -- you just mentioned
20 some Kenworth materials?
21     A.  That's correct.
22     Q.  Do you have a copy of those?
23     A.  Yes, I do.
24     Q.  Is that in your book?
25     A.  I took them out.  These were provided to me

Page 52

1  by Dr. Robinson.
2      Q.  Let me see what you've got there.
3      A.  Some general brochures.  One of them is for
4  a W900 Kenworth, and one is for a T800 Kenworth.  Is
5  that right?
6      A.  That's correct.
7      Q.  These were provided to you by Dr. Robinson?
8      A.  That's correct.
9      Q.  Dr. Robinson or Attorney Robinson?
10         DR. ROBINSON:
11             Attorney Robinson.
12 BY MR. BRITTAIN:
13     Q.  And then you have another one in your blue
14 book right there.  Is that right?
15     A.  That's correct.
16     Q.  And what is that for?
17     A.  Interiors and sleepers.  I didn't really
18 use that.
19     Q.  What did you say, this was a T600 involved
20 in this accident?
21     A.  From what I understand it was a T600.
22     Q.  When did you get these two provided by
23 Attorney Robinson?
24     A.  I got them when I got this right here.
25     Q.  Will you stick these in that book, too, and

Page 53

1  let's get a copy of those?
2      A.  (Complied with request.)
3      Q.  In your affidavit you state that your
4  opinions and conclusions are based upon standard
5  methodologies accepted and utilized throughout the
6  electrical engineering profession.  What standard
7  methodologies are we talking about?
8      A.  We're going to talk about -- we're going to
9  examine the way the wires are mounted in the truck.
10 We're going to just go look at things about
11 batteries.  We're going to try to look at everything
12 that's in there, that kind of thing.
13     Q.  Okay.  Standard methodology, I know like
14 for accountants they have the generally accepted
15 accounting principles.  Is there anything like that
16 in the electrical engineering field?
17     A.  We have the National Electric Code.  That's
18 just something we just go through to make sure
19 everything is done safely.  Trucking industry is
20 going to put that in.  They're going to do that.
21 They're going to meet all those qualifications.
22 Being that I don't have the truck to look at, I'm
23 going to go and make sure those things are met,
24 which the trucking industry is going to meet, and
25 then I'm going to use my own experience and go

LEBLEU

**Page 54**

1  through and say what I know from the electrical
2  world applies and what I know from my own experience
3  investigating or looking at, troubleshooting things,
4  how does that apply.
5      Q.  Does that go the same with respect to the
6  --
7      A.  Which one?
8      Q.  -- concept?  What you just told me about
9  the standard methodologies.
10     A.  That's right.
11     Q.  Would that be the same with respect to any
12 accepted concepts?
13     A.  That's correct.
14     Q.  As far as the opinions you're going to
15 offer today, what you've given me here in Exhibit 6
16 and what you've given me I've marked as Exhibit 2,
17 is that going to encompass all of the opinions that
18 you're going to offer?
19     A.  That's it.
20     Q.  There will be no opinions in addition to
21 what we've been provided with there?
22     A.  No.
23     Q.  All right.  Let's go through your
24 affidavit.  Number 6 here says -- well, hold on,
25 before we do that let me see that book real quick.

**Page 55**

1          DR. ROBINSON:
2              Yes, sir.
3  BY MR. BRITTAIN:
4      Q.  All right.  Looks like Mr. Penick has also
5  provided you with a copy of the affidavits of Edward
6  Thompson and David --
7      A.  That's right.
8      Q.  Both of them?
9      A.  Yes.
10     Q.  Thompson and Tidwell?
11     A.  That's two copies of that.
12     Q.  He provided you with a letter giving you
13 the notice of your deposition?
14     A.  Correct.
15     Q.  And the rest of this book looks like to me
16 the same thing that you all gave us.
17         DR. ROBINSON:
18             Yes.
19     A.  Right.
20 BY MR. BRITTAIN:
21     Q.  Do you have a file of your own which would
22 have any kind of correspondence that you sent to
23 either Mr. Penick or Attorney Robinson or Dr.
24 Robinson?
25     A.  I think they -- the only things they

**Page 56**

1  received if I remember correctly is this statement
2  right here, and my affidavit, and my marked up
3  affidavit.  That's the only thing.
4      Q.  Who is they?
5      A.  The Robinsons.
6      Q.  Have you had any dealings with Henry Penick
7  other than when he sent you that letter about your
8  deposition and the affidavits?
9      A.  That was it.
10     Q.  Let me show you what I'm going to mark as
11 Exhibit 7.  This appears to be a fax from LAPTEC to
12 Attorney Robinson.
13     A.  We developed some questions that we wanted
14 to ask.  Basically it was this fax and then we had
15 this right here.
16     Q.  Let me see what you got there.
17     A.  (Tendering document.)
18         MR. BRITTAIN:
19             Can you make me a copy of this?
20         DR. ROBINSON:
21             Yes.
22         (Off-the-record.)
23 BY MR. BRITTAIN:
24     Q.  Exhibit 7 was a fax that was sent by you to
25 Attorney Robinson on March 28, '05 where you had

**Page 57**

1  some questions that you needed answers to.  Is that
2  right?
3      A.  That's right.
4          DR. ROBINSON:
5              What was the date, March 27?
6          MR. BRITTAIN:
7              March 28.  When we get those copies
8          I'm going to mark those as Exhibit 8.
9  BY MR. BRITTAIN:
10     Q.  Do you think there might be any other
11 correspondence between you and --
12     A.  I know there was a follow-up to that right
13 there.
14     Q.  All right.  Basically they responded to the
15 questions.  I sent them some questions and they
16 responded to the questions.
17         DR. ROBINSON:
18             And could you emphasize who "them" was
19         so we won't confuse Dr. Robinson with me,
20         Attorney Robinson?
21     A.  How about I sent this to Dr. Robinson.
22         DR. ROBINSON:
23             That's to me.
24     A.  And then I got a response from Dr.
25 Robinson.

