# EXHIBIT 9

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                       EASTERN DIVISION
 4
 5   LORI ANN MORRIS,
 6        Plaintiff,
 7   Vs.                    CIVIL ACTION NO.
                            3:02-CV-962-T
 8   FLORIDA TRANSFORMER,
     EDWARD NEAL THOMPSON,
 9   et al.,
10        Defendants.
11
12
13                  * * * * * * * * * * * *
14
15        DEPOSITION OF EDWARD L. ROBINSON, taken
16   pursuant to stipulation and agreement before
17   Haley A. Phillips, Certified Shorthand Reporter,
18   and Commissioner for the State of Alabama at Large,
19   in the Law Offices of Henry L. Penick, 319 17th
20   Street, Birmingham, Alabama, on Thursday, June 22,
21   2006, commencing at approximately 10:05 a.m.
22
23                  * * * * * * * * * * * *
```

Page 2

```
 1                       APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Henry L. Penick, Esq.
     Attorney at Law
 5   Post Office Box 967
     Birmingham, Alabama 35201
 6
 7   FOR THE DEFENDANT:
 8   W. Evans Brittain, Esq.
     Richard E. Broughton, Esq.
     Ball, Ball, Matthews & Novak
 9   Attorneys at Law
     Suite 204
10   2000 Interstate Park Drive
     Montgomery, Alabama 36109
11
12          * * * * * * * * * * * *
13              EXAMINATION INDEX
14   BY MR. BROUGHTON . . . . . . . . .   5
     BY MR. PENICK . . . . . . . . . . 272
15   BY MR. BROUGHTON . . . . . . . . 273
16
              DEFENDANT'S EXHIBIT INDEX
17
      1   File of Robinson & Associates      6
18
      2   Field notes                       74
19
      3   Field notes                       74
20
      4   Photograph                        97
21
      5   Handwritten calculations         132
22
      6   Handwritten calculations         132
23
```

Page 3

```
 1          DEFENDANT'S EXHIBIT INDEX (cont'd)
 2    8   Alabama Uniform Traffic Accident Report   181
 3    9   Map                                       204
 4   10   Map                                       206
 5   11   Sworn affidavit of Mr. Robinson           244
 6   12   Report by Robinson & Associates           244
 7   13   Preliminary report number one             257
 8   14   Preliminary report number two             257
 9   15   Preliminary report number three           257
10   16   Preliminary report number two             261
11   17   Fax to Mr. Messerschmidt from Attorney    263
         Robinson dated March 3, 2005
12
     18   Fax to Mr. Robinson from Mr.              259
13       Messerschmidt dated March 3, 2005
14   19   Fax to Mr. Robinson from Mr.              273
         Messerschmidt dated March 10, 2005
15
                 PLAINTIFF'S EXHIBIT INDEX
16
      1   Curriculum Vitae                          274
17
18                * * * * * * * * * * * *
19
20
21
22
23
```

Page 4

```
 1                      STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of EDWARD L. ROBINSON is taken pursuant
 5   to the Federal Rules of Civil Procedure and that
 6   said deposition may be taken before Haley A.
 7   Phillips, Certified Shorthand Reporter, and
 8   Commissioner for the State of Alabama at Large,
 9   without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 17

1  Q. Do you have any medical training?
2  A. No, not formal medical training. I've been
3     involved in paramedical sort of stuff, like
4     radiation safety and been raised in safety
5     officer at UAB, but I wasn't involved in
6     the day-to-day surveys. It was more
7     administrative. And I've taught courses
8     in -- a licensure course for ...
9  Q. Well, you're not a medical doctor?
10 A. No, I'm not.
11 Q. You don't hold yourself out as an expert in
12    this case being able to determine cause of
13    death?
14 A. Oh, no. No. One thing that you were
15    asking about formal education, I would go
16    to experience also. At one point I had a
17    joint appointment in the forensic science
18    department from the justice program, a
19    graduate program. And I did for a period
20    of time give lectures in one of their
21    introductory graduate courses, a couple
22    hours lecture on accident reconstruction.
23    I didn't try to make an accident

Page 18

1     reconstructionist out of people in two
2     hours, but I tried to show them the
3     physical basis of it and show them more or
4     less what could or couldn't be done, so
5     they would know when to yield for a
6     reconstruction and when it wasn't going to
7     be applicable.
8  Q. Do you have any training in biomechanics?
9  A. No.
10 Q. So you don't hold yourself out in this case
11    as an expert in biomechanics?
12 A. No.
13 Q. You're not holding yourself out as an
14    expert in this case on what specific
15    injuries might have caused the death of
16    Mr. Morris in this case?
17 A. No.
18 Q. Do you hold yourself out as an expert on
19    what -- in this case on what specific
20    objects caused any specific injuries to
21    Mr. Morris?
22 A. Well, in the sense of discerning between
23    the most likely result of the truck

