# EXHIBT 2

Case 3:05-cv-00962-MHT-SRW   Document 62-2   Filed 09/01/2006   Page 1 of 9

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                   EASTERN DIVISION
 4
 5   LORI ANN MORRIS,
 6        Plaintiff,
 7   Vs.                    CIVIL ACTION NO.
                            3:02-CV-962-T
 8   FLORIDA TRANSFORMER,
     EDWARD NEAL THOMPSON,
 9   et al.,
10        Defendants.
11
12
13
             * * * * * * * * * * * * *
14
15        DEPOSITION OF JAMES PATTERSON, taken
16   pursuant to stipulation and agreement before
17   Haley A. Phillips, Certified Shorthand Reporter,
18   and Commissioner for the State of Alabama at Large,
19   at 301 South Ripley Street, Montgomery, Alabama, on
20   Monday, July 10, 2006, commencing at approximately
21   10:30 a.m.
22
23           * * * * * * * * * * * * *
```

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Henry L. Penick, Esq.
     Attorney at Law
 5   Post Office Box 967
     Birmingham, Alabama 35201
 6
     FOR THE DEFENDANT:
 7
     Richard E. Broughton, Esq.
 8   Ball, Ball, Matthews & Novak
     Attorneys at Law
 9   Suite 204
     2000 Interstate Park Drive
10   Montgomery, Alabama 36109
11
             * * * * * * * * * * * *
12
           EXAMINATION INDEX
13
     BY MR. BROUGHTON . . . . . . . .   6
14   BY MR. PENICK . . . . . . . . .  54
     BY MR. BROUGHTON . . . . . . . 129
15   BY MR. PENICK . . . . . . . . . 130
16
           PLAINTIFF'S EXHIBIT INDEX
17
     1   Mr. Patterson's resume           79
18
19         DEFENDANT'S EXHIBIT INDEX
20
21   1   Alabama Uniform Traffic Accident Report   34
22   2   Photograph                                26
23   3   Photograph                                41
```

