# EXHIBT 6

# FREEDOM COURT REPORTING

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   LORI ANN MORRIS,     )
 6        Plaintiff,  )
 7   vs.              ) CASE NUMBER:
 8   FLORIDA TRANSFORMER,  ) 3:05-CV-962-T
 9   EDWARD NEAL THOMPSON,  )
10   et al.,          )
11        Defendants.  )
12
13      DEPOSITION OF EDWARD NEAL THOMPSON
14        In accordance with Rule 5(d) of
15   The Alabama Rules of Civil Procedure, as
16   Amended, effective May 15, 1988, I, Cindy
17   Weldon, am hereby delivering to Henry L.
18   Penick, the original transcript of the oral
19   testimony taken on the 14th day of July,
20   2006, along with exhibits.
21        Please be advised that this is the
22   same and not retained by the Court Reporter,
23   nor filed with the Court.
```

Page 2

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              EASTERN DIVISION
 4
 5   LORI ANN MORRIS,     )
 6        Plaintiff,   )
 7   vs.              ) CASE NUMBER:
 8                    ) 3:05-CV-962-T
 9   FLORIDA TRANSFORMER,  )
10   EDWARD NEAL THOMPSON,  )
11   et al.,          )
12        Defendants.   )
13
14          S T I P U L A T I O N
15        IT IS STIPULATED AND AGREED, by
16   and between the parties through their
17   respective counsel, that the deposition of
18   EDWARD NEAL THOMPSON, may be taken before
19   Cindy Weldon, Certified Shorthand Reporter,
20   Commissioner and Notary Public, at 732 North
21   9th Street, DeFuniak Springs, Florida, on
22   July the 14th, 2006 at 1:15 p.m.
23        IT IS FURTHER STIPULATED AND
```

Page 3

```
 1   AGREED that the signature to and the reading
 2   of the deposition by the witness is waived,
 3   the deposition to have the same force and
 4   effect as if full compliance had been had
 5   with all laws and rules of Court relating to
 6   the taking of depositions.
 7        IT IS FURTHER STIPULATED AND
 8   AGREED that it shall not be necessary for
 9   any objections to be made by counsel to any
10   questions, except as to form or leading
11   questions, and that counsel for the parties
12   may make objections and assign grounds at
13   the time of trial, or at the time said
14   deposition is offered in evidence, or prior
15   thereto.
16        IT IS FURTHER STIPULATED AND
17   AGREED that notice of filing of the
18   deposition by the Commissioner is waived.
```

Page 4

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4        MR. HENRY L. PENICK
 5        THE PENICK BUILDING
 6        319 - 17TH STREET NORTH, SUITE 200
 7        BIRMINGHAM, ALABAMA  35203
 8
 9   FOR THE DEFENDANT:
10        MR. RICHARD BROUGHTON
11        2000 INTERSTATE PARK DRIVE
12        SUITE 204
13        MONTGOMERY, ALABAMA  36109
14
15   ALSO PRESENT:
16        MR. FRANKLIN SCOTT SEAY
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 5

```
                    I N D E X

 3  EXAMINATION BY:                    PAGE
 4  MR. PENICK                           6



 7              E X H I B I T S
 8                                     PAGE
 9  PLAINTIFF'S EXHIBIT NO. 1            26
10  PLAINTIFF'S EXHIBIT NO. 2            37
11  PLAINTIFF'S EXHIBIT NO. 3            41
12  PLAINTIFF'S EXHIBIT NO. 4            48
13  PLAINTIFF'S EXHIBIT NO. 5            68
14  PLAINTIFF'S EXHIBIT NO. 6            71
15  PLAINTIFF'S EXHIBIT NO. 7            73
16  PLAINTIFF'S EXHIBIT NO. 8            76
17  PLAINTIFF'S EXHIBIT NO. 9            94
18  PLAINTIFF'S EXHIBIT NO. 10           97
19  PLAINTIFF'S EXHIBIT NO. 11          121
20  PLAINTIFF'S EXHIBIT NO. 12          128
21  PLAINTIFF'S EXHIBIT NO. 13          130
22  PLAINTIFF'S EXHIBIT NO. 14          133
23  PLAINTIFF'S EXHIBIT NO. 15          135
```

