# EXHIBT 3



IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

LORI ANN MORRIS,

Plaintiff,

Vs.

CIVIL ACTION NO. 3:02-CV-962-T

FLORIDA TRANSFORMER, EDWARD NEAL THOMPSON, et al.,

Defendants.

* * * * * * * * * * * * *

**DEPOSITION OF EDWARD L. ROBINSON**, taken pursuant to stipulation and agreement before Haley A. Phillips, Certified Shorthand Reporter, and Commissioner for the State of Alabama at Large, in the Law Offices of Henry L. Penick, 319 17th Street, Birmingham, Alabama, on Thursday, June 22, 2006, commencing at approximately 10:05 a.m.

* * * * * * * * * * * * *

overturn versus the impact by the other
truck, I think that we can make some
separation on that.

Q.   Well, wouldn't a biomechanic --
biomechanical expert be the proper person
qualified to determine what physical
injuries on Mr. Morris' body were caused by
what particular objects during the accident
sequence?

A.   I'm not trying to do that.

Q.   All right, sir.

A.   My general experience in overturned trucks
is that the injuries that Mr. Morris
received -- the very serious injuries I've
never seen before in an overturned truck
accident, so I would think it highly
unlikely that these injuries would have
been associated with the overturn.  On the
other hand, impact by another vehicle of
comparable mass at 70 miles an hour or 60
miles an hour would be expected to cause
some very serious injuries.

Q.   But you're not testifying as to any

specific injuries on Mr. Morris' body were
caused by any specific objects during the
accident sequence?

A.    I'm not trying to bring it down to that
point, no.

Q.    You're not going to give any opinions on
that?

A.    I'm just going to say that I think his
serious injuries were due to the impact,
not the overturn.

Q.    While we're on that, what -- at what
speed -- Did you calculate a speed of
the -- And I'm going to call for purposes
of this deposition -- And we're going to
get this confused I'm sure, because I
confuse it in my mind.  I'm going to try to
differentiate between Mr. Morris' vehicle
by calling it the Kenworth vehicle and the
vehicle driven by Mr. Thompson by calling
it the Peterbilt vehicle.  Now, we both
know that that's just referring to the
tractor -- or the truck part of the rig,
not the trailer?

A. Somewhere in north Shelby County down around Chelsea.

MR. BROUGHTON: We may be able to find that in the phone book.

A. Yeah, maybe you will.

Q. Who else -- While we're on Mr. Messerschmidt, give me the names of every person that assisted you in your work in any way whatsoever, whether they were employees of yours or whether you consulted them for any data or calculations or opinions in this case.

A. One of my other employees, Gary Johnson, was with Bill Messerschmidt at the site inspection. Really need two people to map the site. We use a total station. And we don't call it surveyors, because we're not licensed civil engineers. But it's the same sort of techniques and precision.

Q. Total station is the computer program?

A. Total station is the survey instrument. Some people might call it a transit, or whatever. It's a device you put out and

memory to remember everything that they said in their affidavits.

Q. Do you remember anything that you took exception to?

You read them yesterday?

A. Yeah.

No, I don't remember anything that I think is misstated or wrong. There may or may not be. He could have been going more than 70. He could have been going 65. But I think Mr. Thompson himself said that he was outrunning his lights, because he said I couldn't see the truck in time to stop. And if you're driving too fast for the range of your lights, regardless of what's in the road, you're outrunning your lights.

Q. Are you an --

A. He made that statement.

Q. Are you an expert on the range of headlights from a Peterbilt?

A. No.

Q. Have you done any investigation, research

in this case to determine the range of the headlights on the Peterbilt?

A. No. But he said he was outrunning them.

Q. Where in his affidavit did he say -- You're talking about his statement that he could not see the truck in time to avoid the collision. You've interpreted that to mean he's saying he was, quote, outrunning his lights?

A. Right.

Q. Have you done -- In this case, have you done any work to determine at what distance away from the Kenworth vehicle that vehicle would have been visible to an oncoming driver of --

A. No.

Q. -- a Peterbilt truck?

A. No, not -- not for a driver of a Peterbilt nor for this specific overturned truck case.

Q. It's your opinion -- Is it your opinion today that any person who fails to avoid hitting an object in the highway at night

is outrunning their lights?
A. For a stationary object in the highway in front of them, yes, I would say they are.
Q. Is there anybody else that shares that opinion?
A. Not based on the way they drive. But the statements in the literature, Paul Olson's book, for example, the Alabama statute all say that you have your vehicle under control so that you can avoid or stop for objects within the range of your lights.
Q. Have you ever testified in any other cases to the contrary?
A. I don't recall. I know that we talked earlier about a truck case with a man who was wearing dark clothing. But he stepped out in front of the truck as I recall, so it wasn't a matter of something that was in the road and there as a stationary object.
Q. Are you aware of any studies or tests done by anyone with facts similar to this case to determine the perception-reaction and avoidability of an accident of this type?

belt.

