# EXHIBT 4

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

```
* * * * * * * *
LORI ANN MORRIS           *
                          *
VERSUS                    *   No. 3:05-CV-962-T
                          *
EDWARD NEAL THOMPSON AND  *
FLORIDA TRANSFORMER       *
* * * * * * * *
```

The deposition of ANDRE E. LeBLEU, P.E., 17474 Opportunity Avenue, Baton Rouge, Louisiana, 70814-7470, taken by counsel for the Defendant at the Office of Edward A. Robinson III, Esq., 600 North Foster Drive, Baton Rouge, Louisiana, commencing at

10:36 a.m. on July 26, 2006.



Reported by:  Kelly G. Young, CCR

Registered Professional Reporter

LEBLEU

### Page 18

1  review. He'll be happy to indicate to you
2  what he reviewed, and at that point he can
3  show you the documents that he reviewed. I
4  think it's in his deposition -- not
5  deposition, affidavit. Some of the things
6  you reviewed are in here. Isn't that
7  correct, Mr. LeBleu?
8  A.  Correct.
9      MR. BRITTAIN:
10     What I will do is this. Can you go
11  through this while -- I'm going to be
12  asking some preliminary questions. Can you
13  go through this --
14     DR. ROBINSON:
15     It wouldn't take me five minutes.
16     MR. BRITTAIN:
17     If you'll go through that, then let me
18  know whether you'll copy for me the whole
19  thing or whether there's some things you're
20  objecting to me seeing. Let me know what
21  those are. If there's anything on there
22  we'll make a privilege log and take it up
23  with Judge Thompson later on. How about
24  that? Can we do that?
25     DR. ROBINSON:

### Page 19

1      That will be fine.
2  BY MR. BRITTAIN:
3  Q.  While he's doing that let me ask you this.
4  Did you go through this Exhibit 1 and bring with you
5  everything that was requested through these items?
6  A.  I've done that.
7  Q.  So that would all be in that booklet that
8  Dr. Robinson is looking through right now?
9  A.  This book, I used some of that right there.
10 I also got some things that I got off the internet,
11 things like that.
12 Q.  Have you ever been involved in any kind of
13 litigation before as an expert?
14 A.  No.
15     DR. ROBINSON:
16     I've looked at it. I don't see any
17  problem with anything in here. The only
18  thing I would like to say again on the
19  record that the letter of May 10th, 2006,
20  was written after his report, and that's a
21  letter from Attorney Penick notifying of
22  the deposition. We'll be happy to make a
23  copy of this available to you. I just
24  hadn't had a chance to see what it was.
25     MR. BRITTAIN:

### Page 20

1      What we'll do is this. We'll go on
2  and do this. Is it all right with you all
3  if she takes that binder, makes a copy of
4  it, and sends the original back to you and
5  attaches a copy to the deposition? Would
6  that be all right?
7      DR. ROBINSON:
8      Is there anything else?
9  A.  This is something you and me worked on.
10     DR. ROBINSON:
11     For the affidavit?
12 A.  Yes.
13     DR. ROBINSON:
14     Do you need that, sir?
15     MR. BRITTAIN:
16     Yes. We're going to go through that
17  in a second.
18 BY MR. BRITTAIN:
19 Q.  Let me -- you've provided us with what I'm
20 going to mark as Exhibit 2. Let me ask you to
21 identify that, please.
22 A.  This is my affidavit.
23 Q.  Okay. Attached to that, did you also
24 include a resume or a CV?
25 A.  That's right.

### Page 21

1  Q.  Is that up to date through when, roughly?
2      DR. ROBINSON:
3      Do you have an extra copy of it with
4  you today?
5  A.  I haven't updated it since then.
6  BY MR. LEBLEU:
7  Q.  So that's your most up to date?
8  A.  That's correct.
9  Q.  It says on here that you're a board
10 certified electrical engineer. Is that correct?
11 A.  That's correct.
12 Q.  And that is for the states of Arkansas,
13 Florida, Louisiana and Texas. Is that correct?
14 A.  That's correct.
15 Q.  You're not board certified in Alabama. Is
16 that correct?
17 A.  That's correct.
18 Q.  Not licensed in Alabama?
19 A.  That's correct.
20 Q.  And what is your board certification in?
21 A.  I think they all end sometime next year.
22 Q.  That was a poor question. It's in the
23 field of electrical engineering?
24 A.  In electrical engineering only.
25 Q.  So this is the first time you've ever been

LEBLEU

**Page 22**

1  retained by anybody to testify?
2      A.  That's correct.
3      Q.  And who was it that first contacted you
4  about testifying in this case?
5      A.  We received a call from Dr. Robinson, I
6  believe.
7      Q.  All right.  Let me ask you this.  Through
8  the course of -- how long have you been an engineer?
9      A.  Since 1987.
10     Q.  All right.  Let me just kind of go through
11 your resume here.  You've been -- LAPTEC has been in
12 existence since 1999?
13     A.  It probably started a few years before
14 then.
15     Q.  Were you one of the founders of LAPTEC?
16     A.  I got in after it was founded.
17     Q.  Have you held the same position as
18 vice-president the entire time you've been there?
19     A.  That's correct.
20     Q.  And in your dealings at LAPTEC, have you
21 ever investigated any electrical systems for 18
22 wheelers?
23     A.  No.
24     Q.  Have you ever done it in your experience
25 ever?