LEBLEU

**Page 58**

1  DR. ROBINSON:
2      From Dr. Robinson the expert?
3  A. Right.
4      MR. BRITTAIN:
5      If I could see that, please I believe
6  I do have a copy of this. Actually I
7  don't. I don't have all that. If I could
8  get a copy of that. Let me see this here,
9  too, and make sure I've got that.
10 BY MR. BRITTAIN:
11 Q. I'm going to mark as Exhibit 8, this is
12 actually, it's the same cover sheet fax as Exhibit
13 7, but it's also got questions that you needed some
14 answers to. Is that right?
15 A. That's correct.
16 Q. And I'm going to go ahead and mark these
17 while we've got them Exhibit 9. If you'll tell me
18 what Exhibit 9 is.
19 A. Apparently this was a cover letter to the
20 affidavit, the original affidavit I got. This looks
21 like a correspondence that I had, what I used to
22 come up with the affidavit.
23 Q. Right now you're referring to the second
24 page of Exhibit 9?
25 A. Yes.

**Page 59**

1  Q. And then what's the third page of Exhibit
2  9?
3  A. And this is the questions I had.
4  Q. What's the fourth page?
5  A. Just the transmittal.
6  Q. Now, what I've marked as Exhibit 10, what
7  is that?
8  A. This is my statement which I faxed to the
9  Robinsons.
10 Q. Now, if I could see the documents that I
11 marked, that one you got in your hand right there,
12 this right here. You can hang on to No. 2. Has
13 Brent Evans done any work on this case?
14 A. We've discussed it.
15 Q. All right.
16 Q. Is there anything that he's done that
17 you're going to rely upon in --
18 A. No.
19 Q. And let me make sure we're clear. You knew
20 what I was going to say. You knew the question was
21 coming before I got through. But you're not going
22 to rely on anything he has done in forming your
23 opinions?
24 A. That's correct.
25 Q. All right. Let's go through, I want to go

**Page 60**

1  through the questions that you had. This was
2  actually looks like an e-mail that was sent from
3  Brent Evans to you, and then you forwarded that on
4  to Attorney Robinson. Is that right?
5  A. That's correct.
6  Q. Photograph of the condition of the
7  batteries. Tell me what you needed that information
8  for.
9  A. We just wanted to see what the batteries
10 looked like.
11 Q. Why is that important?
12 A. The batteries are the primary source of --
13 the only source of electricity for the truck outside
14 of the generator.
15 Q. And all of these nine items right here, I
16 guess these are all important facts that you need to
17 know in order to develop an accurate opinion. Is
18 that fair to say?
19 A. Yes.
20 Q. All right. Close-up -- No. 2 is a close-up
21 photograph of the dashboard control panel for
22 lighting control. We need to be able to see the
23 name plates above the toggle switches. Explain to
24 me what you mean by all that.
25 A. We wanted to look at the switches. At the

**Page 61**

1  time I didn't know exactly what was going on; but
2  maybe we were going to assume we could look at the
3  switches and see what state they were in.
4  Q. What switches are you talking about?
5  A. The switches that control lighting.
6  Q. Would that be the control panel within the
7  cab that the driver would use?
8  A. That's right.
9  Q. You're going to have to explain this to me
10 in pretty basic terms.
11 A. No problem.
12 Q. Why was it important that you needed to see
13 that?
14 A. We felt that might have some affect on
15 forming our opinion.
16 Q. Explain that to me.
17 A. We would just like to look at the switches.
18 If they had been used, what state would they be in?
19 Would they be on or off? As we got further on we
20 don't know if that affects it as much, our opinion
21 of what's going on.
22 Q. Explain to me the reason why that is while
23 we're at it. I will forget to ask you later.
24 A. It got rammed. From what I understand it
25 got hit with the Peterbilt truck afterwards. I

JANET L. PARKER & ASSOCIATES, L.L.C.
P. O. BOX 3321, BATON ROUGE, LA 70821, 225-344-4559

16 (Pages 58 to 61)

LEBLEU

62

1  think after the Peterbilt hit it I've got to guess
2  that everything is -- all bases are off after the,
3  you know, after it got hit by the truck.
4      Q.  What do you mean by that?
5      A.  I don't know what affect that would have on
6  the switches.
7      Q.  Do you know what affect that a rollover
8  would have on those switches?
9      A.  I would tend to think at this point that
10 the switches were pretty sticky.
11     Q.  Now, you think that an impact would have I
12 guess messed everything up so bad that you can't
13 really tell anything, but a rollover would not have
14 that affect?
15     A.  I can't say that.
16     Q.  I'm trying to understand what you just told
17 me though.
18     A.  This is what I have to -- from what I
19 understand the impact tore the cab off the truck.
20     Q.  How did you come to that understanding?
21     A.  I got that off -- I read that someplace.
22     Q.  Do you remember where you read that?
23     A.  I must have read it off the Dr. Robinson
24 report.  Then all bets are off on what state the
25 switches were or anything at that point.