Page 19

1     overturn versus the impact by the other
2     truck, I think that we can make some
3     separation on that.
4  Q. Well, wouldn't a biomechanic --
5     biomechanical expert be the proper person
6     qualified to determine what physical
7     injuries on Mr. Morris' body were caused by
8     what particular objects during the accident
9     sequence?
10 A. I'm not trying to do that.
11 Q. All right, sir.
12 A. My general experience in overturned trucks
13    is that the injuries that Mr. Morris
14    received -- the very serious injuries I've
15    never seen before in an overturned truck
16    accident, so I would think it highly
17    unlikely that these injuries would have
18    been associated with the overturn. On the
19    other hand, impact by another vehicle of
20    comparable mass at 70 miles an hour or 60
21    miles an hour would be expected to cause
22    some very serious injuries.
23 Q. But you're not testifying as to any

Page 20

1     specific injuries on Mr. Morris' body were
2     caused by any specific objects during the
3     accident sequence?
4  A. I'm not trying to bring it down to that
5     point, no.
6  Q. You're not going to give any opinions on
7     that?
8  A. I'm just going to say that I think his
9     serious injuries were due to the impact,
10    not the overturn.
11 Q. While we're on that, what -- at what
12    speed -- Did you calculate a speed of
13    the -- And I'm going to call for purposes
14    of this deposition -- And we're going to
15    get this confused I'm sure, because I
16    confuse it in my mind. I'm going to try to
17    differentiate between Mr. Morris' vehicle
18    by calling it the Kenworth vehicle and the
19    vehicle driven by Mr. Thompson by calling
20    it the Peterbilt vehicle. Now, we both
21    know that that's just referring to the
22    tractor -- or the truck part of the rig,
23    not the trailer?

Page 85

1  belt.
2  Q.  Are you aware of any studies that have been
3      done to determine injuries received from
4      seat belts?
5  A.  No.
6  Q.  You're not testifying today either way as
7      to whether or not the fatal injuries to
8      Mr. Morris were caused by the seat belt?
9  A.  I don't know. It's certainly possible in
10     the kind of impact that he got that just
11     the inertia forces and the weight of his
12     body could have done significant damage
13     like breaking bones.
14 Q.  Have you ever worked in a case for either
15     side where there was a fatality in a
16     rollover?
17 A.  I'm sure I have. I can't put my finger on
18     one right now. But, yeah, it's not
19     uncommon for fatalities in rollovers with
20     cars.
21 Q.  Well, you're not ruling out the fact that
22     Mr. Morris could have been fatally injured
23     during the rollover in this case?

Page 86

1  A.  In my own mind, yes. Because the nature of
2      the injuries is not such that would be on
3      the left side of his body. I mean, he
4      would have bilateral injuries. And that's
5      not going to happen when he -- from that
6      rollover.
7  Q.  But you don't know what injuries caused his
8      death?
9  A.  I haven't -- All I've done is look at the
10     autopsy report. I haven't tried to make
11     any determination beyond that.
12 Q.  And it would be fair to say that Mr. Morris
13     could have received fatal injuries in this
14     case during the rollover?
15 A.  I don't believe that. Because he's belted
16     in, and I don't believe he would have
17     ejected from the simple rollover with his
18     seat belt on.
19 Q.  We don't know -- You don't know -- Because
20     you're not a medical expert, you don't know
21     whether or not he received fatal injuries
22     before ejection, do you?
23 A.  Well, I don't think a medical expert could

Page 87

1  necessarily tell you that. He could tell
2  you what the -- what injuries were
3  associated with the fatality. But I don't
4  think you've got the kinds of forces
5  involved with the rollover by a factor of
6  ten or 100 to cause the kind of injuries
7  that you can get from these impacts.
8  Q.  But that -- that -- And I understand -- I
9      understand you want to give your personal
10     opinion, observation that you think it was
11     more like -- that you think it was more
12     likely in your personal opinion that the
13     impact forces or that injuries received
14     after the impact with the Peterbilt could
15     have caused Mr. Morris' death. But what
16     I'm getting at is you don't have a
17     professional opinion because you're not a
18     medical -- you're not a medical expert,
19     you're not a biomechanical expert, you
20     haven't determined what specific injuries
21     were caused by what specific objects or
22     forces in this case, so you can't give an
23     opinion to any degree of reasonable medical

Page 88

1  certainty as to what caused Mr. Morris'
2  death in this case?
3  A.  No, I can't give a medical opinion or a
4      biomedical (sic) engineering opinion. I'm
5      just basing it on experience looking at
6      other vehicle wrecks over the last 40 years
7      as to what kind of forces won't cause what
8      kind of injuries.
9  Q.  But you do agree that people have been
10     fatally injured in rollover accidents?
11 A.  They have.
12 Q.  The next comment on Defendant's Exhibit 2
13     says no evidence the belt was slash
14     something?
15 A.  Was not worn.
16 Q.  No evidence the belt was not worn except
17     the belt locked fully.
18 A.  Uh-huh (positive response). In extended
19     position.
20 Q.  What does that mean?
21 A.  Well, belt locked fully extended.
22 Q.  Belt locked fully extended.
23 A.  Right.