Page 3

```
 1         DEFENDANT'S EXHIBIT INDEX
 2   4   Photograph                                42
 3   5   Photograph                                43
 4   6   Photograph                                45
 5
 6
             * * * * * * * * * * * * *
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1                STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of JAMES PATTERSON is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Haley A. Phillips,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 17

1 computer operator. I've trained in
2 forensic laser mapping of crash scenes,
3 interviewing and interrogation for the
4 traffic crash investigator, commercial
5 vehicle accident investigation, linear
6 momentum and vector diagramming of the
7 crash scene, computerized collision
8 diagramming, pedestrian accident
9 investigation, motorcycle accident
10 investigation, applied physics for accident
11 reconstruction, photography for the traffic
12 crash investigator.
13     And since that time I've also
14 reattended an update of traffic crash
15 reconstruction in 2003. I'm trained as an
16 operator of the Vetronic Crash Data
17 Retrieval Systems. I'm also certified by
18 the Alabama Peace Officers Standards and
19 Training Commission as an instructor in the
20 field of traffic crash investigation.
21 Q. Do you as part of your duties or have you
22    as part of your duties with the Alabama
23    State Troopers reconstructed truck

Page 18

1 accidents?
2 A. Yes, sir, I have.
3 Q. And for how many years have you done that?
4 A. Since 1993.
5 Q. Do you -- Are you qualified as an accident
6    reconstructionist?
7     MR. PENICK: Objection to whether
8     or not he's qualified.
9 A. That would be a question for the Court.
10    I'm trained as an accident
11    reconstructionist.
12 Q. Do you consider yourself qualified as an
13    accident reconstruction?
14     MR. PENICK: Same objection.
15 Q. You can answer.
16 A. That would be a question for the Court to
17    answer.
18 Q. Have you testified in any civil or criminal
19    cases as an accident reconstructionist?
20 A. Yes, sir, I have.
21 Q. How many, approximately?
22 A. Many. I don't know. Quite a few.
23 Q. In state and federal court?

Page 19

1 A. Yes, sir.
2 Q. Do you know if you've testified as an
3    accident reconstructionist in -- expert in
4    federal court here in the Middle District
5    of Alabama?
6 A. I don't know. I can't recall.
7     MR. BROUGHTON: I'm going to
8     offer -- Henry, I'm going to
9     offer Sergeant Patterson as an
10     expert in accident
11     reconstruction to the extent
12     he has opinions that he formed
13     from his investigation of this
14     particular case at this time.
15     MR. PENICK: We renew our
16     objection to any expert
17     opinion rendered by this
18     witness for lack of predicate,
19     lack of qualifications as an
20     expert in the area of accident
21     reconstruction.
22 Q. Sergeant Patterson, just to make sure that
23    the Record is clear on this, you did form

Page 20

1 an opinion as I understand it about whether
2 the accident was avoidable or unavoidable
3 by Mr. Thompson, the driver of the
4 Peterbilt?
5 A. Yes, sir, I did.
6 Q. And that opinion was what?
7     MR. PENICK: Same objection about
8     lack of predicate to testify
9     as an expert witness.
10 A. It's my opinion that it was not possible
11    for Mr. Thompson to avoid this crash faced
12    with the circumstances that he was.
13 Q. And that opinion is based on a reasonable
14    degree of accident reconstruction certainty
15    based on your investigation of this
16    accident?
17 A. I'm sorry. Would you repeat that?
18 Q. Yes, sir. Is that opinion based on a
19    reasonable degree of accident
20    reconstructionist's certainty based on your
21    investigation of this accident?
22     MR. PENICK: Same objection to the
23     form of the question and to

Page 25

1 criminal investigation initiated by my
2 unit, I did not attempt to do so.
3 Q. Did you interview either of the occupants
4 of the Peterbilt?
5 A. It was not possible to interview
6 Mr. Morris, and I don't recall whether I
7 spoke with Mr. Thompson or not.
8 Q. Well, he had a passenger too. You don't
9 recall --
10 A. I don't recall speaking to anyone. I may
11 have. I'm not saying I didn't. I just
12 don't recall whether that conversation
13 occurred or if -- and even if it did the
14 content of those conversations.
15 Q. When you took the -- Do your photographs --
16 any of your photographs depict any evidence
17 on the roadway as to where and in which
18 lanes the Panther vehicle had overturned in
19 the initial accident as you described it?
20 A. I believe that it was blocking all of the
21 leftmost lane and partially blocking the
22 right lane, if not completely.
23

Page 26

1 (Defendant's Exhibit P-2 was marked
2 for identification.)
3 Q. Let me show you what I've marked as
4 Defendant's Exhibit P-2 and ask you did you
5 take that photograph.
6 A. I did.
7 Q. Does that photograph fairly and accurately
8 depict the scene as it was that night when
9 you arrived?
10 A. Yes, sir, it did -- it does.
11 Q. Have either of those vehicles been -- Were
12 either of those vehicles moved before your
13 arrival?
14 A. No, sir.
15 Q. Can you tell me in that photograph or can
16 you describe in that photograph how the
17 trailer of the -- that the Peterbilt was