Page 6

1       EDWARD NEAL THOMPSON,
2  after first being duly sworn, testified
3         as follows:
4  EXAMINATION BY MR. PENICK:
5       THE COURT REPORTER: Usual
6  stipulations?
7       MR. PENICK: Yes.
8       MR. BROUGHTON: Yes.
9       Q. Good afternoon, Mr. Thompson, how
10 are you?
11      A. Fine.
12      Q. I'm Henry Penick, as you know.
13 I'm representing Ann Lori Morris as the
14 plaintiff in this case. And we're here
15 about the accident that occurred on the 2nd,
16 2004. Have you ever had your deposition
17 taken before?
18      A. Not as I recall.
19      Q. But you were here during the
20 deposition of Mr. Tidwell; right?
21      A. Yes, sir.
22      Q. And your deposition will be pretty
23 much the same as that I'll be asking

Page 7

1  questions and you will answer the
2  questions. If you don't understand, ask me
3  to repeat it.
4       The same thing we said when Mr.
5  Tidwell was here, that if you need to take a
6  break for some reason, you can do that. But
7  if we're in the middle of a question, please
8  finish answering your question before you
9  take a break.
10      A. Yes, sir.
11      Q. It's not a quiz or anything. So
12 if there's a question that you think is kind
13 of a trick question, just have me explain it
14 and I'll try to explain it to you.
15      A. Yes, sir.
16      Q. But if you answer the question, we
17 will assume that you answered it as asked.
18 Is that fair enough?
19      A. Yes, sir.
20      Q. Now, you also heard while we were
21 talking to Mr. Tidwell that when you're
22 answering, you can't answer with head nods
23 or shakes.

Page 8

1       A. Yes, sir.
2       Q. Because she has to take it down.
3  So use audible yes's and no's. Okay?
4       A. Yes, sir.
5       Q. Okay. Again, as we did with Mr.
6  Tidwell, let me learn a little bit more
7  about you by letting you tell me a little
8  bit about your upbringing, when you were
9  born and where you went to school.
10      A. Born in Geneva, Alabama. Went to
11 school in Geneva to the eleventh grade.
12      Q. Did not graduate then; right?
13      A. No, sir.
14      Q. What year did you last attend --
15 Geneva High, was it?
16      A. Yes, sir. 1980, I believe it
17 was.
18      Q. And when you stopped going to
19 school in 1980, what did you do after that?
20      A. I went to work at IGA in Geneva --
21 Well, I was working at IGA in Geneva while I
22 was in school.
23      Q. What does IGA make?

2 (Pages 5 to 8)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  anything about that one.
2     Q. Okay. Is there anything on your
3  report that's incomplete or incorrect?
4     MR. BROUGHTON: You mean does he
5  dispute any of the information on that
6  report?
7     Q. Or is there anything that's
8  omitted from this report that you know
9  about?
10     A. To the best of my knowledge,
11  that's -- The wreck I had with Dart is not
12  on here.
13     Q. Okay. Let's talk about that. Was
14  Dart the next place you went after McLane's?
15     A. Yes, sir.
16     Q. Just so we can make sure about
17  McLane's before moving on, you didn't have
18  any accidents or infractions?
19     A. No, sir.
20     Q. Nobody asked you to leave?
21     A. No, sir.
22     Q. Then tell me about your next
23  episode with Dart.

Page 34

1     A. Went to work with Dart sometime in
2  -- I can't remember exactly. I think it
3  was 2004, the first part of 2004. I went to
4  work to -- right in August of 2004.
5     MR. BROUGHTON: 2003 or 2004?
6     THE WITNESS: 2004.
7     A. When I left McLane's there, I
8  didn't do much of nothing there for a while
9  after I left them until I went to Dart.
10     Q. Okay. Well, let's talk about when
11  you left Dart. And I think we can put it in
12  perspective. Do you recall when you left
13  Dart?
14     A. Yes, sir.
15     Q. When was that?
16     A. Right at August of 2004.
17     Q. All right. So when did you start
18  with Dart?
19     A. The first -- January of --
20  sometime in 2004.
21     Q. So you were with them that last
22  time for about eight months?
23     A. Yes, sir.