Q. Are you aware of any studies that have been done to determine injuries received from seat belts?

A. No.

Q. You're not testifying today either way as to whether or not the fatal injuries to Mr. Morris were caused by the seat belt?

A. I don't know. It's certainly possible in the kind of impact that he got that just the inertia forces and the weight of his body could have done significant damage like breaking bones.

Q. Have you ever worked in a case for either side where there was a fatality in a rollover?

A. I'm sure I have. I can't put my finger on one right now. But, yeah, it's not uncommon for fatalities in rollovers with cars.

Q. Well, you're not ruling out the fact that Mr. Morris could have been fatally injured during the rollover in this case?

A.    In my own mind, yes.  Because the nature of
      the injuries is not such that would be on
      the left side of his body.  I mean, he
      would have bilateral injuries.  And that's
      not going to happen when he -- from that
      rollover.

Q.    But you don't know what injuries caused his
      death?

A.    I haven't -- All I've done is look at the
      autopsy report.  I haven't tried to make
      any determination beyond that.

Q.    And it would be fair to say that Mr. Morris
      could have received fatal injuries in this
      case during the rollover?

A.    I don't believe that.  Because he's belted
      in, and I don't believe he would have
      ejected from the simple rollover with his
      seat belt on.

Q.    We don't know -- You don't know -- Because
      you're not a medical expert, you don't know
      whether or not he received fatal injuries
      before ejection, do you?

A.    Well, I don't think a medical expert could

necessarily tell you that. He could tell you what the -- what injuries were associated with the fatality. But I don't think you've got the kinds of forces involved with the rollover by a factor of ten or 100 to cause the kind of injuries that you can get from these impacts.

Q. But that -- that -- And I understand -- I understand you want to give your personal opinion, observation that you think it was more like -- that you think it was more likely in your personal opinion that the impact forces or that injuries received after the impact with the Peterbilt could have caused Mr. Morris' death. But what I'm getting at is you don't have a professional opinion because you're not a medical -- you're not a medical expert, you're not a biomechanical expert, you haven't determined what specific injuries were caused by what specific objects or forces in this case, so you can't give an opinion to any degree of reasonable medical

certainty as to what caused Mr. Morris' death in this case?

A. No, I can't give a medical opinion or a biomedical (sic) engineering opinion. I'm just basing it on experience looking at other vehicle wrecks over the last 40 years as to what kind of forces won't cause what kind of injuries.

Q. But you do agree that people have been fatally injured in rollover accidents?

A. They have.

Q. The next comment on Defendant's Exhibit 2 says no evidence the belt was slash something?

A. Was not worn.

Q. No evidence the belt was not worn except the belt locked fully.

A. Uh-huh (positive response). In extended position.

Q. What does that mean?

A. Well, belt locked fully extended.

Q. Belt locked fully extended.

A. Right.

Well, he's still going to hit the truck,
but he's going to be going slower when he
hits the truck.  If he brakes for 144.7
feet and he starts off braking at 70 miles
an hour, then he's going to be going in the
low 20s when he impacts.

Q.    By your calculations -- If I'm
understanding you correctly, by your
calculations in Defendant's Exhibit 5 and
Defendant's Exhibit 6 assuming optimum
conditions of braking efficiency and
perception-reaction, the Peterbilt is still
going to hit the Kenworth at 23 miles an
hour?

A.    Right.  If he doesn't steer off the main
part of the road onto the shoulder.

Q.    Right.  So there's no way to avoid --
There's no way that Mr. Thompson could have
avoided this collision?

           MR. PENICK:  Object to the form of
           the question.

Q.    Correct?

A.    No.  That's incorrect.  One, at that speed

he should have been able to steer off.
And, two, if the coefficient -- If the
braking efficiency is a little higher or he
reacts a little faster, he can still manage
to stop in time to not hit the truck.

Q.    How's he going to do that?  Show me -- Show
me your calculation where he avoids --
where he's able to stop?

No.  The one you've already done.