**Page 23**

1      A.  No.
2      Q.  I'm not going to go -- what did you do at
3  Power and Control Systems in Baton Rouge?
4      A.  Basically the same things I've done for
5  LAPTEC.
6      Q.  Okay.  And what about Bertrand Engineers?
7      A.  All of these except the beginning ones,
8  FAA, was basically -- we were working more with
9  radar systems instead of commercial industrial
10 electrical systems.
11     Q.  Tell me generally what you concentrate on.
12 Do you work on buildings?
13     A.  I work primarily on electrical systems,
14 protection of electrical systems.  We're considered
15 to be experts on every aspect of electrical systems.
16     Q.  You said protection of electrical systems.
17 Would that be like from power surges or lightning
18 strikes?
19     A.  That would be that, that's correct.
20     Q.  What percentage do you think of your work
21 is devoted towards protection of electrical systems?
22     A.  I would say 50 percent at least.
23     Q.  All right.  So that's your primary focus.
24 Is that correct?
25     A.  That's what we attempt to do.

**Page 24**

1      Q.  And tell me, kind of break down what else
2  you do.  I don't know much about electrical
3  engineering.
4      A.  Beyond that we do designs, which we
5  implement in whatever facilities that we're
6  contracted to do so.  We develop a design which
7  specifies every part and piece that goes with the
8  electrical system.  Not the major parts.  We'll tell
9  them the wire, how to install the wire, how to
10 connect it, the equipment that's going to connect
11 it, all the breakers, the protective devices in the
12 breakers, down to the motors.  We look at how it's
13 going to be loaded, so forth.  Do you need more
14 detail?
15     A.  That's plenty right there.
16     Q.  What are you doing these designs for?  Is
17 it buildings; is it computers; is it cars?
18     A.  We basically provide power for buildings,
19 industrial systems.  That's pretty much it.  We
20 analyze systems, also, for various electrical
21 properties to make sure they operate within safe
22 applications.
23     Q.  Any of your design work, has that ever been
24 done for 18 wheelers?
25     A.  No.

**Page 25**

1      Q.  What about any kind of vehicles or
2  automotive equipment?
3      A.  No.
4      Q.  Anything other than buildings?
5      A.  It's basically going to be power systems
6  that we've done for whatever, motors that supply
7  power to motors or devices or something within a
8  facility.
9      Q.  When you say motors, is that kind of like
10 if you were in a plant --
11     A.  That's right.
12     Q.  -- and they've got a big old generator or
13 something running, that's what you're talking about?
14     A.  Yes.  I'm going to get electrical power to
15 power motors or lights or any types of things that
16 require electrical service.
17     Q.  You started with FAA, and then you moved
18 back to Baton Rouge and have been here ever since
19 doing that same kind of work?
20     A.  That's correct.
21     Q.  When were you born?
22     A.  Nineteen sixty-four.
23     Q.  And where did you go to college?
24     A.  I went to the University -- it's now
25 University of Louisiana at Lafayette.

**Page 50**

1  correct?
2      A.  That's correct.
3      Q.  All right.  Back to your report or your
4  affidavit.  Is this the only thing -- you don't have
5  a report, do you?
6      A.  I've got a very short report that I
7  presented earlier.
8          DR. ROBINSON:
9             That was the project note.
10         MR. BRITTAIN:
11            I'm going to mark that as Exhibit 6.
12         DR. ROBINSON:
13            What was No. 5?  Was that the
14     affidavit?
15         MR. BRITTAIN:
16            Five is that fax.
17         DR. ROBINSON:
18            Okay.
19         MR. BRITTAIN:
20            Four is the book.
21         DR. ROBINSON:
22            And this is Exhibit No. 6 then, and
23     this is the project note.
24         MR. BRITTAIN:
25            Right.