63

1      Q.  What's your understanding -- so I guess
2  based on the force of the impact between the
3  Peterbilt and the Kenworth, is that what you're
4  telling me?
5      A.  From the cab being torn off the trailer
6  from what I understand.  From what I understand.  I
7  don't know exactly where I got that from right at
8  this point.  I can't say what happened after that.
9      Q.  But you've never investigated an 18 wheeler
10 that's rolled over before, have you?
11     A.  That's correct.
12     Q.  You don't know what kind of force is
13 involved in a rollover event, do you?
14     A.  I do not know.
15     Q.  Are you aware of the fact that many times
16 people are killed in a rollover when a truck rolls
17 over?  Are you aware of that?
18     A.  You're telling it to me.
19     Q.  Did you know that that happens?
20     A.  I can't say that I knew that or don't know
21 that.
22     Q.  I'll represent to you that when we took
23 Trooper Patterson's deposition he said that is the
24 most common cause of fatalities in trucking wrecks
25 is rollovers.  Were you aware of that?

64

1      A.  No.
2      Q.  Would you agree with me that that would
3  tend to indicate that there was some pretty
4  significant force going on on this rollover
5  collision if that's the number one cause of
6  death --
7      A.  I don't know that --
8          DR. ROBINSON:
9              Object.  You're asking questions
10         outside of his expertise, Counsel.  Calls
11         for speculation.
12 BY MR. BRITTAIN:
13     Q.  Let me make sure I understand.  You're
14 saying that the photograph of the dashboard control
15 panels, you're not as concerned with that any more
16 because the destruction that would have been caused
17 by the impact would have been so severe that it
18 wouldn't be helpful?
19     A.  Yes.  Nobody can say what the impact would
20 have done to the switches.
21     Q.  And I guess the same could be said with
22 respect to the rollover, too.  Is that right?
23     A.  I don't know.
24     Q.  Number 3 here says, Were the lights turned
25 off by anyone at the scene?  Why is that important?

65

1      A.  I just want to know.  Clearly that would
2  indicate that the lights were on.
3      Q.  Number 4, What was the position of the key
4  in the ignition at the scene.  What does that mean?
5      A.  We were just -- at that point we didn't
6  quite know everything involved so we wanted to know
7  was the truck running, was it not running?  Now we
8  know that with the truck off it doesn't have any
9  affect on the lights.
10     Q.  So No. 4 doesn't matter?
11     A.  That's right.
12     Q.  Number 5, What is the condition of the
13 lights on the truck and trailer now?  Do the lights
14 appear to be intact and functional?  Tell me why
15 that's important.
16     A.  Obviously, that's going to affect if the
17 lights can be used or not after the impact or
18 whatever.  This is our initial question trying to
19 find out what went on so we could formulate our
20 opinion.
21     Q.  Is that still something that you think as
22 we sit here today is pretty important to know?
23     A.  It would be nice to know.
24     Q.  Number 6, What is the type and manufacture
25 of each battery?  Tell me why you need to know that.

LEBLEU

## 66

1   A. Just wanted to be able to do some research
2   on the batteries. That's all.
3   Q. And is that, as we sit here today, still
4   something that's important in formulating your
5   opinion?
6   A. I think all batteries generally from my
7   experience are fairly similar. So they're going to
8   be built the same. They're going to be able to
9   withstand a certain minimal amount of pressure
10  that's going to be -- I think it might even be
11  regulated. I can't say that for sure. I expect any
12  battery that would be used would be similar.
13  Q. So No. 6, that doesn't really matter any
14  more?
15  A. At this point I don't think it matters.
16  Q. Number 7, What was the condition of the
17  wire harness feeding the lighting at the scene?
18  First of all, tell me what you're asking for there.
19  A. We just wanted to -- did anybody look at
20  the wire? That's basically all we wanted to know.
21  Q. Wire between what?
22  A. Wiring is the life blood of the electrical
23  system. If there was something mangled or something
24  odd about the wiring we would like to know that so
25  that we could formulate our opinion.

## 67

1   Q. And you're talking about the wiring
2   throughout the tractor?
3   A. That's correct.
4   Q. Number 8 says, Have the light switch
5   positions been changed since the accident? What
6   does that mean?
7   A. I think that was -- the original question
8   we were asking about, it would fall in the same vein
9   as that. We just wanted to know if somebody
10  operated the lights and if they were on.
11  Q. Number 9, What was the approximate period
12  between the rollover and the collision? Tell me why
13  that is important.
14  A. We just want to know what actually
15  happened.
16  A. I just -- I was just trying to gain more
17  information about what went on, really.
18  Q. All right. Then looks like in response to
19  that -- let me look at this a second. Number 11
20  here is a fax from Attorney Robinson to you and
21  Brent Evans that says, Alabama State Police report
22  confirms everything was working on both vehicles and
23  all lights were on. Do you know where that
24  information came from?
25  A. No.

## 68

1   Q. Have you seen anything in the police report
2   that indicates that at the time of impact all the
3   lights were on?
4   A. No.
5   Q. It says, Therefore, it is permissible to
6   state given the state police findings it is more
7   probable than not that the ignition switch and
8   lights and battery were on and properly functioning.
9   Did this have anything to do with your
10  opinion that the lights were on and functioning at
11  the time of impact?
12  A. No.
13  Q. Page No. 5 to Exhibit 11 appears to be --
14  are those the responses that you got back from
15  Robinson and Associates?
16  A. Yes.
17  Q. And that addresses each of the questions
18  that you asked. Is that correct?
19  A. Yes.
20  Q. And it looks like there are ten answers.
21  There were nine questions. We'll have to figure out
22  what the difference was. Let's just go through
23  whatever questions were asked. Number 1 on Dr.
24  Robinson's letter says, Do all of the lights stay on
25  when the ignition is turned off? And they told you