22 (Pages 85 to 88)

    stretch mark would have required severe enough impact that, in my opinion, that truck wouldn't still be in use if that stretch mark had come from a prior accident.

Q. What sort of force in foot-pounds or force measurements is required to make that mark that you call a stretch mark on the belt fabric?

A. My estimate would be several thousand pounds. I believe the tensile of those belts is something like 5,000 or 6,000 pounds. So you'd have to have some fraction -- some reasonable fraction of that to cause the stretch marks.

    In a case of fairly low speed accidents, I've seen quantitative data where collisions with barriers for automobiles at 20, 25 miles an hour with results in accelerations on the occupants of 20 Gs of acceleration. This means for a few tens of milliseconds -- 100 milliseconds that the apparent weight of

|   |   |   |
|---|---|---|
| 1 |  | the occupant is 20 times what his normal |
| 2 |  | weight is. So a 100-pound person would |
| 3 |  | suddenly weigh a ton. 20 Gs, a ten-pound |
| 4 |  | baby suddenly weighs 200 pounds. That's |
| 5 |  | the reason they tell you don't hold a baby |
| 6 |  | in the car. You can't hold it during that |
| 7 |  | impact. |
| 8 |  | I think the kinds of forces we're |
| 9 |  | talking about with a 60 or 70 miles an hour |
| 10 |  | impact with the other truck would result in |
| 11 |  | forces significantly higher than that. I'm |
| 12 |  | thinking we're talking in terms of several |
| 13 |  | tens of Gs. So the man sitting here in the |
| 14 |  | seat with the bottom facing the truck and |
| 15 |  | the truck hits it, it may momentarily be |
| 16 |  | 100 Gs. This 100-pound man may for a few |
| 17 |  | milliseconds weigh 10,000 pounds for |
| 18 |  | just -- His bounce back from the seat then |
| 19 |  | can stretch that belt very readily. We're |
| 20 |  | talking about tremendous force. |
| 21 | Q. | Have -- And I appreciate the information |
| 22 |  | you gave us. Did you or Messerschmidt do |
| 23 |  | any calculations in this case to determine |

257

1  Q.   Okay. He didn't give you a reason? You
2       don't keep a personnel file on employees
3       like that?
4  A.   No.
5  Q.   The -- We marked these, too, didn't we?
6       Defendant's Exhibits 11 and 12 are your
7       sworn affidavit and your March final
8       version of your report; correct?
9  A.   Right.
10 Q.   All right. And I want to mark as --
11      Defendant's Exhibits 13, 14 and 15 will
12      be -- I'm going to mark these up at the top
13      of the page -- what we understand from our
14      quick review to be preliminary reports one,
15      two and three.
16           (Defendant's Exhibits 13, 14 and 15
17            were marked for identification.)
18 Q.   They're not numbered, but I'm numbering
19      them Plaintiff's -- I mean Defendant's
20      Exhibits 13, 14 and 15. And I'll just go
21      one at a time.
22           Defendant's Exhibit 13 is this
23      version. Now, we can look at it together.

|   |    |   |
|---|----|---|
| 1 |    | Or do you have a copy?  Is that your -- |
| 2 |    | Well, I'll just ask you.  Is that your -- |
| 3 |    | Is that your initial report? |
| 4 | A. | That was the initial draft of the report, yes.  This was not sent out. |
| 6 | Q. | Who was that sent to? |
| 7 | A. | It was internal.  You said you wanted the entire file, so I downloaded everything that was on the computer.  What happens is when we do a preliminary report and save it, then when we start modifying it.  We usually pull it up, reopen it and resave it in case of a computer glitch.  So we end up with the draft and the second draft and the third draft and so forth. |
| 16 | Q. | All right.  So that -- Do you know when that preliminary first draft was issued? |
| 18 | A. | I don't have a date on what's marked preliminary report.  Preliminary reports two and three are both 3/17/05. |
| 21 | Q. | All right.  Did you get any feedback -- Did you submit the first preliminary report, Defendant's Exhibit 13 -- did you submit |

259

```
 1        that one to Attorney Robinson or Attorney
 2        Penick?
 3   A.   Not to Penick.  I can't recall if I showed
 4        that one to Robinson or not.  I remember
 5        editing pretty heavily one of the things
 6        that he suggested, and I think that was the
 7        sworn affidavit.  I may have faxed him a
 8        copy of the preliminary report to show him
 9        what we were -- what areas we were
10        covering.  Yeah.  He has --
11             (Defendant's Exhibit 18 was marked
12             for identification.)
13   Q.   Let me show you Defendant's Exhibit 18.
14   A.   Yes.  I did send him preliminary report
15        number two.
16   Q.   Well, Defendant's Exhibit 18 is -- looks to
17        be a fax cover sheet March 3, 2005.  Is
18        that the original preliminary report
19        transmittal to Attorney Robinson?
20   A.   I think it was.
21   Q.   Okay.  And that goes with, then,
22        Defendant's Exhibit 13; right?  That was
23        the cover fax for Defendant's Exhibit 13?
```