18 pulling is positioned?
19 A. The trailer of the Peterbilt is aligned to
20 the right side of the rightmost lane with
21 the right side trailer wheels just outside
22 the fog line to the right of the roadway.
23 In other words, it's partially out of the

Page 27

1 right-hand lane to the right.
2 Q. Were you able to determine a point of
3 impact between the Peterbilt and the -- or
4 an area of impact between the Peterbilt and
5 the overturned Panther vehicle?
6 MR. PENICK: Let me object to
7 testimony at this point as to
8 whether or not he even
9 determined the point of
10 impact.
11 MR. BROUGHTON: That's what I
12 asked.
13 MR. PENICK: So lack of proper
14 predicate for him to give
15 testimony on this point.
16 A. I have an opinion as to an approximate area
17 of impact. As far as a specific point, I
18 can't narrow it down that closely, but I do
19 believe I can narrow it down to an area.
20 Q. What's your opinion as to the area of
21 impact?
22 A. It's within the right-hand northbound lane
23 of I-85.

Page 28

1 Q. Does the --
2 A. And when I describe that, I'm referring to
3 the nose of the Peterbilt at the point that
4 it collided with the trailer of the
5 Kenworth.
6 MR. PENICK: Same objection.
7 Q. Did -- Can you show me on that photograph
8 that approximate area of impact?
9 A. It's further back than this photograph
10 depicts.
11 Q. All right. In Defendant's Exhibit P-2 if
12 you'll look on the pavement there -- And
13 tell me first, what is -- what is the
14 pavement? What material of construction is
15 in that area? Do you remember?
16 A. Asphalt.
17 Q. Asphalt.
18 A. It's just standard asphalt. It's not a
19 concrete roadway.
20 Q. The marks I'm looking at -- And let me walk
21 around if I can. There are some curved
22 marks in the left-hand lane. What is your
23 observation of those marks? You were out

Page 33

1  A. It had not.
2  Q. And any tire marks that are depicted in
3     that photograph were there the night of
4     this accident; correct?
5  A. That is correct.
6  Q. And, again, describe what you were
7     describing about these particular tire
8     marks.
9  A. These tire marks are aligned down the
10    right-side lane and --
11 Q. The right side of --
12 A. The right side of the right-hand lane.
13    They appear to lead directly to the trailer
14    tires of the --
15    This is the Peterbilt, is it not?
16 Q. Right. That's confusing.
17 A. -- the Peterbilt.
18 Q. Which trailer tires? Which side of the
19    trailer?
20 A. The left side tandems of the trailer, the
21    utility trailer pulled by that truck. They
22    appear to lead directly to it. I cannot
23    see in this photograph if they continue on

Page 34

1     past that to determine for certain whether
2     they're from the drive axle or the tandem.
3     However, they appear to stop directly at
4     the tire position of the trailer.
5          (Defendant's Exhibit P-1 was marked
6           for identification.)
7  Q. All right. Let me show you Defendant's
8     Exhibit P-2 and ask you to identify -- I
9     mean, Defendant's Exhibit P-1, which I
10    haven't yet offered, and ask you what that
11    is.
12 A. This is the crash report prepared by
13    Trooper Alex Huntley regarding this crash.
14 Q. All right. And it has been reported by
15    other people that have reviewed Defendant's
16    Exhibit P-1 that that drawing shows no skid
17    marks or tire marks.
18        MR. PENICK: Object to the preface
19           of the question about what
20           other people have said about
21           it.
22 Q. And my question to you is, does that
23    drawing show the tire marks or skid marks

Page 35

1     that are shown in Defendant's Exhibit P-2?
2  A. No, sir, it does not, nor does it
3     accurately depict the positions of the
4     vehicles.
5        MR. PENICK: Object to the
6           answer. It was nonresponsive
7           to the question.
8  Q. And do you have an explanation for that?
9  A. An explanation for why the tire marks are
10    not depicted?
11 Q. Why the tire marks are not depicted and why
12    the scene might not be accurately depicted
13    in that particular drawing in Defendant's
14    Exhibit P-1.
15 A. Trooper --
16        MR. PENICK: Object to the -- this
17           question because it requires
18           speculation on the part of the
19           witness.
20 Q. Go ahead.
21 A. Trooper Huntley prepared a not-to-scale
22    diagram. It's not intended to perfectly
23    depict the final position of this vehicle.

Page 36

1     And it poorly depicts the final positions
2     of the -- particularly vehicle number two,
3     the Thompson vehicle. And I don't know why
4     he left the tire marks off. This was a
5     very dark night. He may have failed to
6     observe them and not realized they were
7     there. But, again, that is speculating. I
8     don't know why he left them off. However,
9     they were present. He didn't put them on
10    the diagram.
11 Q. In the absence --
12        MR. PENICK: We renew our
13           objection to that answer since
14           it was speculation on his
15           part.
16 Q. Also on the drawing -- And this is I
17    guess -- Is there a page number on that
18    drawing? I call it page four of
19    Defendant's Exhibit P-1. Why don't we
20    number these?
21        MR. BROUGHTON: Henry, do you have
22           an issue with that --
23        MR. PENICK: No, I don't.