Page 35

1     Q. All right. Where were you being
2  dispatched out of?
3     A. Minneapolis, Minnesota.
4     Q. Did they have a physical location
5  here that you operated under at all?
6     A. No, sir. Just satellite. Tell
7  you where to go to get your next load at.
8     Q. Okay. And then you said that
9  sometime while driving for them, you got in
10  an accident?
11     A. It was in -- let's see. I believe
12  it was -- may have been June 2004.
13     Q. What do you recall about that
14  accident?
15     A. I was in Nashville, Tennessee
16  coming across Interstate 40 and they was --
17  you get on the ramp where cars get back on
18  the interstate, and there was two cars
19  coming back out to the interstate.
20     I slowed down to let them get
21  ahead of me. The first car pulled over in
22  front of me. The second car went around the
23  first car and speeded up.

Page 36

1     So we were building our speed back
2  up to forty-five mile an hour. And then
3  that car in front that went around the first
4  car slammed on brakes and there wasn't
5  nothing I could do.
6     I went into the back of the other
7  car. And it was road rage is what we found
8  it ended up to be.
9     Q. It was road rage between the first
10  -- the two cars ahead of you?
11     A. Yes.
12     Q. And that's why the person ahead
13  slammed on the brakes?
14     A. Yes, sir.
15     Q. Caused --
16     A. And after we slammed on brakes and
17  I hit the car, he took off.
18     Q. Okay.
19     A. I went to court in Nashville. And
20  everything that happened -- you know, with
21  it being road rage, to have it kept off my
22  record.
23     Q. And what did they decide in

Page 53

1   Q.  Okay.  And your testimony is that
2   in mid stream of your employment, Dart just
3   told you to go see a doctor?
4   A.  Yes, sir.
5   Q.  Did they not get a physical before
6   you were hired?
7   A.  Well, you got a physical.  Most
8   trucking companies -- which we do it, too --
9   as you are employed through your employment,
10  you get a random drug test.
11  Q.  But this -- You don't guess this
12  was a random drug test, was it?
13  A.  They told me to go down there.  I
14  don't ask questions.  I do what the employer
15  tells me to go do.
16  Q.  Okay.  Now, the next sheet you
17  have, do you see on that last sheet -- I
18  guess the way you have them stacked.
19  A.  I've got it right here.
20  Q.  That last sheet.  Do you see
21  whether or not you -- she rated you to be
22  qualified or disqualified from driving?
23  A.  Undoubtedly I was qualified to

Page 54

1   come back in -- it looks like April of 2005.
2   Q.  Okay.  But what about the check
3   mark below?  What does it say?
4   A.  It shows temporarily
5   disqualified.  That's -- And then when I
6   went back and took it, that's when they
7   qualified me here.  But it still says
8   temporarily disqualified.
9   Q.  Due to what?
10  A.  Diabetes.
11  Q.  Okay.  And was that when you were
12  -- when she checked you, she found out that
13  your diabetes was above one sixty-five?
14  A.  Yes.  That's when I went back.
15  They -- That's when they first checked me
16  the first time and then I went back.
17  Q.  And according to what she wrote,
18  you were at two thousand?
19  A.  No.  That's --
20  Q.  According to what she wrote?
21  A.  I disagree with that because
22  anybody -- It also says right here in the
23  bottom of that page, too, it was -- at

Page 55

1   fasting, it was two oh seven.
2   Q.  It says Glucosa, two oh seven
3   fasting?
4   A.  That's your blood --
5   Q.  Does that mean with the Glucosa?
6   A.  No.  That's just where they said
7   that's what your sugar is.
8   Q.  Yes.  But do you notice that on
9   that date, it's got 4-28 in front of it
10  instead of 4-26?
11  A.  Yes, sir.
12  Q.  Do you think that was a different
13  reading on 4-28, two days later?
14  A.  Yes, sir.  It was coming down.
15  Q.  All right.  But that doesn't
16  indicate what it was on 4-26 then, does it?
17  A.  No, sir.  But I disagree with the
18  two thousand.
19  Q.  Okay.  All right.  Do you know
20  whether or not the Glucofage and the
21  Glucosa, whether or not it includes insulin
22  in those drugs?
23  A.  I don't know.  I take it as a