A.    Oh, it's not in there.

Q.    You haven't done a calculation?

A.    I told you I had done a number of
calculations and that this was one example
of the calculations.  And if you want me to
do a calculation to see what would be
involved if he stops, I can do this.  It's
not on this page right here.

Q.    Have you done a calculation using -- What
would his speed be -- What would the speed
at impact be if you used the .5 drag factor
on Defendant's Exhibit 5?

A.    Do you want me to calculate it?

Q.    Please.

A. Okay.

I think I've got an error in that calculation. It's higher speed than that. It's 48 miles an hour at .6 for 144.7. For .5, it would be 52.

Q. And what about for .6 -- I mean for .4?

A. Well, that's not an applicable case on rainy slick tires and so forth. But if you use a .4 times -- It would be 56.

Q. So it -- At best using your calculation with a .6 drag factor, the Peterbilt would have still hit the Kenworth at 48 miles an hour?

MR. PENICK: Object to the form of the question. He said it would be traveling at that speed when he got to the Kenworth, not that it would hit the Kenworth.

THE WITNESS: Right.

Q. But it still impacts at 48 miles an hour?

MR. PENICK: Object to the form of the question. He didn't say

that.

A. If he doesn't steer away. Certainly if he --

Q. Where -- All right. Where would you have suggested with a couple seconds of perception-reaction time at 3 a.m. in the morning on September 2, 2004 -- where would you have suggested Mr. Thompson steer his vehicle to avoid this accident?

A. Onto the shoulder.

Q. Which way, right or left?

A. Right.

Q. And how --

A. Because the trailer is on the left.

Q. And do you know what's over there on the right side of that highway?

A. I believe we do. All I see in that vicinity is a paved shoulder.

Q. How many seconds did it take you to find that information?

A. I didn't time it.

Q. Well, I did. Would you know it took you 15 seconds to find out that there was a paved

shoulder over there on the right side of I-85?

MR. PENICK: I'm going to object to the form of the question.

A. Might well have taken me two or three -- Well, it might have taken me an hour if I had gone back to the computer and pulled that file down again.

Q. Do you know how far the drop-off is from that shoulder down to the bottom of the ravine over on that side of the road?

MR. PENICK: Objection to the assumption that there's a ravine on that side of the road.

A. I don't see one.

Q. It's your testimony that there's no drop-off --

A. No, I'm not.

Q. -- on that side of the road?

A. I'm saying I don't see a ravine in that area of the road in the aerial photograph.

Q. But that's going to be your testimony to

the jury, that with the time and the situation facing Mr. Thompson he should have driven his eighteen-wheeler with transformers on the back of it off the side of that highway?

A. Onto the shoulder, yeah.

Q. Did you -- Have you given that opinion before today?

A. No. Nobody has asked me where would he steer before today.

Q. If he's trying to stop his vehicle in the highway, the best he can do according to your calculations is hit that Kenworth at 48 miles an hour; correct?

MR. PENICK: Objection to the form of the question.

A. No, that's not correct. As we've said, these are -- this is one example of the calculations. If he had responded quicker or if he could see further, then that speed would be lower.

Q. The -- And the speed is higher at a .4 drag factor. And what's the maximum speed that

you calculated?

A. A drag factor four really is not pertinent to this case. But, now, if you want to do that, we could calculate it with a drag factor --

Q. Oh, I thought you just did. Did you calculate --

A. I could calculate with a .2 if you want to.

Q. What did you calculate at .4? That's all I'm asking. You just did it; right?

A. At .4 I calculated 56. Now, if you wanted to go down to a .2, we could calculate above 60.

Q. What I would like for you to do, though -- As I understand it, the calculation in Defendant's Exhibit 6 is inaccurate; correct?

A. That's what I'm seeing. Let me run though it one more time. I think I made a mistake about midnight last night.

Q. You made this calculation last night?

A. Yes, I did.

Yeah. 48, 52, 56.

understand what that is.

And then on Defendant's Exhibit 6 and your copy, which is now Defendant's Exhibit 7 which shows the -- still shows the incorrect value of 23.8, also shows the correct values we just went over of 48 miles per hour up to 56 miles per hour at impact assuming drag factors of .4 through point -- or .6 down to .4; right?

MR. PENICK: Object to the form of the question.

A. And also assuming a perception-reaction time of two seconds.

Q. That's where I'm going with that. I want to find out what's in these calculations. Because you've got here on the top a value of 350 feet. And I'm not familiar with that -- where that number came from.