**Page 51**

1  BY MR. BRITTAIN:
2      Q.  Other than the affidavit and the project
3  note, are there any other reports, or affidavits, or
4  anything else that you plan on using or that you
5  developed?
6      A.  I plan on using the brochures that were --
7  that I had.
8      Q.  I'm going to get to that in a second.
9  Other than what you've generated.  I'm just talking
10 about what you've generated.
11     A.  No, that's it.
12         DR. ROBINSON:
13            Attorney Brittain, could I just ask
14     you did you give an exhibit number to the
15     affidavit yet?  I didn't get that.
16         MR. BRITTAIN:
17            Number 2.
18 BY MR. BRITTAIN:
19     Q.  Do you have a copy of -- you just mentioned
20 some Kenworth materials?
21     A.  That's correct.
22     Q.  Do you have a copy of those?
23     A.  Yes, I do.
24     Q.  Is that in your book?
25     A.  I took them out.  These were provided to me

**Page 52**

1  by Dr. Robinson.
2      Q.  Let me see what you've got there.
3      A.  Some general brochures.  One of them is for
4  a W900 Kenworth, and one is for a T800 Kenworth.  Is
5  that right?
6      A.  That's correct.
7      Q.  These were provided to you by Dr. Robinson?
8      A.  That's correct.
9      Q.  Dr. Robinson or Attorney Robinson?
10         DR. ROBINSON:
11            Attorney Robinson.
12 BY MR. BRITTAIN:
13     Q.  And then you have another one in your blue
14 book right there.  Is that right?
15     A.  That's correct.
16     Q.  And what is that for?
17     A.  Interiors and sleepers.  I didn't really
18 use that.
19     Q.  What did you say, this was a T600 involved
20 in this accident?
21     A.  From what I understand it was a T600.
22     Q.  When did you get these two provided by
23 Attorney Robinson?
24     A.  I got them when I got this right here.
25     Q.  Will you stick these in that book, too, and

**Page 53**

1  let's get a copy of those?
2      A.  (Complied with request.)
3      Q.  In your affidavit you state that your
4  opinions and conclusions are based upon standard
5  methodologies accepted and utilized throughout the
6  electrical engineering profession.  What standard
7  methodologies are we talking about?
8      A.  We're going to talk about -- we're going to
9  examine the way the wires are mounted in the truck.
10 We're going to just go look at things about
11 batteries.  We're going to try to look at everything
12 that's in there, that kind of thing.
13     Q.  Okay.  Standard methodology, I know like
14 for accountants they have the generally accepted
15 accounting principles.  Is there anything like that
16 in the electrical engineering field?
17     A.  We have the National Electric Code.  That's
18 just something we just go through to make sure
19 everything is done safely.  Trucking industry is
20 going to put that in.  They're going to do that.
21 They're going to meet all those qualifications.
22 Being that I don't have the truck to look at, I'm
23 going to go and make sure those things are met,
24 which the trucking industry is going to meet, and
25 then I'm going to use my own experience and go

LEBLEU

Page 94

```
 1  see any pictures taken that would indicate the
 2  lights of the Kenworth were on even after the final
 3  impact?
 4      A.  All I can say is after the impact there was
 5  no -- from the pictures I saw which were after the
 6  impact there were no lights on.
 7      Q.  You've shown me a picture there of a
 8  headlight that's intact, and you said that in your
 9  opinion supports your belief that the lights were on
10  after the rollover?
11      A.  That's right.
12      Q.  We know -- assume the lights were off after
13  the second impact?
14      A.  Right.
15      Q.  That picture was taken after that impact.
16  Isn't that right?
17      A.  That's right.
18      Q.  So if the lights were off after the impact
19  with the Peterbilt, I mean the fact that that
20  headlight is intact wouldn't really mean anything,
21  would it?
22      A.  After the second impact it doesn't mean
23  anything. The first impact on the ground would lead
24  me to believe that -- this appears to be on the
25  driver's side, and the light structure is not messed
```

Page 95

```
 1  up.
 2      Q.  What I'm saying is this. I mean we know
 3  the lights were off. When all the dust cleared and
 4  everything stopped, no more impacts, no more damage,
 5  nothing, we know the lights were off. All right?
 6      A.  Okay.
 7      Q.  Now, you're saying that this picture that
 8  was taken after the fact that shows this intact
 9  headlight means to you the light was on before the
10  impact from the Peterbilt. Am I understanding you
11  correctly to say that?
12      A.  This light being that the light box from
13  what I can see in this picture appears to still be
14  intact lends me to believe that this light structure
15  was okay after the rollover.
16      Q.  Well, based on that then, based on that
17  belief wouldn't you expect then for the lights to be
18  on even after everything was all said and done with?
19      A.  You mean after this, after the second
20  impact?
21      Q.  After the second impact.
22      A.  Well, obviously, the light is not on the
23  truck at that point.
24      Q.  Did somebody pick that up and put it in
25  there?
```

Page 96

```
 1      A.  I guess so.
 2      Q.  Is it connected in any way to the truck?
 3      A.  From what I can see there, no.
 4      Q.  Do you know whether that came off at the
 5  rollover or whether it came off at the impact?
 6      A.  I don't know that.
 7      Q.  If it came off during the rollover would
 8  you agree with me that it isn't going to be lighting
 9  up?
10      A.  If it came off during rollover certainly.
11      Q.  Can you say one way or the other which one
12  caused it to come off?
13      A.  I can't say that.
14          MR. ROBINSON:
15          More probably than not.
16      A.  More than probably not I would assume it
17  would be on after the rollover.
18  BY MR. BRITTAIN:
19      Q.  Tell me why that is.
20      A.  Because this light -- I made a point to
21  look at trucks this weekend, and that light is also
22  right within the wheel.
23      Q.  On which side?
24      A.  Both sides.
25      Q.  Which side did this light come from?
```