## 69

1   that, All lights should stay on, similar to an
2   automobile.
3       Were you not aware of that fact when you
4   posed that question to them?
5   A. I was not aware of that.
6   Q. Have you done any kind of investigating on
7   your own to determine whether or not that is in fact
8   the case?
9   A. You'll have the -- we do have some
10  schematics that I obtained later on after that that
11  it's just like a car.
12  Q. Is that what you got in the last couple of
13  weeks?
14  A. Yes.
15  Q. Photograph of the condition of the
16  batteries. And they told you that, We do not
17  normally photograph batteries and did not do so in
18  this case. Further, the engine compartment was
19  inaccessible when the tractor was inspected, blah,
20  blah, blah.
21      So you've never seen any photographs of the
22  battery. Is that correct?
23  A. No.
24  Q. And it's important that you know what
25  condition the batteries were in because that would

LEBLEU

### Page 78

1  copy of this back?
2      DR. ROBINSON:
3          Let us make a copy of it first, and
4      then you can mark it.
5      (Off-the-record.)
6  BY MR. BRITTAIN:
7      Q. I'm going to mark this as 11. I want you
8  to take my pen and draw on here the wire that you
9  were just talking about that was the most . . .
10     A. (Complied with request.)
11     Q. And what does that wire run from and to?
12     A. I don't know.
13     Q. Do you even know if it has anything to do
14  with the lights?
15     A. No, I don't know if it has anything to do
16  with that. My contention is that on the rollover
17  this right here is usually going to be one of the
18  things that impacts the ground. And even after
19  getting hit by the Peterbilt, this right here, which
20  was probably one of the points rubbing on the
21  ground, seems to me that it would have, by all of
22  this damage right here that this is still in good
23  shape.
24     Q. What you're saying is that one way for the
25  wiring to be destroyed or the lights would be if the

### Page 79

1  truck slid along its side and the contact between
2  the wire and the pavement basically destroyed the
3  connection?
4      A. What I'm saying is if the wire, the wire is
5  held securely in the truck and being -- it would
6  stay there. Being this was at a point where it
7  would be most apt from what I can see to be in
8  contact with the ground, it was protected enough
9  that any other wiring within the truck would
10  probably not be damaged from this exhibit right
11  here for lack of a better word.
12     Q. There wasn't any wiring at all damaged in
13  the truck is what you're saying?
14     A. I don't know that.
15     Q. The wiring that you and I just went over
16  that's -- tell me what model we were looking at.
17     A. We were talking about a T800.
18     Q. That's not the tractor that was involved in
19  this accident, is it?
20     A. No, that's not it.
21     Q. Do you know whether the tractor that was
22  involved in this is wired the same way as that
23  tractor?
24     A. I don't know that. I assume so.
25     Q. Is there any reason why you haven't gotten

### Page 80

1  the model T600 brochure?
2      A. I did get a T600 brochure off the internet.
3      Q. Does that have the schematics of the
4  wiring?
5      A. No. I think it's got the same pictures.
6      DR. ROBINSON:
7          The same schematic.
8      MR. BRITTAIN:
9          If you will, will you -- I'm going to
10     need a copy of that, too.
11     DR. ROBINSON:
12         Could we do -- all of these or just
13     the pertinent pages?
14     MR. BRITTAIN:
15         I do want the whole thing.
16     DR. ROBINSON:
17         Let me go and make the whole thing
18     then.
19     (Off-the-record.)
20  BY MR. BRITTAIN:
21     Q. The schematic that you're showing me there,
22  that's the connection of the --
23     A. This is the way they -- the wiring and all
24  of their devices are contained within the C beam.
25     Q. In the trailer?

### Page 81

1      A. That's right.
2      Q. What about in the tractor?
3      A. The tractor, I know that it's got, from
4  what I can remember from just looking, it's got all
5  of the wiring contained within basically the metal
6  parts within the trailer protected from the
7  environment, things like that. It also has kind of
8  a bungie cord type attachment with some locked hubs.
9      Q. And that's based on you opening up the hood
10  of some of these tractor trailers?
11     A. Just looking at them.
12     Q. Would that be I guess early on when you
13  would look at the ones that would pull up where you
14  all were, or is that from your inspection of the
15  Kenworths at the Kenworth dealership?
16     A. It would be early on.
17     Q. And you don't know whether on the tractors
18  you had been looking at there whether any changes
19  had been made to that, do you, to those tractors?
20     A. I can't say specifically about the tractor
21  that Mr. Morris was driving.
22     Q. You have no idea what the wiring was like
23  in the tractor of Mr. Morris?
24     A. No, that is correct.
25     DR. ROBINSON:

LEBLEU

Page 82

1    Insofar as the question that you just
2    asked, in all fairness to the witness, the
3    question he asked is did you know anything
4    about the wiring of that particular truck
5    or did you have the opportunity to look in
6    the schematics or either on your computer
7    at the wiring for that truck model?
8    A.   Yes.
9        MR. BRITTAIN:
10       That wasn't my question.
11       MR. BRITTAIN:
12       My question is whatever it is. It
13   will read back whatever it was.
14       DR. ROBINSON:
15       But the point is, so the witness's
16   response can be clarified and understood --
17       MR. BRITTAIN:
18       Let the witness testify. I'd like him
19   to tell me that, you know, as opposed to
20   you telling me that.
21       DR. ROBINSON:
22       We don't want to mislead the court on
23   what the witness's testimony is.
24   BY MR. BRITTAIN:
25   Q.   Did you understand the question I asked you