```
 1      vehicle traveled for 530 feet from the time
 2      it ran off the road into the median until
 3      it came back into the roadway.
 4   Q. All right.  Now -- And so you arrived at
 5      the scene.  And was there anybody other
 6      than Alex Huntley there taking field notes?
 7   A. I'm sure there were a lot of people there.
 8      These crashes tend to draw lots of
 9      emergency personnel when they involve
10      commercial vehicles.  There were firemen
11      there.  I don't recall if there were other
12      troopers there.  You know, I've been to
13      many, many crashes since this time.  I
14      don't -- I didn't make any notes as to who
15      was present.
16   Q. And I think you said that you were there
17      for a limited time.  How long were you
18      there?
19   A. I don't know.  Maybe an hour, hour and a
20      half, I'm guessing.  I have no idea exactly
21      how long I was there.
22   Q. All right.  When you got there, did you see
23      the driver of the Peterbilt, Mr. Thompson?
```

```
 1   A. I don't recall seeing him.
 2   Q. Do you recall talking to him?
 3   A. No, sir, I don't recall that.
 4   Q. Do you recall talking to the passenger in
 5      the vehicle with Mr. Thompson, Mr. Tidwell?
 6   A. I do not -- I do not recall that.
 7   Q. Did you interview or talk to anyone?
 8   A. I don't -- I remember talking to the driver
 9      of the UPS truck.  I recalled that today.
10      I don't remember the substance of that
11      conversation.
12   Q. But you don't know whether or not the
13      driver of the UPS truck actually witnessed
14      the collision, though, do you?
15   A. My best recollection is that he did.  I
16      know that he was involved in a hard braking
17      event to avoid colliding into the rear of
18      the truck.  But I don't recall exactly what
19      he said.
20   Q. Do you think that hard braking that he did,
21      though, was to avoid colliding with some
22      stationary objects that he saw in front of
23      him?  In other words, these two other
```

```
 1      vehicles that had come to a rest by the
 2      time he saw them.
 3   A. It's possible.
 4   Q. Okay.  So you're not -- So you can't say
 5      for certain that the UPS driver saw any of
 6      this accident?
 7   A. My best recollection is that he did, but I
 8      do not recall that for 100 percent
 9      certainty.
10   Q. Do you recall talking to Trooper Huntley?
11   A. I don't recall talking to him.  I'm sure I
12      did.  It would be unnatural for me not to
13      be at the scene of a crash and speak with
14      the trooper on the scene.  However, I don't
15      recall speaking to him.
16   Q. Do you recall speaking to anybody there
17      other than the UPS driver?
18   A. No.  But I'm sure I did.
19   Q. Now is your chance.  Is there anybody else
20      that you spoke to?
21   A. Again, yes, I'm sure there are other people
22      I spoke to.  I thought I just answered
23      that, Mr. Penick.  I don't recall who they
```

```
 1      were or what we talked about.  Once I
 2      determined that the driver of the causative
 3      vehicle was deceased, I ceased being in
 4      investigator mode.  I'm a criminal
 5      investigator.
 6   Q. And I believe that you said once you got
 7      there and you saw that Morris was deceased
 8      that you decided that it was not a criminal
 9      investigation?
10   A. It was obvious to me that Mr. Morris had
11      caused this crash, therefore, there was no
12      one to prosecute.
13   Q. Okay.  Let me go back and look at the
14      Defendant's Exhibit 1 and see if you can
15      help me with this.  On the front of
16      Defendant's Exhibit 1, there appears to be
17      a box that says prime contributing
18      circumstances.  Is that what it says?
19   A. Yes, sir.
20   Q. And it says 27.  Do you know what 27 is?
21   A. Yes, sir.  It's at the bottom left of your
22      report.
23   Q. I can't read it it's so small.  Can you
```

Page 113

```
 1   Q.  But wouldn't it also depend upon how much
 2       light you're throwing out there on the
 3       object?
 4   A.  Absolutely.  It would depend on the candle
 5       power of the light source.
 6   Q.  On a --
 7   A.  Headlights are all much the same.
 8   Q.  On a very dark night like this, do you
 9       think that they should -- a person should
10       have had on his high beams or low beams?
11   A.  Depending on whether he's meeting any
12       traffic or not or following any traffic.
13       He would need to be in compliance with
14       Alabama law regarding headlight use.  And
15       it's an interstate highway.
16   Q.  Also on the police report down near the
17       Peterbilt -- this is your Exhibit 1 --
18       where it says other contributing
19       circumstances it says 97.  What is that?
20   A.  97 means none, that there was no
21       contributing circumstance on the part of
22       the Peterbilt.
23   Q.  Okay.
```

Page 114

```
 1   A.  In other words, he did nothing wrong.
 2   Q.  In your opinion?
 3   A.  That would be in the opinion of Trooper
 4       Huntley who made that report.  However, I
 5       concur.
 6   Q.  When you gave your opinion about how this
 7       accident occurred, in addition to the
 8       lighting you said the alignment of the
 9       vehicles prior to impact.
10   A.  Yes.
11   Q.  Do you have any knowledge about the
12       alignment of the vehicles prior to impact?
13   A.  I have -- Their final rest positions and
14       the marks on the roadway indicate to me
15       that the Morris vehicle was lying on its
16       left side with the rear of the trailer
17       toward the median, the tractor out in both
18       lanes.
19   Q.  But I believe you said that the -- in your
20       earlier testimony that the tractor was
21       partially blocking the right lane.  Is that
22       what you said?
23   A.  Mostly blocking the right lane.
```

Page 115