Page 56

1   pill.
2   Q.  Okay.
3   A.  The best of my knowledge -- and I
4   may not be wrong with this -- may not be
5   right with this -- but a type one diabetic
6   is insulin.  I'm a type two, which is pills.
7   Q.  Okay.  But in both cases, it's a
8   lack of insulin production in the body
9   that's causing this diabetes; right?
10  A.  The best I understand.
11  Q.  Okay.
12  A.  You can control it with pills or
13  taking insulin.  And I take pills.
14  Q.  Okay.  Are you aware of any
15  occasion that any doctor has administered
16  insulin to you?
17  A.  No, sir.  No doctor has ever
18  administered insulin to me, no.
19  Q.  As a result of this examination,
20  did she issue you this certificate that's on
21  the first page of Plaintiff's Exhibit 4?
22  A.  Yes, sir.
23  Q.  And it shows, I guess, the

14 (Pages 53 to 56)

FREEDOM COURT REPORTING

Page 97

1 headlights were on?
2  A. The headlights were not on.
3  Q. Do you know whether or not they
4 were not on or you just didn't see them?
5  A. They were not on.
6  Q. Do you recall giving an affidavit
7 in this case before?
8  A. Not that I know of.
9  Q. Let me show you what I'll mark for
10 identification as Plaintiff's Exhibit 10.
11    (Whereupon, Plaintiff's Exhibit
12 No. 10 was marked for identification.)
13  Q. We can substitute a clean copy for
14 this. Let me show you what we've marked as
15 Plaintiff's 10, the last page of Plaintiff's
16 10. Does that appear to be your signature?
17  A. No, sir.
18  Q. That is not your signature?
19  A. No, sir.
20  Q. I'm sorry. I gave you the wrong
21 one. Now let me show you what we've marked
22 as Plaintiff's Exhibit 10.
23  A. We might get along on this one.

Page 98

1  Q. Let me show you the last page. Is
2 that your signature?
3  A. Yes, sir.
4  Q. All right. Let me call your
5 attention to that second page.
6  A. All right, sir.
7  Q. Well, first of all, look at the
8 entire document. And after you have looked
9 at the entire document, tell me where if at
10 any point where you said that the lights on
11 Morris' tractor trailer were not on.
12  A. Where it says I never saw any
13 reflector lights or tape or any headlights,
14 taillights or other lights from the
15 overturned tractor trailer.
16  Q. Okay. It says that you never saw
17 them; right?
18  A. No, sir.
19  Q. Now, does it say that the lights
20 were not on on Morris' vehicle?
21  A. No, sir.
22  Q. Okay. Here today, would you say
23 that you didn't see them or would you say

Page 99

1 that they just were not on?
2  A. They were not on.
3  Q. Okay. Let me also call your
4 attention then back to Plaintiff's Exhibit
5 9. I believe you said that when you -- as
6 you approached Morris' overturned tractor
7 trailer, you saw some tires; is that right?
8  A. Yes, sir.
9  Q. Do you know if those were the
10 tires of the tractor or the tires of the
11 trailer?
12  A. Tires of the trailer.
13  Q. The tires of the trailer?
14  A. Yes, sir.
15  Q. All right. What lane was the
16 tires of the trailer in?
17  A. They was probably to the mid -- in
18 the median type --
19  Q. You mean like in the middle
20 between the two lanes?
21  A. No. They was in the median
22 because the tractor was slammed across the
23 highway into the emergency lane.