A. That's my perception or my understanding from the literature of what you might expect from high-beam lights.

Q. From -- In other words, you're saying that's how far the high beams on the

Peterbilt would have illuminated objects?

A.    Yeah.  And I think that's a very conservative distance, but that's what I --

Q.    Where did you get the 350 feet?

A.    There are -- I don't know.  Just general literature that I've read over the years. I think there's a figure on that, maybe in Olson's book.  I'm not sure.  What usually they give you is the illumines intensity at various test points.  They don't say how far you can see, because that does depend on the brightness and size of the object you're illuminating.

Q.    Well, doesn't it also depend on the other conditions at the time?

A.    Well, I'm assuming clear weather, no rain and a driver that's alert and no fog and you have an object in the road in front of you.

Q.    So that's under the best conditions of weather and visibility?

A.    I don't know whether you call that -- I guess you call that the best.

Q. You --

A. There's no visual impairment due to the weather.

Q. Did you gather that 350-foot figure prior to the time you made this calculation last night?

A. Yeah. I've seen that figure many times or heard that figure many times mentioned over the years.

Q. When you used it last night, did you go to a reference source to get that figure?

A. I tried to refresh my memory. And as I say, most references give you the illumines intensity as a function of test points. But as I recall, Paul Olson's book does use a 350 feet for --

Q. I just -- I just want to know what reference source you used last night to refresh your recollection.

A. Last night I looked at Paul Olson's book. I looked at the federal regulations. I looked at several SAE papers. I looked at another reference book or two. Most of

these didn't give any specific information.

Q. What did Paul Olson's book give -- Which one gave you 350 feet?

A. He agreed with 350 feet. If you want, I can go back and dig up the reference. And he refers to another article in the book.

Q. What's Paul Olson's book?

A. I don't the exact title of it.

Q. I just want to know -- What I'm trying to find out is if last night when you used this 350 that you got it from a reference source specifically and -- or if it's something you extrapolated in your mind. Or if you got a specific number from a specific page of a specific paper, I would like a copy of that specific page from that specific reference source?

A. I'll see if I can find the Paul Olson reference. But this is also consistent with prior experience in both looking at -- with an awareness as to how far do high beam lights go down the road and looking at other articles that refer to perception and

right?

A. Right.

Q. Those would not have been visible to Mr. Thompson; correct?

A. Not likely.

Q. The -- Any running lights on the topside -- I mean on the right side of the tractor and the trailer after it rolled over had they been on would have been -- would not have been visible by Mr. Thompson as he approached? They would have been vertical; correct?

A. Well, they would be up eight feet off the ground. For a trailer in the usual driver's eye height in a cab is about nine and a half feet. So he would have been on -- slightly above eye level of the trailer marker lights. And the trailer end that's lower in the median, he would have been several -- two or three feet higher. Those lights he probably could have seen.

Q. Have you done -- Have you done any tests or studies with exemplars to determine whether

Q. Do you know the distance from the windshield of the Kenworth to the front bumper of the Kenworth?

A. I don't recall that number, but it's probably somewhere in the literature. I don't see a vehicle data. I thought we had a vehicle data section that gave the published truck data. I don't see it right now. It's -- a digital truck index would normally pull that up and put it in the file.

Q. Eight to ten feet?

A. From the windshield to the front of the truck?

Q. To the front bumper.

A. In that ballpark.

Oh, here's what I'm looking for.

Q. What section was that in?

A. I don't know. It's in here somewhere. But it's a copy of the Kenworth model T600. Distance from the front axle to the front bumper, 46 inches; to the back of the cab from the front axle, 74 inches. All we

could do is sort of scale it. It doesn't give that particular dimension. And I don't know how authentic that drawing is from a scale of factors other than the ones they give. It looks like it's just over about five feet, about five feet two inches from the front of the hood to the base of the windshield.

Q. All right. And the -- Do you know what the terrain looked like off the right side of I-85 going north towards Atlanta at the point where the Kenworth rolled over?

A. All I have is the aerial photographs. I can see the shoulder -- paved shoulder of the road. I don't see in that photograph -- Okay.

Q. If the Kenworth headlights were on, do you know what they -- after the rollover, do you know what, if anything, they would have illuminated out in that direction?

A. Well, the trees and bushes and such.

Q. Do you know if there were any trees and bushes and such in the direction that the

would not have been off out in the median; would not have been --

A. I didn't say the taillights. I said the side marker lights.

Q. I know. I've gone to another -- I've gone to the taillights.

A. Oh, I'm sorry. We're going to another question.

Q. Yeah. Well, it's the same -- it was the same question, but you didn't mention anything about the taillights. The taillights I'm assuming would not have been visible to --

A. My assumption was that the rear of the trailer was pointing so far into the median that they wouldn't have been visible.