Page 97

```
 1      A.  I think that would be on the left side.
 2      Q.  Driver's side?
 3      A.  Uh-huh (indicating an affirmative
 4  response).
 5      Q.  Do you know it came from the driver's side,
 6  or do you think it came from the driver's side, or
 7  are you just guessing that it came from the driver's
 8  side?
 9      A.  I don't know.
10      Q.  The basis of your opinion though, you're
11  assuming that it did come from the driver's side?
12      A.  It would lend to that being that that was
13  the other side -- this rubbed against -- this light
14  could only come from that side. The other side
15  would not have been damaged. It wouldn't have
16  rubbed against the ground. It wouldn't have been in
17  a place where it could have come off the truck
18  unless somebody took the opportunity to take it off
19  the truck.
20      Q.  It's just as likely that this came off of
21  the passenger's side, isn't it?
22      A.  No.
23      Q.  Tell me why that is.
24      A.  Because the driver's side was on the
25  ground.
```

LEBLEU

**Page 98**

1  Q. What does that -- explain this to me. I
2  don't understand what you're telling me.
3  A. I'm just saying that that side of the truck
4  is right there on the ground, which I don't know how
5  the truck laid on the ground. This is going to be
6  very near the ground. From what I could see the
7  Peterbilt truck that ran into the back of it right
8  here, this wouldn't have rubbed off, wouldn't have
9  been forced off in any way. It appears it's forced
10 off. It looks like there's some tears right there.
11 Q. But, again, you don't know whether that was
12 forced off by the rollover, by the impact with the
13 Peterbilt, or by them putting it on a wrecker and
14 hauling it down the road either, do you?
15     DR. ROBINSON:
16         I would just object to the form
17     because we do know this is a photograph
18     taken after the collision. We do know
19     that.
20 A. That's correct.
21 BY MR. BRITTAIN:
22 Q. Do you know whether that photograph was
23 taken at the accident scene?
24 A. This was taken with Mr. Messerschmidt, the
25 investigator.

**Page 99**

1     COURT REPORTER:
2         Whose investigation?
3     DR. ROBINSON:
4         Dr. Edward L. Robinson's office.
5 BY MR. BRITTAIN:
6 Q. All right. Here is my question. So that
7 was taken after it was already taken to the
8 junkyard?
9 A. Yes.
10 Q. You don't know whether this light right
11 here had been removed between the accident scene and
12 the junkyard, do you?
13 A. I can't say where it is, you know, where it
14 was removed.
15 Q. So it could have either come off the
16 rollover, or it could have come off during the
17 impact, or it could have come off when somebody
18 pulled it off later and sometime in between the
19 impact and when this picture was taken?
20 A. Yes, sir.
21 Q. And all of those is equally likely?
22 A. I think I'm stepping out of my bounds as an
23 electrical guy to comment on when it would have come
24 off.
25 Q. All right. Explain to me how the bulbs in

**Page 100**

1  the cab, how the filaments in the cab bulb give any
2  indication to you that lights were on outside?
3  A. Just if the bulbs went through a rollover
4  and an impact from the second, it would stand to
5  believe that the lights would still operate. Being
6  it was night we can all assume that he had his
7  lights on. From that I can say, you know, I would
8  assume or more probable than not that the lights
9  would be, you know, they could operate.
10 Q. And according to the way you're developing
11 that opinion, the lights should have been on even
12 after the impact?
13 A. No, I can't say that.
14 Q. Tell me what the difference is. I mean the
15 filament in the cab remained intact we know from the
16 rollover and then from -- even after the impact. So
17 what changes between the rollover and impact?
18 A. After the impact, again, we said the cab
19 was thrown off of the tractor. So at that point we
20 don't -- all bets are off. We don't know what
21 happened.
22     DR. ROBINSON:
23         He needs to know why.
24 BY MR. BRITTAIN:
25 Q. What I'm trying to figure out is how does a

**Page 101**

1  filament of a light inside the cab have anything to
2  do with -- I mean I'll agree with you if -- I don't
3  agree that this is what happened, but if the cab was
4  separated from the chassis during the impact and the
5  wires were broken, that the light in the cab
6  wouldn't be on any more, and that if everything was
7  hooked up properly it would have been on beforehand.
8  I understand what you're saying as far as that goes.
9  But what I'm saying is what difference does
10 it make as far as that filament goes?
11 A. What I'm saying is if the lights were on --
12 he went through and had a rollover, we have a
13 filament that's intact, then he got hit by another
14 truck and the filament is intact. To me that
15 indicates that the lights are pretty tough, they can
16 handle it, they're going to be on.
17 Q. You're talking about the filaments within
18 the lights, the headlights, taillights and running
19 lights and all that?
20 A. More probable than not.
21 Q. So based on the fact that -- where exactly
22 is this interior light filament, the interior light
23 actually that the bulb went into?
24 A. I can't say exactly what these bulbs come
25 from. They took a shot of these two, these two