Page 83

1    earlier?
2    A.   Please restate the question.
3    Q.   Like I told you early on, if for some
4    reason I ask you a question that doesn't make sense
5    you tell me that. I want to make sure we're on the
6    same page. But you have no earthly idea of what the
7    wiring was like in the Kenworth Mr. Morris was
8    driving at the time of this accident, do you?
9        DR. ROBINSON:
10       The particular truck you're saying,
11   Mr. Brittain?
12       MR. BRITTAIN:
13       Yes, the Kenworth he was driving at
14   the time of this accident.
15   A.   That's right, I can't.
16       DR. ROBINSON:
17       Here are the pictures back from the
18   model of the truck that Mr. Morris was
19   driving. Is that right?
20   A.   This is the current brochure regarding the
21   T600, which I believe is what Mr. Morris was
22   driving.
23   BY MR. BRITTAIN:
24   Q.   This is Exhibit 12. What year model is
25   this?

Page 84

1    A.   I'm sure that's the latest.
2    Q.   Two thousand six?
3    A.   Their latest brochure on that truck, so
4    it's 2006.
5    Q.   And what year model was Mr. Morris driving?
6    A.   I understand it was a 1998.
7    Q.   You don't know what, if any, changes have
8    been made in the design between Exhibit No. 12 and
9    the one he was driving?
10   A.   No.
11   Q.   What I was going to ask you -- continue.
12   Tell me everything else. So far we've gone over the
13   plate system or whatever that holds the batteries
14   down and the wire right there. Is there anything
15   else?
16   A.   The other thing I looked at was this
17   headlight right here, which apparently --
18   Q.   Go ahead and draw on it. Is that mine?
19   Here, use mine.
20   A.   This headlight right here is still intact.
21   Even though it's not where it was, the lights are
22   still intact from what I can see right there. So
23   these lights are not damaged from what I can see
24   right here. The glass is not cracked or anything
25   like that. The other thing is we had some shots of

Page 85

1    bulbs right here that are in the cab and they're --
2    all of their filaments are still intact.
3        DR. ROBINSON:
4        Filaments still intact.
5    BY MR. BRITTAIN:
6    Q.   All right. Is there anything else?
7    A.   That doesn't look like it's intact but it
8    is. We can get a better shot if you'd like.
9    Q.   Put a star on this page that you're talking
10   about.
11   A.   (Complied with request.)
12   Q.   Is there anything else other than what
13   you've gone over with me right now that from a
14   factual standpoint or in any way you contend
15   supports your opinion that the lights were on after
16   the rollover?
17   A.   The only other thing I think at this point
18   is basically two things. I did get schematics of
19   this, and the lights, and the marker lights, and the
20   trailer lights, I can give you that, are all on
21   different circuits. So that would lend to more
22   reliability on the electrical system. So that would
23   to me show the fact that there's better chances of
24   lights being on.
25   Q.   You're telling me that the tractor lights

LEBLEU

**Page 86**

1  and the trailer lights are on different systems?
2     A.  They're all powered from the same stuff,
3  but the wiring that goes out --
4         DR. ROBINSON:
5         I'll be happy to make a copy of that
6     after you identify it.
7     A.  For example, we have a number of circuits
8  here, and there's different head lamps, flood lamps,
9  parking tail lamps, sign lamps, different circuits.
10 So that would lend more reliability in the wiring
11 system.
12 BY MR. BRITTAIN:
13    Q.  Where did you get a copy of this?
14    A.  I got this from Kenworth.
15    Q.  Is that for the '96 T600?
16    A.  That's for this VIN model.
17    Q.  The '98?
18    A.  That's right.
19    Q.  You're going to have to explain that to me.
20 When you say they're on different circuits, how many
21 different circuits are there?
22    A.  I don't know how many circuits there are.
23 I guess I could count them right here, but there's
24 -- basically these little half little moon shapes,
25 those are circuit breakers. And then I go down

**Page 87**

1  through here and it says head lamps, flood lamps,
2  parking tail lamps, sign lamps. These are different
3  circuits, and now we can just follow the wiring out
4  to different lamps. So these come out in different
5  places.
6     Q.  Where is the battery?
7     A.  The battery, let's see, I believe they show
8  the battery box in this drawing right here, and then
9  they move off into there's a circuit breaker box
10 contained within the structure.
11    Q.  All right. I want you to circle -- well,
12 go ahead, let's get a copy of that.
13        DR. ROBINSON:
14        What exhibit would this be?
15        MR. BRITTAIN:
16        Thirteen.
17    A.  I have one more thing and then that will be
18 it.
19 BY MR. BRITTAIN:
20    Q.  We're going to mark this as Exhibit 13.
21 Tell me again what this is.
22    A.  I believe this right here is kind of a
23 basic wiring harness right here.
24    Q.  All right. Take my pen on Exhibit 13 and
25 circle where the battery is.