```
 1   Q.  All right.  Now, on this particular
 2       straightaway, did this road have an
 3       emergency lane off to the right?
 4   A.  Yes, sir it did.
 5   Q.  And I think you used the term fog line.  Is
 6       that that solid white line that's on the
 7       far right of the roadway?
 8   A.  Yes, sir.
 9   Q.  And then beyond that white line is the
10       emergency lane; right?
11   A.  Yes, sir.
12   Q.  Do you know how wide that emergency lane
13       is?
14   A.  I didn't measure this one.  Typically ten
15       feet.
16   Q.  Do you know how wide a tractor-trailer is?
17   A.  Typically eight to eight and a half feet.
18   Q.  So a tractor-trailer could really go down
19       that emergency lane; right?
20   A.  It's physically -- Its dimensions allow it
21       to do so.  Whether it could swerve into it
22       and maintain alignment in a 10-foot lane
23       without a trailer swing or going off the
```

Page 116

```
 1       roadway to the right depends on how much
 2       time there is to react.  But it's
 3       physically -- Its physical dimensions would
 4       allow it to drive down an emergency lane.
 5   Q.  And I think you mentioned the side of the
 6       roadway.  Do you know whether or not the
 7       side of the roadway was essentially level
 8       at this location?
 9   A.  My best recollection of this is that it's
10       not.  It slopes off to the right toward a
11       wooded area, a wet wooded area.
12   Q.  Well, it always slopes off to the right on
13       the right-hand side.  But does it slope
14       greatly or slightly?
15   A.  Enough to -- A significant grade.
16   Q.  Do you think there's a significant grade
17       there?
18   A.  Yes, sir.  My best recollection.  You
19       know --
20   Q.  But you don't have any pictures of that
21       right now to refresh your recollection, do
22       you?
23   A.  No.
```

```
1   Q.  Have you ever seen a cab to be totally
2       separated from a tractor in any other
3       accident?
4   A.  Quite a few times.
5   Q.  Can you recall any one right here?
6   A.  I recall one. I can't remember the -- I
7       know the decedent's name was Tindall. It
8       happened on U.S. 231 just south of
9       Montgomery. That's one that I can recall.
10      However, there have been many. These cabs
11      are typically air mounted. They're mounted
12      on airbags that allow a more comfortable
13      ride for these stiffly suspended trucks.
14      They're not substantially bolted down to
15      the cab. In a crash where forces are
16      exerted on them, they can -- They come off
17      quite often, that's what I'm trying to say.
18  Q.  And when you mention Tindall, how long was
19      that that that accident occurred?
20  A.  Maybe year and a half, two years. But
21      there have been many more than that.
22  Q.  2004?
23  A.  Something like that.
```

```
1   Q.  All right. Now, you also said that your
2       opinion was based on your knowledge of
3       visibility?
4   A.  Based on my training and experience in the
5       field of conspicuity.
6   Q.  And how many courses have you had in that?
7   A.  Almost every crash investigation course
8       that I have taken deals in some form with
9       driver perception and conspicuity factors.
10      Because our vision is the most important
11      sense that we have when it comes to
12      operating safely a motor vehicle.
13      Therefore, any crash investigation course
14      must deal with conspicuity issues.
15      However, the one that focused almost
16      exclusively on conspicuity issues was the
17      human factors course which was 40 hours of
18      training with in the field of nighttime
19      visibility and conspicuity testing of
20      various vehicles, pedestrians and types of
21      headlights. But every crash investigation
22      course deals with conspicuity.
23  Q.  Let me give you a hypothetical about
```

```
1       conspicuity. What if Thompson had seen
2       Morris' vehicle in time to apply his
3       brakes, slow the vehicle and take it off to
4       the right into the emergency lane, could
5       the accident have been avoided?
6           MR. BROUGHTON: Object to the
7       form. Assumes facts not in
8       evidence.
9   A.  Had he -- Had it been possible for him to
10      see that vehicle in his path in time to do
11      so, then he could have either brought the
12      vehicle to a stop or did, as you said,
13      slowed it and driven around it in the
14      emergency lane. That would have required
15      him to be able to see the vehicle at some
16      500 feet away.
17  Q.  To stop it?
18  A.  No. He must first see it, identify it as a
19      hazard, formulate a plan as to what he
20      needs to do, and then initiate a physical
21      reaction and then carry out that physical
22      reaction. All that takes time. In other
23      words, reaction time.
```