Page 100

1  Q. Do you know whether or not the
2 tractor was over in the emergency lane?
3  A. To the best of my knowledge, it
4 was over a couple of feet. The best I can
5 remember.
6  Q. Let me call your attention back to
7 Plaintiff's Exhibit 10 again. Is 10 the
8 affidavit that you gave? Do you see
9 anywhere in your affidavit where you said
10 that the tractor of Morris' vehicle was all
11 the way across both lanes and into the
12 emergency lane?
13  A. Let's see. It was a very dark
14 night. As we approached where the accident
15 occurred, all of a sudden, I saw in my
16 headlights what appeared to be vehicle tires
17 out across the road.
18    And I said oh, my God and slammed
19 on the brakes. We braced for the
20 collision. We were not able to stop before
21 the front of my tractor hit the underside of
22 the tractor on the other vehicle.
23    There was no time to react other

25 (Pages 97 to 100)

FREEDOM COURT REPORTING

Page 101

1  than the way I did react. I was unable to
2  avoid this collision.
3      Q. Now, do you see anywhere in this
4  affidavit where you say that the overturned
5  tractor trailer, Morris' tractor trailer,
6  was blocking all or both of the lanes,
7  including into the emergency lane?
8      A. It was across the road.
9      Q. But it doesn't mention emergency
10 lane at all, does it?
11     A. No, sir.
12     Q. As a matter of fact, it doesn't
13 really state that it was blocking both lanes
14 of the road either, does it?
15     A. No, sir.
16         MR. BROUGHTON: Wait a second
17 now. Read that next paragraph. You stopped
18 at --
19         MR. PENICK: Wait a minute. Don't
20 coach him. Don't coach him.
21         MR. BROUGTON: Well, let him read
22 the whole thing.
23     A. As soon as our vehicle stopped --

Page 102

1          MR. BROUGHTON: No. The next
2  paragraph that --
3      Q. Let's take this up on the
4  re-examination in just a minute, okay,
5  because he's going to ask you about it later
6  on. But let us move on with this.
7          MR. BROUGHTON: Well, let him read
8  the thing. The question was, does it say
9  anywhere in there that it was blocking both
10 lanes of traffic.
11         MR. PENICK: And what I'm saying
12 is that you're trying to coach him to
13 wherever he wants to read to wherever you
14 want him to read. And that's something that
15 you might want to do on examination when you
16 get the witness in just a minute.
17     A. Are we trying to -- You asked
18 about the affidavit. We want to put it all
19 out the way it actually happened. And on
20 here, it says there was nothing wrong with
21 the headlights on our truck or with the
22 brakes on our truck.
23         I did everything I could do to

Page 103

1  avoid the accident. The first thing I saw
2  -- I saw that told me there was an object
3  blocking both lanes of traffic ahead of me
4  was some tires and then the underside of the
5  overturned tractor trailer.
6      Q. And where are you reading?
7      A. I never saw any reflector lights
8  or tape, or any headlights, taillights or
9  other lights from the overturned tractor
10 trailer.
11         From my view of the overturned
12 tractor trailer after the accident, it was
13 apparent that any reflectors or reflector
14 tape would have been either against the
15 pavement on the driver's side or facing the
16 sky on the passenger's side or facing the
17 median on the rear end of the tractor and
18 trailer.
19         Any headlights would have been
20 shining off the highway on the right. Any
21 taillights would have been shining to the
22 rear and to the median. If either the
23 headlights or taillights was still

Page 104

1  functioning as we approached, there was no
2  vision -- it was not visible to me.
3          The first thing that I saw that
4  indicated there was an overturned vehicle
5  was when my headlights picked up the tires
6  and I slammed on the brakes just quickly as
7  I could at that point.
8          I had not seen Morris' vehicle
9  before that point and only learned
10 afterwards that it had been down in the
11 median before overturning.
12     Q. All right. Now, again, none of
13 that mentioned that Morris' tractor was
14 blocking the emergency lane, does it?
15     A. To the best my knowledge, no.
16     Q. Okay. Now, on this stretch of
17 highway, just to the right of the emergency
18 lane, just to the right of the emergency
19 lane, do you recall whether or not -- what
20 kind of slope, if any, there was over to the
21 right-hand side?
22     A. There's a pretty steep slope there
23 right where he was at.

26 (Pages 101 to 104)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660