Q. Right. And it's possible -- It's certainly possible that the headlights on the Kenworth tractor were pointing off -- in a direction off the side of that road that they would not have been detectable?

A. That's possible.

Q. And --

A.    Well, at least they wouldn't have been
      easily discernable.  They probably would
      have been detectable if you had known to
      look for them.

Q.    And we don't know that any of the side
      lights would have been detectable any
      closer than whatever that distance would
      have been -- that the headlights of the
      Peterbilt would have illuminated the bottom
      of the truck anyway?

A.    Well, I haven't looked into that.  I don't
      know.

Q.    On any of your opinions that you intend to
      offer in this case, have you had what I
      would characterize as a peer review of
      those opinions?

A.    Peer review in discussion within our
      organization but, no, not outside.

Q.    Only you, Johnson and Messerschmidt?

A.    Right.

Q.    Were there any things that -- any
      observations, conclusions, opinions that
      Messerschmidt or Johnson had that you

that --

A. On the diagram.

Q. Where does it show in the accident report where the front bumper of the Morris tractor was at impact?

A. It shows a point of impact in the left lane of the trooper's diagram. And if that impact was underneath the driver's position, then the front of the truck would have been some seven or eight feet maximum beyond that point which would have not even completely blocked the right lane.

Q. Where does it show in that accident report where the front bumper of the Morris --

A. It shows --

Q. -- Kenworth tractor was?

A. -- where the point of impact was. And we have to deduce that from the dimensions of the truck. He doesn't try to show the position of the truck after it comes to stop from the slide.

Q. And -- Well, let me ask you this. Will you rely on the testimony of the investigating

                    reserve any objections you

                    might have, but I do want to

                    mark them as exhibits in this

                    case.

Q.    That's all I've got.  Thank you.

                    **EXAMINATION**

**BY MR. PENICK:**

Q.    Doctor, I have one question.  Do you have

      an opinion based upon reasonable -- a

      reasonable degree of accident

      reconstruction certainty whether Edward

      Thompson, the driver of the Peterbilt,

      could have avoided this accident?

                  MR. BROUGHTON:  Object to the

                    form.

A.    Yes.

Q.    What is that opinion?

A.    That if he is, in fact, braking and slowing

      down as he approaches the Morris truck -- I

      can't keep them separate.  But as he

      approaches the Morris truck, there was an

      emergency lane and space beyond that that

      he could have steered onto.  And I think

that the light pattern indication is not an accurate representation where the tractor was located after the overturn and that he could have gone around the Morris vehicle.

Q. Okay. What is the significance of absence of skid marks in this case?

A. That he either had defective brakes or that he didn't get on the brakes until very shortly before the impact. In other words, he hadn't had his brakes on long enough to cause the wheels to stop rotating and heat up the contact with the pavement and leave marks.

MR. PENICK: That's all at this time.

**EXAMINATION**

**BY MR. BROUGHTON:**

Q. Just one follow-up. And I want to give you full opportunity, Mr. Robinson. At this time are there any other opinions that you've given in any of these affidavits or preliminary reports or final reports or documents generated by you and

Messerschmidt and Johnson that you now want to change besides the ones that you have changed in the last -- this last session of your deposition?

MR. PENICK: I object to the form of the question to the point that he claims that he's changed his testimony, which he has not.

A. What I've changed was results of the calculations that I made an error in making the calculation. No, I don't think of anything else that needs changing or adding.

Q. That's all I have. Thank you.

(Plaintiff's Exhibit 1 was marked for identification.)

* * * * * * * * * * * * *

FURTHER DEPONENT SAITH NOT

* * * * * * * * * * * * *

REPORTER'S CERTIFICATE

STATE OF ALABAMA:

ELMORE COUNTY:

I, Haley A. Phillips, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, do hereby certify that I reported the deposition of:

**EDWARD L. ROBINSON**

who was first duly sworn by me to speak the truth, the whole truth and nothing but the truth, in the matter of:

LORI ANN MORRIS,
Plaintiff,
vs.
FLORIDA TRANSFORMER,
EDWARD NEAL THOMPSON,
et al.,
Defendants.
In The U.S. District Court
For the Middle District of Alabama
Eastern Division
Case Number 3:02-CV-962-T

on Thursday, June 22, 2006.