LEBLEU

**Page 102**

1  inner side lights.
2    Q.  You're talking about these two things right
3  here on the last page?
4    A.  Right.
5    Q.  So you say, based on the fact that the
6  filaments were intact on these looks like overhead
7  lights inside the cab, you think the filaments in
8  the headlights, taillights and everything else would
9  not have been damaged or would still remain intact?
10    A.  More probable than not.
11        DR. ROBINSON:
12            Note, too, that he pointed to a
13        headlight there in answer to your question
14        earlier.
15  BY MR. BRITTAIN:
16    Q.  Do you have any earthly idea on the
17  difference in the amount of force that would have
18  been applied to the interior lights versus the
19  amount of force that will be applied to the exterior
20  lights in the course of a rollover?
21    A.  No, I would -- I'm not going to go there.
22    Q.  And there is a certain amount of force --
23  there's only a certain amount of force that a
24  filament is going to withstand before it's going to
25  break, right?

**Page 103**

1    A.  Yes.
2    Q.  So if the force applied to the exterior
3  lights was much greater than the force applied to
4  the interior light, it's very likely that those
5  lights would have gone out and the interior lights
6  or at least the filaments would not be damaged. Is
7  that fair to say?
8    A.  Please restate the question.
9    Q.  If the force that was exerted on the
10  exterior light filaments was much greater than the
11  force exerted on the interior light filaments, is it
12  likely that the exterior light filaments would be
13  damaged while the interior light filaments would
14  remain intact?
15    A.  Well, I don't think that's a question that
16  we can answer because we don't know the difference
17  between the force.  How can you say there's a
18  difference in force?
19    Q.  Just assume for purposes of my question
20  that there is.
21    A.  There could be a difference in how the
22  filament would withstand it. Answering the question
23  that you are asking.
24    Q.  Assuming that there was a difference in
25  force on the interior filaments and the exterior

**Page 104**

1  filaments.
2    A.  We can't say that.  I don't know that.
3    Q.  I know you don't, but assume that there was
4  for purposes of this question.  I get to ask you
5  hypothetical questions.
6        DR. ROBINSON:
7            At what point in time?  Are you
8        talking about at the time of the --
9  BY MR. BRITTAIN:
10    Q.  Is there ever a point in time, is there a
11  situation where the exterior force on the filaments
12  on the exterior lights would be greater than the
13  force on the interior -- interior light filament
14  that that situation could happen?
15    A.  I can't say as a mechanical. I'm not a
16  mechanical. If I hit a vehicle, or a structure or
17  something like that I'm hitting it with a certain
18  amount of force.  So everything that I'm hitting is
19  going to be exposed to that force whether it's
20  contained inside or outside.  I'm confused by the
21  question.  I don't know how to respond.
22        If you said that I have two bulbs and I hit
23  them with a different amount of force I could say,
24  yes, the one that's hit with the more force the
25  filaments probably would be, you know, assuming we

**Page 105**

1  damaged both of them, this one would be more
2  damaged.  If I hit this one with more force would
3  there be a better chance the one hit with more force
4  would break more than the other one with less? Yes.
5    Q.  The lights on this tractor trailer, they
6  could go out for numerous different reasons.  Isn't
7  that right?
8    A.  That's correct.
9    Q.  One would be like if you went up to them
10  with a baseball bat and busted them all out.  That's
11  one way, right?
12    A.  Right.
13    Q.  Or the damage that would be put on the
14  actual light and the filament itself from either the
15  rollover or the collision.  Is that right?
16    A.  That's correct.
17    Q.  Another way would be if a wire was severed
18  or cut and the electricity could no longer get to
19  it.  Is that correct?
20    A.  Absolutely.
21    Q.  And that could also happen either in a
22  rollover or from impact.  Is that correct?
23    A.  Yes.
24    Q.  And another way I guess would be for the
25  battery to malfunction?

LEBLEU

142
1  for Engineers and Surveying?
2     A.  Yes.
3     Q.  What's the surveying; what is that?
4     A.  That's just to encompass all engineering
5  and surveying, land surveying.
6     Q.  What about the Institute of Electrical and
7  Electronics Engineers, are you a member of that,
8  too?
9     A.  I am.
10    Q.  Is that a national organization?
11    A.  That's a worldwide organization.
12    Q.  Worldwide, okay.  Under your experience you
13 indicate that you have experience in dealing with
14 motor start studies, things of this nature?
15    A.  That's right.
16    Q.  Does that encompass all types of motor
17 starts, cars, trucks?
18    A.  No.  That can only be large motors, any
19 size motor.
20    Q.  But they do have the same principles as
21 motors in cars, too, do they not?
22    A.  Yes.
23    Q.  Insofar as these companies that you have
24 worked with, you've worked with companies I
25 understand -- I see Valero Refining of Krotz