**Page 88**

1         DR. ROBINSON:
2         We do have lunch if anybody wants to
3     take a break or grab something and bring it
4     in.
5     A.  The batteries are not shown on here.
6  BY MR. BRITTAIN:
7     Q.  The batteries aren't shown on this?
8     A.  No, they're not. And the reason that they
9  probably didn't show them is because the batteries
10 are like a backup system. It's a DC system. The
11 motor generates electricity, the battery generates
12 electricity.
13    Q.  Where on here is the I guess the main power
14 source?
15    A.  You have some buss bars right here.
16    Q.  Do me a favor. I need you to mark it on my
17 exhibit. If you'll circle.
18    A.  Right here we have what we call a battery
19 buss bar, b-u-s-s, and that's going to be the point
20 where all these devices come out, similar to a panel
21 in your house.
22    Q.  Let me stop you there. What all is hooked
23 up to that battery buss bar?
24    A.  We have a number of spare breakers that can
25 be used for things, stop lamps, horn, marker lamps,

**Page 89**

1  I can't read this one, radio, spot lamps. I don't
2  know what that one is. F-O-B lamps, head lamps,
3  flood lamps, PK/TO, which would be parking tail
4  lights. Then there's sign lamps, terminal strip,
5  dome lamps, and another one I can't read.
6     Q.  So all the lights are hooked up through
7  that battery buss box?
8     A.  That's right, the buss bar.
9     Q.  Where is that located? Is that in the
10 tractor?
11    A.  That would be in the, if we're calling this
12 the tractor right here, yes. And that is located
13 right in front of the driver's -- I have a picture
14 of it.
15    Q.  Tell you what do. Where is that -- see if
16 you can find it on Exhibit 12 for me.
17    A.  Right here (indicating). Now, right here
18 they have a cover that goes over that, and that's on
19 here. There's a cover over this, and this is
20 basically right around where your left foot is when
21 you're driving.
22    Q.  Is this where it's located in the tractor
23 trailer that Mr. Morris was driving, also?
24    A.  Yes.
25    Q.  There's fuses in there?

LEBLEU

Page 90

1    A. Yes. There's some fuses. There's
2  breakers. It depends on what they have. All of the
3  breakers are -- they're contained within a plastic
4  case.
5    Q. You've not had the opportunity to examine
6  this power buss box?
7    A. I've looked at one. I took the cover off
8  and looked at it.
9    Q. I keep calling them box, but the power buss
10 bar that was in the Morris tractor trailer, you
11 haven't had an opportunity to review that, have you?
12   A. No.
13   Q. You don't know whether it was completely
14 destroyed or not, do you?
15   A. No, I do not.
16   Q. You don't know whether it could have
17 completely been destroyed in the rollover, do you?
18   A. No, I cannot say that.
19   Q. You understand the rollover happened on the
20 driver's side of the vehicle, right?
21   A. That's correct. I do understand that, and
22 from what I understand it's somewhere in this area
23 on the other side of the seat down where his foot --
24 opposite the accelerator.
25   Q. Okay. And tell me whether you can give an

Page 91

1  opinion on this or not, but will the fuses become
2  dislodged with a significant amount of force?
3    A. I cannot give an accurate opinion on that.
4  I did look at some of the breakers that are used in
5  these applications. They have a wide blade that
6  they force them in with, and they're contained
7  within plastic. My experience with these in
8  nonmoving situations is very tough.
9    Q. But you don't have any experience on that
10 as far as a rollover of an 18 wheeler on an
11 interstate?
12   A. I can't say that. Yes.
13   Q. So it is possible that during the rollover
14 event it could have knocked out fuses that would
15 have kept these lights on?
16   A. That's possible.
17   Q. Anything else that you can point me to that
18 supports your opinion that these lights were on at
19 the time of impact?
20   A. I think that would be it.
21   Q. I'm kind of going to go through these
22 things now. One of the things we talked about that
23 was in that brochure on one of the tractor trailers
24 you were talking about the cover plate that goes
25 over the batteries and has those bolts and nuts and

Page 92

1  everything holding them together, right?
2    A. There's a number of things. You know, they
3  have straps that could hold them or bolts.
4    Q. You don't know whether it was straps or
5  bolts in this particular model, do you?
6    A. No, I can't say that.
7    Q. You don't know whatever it was whether they
8  were still in place at the time --
9    A. I can't say that.
10   Q. You knew what my question was going to be,
11 but let me make sure we get it clear on the record.
12 You don't know whether it was straps, bolts or
13 whatever that was securing those batteries; you
14 don't know whether those were in place at the time
15 of this accident, do you?
16   A. I cannot say that they were.
17   Q. It's possible then if those weren't in
18 place that the batteries could have come out during
19 the rollover event, is that true?
20   A. If those were not in place that's true.
21   Q. Are you aware of any situations where
22 during a rollover, even if they are in place, that
23 those systems fail?
24   A. No.
25   Q. And I guess you wouldn't be because you

Page 93

1  haven't ever seen a rollover event other than this
2  one, right?
3    A. That's true.
4    Q. Let me ask you about the headlight. You
5  had that picture of that headlight that was intact,
6  right?
7    A. That's correct.
8    Q. Do we all agree that the lights were off
9  after the Peterbilt impact?
10   A. Yes.
11   Q. That picture you've got there --
12   A. Wait, let me say I would assume so.
13   Q. If that's what the testimony is, you
14 wouldn't have any reason to dispute that, would you?
15   A. No.
16   Q. And from everything you've heard thus far,
17 there's no question but that the lights were off
18 after the Peterbilt impact. The only question is
19 whether or not they were off before the Peterbilt --
20   A. That's what the driver of the other truck
21 said in his deposition.
22   Q. And you viewed the photographs taken by the
23 state troopers out there at the accident scene?
24   A. That's right.
25   Q. And in viewing those photographs, did you