```
1   Q.  Okay.
2   A.  There's something -- You're driving down a
3       roadway at night. You see something in
4       your path. First, you have to say what is
5       that and then decide that it -- whether it
6       is or is not a hazard to you and then you
7       have to decide what to do about it. All
8       that takes time. If he's going 70 miles
9       per hour, then he's traveling at, what, 105
10      feet per second approximately and every
11      second that goes by he's covering up 105
12      feet of this space that he has available to
13      initiate his plan to get around this
14      hazard.
15  Q.  I think you told us earlier that it takes
16      four-tenths of a second reaction time --
17  A.  No, sir, that's not what I said. I said
18      there's a brake lag in a commercial vehicle
19      typically of four-tenths of a second.
20      Four-tenths of a second reaction time is
21      absolutely ridiculous. That's not what I
22      said.
23  Q.  All right. But assuming he has perception
```

Case 3:05-cv-00962-MHT-SRW Document 62-2 Filed 09/29/06 Page 9 of 9
Case 3:05-cv-00962-MHT-SRW Document 63-12 Filed 01/29/07 Page 9 of 9
Deposition of James Patterson                                    July 10, 2006

Page 129

1  clear, you have nothing here today to tell
2  you how much skid marks Thompson's
3  tractor-trailer made until impact?
4  A. No. I did not measure those marks myself.
5     And if they were measured, I've not been
6     made aware of the measurements.
7  Q. All right.
8     MR. PENICK: That's all.
9     MR. BROUGHTON: Just one follow
10    up.
11    EXAMINATION
12 BY MR. BROUGHTON:
13 Q. Everything you saw, the tracks of the
14    Morris vehicle down in the median, all that
15    evidence is consistent with a driver simply
16    falling asleep?
17    MR. PENICK: Objection to --
18    Objection to the question.
19    Assumes facts in evidence and
20    is conjecture and
21    hypothetically, speculative
22    and everything else.
23 Q. You can answer.

Page 130

1  A. Yes.
2     MR. BROUGHTON: That's all I
3     have.
4     MR. PENICK: Let me follow up with
5     that question.
6     EXAMINATION
7  BY MR. PENICK:
8  Q. Do you have any evidence whatsoever to tell
9     you that Morris fell asleep when he went
10    into the median?
11 A. I don't have any evidence directly from
12    Mr. Morris who was deceased, therefore, I
13    could not ask him any questions. What I
14    can say based on my training and experience
15    in traffic crash investigation, the
16    movements of his vehicle are completely
17    consistent with many other crashes that
18    were the result of an asleep driver. That
19    combined with the time of the morning,
20    3:25 a.m. -- I did not inspect his
21    logbook. I don't know what his working
22    hours had been. But a 3:25 a.m. crash, a
23    driver going off into the median, that

Page 131

1  causes me to form an opinion that
2  drowsiness or being asleep is the most
3  likely cause of this.
4  Q. Okay.
5  A. However, I cannot substantiate that with
6     any physical or forensic evidence.
7  Q. And not to any degree of certainty?
8  A. No.
9  Q. For example, as you just said, you don't
10    know how long he had been driving before he
11    went off; right?
12 A. No, I don't.
13 Q. You don't know whether or not he had just
14    started driving, do you?
15 A. Don't know.
16 Q. And you don't know whether or not another
17    vehicle could have forced him off the road
18    either, do you?
19 A. I am more convinced that that did not occur
20    because of the angle that he went off the
21    roadway at was not abrupt.
22 Q. Typically if somebody merged over onto
23    him -- if somebody merged over into his

Page 132

1  lane, wouldn't he go off -- go off into the
2  median?
3  A. He might. I wouldn't.
4  Q. Okay.
5  A. If a car was coming over on me, I'd stay
6     there.
7  Q. You don't have any evidence that a car --
8     Well, let me rephrase that.
9  A. You're correct.
10 Q. Well, you don't have any evidence whether
11    or not someone had forced him off the road.
12 A. There's no evidence to indicate that
13    someone had forced him off the road.
14 Q. And you don't know whether or not that
15    occurred, do you?
16 A. Well, what we'd have to assume is that if
17    it's a car that it's in his blind spot. To
18    be in a position to force him off the road,
19    it has to be in his blind spot. How can
20    something you can't see force you off the
21    road?
22 Q. Somebody was driving along in the outside
23    lane and started moving over into the