143
1  Springs, Louisiana, unit short circuit study.
2  You've done those kind of studies?
3     A.  Yes.  Basically --
4     Q.  Unit relay coordination studies?
5     A.  We look at their electrical systems and
6  provide reports on the state of it, how it operates,
7  things like that.
8     Q.  And I see Marathon Ashland Petroleum of
9  Texas City, Texas?
10    A.  That's right.
11    Q.  You've done plant wide short circuit
12 studies, also?
13    A.  Yes.  We provide them a means to increase
14 reliability of their processes by doing some things
15 with their electrical system.
16    Q.  I see Shell Refinery, Norco, Louisiana,
17 short circuit calculations and relay coordination
18 study.
19    A.  That's right.  We look at all of the
20 equipment, their electrical units to make sure
21 they're reliable and are able to provide the service
22 they need.
23    Q.  And I see in Pasadena, Texas, Agrifos,
24 Incorporated, plant wide low flow studies and plant
25 wide short circuit studies?

144
1     A.  Same situation.
2     Q.  Have you given any presentations on studies
3  of relays and short circuit presentations or papers
4  or anything?
5     A.  From time to time we do provide them.  Our
6  niche at the company is to provide -- increase
7  reliability in protection of electrical systems, and
8  that's what we're doing.
9     Q.  Insofar as the schematics and everything,
10 the materials that you've indicated you reviewed and
11 looked at and examined in this type of Kenworth
12 truck -- it was what model, a T600?
13    A.  T600.
14    Q.  You've looked at the schematics on this
15 truck, the electrical system and things of this
16 nature and other similar Kenworth trucks and other
17 trucks that may be outside the Kenworth family?
18    A.  Yes.
19    Q.  And do they basically all operate with the
20 same electrical principles?
21    A.  Yes, they do.
22    Q.  And insofar as your report, you have
23 indicated that you gave a report, and I think your
24 report was listed as a project note came under
25 LAPTEC, Incorporated, Power System Specialists, and

145
1  it has project note, subject Vernell B. Morris case,
2  and I think that was marked as one of the exhibits.
3  Was it 1 or 2?
4        MR. BRITTAIN:
5        Exhibit 6.
6  BY DR. ROBINSON:
7     Q.  I'm simply saying that was the essence of
8  your report, was it not?
9     A.  That's correct.
10    Q.  And then you also had an affidavit
11 executed, was it not?  This affidavit which is the
12 affidavit -- that's your affidavit is No. 2.  It's
13 already entered as Exhibit No. 2.  This is the
14 affidavit -- who notarized this affidavit?  Was this
15 notarized before a licensed notary in the State of
16 Louisiana?
17    A.  Yes.
18    Q.  And is that notary's name Mr. -- looks like
19 Frank R. --
20    A.  Travis LeBleu.
21    Q.  Travis, Travis R. LeBleu, from Baton Rouge,
22 Louisiana?
23    A.  Yes.
24    Q.  Do you stand by the affidavit and the
25 opinions that you reached and the conclusions that

LEBLEU

---

Page 146

1  you made? Do you stand by those opinions and
2  conclusions?
3     A.  Yes.
4     Q.  Were they based upon your review of the
5  evidence which you've already testified to?
6     A.  Yes.
7     Q.  And insofar do you feel that these
8  conclusions and opinions are derived based upon due
9  deference to sound electrical engineering principles
10 and methodologies in that profession?
11    A.  Yes.
12    Q.  And insofar as your opinions, do you feel
13 more probable than not that the opinions announced
14 in paragraph 6 are more probable than not still your
15 opinions today, that is that his detailed
16 examination review of the aforementioned data
17 gathered by the Alabama State Police and gathered by
18 the accident reconstructionist and physicist Dr.
19 Edward L. Robinson reveals that both vehicles, the
20 1998 Morris Kenworth tractor trailer and the
21 Thompson Peterbilt tractor, would have necessarily
22 had their headlights on while traveling on the
23 highway, and it is more probable than not that after
24 experiencing the rollover all or substantially all
25 of the Kenworth truck lights and trailer lights

Page 147

1  would have remained on and remained visible?
2        MR. BRITTAIN:
3            Object to the form.
4     A.  Yes.
5  BY DR. ROBINSON:
6     Q.  And my question to you here I'd just like
7  to ask is that insofar No. 7, is it still your
8  opinion based upon your testimony here today that
9  the manufacturer's data on the Kenworth truck
10 confirms that the batteries in this type of 1998
11 Kenworth tractor are designed mechanically to be
12 held in place so as to prevent any movement and any
13 disconnection, and for this reason, given all the
14 ultra-securing structures that were in place, that
15 it is more probable than not that the batteries and
16 wiring was maintained and was still connected to the
17 power source after the rollover event and remained
18 on and connected until the collision impact by the
19 1995 Peterbilt tractor trailer --
20    A.  Yes.
21    Q.  -- which totally knocked the 1998 Kenworth
22 tractor loose from its trailer?
23       MR. BRITTAIN:
24           Object to the form.
25    A.  Yes.