LEBLEU

Page 94

1  see any pictures taken that would indicate the
2  lights of the Kenworth were on even after the final
3  impact?
4      A.  All I can say is after the impact there was
5  no -- from the pictures I saw which were after the
6  impact there were no lights on.
7      Q.  You've shown me a picture there of a
8  headlight that's intact, and you said that in your
9  opinion supports your belief that the lights were on
10 after the rollover?
11     A.  That's right.
12     Q.  We know -- assume the lights were off after
13 the second impact?
14     A.  Right.
15     Q.  That picture was taken after that impact.
16 Isn't that right?
17     A.  That's right.
18     Q.  So if the lights were off after the impact
19 with the Peterbilt, I mean the fact that that
20 headlight is intact wouldn't really mean anything,
21 would it?
22     A.  After the second impact it doesn't mean
23 anything.  The first impact on the ground would lead
24 me to believe that -- this appears to be on the
25 driver's side, and the light structure is not messed

Page 95

1  up.
2      Q.  What I'm saying is this.  I mean we know
3  the lights were off.  When all the dust cleared and
4  everything stopped, no more impacts, no more damage,
5  nothing, we know the lights were off.  All right?
6      A.  Okay.
7      Q.  Now, you're saying that this picture that
8  was taken after the fact that shows this intact
9  headlight means to you the light was on before the
10 impact from the Peterbilt.  Am I understanding you
11 correctly to say that?
12     A.  This light being that the light box from
13 what I can see in this picture appears to still be
14 intact lends me to believe that this light structure
15 was okay after the rollover.
16     Q.  Well, based on that then, based on that
17 belief wouldn't you expect then for the lights to be
18 on even after everything was all said and done with?
19     A.  You mean after this, after the second
20 impact?
21     Q.  After the second impact.
22     A.  Well, obviously, the light is not on the
23 truck at that point.
24     Q.  Did somebody pick that up and put it in
25 there?

Page 96

1      A.  I guess so.
2      Q.  Is it connected in any way to the truck?
3      A.  From what I can see there, no.
4      Q.  Do you know whether that came off at the
5  rollover or whether it came off at the impact?
6      A.  I don't know that.
7      Q.  If it came off during the rollover would
8  you agree with me that it isn't going to be lighting
9  up?
10     A.  If it came off during rollover certainly.
11     Q.  Can you say one way or the other which one
12 caused it to come off?
13     A.  I can't say that.
14         MR. ROBINSON:
15            More probably than not.
16     A.  More than probably not I would assume it
17 would be on after the rollover.
18 BY MR. BRITTAIN:
19     Q.  Tell me why that is.
20     A.  Because this light -- I made a point to
21 look at trucks this weekend, and that light is also
22 right within the wheel.
23     Q.  On which side?
24     A.  Both sides.
25     Q.  Which side did this light come from?

Page 97

1      A.  I think that would be on the left side.
2      Q.  Driver's side?
3      A.  Uh-huh (indicating an affirmative
4  response).
5      Q.  Do you know it came from the driver's side,
6  or do you think it came from the driver's side, or
7  are you just guessing that it came from the driver's
8  side?
9      A.  I don't know.
10     Q.  The basis of your opinion though, you're
11 assuming that it did come from the driver's side?
12     A.  It would lend to that being that that was
13 the other side -- this rubbed against -- this light
14 could only come from that side.  The other side
15 would not have been damaged.  It wouldn't have
16 rubbed against the ground.  It wouldn't have been in
17 a place where it could have come off the truck
18 unless somebody took the opportunity to take it off
19 the truck.
20     Q.  It's just as likely that this came off of
21 the passenger's side, isn't it?
22     A.  No.
23     Q.  Tell me why that is.
24     A.  Because the driver's side was on the
25 ground.

LEBLEU

**98**

1  Q. What does that -- explain this to me. I
2  don't understand what you're telling me.
3  A. I'm just saying that that side of the truck
4  is right there on the ground, which I don't know how
5  the truck laid on the ground. This is going to be
6  very near the ground. From what I could see the
7  Peterbilt truck that ran into the back of it right
8  here, this wouldn't have rubbed off, wouldn't have
9  been forced off in any way. It appears it's forced
10 off. It looks like there's some tears right there.
11  Q. But, again, you don't know whether that was
12 forced off by the rollover, by the impact with the
13 Peterbilt, or by them putting it on a wrecker and
14 hauling it down the road either, do you?
15      DR. ROBINSON:
16           I would just object to the form
17      because we do know this is a photograph
18      taken after the collision. We do know
19      that.
20  A. That's correct.
21 BY MR. BRITTAIN:
22  Q. Do you know whether that photograph was
23 taken at the accident scene?
24  A. This was taken with Mr. Messerschmidt, the
25 investigator.

**99**

1      COURT REPORTER:
2           Whose investigation?
3      DR. ROBINSON:
4           Dr. Edward L. Robinson's office.
5 BY MR. BRITTAIN:
6  Q. All right. Here is my question. So that
7 was taken after it was already taken to the
8 junkyard?
9  A. Yes.
10  Q. You don't know whether this light right
11 here had been removed between the accident scene and
12 the junkyard, do you?
13  A. I can't say where it is, you know, where it
14 was removed.
15  Q. So it could have either come off the
16 rollover, or it could have come off during the
17 impact, or it could have come off when somebody
18 pulled it off later and sometime in between the
19 impact and when this picture was taken?
20  A. Yes, sir.
21  Q. And all of those is equally likely?
22  A. I think I'm stepping out of my bounds as an
23 electrical guy to comment on when it would have come
24 off.
25  Q. All right. Explain to me how the bulbs in