Page 148

1        DR. ROBINSON:
2            Subject to the objection.
3  BY DR. ROBINSON:
4     Q.  And insofar as paragraph 8 there's a word
5  here, and I'm sure the word is probably a typo but
6  I'll ask.  In paragraph 8 your affidavit says -- it
7  has the word collection, and I think that word is
8  supposed to be collision, but let me read the whole
9  paragraph.  That because the manufacturer's
10 electrical schematics show that the lighting for the
11 tractor trailer is routed within the structure of
12 the cab or tractor it is more probable than not that
13 the tractor and the tractor lights were on and
14 clearly visible with the attendant tractor trailer
15 and remained on and visible until the -- it says
16 collection, but you mean collision, do you not?
17    A.  Yes.
18    Q.  --- collision by the 1995 Peterbilt.  Do
19 you still stand by that?
20       MR. BRITTAIN:
21           Object to the form.
22    A.  Yes.
23 BY DR. ROBINSON:
24    Q.  And do you stand by the rest of the
25 findings, particularly that of paragraph No. 9, That

Page 149

1  my personal examination and review of the pictures
2  of the interior of the 1998 Kenworth revealed that
3  the interior indicating lighting filaments were
4  still intact even after the collision by the 1995
5  Peterbilt tractor.  This finding enables me to
6  surmise to a reasonable degree of professional
7  electrical engineering certainty that the exterior
8  lights of the 1998 Kenworth cab and trailer were
9  more probable than not intact and operating until
10 impact collision with the 1995 Peterbilt tractor
11 trailer which tore or disabled the 1998 tractor cab
12 from its trailer.
13       MR. BRITTAIN:
14           Object to the form.
15 BY DR. ROBINSON:
16    Q.  Do you still stand by that?  Subject to the
17 objection, is that correct?
18    A.  Yes.
19    Q.  What about No. 10, Pursuant to my review of
20 the accident reconstruction expert and physicist's
21 report, Dr. Edward L. Robinson, and my review of the
22 installation details from Kenworth, it is reasonable
23 to state that the exterior lights would be more
24 probable than not on and operating until the
25 collision by the 1995 Peterbilt tractor trailer?

LEBLEU

### 154

1  like the place close to where that light would be.
2      Q.  And look, right under here there's another
3  area that tells us about lights under here. That
4  looks like number -- is this 16, also? It says 16,
5  17, whatever. Tell me.
6      A.  Sixteen, 17, 12 and 13.
7      Q.  So 16, 17, 12 and 13 or is it 18? It may
8  be 18. But it shows that lights are supposed to be
9  under the truck, also. When I say truck I mean
10 under the tractor or the cab. What I'm trying to
11 find out, and I'll just ask you this question --
12 this photograph shows you better. One of them I
13 have shows better. Right here. Here it is. This
14 photograph here, it shows -- these are lights and
15 not reflectors. Is that correct?
16     A.  Those are lights.
17     Q.  And what I'm saying is that isn't it more
18 probable than not, would you have an opinion, Mr.
19 LeBleu, that if the cab at the time prior to the
20 collision if the cab were connected, and we have no
21 testimony that's been introduced to say it was not
22 connected prior to the collision, but if prior to
23 the collision the cab was connected to the trailer,
24 would these lights here, I'm pointing right here,
25 would these lights under the trailer behind the

### 155

1  first four sets of wheels, isn't it more probable
2  than not that these set of lights were supposed to
3  still be on, also?
4         MR. BRITTAIN:
5             Object to the form.
6      A.  I think those lights would have been on. I
7  can't say what specifically those lights are.
8  BY DR. ROBINSON:
9      Q.  But it's more probable than not that they
10 would have been on?
11     A.  Yes.
12     Q.  Insofar as even the reflectors -- this is
13 the back of the trailer. The same US Department of
14 Transportation, Office of Motor Vehicle Carrier
15 Standards, Federal Motor Carrier has safety
16 regulations referred to as ,D. They also require
17 that these vehicles be equipped with illuminating
18 reflectors. What I'm trying to say is that here is
19 a photograph of Mr. Morris's vehicle. We know it's
20 his vehicle because it has on the back of it Same
21 Day Door To Door Service on it, okay, and it's
22 flipped over. Do you see any indication of
23 reflectors that are federally mandated to be on this
24 that are supposed to be illuminated?
25         MR. BRITTAIN:

### 156

1             Object to the form.
2      A.  If the light hit them?
3  BY DR. ROBINSON:
4      Q.  Yes, sir.
5      A.  They would have been illuminated.
6      Q.  Does it appear that there are illuminating
7  reflectors on there?
8      A.  Yes.
9         DR. ROBINSON:
10            What number are we on, Mr. Brittain?
11        MR. BRITTAIN:
12            The last one was 14.
13        MR. ROBINSON:
14            So if we could call this one, the
15 first one I referred to about the lights
16 behind the first set of wheels under the
17 trailer and this one here is the reflectors
18 on the trailer. I'd like to call this --
19 you said 15? We were at 14. So this would
20 be 15 and 16 if I'm correct. I stand to be
21 corrected if I'm in error. I think it's 15
22 and 16. So if we could attach these.
23 BY DR. ROBINSON:
24     Q.  Does it still remain your opinion from
25 looking at those fuses and looking at the headlight

### 157

1  that was on the cab even after the incident from the
2  pictures taken by Dr. Robinson or his assistant Mr.
3  Messerschmidt that those fuses were intact and not
4  blown out even after the collision?
5         MR. BRITTAIN:
6             Object to the form.
7  BY DR. ROBINSON:
8      Q.  I say fuses. I meant filaments. I meant
9  filaments of those light bulbs.
10     A.  They looked like they were intact after the
11 collision.
12     Q.  What about the light from the headlight,
13 did it look like that light was damaged that would
14 have stopped it from burning prior to the collision?
15     A.  I cannot comment on the filament inside,
16 but the exterior of the light looked like it was
17 still intact.
18     Q.  Insofar as -- this is mundane so forgive me
19 for doing this. About how many hours of preparation
20 did you undertake or undergo to be prepared for this
21 deposition today? Was it one, two, three, four
22 hours, five or more?
23     A.  I would guesstimate --
24     Q.  We have to as reasonably as possible
25 because it's on Attorney Brittain's tab here. He's

158

1  already asked how much you charge an hour so we just
2  need to quantify.
3      A.  I think it's -- just from the time we spent
4  I think eight hours is reasonable.
5      Q.  And then for the time today if we started
6  -- what time did we start, Madame Reporter?
7          COURT REPORTER:
8          10:38.
9  BY DR. ROBINSON:
10     Q.  At 10:38 and the deposition was scheduled
11 at 10:30.  We started about eight minutes later.
12 And here it is now almost seven minutes before two.
13 What would that be, 10:30, 11:30, 12:30, 1:30, about
14 three and a half hours -- three hours and fifteen
15 minutes.  You haven't received a check yet from Mr.
16 Brittain yet, have you?
17     A.  No.
18     Q.  So the total hours, the eight hours plus
19 the three of the deposition, or did you mean the
20 three to be part of the deposition, the preparation
21 hours and the deposition?
22     A.  That's included.
23     Q.  Just eight hours?
24     A.  Yes.
25         DR. ROBINSON:

159

1          That's considerate of you.  I'm sure
2      Attorney Brittain appreciates it, too.  It
3      shows that you're a fair person, and we
4      appreciate it.  But, again, I thank you so
5      very much, and these documents that you
6      have reviewed and everything, we thank you
7      for making them available to Attorney
8      Brittain so we could accommodate him.  I
9      have no questions unless Attorney Brittain
10     has some.
11         (Off-the-record discussion.)
12         MR. BRITTAIN:
13         There were two Exhibit 11s.
14         DR. ROBINSON:
15         That would be most confusing.  Thank
16     you for catching that.
17         MR. BRITTAIN:
18         I'm going to mark the March 28 fax
19     11A, and I'll make these pictures that you
20     drew for me 11B.
21         DR. ROBINSON:
22         11B and 11?
23         MR. BRITTAIN:
24         11A and 11B.
25 EXAMINATION BY MR. BRITTAIN:

160

1      Q.  And then one thing I think when you all
2  were reading that affidavit a little while ago, if I
3  understood your earlier testimony, you don't know
4  whether the lights, even if they were on, would have
5  been visible to Thompson and Tidwell.  Is that
6  right?
7      A.  That is true.
8      Q.  And you don't know whether the tractor was
9  attached to the trailer at the time of impact with
10 the Peterbilt, do you?
11     A.  I don't know that.
12         MR. BRITTAIN:
13         Thank you.  That's all I've got.
14         (DEPOSITION CONCLUDED AT 1:49 P.M.)

161

STATE OF LOUISIANA:
PARISH OF EAST BATON ROUGE:
    This certification is valid only for a
transcript accompanied by my original signature and
original blue stamp on this page.
    I, Kelly G. Young, Certified Court Reporter in
and for the State of Louisiana, as the officer
before whom this testimony was taken, do hereby
certify that the witness to whom oath was
administered, after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
hereinbefore set forth in the foregoing pages; that
this testimony was reported by me in the stenotype
reporting method, was prepared and transcribed by me
or under my personal direction and supervision, and
is a true and correct transcript to the best of my
ability and understanding; that I am not related to
counsel or to the parties herein, nor am I otherwise
interested in the outcome of this matter.
    Baton Rouge, Louisiana, on this date,
_____, 2006.

_____
KELLY G. YOUNG, RPR, CCR
Certificate No. 91025
State of Louisiana