**100**

1 the cab, how the filaments in the cab bulb give any
2 indication to you that lights were on outside?
3  A. Just if the bulbs went through a rollover
4 and an impact from the second, it would stand to
5 believe that the lights would still operate. Being
6 it was night we can all assume that he had his
7 lights on. From that I can say, you know, I would
8 assume or more probable than not that the lights
9 would be, you know, they could operate.
10  Q. And according to the way you're developing
11 that opinion, the lights should have been on even
12 after the impact?
13  A. No, I can't say that.
14  Q. Tell me what the difference is. I mean the
15 filament in the cab remained intact we know from the
16 rollover and then from -- even after the impact. So
17 what changes between the rollover and impact?
18  A. After the impact, again, we said the cab
19 was thrown off of the tractor. So at that point we
20 don't -- all bets are off. We don't know what
21 happened.
22      DR. ROBINSON:
23           He needs to know why.
24 BY MR. BRITTAIN:
25  Q. What I'm trying to figure out is how does a

**101**

1 filament of a light inside the cab have anything to
2 do with -- I mean I'll agree with you if -- I don't
3 agree that this is what happened, but if the cab was
4 separated from the chassis during the impact and the
5 wires were broken, that the light in the cab
6 wouldn't be on any more, and that if everything was
7 hooked up properly it would have been on beforehand.
8 I understand what you're saying as far as that goes.
9      But what I'm saying is what difference does
10 it make as far as that filament goes?
11  A. What I'm saying is if the lights were on --
12 he went through and had a rollover, we have a
13 filament that's intact, then he got hit by another
14 truck and the filament is intact. To me that
15 indicates that the lights are pretty tough, they can
16 handle it, they're going to be on.
17  Q. You're talking about the filaments within
18 the lights, the headlights, taillights and running
19 lights and all that?
20  A. More probable than not.
21  Q. So based on the fact that -- where exactly
22 is this interior light filament, the interior light
23 actually that the bulb went into?
24  A. I can't say exactly what these bulbs come
25 from. They took a shot of these two, these two

LEBLEU

### Page 114

1  Q. Back to the light. You don't know whether
2  it was ever put on there to begin with, and you
3  don't know whether even if was it had been removed
4  by the time this accident happened?
5  A. I can't say whether the light was on or
6  off. I think that is probably something we have to
7  find out about. That's something that Panther, too,
8  would know about.
9  Q. Did you call them to find that out?
10  A. I did not do that.
11  Q. Now, are you aware that there was some
12  damage done to the trailer, it was bent up during
13  the rollover?
14  A. No, I wasn't specifically aware of that.
15  Q. Do you know whether there was any?
16  A. No. I did see them going through the
17  median and all that.
18  Q. You're aware it drove through a median I
19  think about 150 feet or 150 yards, I can't remember,
20  before coming back up and rolling over?
21  A. I saw the reconstruction map, yes.
22  Q. Do you know whether when it went through
23  that median then whether that light could have been
24  knocked off or disabled, assuming it was even on
25  there?

### Page 115

1  A. I can't say whether it was or not.
2  Q. Back to what they could or could not see
3  then. Are you able to tell me that, you know, 300
4  feet from this overturned Kenworth they should have
5  been able to see it based on -- assuming the lights
6  were on?
7  A. No, I cannot say that.
8  Q. So even if the lights were on, you're not
9  able to say one way or the other whether or not they
10  could have even seen the lights?
11  A. I can't say that.
12  Q. It's possible that these lights were on,
13  that the headlights would be pointed out into the
14  trees, assuming there were even any trees there, and
15  they never would have been able to see them?
16  DR. ROBINSON:
17  I'm going to object because anything
18  is possible. We have to ask questions on
19  the basis of the actual facts, and I think
20  those questions are not in line with the
21  factual scenario actually presented.
22  BY MR. BRITTAIN:
23  Q. Let me ask you this. This is a
24  hypothetical. Assume that the tractor was laying
25  over on its side and the lights were still on, and I

### Page 116

1  think your general understanding is that there are
2  no trees there. If you've got lights shining off
3  into nothing and there's nothing to reflect the
4  light back, are you going to be able to see that?
5  DR. ROBINSON:
6  Are you asking him who could see, him
7  or the driver, Mr. Thompson or his
8  passenger could see? Are you asking him to
9  give an opinion on what they saw or didn't
10  see?
11  BY MR. BRITTAIN:
12  Q. Let me ask you this. How far out do those
13  headlights usually work on a tractor trailer?
14  A. I don't know.
15  Q. You don't know if you are driving it
16  regular how far down the road you could see?
17  A. I don't -- I can't say.
18  Q. You don't know the power, however you want
19  to call it, illumination of the headlights or
20  anything like that?
21  A. I don't know that.
22  Q. You tell me whether you're familiar with
23  lights to the extent of how far away people can see
24  them, why you're able to see a light, whether it be
25  reflection or something like that. Is that

### Page 117

1  something you're qualified to give expert testimony
2  on?
3  A. Not at this time.
4  Q. You said not at his time. Have you signed
5  up for any classes to learn how to become --
6  A. We do lighting and we have to -- there's
7  things that we have to apply, but I don't know
8  specifically anything about vehicle lighting, and
9  then it's been such a long time since I've done
10  anything with lighting that I would have to go
11  refresh myself on that situation.
12  Q. Well, tell me if you can answer this
13  question or if you can't, but if you take a
14  headlight of an 18 wheeler, and you shine it off
15  into nothing, just dark, are you going to be able to
16  see the light if you're standing behind it?
17  A. If I'm standing behind it? It depends.
18  How is the beam deflected? Does he have his low
19  beams or high beams on, those kind of things, you
20  know.
21  Q. Either one. You tell me with low beams.
22  A. He had the low beam on and I'm standing
23  behind him, certainly that's -- I'm not trying to
24  give any expert opinion on what happened here, but
25  if I'm standing behind a truck and it's shining a